**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| | : | Chapter 11 |
| HOUSTON REGIONAL SPORTS | : | |
| NETWORK, L.P. | : | |
| Alleged Debtor. | : | Case No.: 13-35998 |
| | : | |
| | : | |

**EMERGENCY MOTION OF PETITIONING CREDITORS FOR APPOINTMENT OF
INTERIM CHAPTER 11 TRUSTEE**

**THE COURT WILL CONDUCT A HEARING IN THIS MATTER AT A TIME TO BE
DETERMINED BY THE COURT IN THE U. S. COURTHOUSE, 515 RUSK, HOUSTON,
TEXAS, 77002.**

**BLR 9013-1(i) NOTICE: EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE
COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL
HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED
RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT
WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. BLR 9013-1(b)**

**NOTICE: THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT
YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT
THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING
PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO
THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN
21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST
STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A
TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER
NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN
AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES
AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE
HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

Houston SportsNet Finance, LLC, Comcast Sports Management Services, LLC, National

Digital Television Center, LLC, and Comcast SportsNet California, LLC. (collectively, the

"Petitioning Creditors") hereby move, pursuant to 11 U.S.C. § 1104, for the appointment of an

interim trustee in this Chapter 11 case to administer the affairs of the alleged debtor, Houston

Regional Sports Network, L.P. (the "Alleged Debtor" or "Network"), the corporate general

partner of which is Houston Regional Sports Network, LLC ("General Partner"), because of a present, debilitating deadlock in the General Partner's, and hence the Network's, management. In support hereof, the Petitioning Creditors rely on the Declarations of Robert S. Pick, Jon D. Litner, Bruce A. Davis, and John C. Ruth, attached hereto as Exhibits A through D, and further respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of this motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein is section 1104 of the Bankruptcy Code (the "Code").

## INTRODUCTION

3.      The Alleged Debtor is a joint enterprise among affiliates of the Houston Astros baseball team ("Astros"), the Houston Rockets basketball team ("Rockets"), and Houston SportsNet Holdings, LLC ("Comcast Owner"), an affiliate of Comcast Corporation (together with its affiliates, "Comcast").  The primary purpose of the enterprise was to create and operate a regional sports programming service ("Service") to exhibit and distribute live Astros and Rockets games within the league-permitted local territories.  As a result of fundamental disagreement among the partners about the direction and management of the Network, the Alleged Debtor faces an urgent financial and corporate governance crisis.  The Network cannot pay its bills as they come due, cannot raise capital, and cannot make key business decisions. ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████ As a result, and as set forth further below, to avoid the destruction of the

Network's substantial value, the Alleged Debtor requires the appointment of a Chapter 11 trustee

on an emergency basis.

4.    ████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

5.    For months, the parties to the enterprise have struggled to reach agreement on

action that would have avoided this bankruptcy proceeding. █████████████████████████

█████████████████████████████████████████████

████████████████████████████████████ But as a

result of the impasse among the parties, the Network is now insolvent.  As a result, after many efforts to avoid this day, the Petitioning Creditors—each an affiliate of Comcast, but each a separate entity that holds a claim not subject to bona fide dispute—have filed this involuntary bankruptcy case.

6.      The Network does have assets—including the right to telecast Astros and Rockets games, the right to receive monthly fees under an affiliation agreement with Comcast Cable Communications, LLC ("Comcast Cable") for distribution of the Network's Service, and rights to receive revenue from a few smaller operators that carry the Service.  These assets have significant value, the protection of which is the central purpose of this involuntary bankruptcy filing.

7.      Houston SportsNet Finance, LLC ("Comcast Lender"), the Network's secured lender, believes the Network's assets have meaningful value, and would be prepared to make a bid to acquire either the Network (under a plan of reorganization) or substantially all of its assets. Comcast Lender believes that such a transaction—if it were to close by the end of the calendar year, and based on the Network's indebtedness of which it is presently aware and that which it anticipates the Network would incur by year end—would likely lead to prepetition creditors' claims and all reasonably foreseeable administrative expenses being paid in full, and a material distribution to equity holders.  Comcast Lender of course appreciates that any such transaction would need to be negotiated with and acceptable to the chapter 11 trustee, subject to an open auction process, and ultimately approved by this Court.  In addition, Comcast Lender stands prepared, if requested by a Chapter 11 Trustee, to negotiate over the terms of possible debtor-in-possession financing necessary to finance the Network's operations until a sale can be consummated.

8.     Petitioning Creditors are thus by no means seeking to dictate or asking this Court itself to determine how those assets will be restructured, liquidated, or otherwise treated.  Rather, they are asking this Court to appoint an independent and disinterested Trustee who will owe a fiduciary duty to the Alleged Debtor's estate, and who will be well equipped to make those decisions for the otherwise hamstrung Alleged Debtor.  Absent the appointment of a Trustee, the substantial value that is currently locked up as a result of the dysfunction in the Alleged Debtor's governance structure will likely be lost—and lost forever—in the immediate future.

9.     This Court has discretion to appoint an interim Chapter 11 trustee for "cause" or if such appointment is the best interest of the estate.  11 U.S.C. § 1104(a).  Courts find "cause" justifying the appointment of a Chapter 11 trustee where there are inherent conflicts of interests such that the parties are "'working at cross purposes,'" *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 473 (3d Cir. 1998) (quoting *In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599 (5th Cir. 1996)).  In addition, "when the board of directors of a debtor corporation is effectively deadlocked, appointment of a trustee is in the best interests of the bankruptcy estate."  *In re New Orleans Paddlewheels, Inc.*, 350 B.R. 667, 692 (Bankr. E.D. La. 2006).  Thus, although the appointment of a Chapter 11 trustee on an emergency basis is an extraordinary remedy, this case presents precisely the type of exceptional circumstance in which such relief is necessary and appropriate.

## BACKGROUND

10.     The Network is a Delaware limited partnership.  It is the owner and operator of the Service, a Houston-area regional sports television network that produces and distributes sports programming on a full time basis.

## I.     The Network

11.     The Network has three limited partners—Comcast Owner, Rockets Partner, L.P. ("Rockets Partner"), and Astros HRSN LP Holdings LLC ("Astros Partner").  The Network also has one general partner—Houston Regional Sports Network, LLC (the "General Partner")— which, subject to certain limitations, exercises exclusive management, supervision, and control over the Network's properties and business.  The General Partner's sole purpose is to serve as the Network's general partner; it has no authority or power to act outside of that role.  The General Partner has three members—Comcast Owner, JTA Sports, Inc. ("Rockets Owner")[1], and Astros HRSN GP Holdings LLC ("Astros Owner")[2].  Thus, whether as limited partners of the Network or members of the General Partner, affiliates of the Rockets, the Astros, and Comcast are the three (and the only three) owners and operators of the Network.

12.     ███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

13.     In October of 2010, the Astros and the Rockets reached an agreement with an affiliate of Comcast for the purpose of launching the Service, a new regional sports programming network that would distribute the teams' games and other team-related programming within the league-permitted local territories.  On October 29, 2010, after lengthy negotiations among Comcast, the Rockets and the Astros, including then-Astros-owner Drayton McLane, the parties

---

[1]  Rockets Partner, Rockets Owner, and Rocket Ball, Ltd. d/b/a the Houston Rockets ("Rockets Team") are collectively referred to herein as "Rockets."  The Rockets Team is a professional basketball franchise in the National Basketball Association.

[2]  Astros Partner, Astros Owner, and Houston Astros, LLC ("Astros Team") are collectively referred to herein as "Astros."  The Astros Team is a professional baseball franchise in Major League Baseball.

entered into the Network's and General Partner's operating agreements and other integrated transaction documents (the "Transaction Documents"), pursuant to which Comcast was admitted as a limited partner of the Network and as a member of the General Partner.  As described in greater detail below, the transaction also provided for, among other things, the Network's right to exploit the Rockets' and Astros' media rights, to receive management oversight and operational services from Comcast Sports Management Services, LLC ("Comcast Services"), to be carried on local cable systems owned by Comcast Cable under an affiliation agreement, and to borrow up to $100 million from Comcast Lender.

**II.     The Petitioning Creditors and the Network's Inability to Pay Its Debts As They Become Due**

14.     As set forth in the Declaration of Jon D. Litner ("Litner Declaration") as part of the October 2010 transaction, the Network entered into an amended and restated media rights agreement with each of the Astros and the Rockets (the "Astros Media Rights Agreement" and the "Rockets Media Rights Agreement," respectively), ████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████

15.     ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

16.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

17.      As set forth in the Declaration of Robert S. Pick, the Network also entered into an

agreement (the "Credit Agreement") with Comcast Lender ████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████

18.   ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████ As of May 29, 2013, the

Comcast Loan has been fully drawn.  Thus, the aggregate principal balance of the Comcast Loan

is currently $100 million. █████████████████████████████████

████████

      19.      As set forth in the Litner Declaration, on October 29, 2010, the Network also

entered into an agreement (the "Services Agreement") with Comcast Services, pursuant to which

Comcast Services agreed to provide the Network with management oversight and various

defined "Operational Services" in exchange for an annual fee (the "Service Fee") █████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ The pro-rated amount due as of the filing of the involuntary petition

is $1,251,573.75.

      20.      As set forth in the Declaration of Bruce A. Davis, National Digital Television

Center, LLC provides transmission related services to the Network.  As of the date of the filing

of the involuntary petition, it holds an unsecured  claim against the Network for $10, 517.50 for services provided.

21.     As set forth in the Declaration of John C. Ruth, Comcast SportsNet California, LLC facilitates the provision of production services to the Network.  As of the date of the filing of the involuntary petition, it holds an unsecured claim against the Network for $43,129.02.

22. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████

23. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████████████████████

24. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████



25.

26.

27.

## III.   Failure of Management

28.     The General Partner is managed by a Board of Directors (the "GP Board") that is comprised of one representative each from the Astros and the Rockets and two representatives from Comcast.   Effectively, the GP Board manages the Network, pursuant to the Second Amended and Restated Limited Liability Company Agreement of the General Partner, dated

October 29, 2010 and executed by and among the members of the General Partner (the "GP

Operating Agreement").  ████████████████████████████████████████████

████████████████████████████████████

29.  ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████  As further described herein, however, the GP Board is simply unable to reach the

requisite consent on most key decisions.  As a result, it has become effectively impossible for the

Network to operate, thus precipitating the Network's current financial distress.

**A.**      **Inability to Enter Into Affiliation Agreements**

30.      Regional sports networks like the Network generate the vast majority of their

revenue by entering into affiliation agreements with MVPDs that agree to carry the network in

exchange for per-subscriber fees, such as the Comcast Cable Agreement.

31.      Back in October 2010, in conjunction with the negotiation of the other

Transaction Documents, the Rockets and Astros negotiated directly with Comcast Cable

regarding the terms and rates that it would agree to with respect to its carriage of the Network's

Service.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████



32.

33.     On November 17, 2011, Jim Crane and a group of investors (the "Crane Ownership Group") purchased the Astros from Drayton McLane, including the Astros' interest

in the Network and its General Partner.

34. ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

35. ████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

█████████████████████████████

**B.     The Failure of Efforts to Fund or Restructure the Network**

36.     With the GP Board at a complete impasse, the Network is powerless to continue

its affairs and pay its debts. ████████████████████████████████████

████████████████████████████████████ As described in greater detail below, the deadlock among the parties has thwarted all efforts to engage in any constructive exercise to salvage the Network.

37.   ████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████

38.   ████████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

39.   ██████████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████



40.

41.

. Accordingly, the question before this Court is by no means who is "right" or "wrong" in the various disagreements that have arisen among the parties.  This bankruptcy filing is *not* an effort to have this Court adjudicate any such dispute.  Rather, regardless of who is to blame, the point of this proceeding is to preserve

the going concern value of the Network for the benefit of all of its constituencies—an objective that manifestly cannot be achieved by any means other than through the bankruptcy process.

### III.    The Involuntary Petition

42.    On September 27, 2013, the Petitioning Creditors filed an involuntary Chapter 11 bankruptcy petition against the Network pursuant to section 303(a) of the Code.  Pursuant to Bankruptcy Rule 1011(b), the Network's response to the petition is due on October 18, 2013.

### RELIEF REQUESTED

43.    The Petitioning Creditors seek the entry of an order, pursuant to section 1104 of the Code directing the Office of the U.S. Trustee to appoint an interim trustee in this Chapter 11 case.

### ARGUMENT

44.    Section 303(f) of the Code provides that a debtor in an involuntary case will continue to operate its business as a debtor-in-possession absent an order of the court.  Indeed, there is a strong presumption that a debtor should remain in possession of its estate and control its affairs.  *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989).  That presumption only holds true, however, if management, among other things, is free from conflicts and not "effectively deadlocked."  *See Marvel Entm't*, 140 F.3d at 474; *New Orleans Paddlewheels*, 350 B.R. at 692.

45.    11 U.S.C. § 1104—which allows for the appointment of a trustee in a Chapter 11 case—provides an "important protection that the Court should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession."  *In re Colorado-Ute Elec. Ass'n, Inc.*, 120 B.R. 164, 173-74 (Bankr. D. Co. 1990).  It provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice

and a hearing, the court shall order the appointment of a trustee—

> (1) for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management, either
> before or after the commencement of the case, or similar cause, but not
> including the number of holders of securities of the debtor or the amount
> of assets or liabilities of the debtor; or

> (2) if such appointment is in the interests of creditors, any equity security
> holders, and other interests of the estate, without regard to the number of
> holders of securities of the debtor or the amount of assets or liabilities of
> the debtor.

11 U.S.C. § 1104(a).

46.     Section 1104 thus establishes two independent grounds for the appointment of a
Chapter 11 trustee:  It provides for the mandatory appointment of a trustee for cause; and it
grants the court discretion to appoint a trustee in the absence of cause when the appointment is in
the best interests of creditors.  11 U.S.C. § 1104(a)(1),(2).  A party moving for a trustee's
appointment may establish the need for a trustee under either ground "by clear and convincing
evidence."  *Marvel Entm't*, 140 F.3d at 471.

47.     As set forth more fully below, the facts here warrant the appointment of a Trustee
on both grounds.  The total gridlock in the GP's Board and thus the Network's management
provides cause for a trustee's appointment.  Each member of the General Partner is an affiliate of
an important creditor and contractual counterparty of the Network.  And there is no question that
if the existing corporate governance structure remains in place, the Network will remain
encumbered by management deadlock and paralysis and the Network will be unable to take
actions necessary to operate its business affairs for the benefit of creditors and other
stakeholders.  Accordingly, the best interest of the Network's other constituencies will be served
by the appointment of an independent interim chapter 11 trustee.

**I.      The Network is a Proper Involuntary Debtor under 11 U.S.C. § 303**

48.      By its terms, Section 1104 applies "at any time after commencement of the case[,]" and therefore may be invoked during the "gap period" in an involuntary case.  *See In re Prof'l Accountants Referral Servs., Inc.*, 142 B.R. 424, 429 (Bankr. D. Colo. 1992) ("[T]he appointment of a trustee during the gap period—before an order for relief is entered—is authorized and proper under 11 U.S.C. §§ 1104(a)(1), 105, and by analogy, 303(g).").

49.      Before a court may order a trustee's appointment during the "gap period," the movant must show as a threshold matter, a "reasonable likelihood, or probability, that this Debtor will eventually be found to be a proper involuntary debtor under 11 U.S.C. § 303 and that an order for relief will enter."  *Prof'l Accountants*, 142 B.R. at 429.  That test is fully satisfied here.

50.      Under Section 303(b)(1), an involuntary petition may be commenced "by three or more entities, each of which is … a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, … if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims.…"  11 U.S.C. § 303(b)(1).  As described above, the four Petitioning Creditors collectively hold claims against the Network in the amount of $101,305,220.27, of which $1,305,220.77 is unsecured.[3]  As set forth in the attached Declarations, these obligations are not contingent or subject to a bona fide dispute.  Nor are there legal or factual questions regarding the Network's liability to the Petitioning Creditors, or the amount of their claims.

---

[3] Comcast Lender is a valid petitioning creditor under Section 303(b)(1) even if its claim is fully secured.  *See Paradise Hotel Corp. v. Bank of Nova Scotia*, 842 F.2d 47, 50 (3d Cir. 1988) (fully secured creditor may be one of the three creditors filing an involuntary petition, so long as the total unsecured debt of the petitioning creditors satisfies the statutory amount of Section 303(b)(1)).

51.     Nor can there be any dispute that the Network "is generally not paying [its] debts as [they] become due."  11 U.S.C. § 303(h)(1).  The Network's largest matured debts—the July and August installment payments to the Astros—remain unpaid and are by themselves more than sufficient to meet this standard.  *See In re Fischer*, 202 B.R. 341, 350-51 (E.D.N.Y. 1996).  Moreover, the Network has insufficient funds to make installment media rights payments that will come due and owing to Astros and Rockets in the next 60 days.  Accordingly, the statutory standards are readily satisfied.

## II.     There is Cause to Appoint a Chapter 11 Trustee

52.     The facts in this case warrant the appointment of an interim trustee under 11 U.S.C. § 1104(a).  While section 1104(a) enumerates four bases on which a court may find cause—fraud, dishonesty, incompetence, and gross mismanagement—those grounds are illustrative, not exclusive, *see Colorado-Ute*, 120 B.R. at 174 (citing *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988)), and this Court has broad discretion when determining whether the facts before it constitute "cause."  *See, e.g.*, *In re Cardinal Industr.*, 109 B.R. 755 (Bankr. S.D. Ohio 1990) (finding the cumulative effect of various events that caused a loss of confidence in the debtor's management to be "cause" for the appointment of a trustee); *Colorado-Ute*, 120 B.R. at 175 (appointing a trustee because of conflicts between the debtor's management and its creditors).[4]

53.     "[M]ere conflicts or acrimony between debtor and creditor" do not automatically "mandate the appointment of a trustee[;]" however, courts routinely find cause when there are "inherent conflicts [that] extend beyond the healthy conflicts that always exist between debtor and creditor, or ... when the parties 'begin working at cross-purposes.'"  *Marvel Entm't*, 140 F.3d

_____

[4] If the court finds cause for the appointment of a trustee, "the Court has no discretion, but must appoint a trustee."  *Colorado-Ute*, 120 B.R. at 174.

at 471-73 (affirming appointment of chapter 11 trustee where controlling shareholder group that took over debtor management in an hostile manner post-petition also controlled creditors of the debtor, and extreme acrimony existed between controlling shareholder group and other creditors of the debtor who had opposed the takeover) (citing *In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599 (5th Cir. 1996) (adopting on rehearing the dissent's opinion in 69 F.3d at 751)). *See also In re New Towne Dev., LLC*, 404 B.R. 140, 149 (Bankr. M.D. La. 2009) (appointing chapter 11 trustee where members of debtor's management were engaged in disputes and half of debtor's management owned debtor's principal creditor).

54.     In *Cajun Electric*, for example, the Fifth Circuit upheld the appointment of a Chapter 11 trustee based on the debtor's acrimonious relations with creditors and its board's irremediable conflicts. *In re Cajun Elec.*, 74 F.3d at 599 (adopting on rehearing the dissent's opinion in 69 F.3d 746, 751). There, the Louisiana Public Service Commission ("LPSC") had ordered Cajun to lower its electricity rates, making it impossible for the company to meet its debt obligations. *In re Cajun Elec.*, 69 F.3d 746, 747 (5th Cir. 1995). Cajun's board members had to decide whether to appeal the LPSC order; however, many of its members were managers or board members of Cajun's electric cooperatives, which cooperatives bought electricity from Cajun. *Id.* Therefore, if those members voted to appeal the rate decrease, they would effectively be voting to raise the prices of electricity for the cooperatives. *Id.* The court concluded that appointment of Chapter 11 trustee was appropriate because the debtor-creditor conflict went "beyond the 'inherent' conflicts under which all healthy cooperatives operate." *Id.* at 751. Indeed, it noted that members of the board had been working at "cross-purposes," mandating an "appointment [as] the only effective way to pursue a reorganization." *Id.*

55.     As described above, the corporate governance crisis facing the Alleged Debtor has created total gridlock. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Whatever the reasons for the deadlock and regardless of who is to blame, it cannot be disputed that the key constituencies of the Alleged Debtor are now unable to take the actions necessary to preserve the Network as a going concern.  The conflicts go beyond mere acrimony:  the General Partner's Board has been, and unless effectively replaced by a Chapter 11 trustee, will continue to be working at "cross-purposes."  *Cajun Elec.*, 69 F.3d at 751.  There is thus cause to appoint an interim trustee—indeed, it is "the only effective way to pursue a reorganization."  *Id.*

**III.     The Appointment of a Trustee is in The Best Interests of Creditors**

56.     Even if this Court were not to find cause under section 1104(a)(1), the appointment of an interim trustee is appropriate under section 1104(a)(2).  Section 1104(a)(2) authorizes the appointment of a trustee if the appointment is in the "best interests" of creditors, and gives the courts broader discretion than subsection (a)(1).  *Marvel Entm't*, 140 F.3d at 474 ("§ 1104(a)(2) 'envisions a flexible standard'"); *see also In re Bellevue Place Associates*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994), *aff'd*, 1994 U.S. Dist. LEXIS 17409 (N.D. Ill. Dec. 6, 1994); *In re Microwave Products of America, Inc.*, 102 B.R. 666, 675 (Bankr. W.D. Tenn. 1989) (appointment of trustee was in the best interests of creditors where ineffective management created a lack of creditor confidence and internal conflicts).

57.     To determine best interests of creditors, courts "resort to broad equity powers. … Equitable remedies are a special blend of what is necessary, what is fair, and what is workable."

*In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980).  Applying those powers to appoint a trustee under section 1104(a)(2), courts "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests."  *Id.*

58.     Courts have long recognized that a trustee should be appointed under section 1104(a)(2) if the debtor and/or its key constituencies have conflicts that would prevent a debtor-in-possession from managing the business in the best interests of creditors.  *See Marvel Entm't*, 140 F.3d at 474; *In re L.S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. W. Va. 1980) (appointing trustee was in best interest of creditors where current management would result in conflict). "[W]hen the board of directors of a debtor corporation is effectively deadlocked, appointment of a trustee is in the best interests of the bankruptcy estate."  *New Orleans Paddlewheels*, 350 B.R. at 692 (citing *Matter of Tahkenitch Tree Farm P'ship*, 156 B.R. 525 (Bankr. E.D. La. 1993)).

59.     It is clear that the Network cannot operate its business or preserve itself as a going concern under its current corporate governance structure, which has resulted in an irreconcilable impasse, ██████████████████████████████████████████████████████████████ ██████████████████  Where, as here, management is deadlocked, the appointment of a trustee is the best (and only) recourse to ensure reorganization and payments to creditors.  *See Marvel Entm't*, 140 F.3d at 474 ("[T]he selection of a plan … is in the best interests of all creditors, and the best way to achieve that result is to appoint a trustee."); *see also In re Colorado-Ute*, 120 B.R. at 176 (appointment in best interests where "serious conflicts … between and among the debtor, its board and creditors make the prospect for gridlock seem more probable than the ability to rehabilitate the debtor").

60.     In addition, there are likely few other creditors in the case who would be adversely affected by the costs of a Chapter 11 trustee.  *See In re Sundale, Ltd.*, 400 B.R. 890,

901 (Bankr. S.D. Fla. 2009) (explaining that in deciding whether to appoint trustee, court should consider the costs to creditors); *In re Sharon Steel Corp.*, 86 B.R. 455, 466 (Bankr. W.D. Pa. 1988) ("In a case of this magnitude, the cost of having a trustee in place is insignificant when compared with the other costs of administration and when compared with the enormous benefit to be achieved by the establishment of trust and confidence in ... management.").  And in any event, any potential costs are clearly outweighed by the benefits of having an interim trustee set the Network back on whatever forward-looking track that trustee determines most appropriate. Moreover, as described above, because Comcast is prepared to negotiate with a trustee toward a proposal that allow creditors and administrative claimants to be paid in full, and material value to be distributed to equity holders, there can be little question that the appointment of a trustee would serve the estate's interests.  As the Bankruptcy Court in the Eastern District of Louisiana has stated, "Without a board to approve a plan, none can be formulated or proposed.  Without a plan, this debtor may not emerge from bankruptcy and the creditors [cannot] be paid." *New Orleans Paddlewheels*, 350 B.R. at 692.  Precisely the same is true here.

## CONCLUSION

For the foregoing reasons, the Petitioning Creditors respectfully request that the Court order the appointment of an interim Chapter 11 trustee.

Respectfully submitted,

Howard M. Shapiro                                    /s/   Vincent P. Slusher
Craig Goldblatt                                      Vincent P. Slusher
Jonathan Paikin                                      Andrew Zollinger
WILMER CUTLER PICKERING HALE AND                     DLA PIPER
    DORR LLP                                         1717 Main Street
1875 Pennsylvania Ave., N.W.                         Suite 4600
Washington, D.C.  20006                              Dallas, Texas 75201-4629
(202) 663-6000                                       (214) 743-4500

George W. Shuster, Jr.                               Arthur J. Burke
WILMER CUTLER PICKERING HALE AND                     Timothy Graulich
    DORR LLP                                         Dana M. Seshens
7 World Trade Center                                 DAVIS POLK & WARDWELL LLP
250 Greenwich Street                                 450 Lexington Avenue
New York, NY 10007                                   New York, NY 10017
(212) 230-8800                                       (212) 450-4000

*Counsel for the Petitioning Creditors*

Dated: September 28, 2013