United States District Court
Southern District of Texas
FILED

OCT 7 2013

David J. Bradley, Clerk of Court

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

In re:                                  )
                                        )
HOUSTON REGIONAL SPORTS                 )     Chapter 11
NETWORK, L.P.                           )
                                        )     Case No. 13-35998
            Alleged Debtor.             )
                                        )
                                        )

---

## HOUSTON ASTROS' MOTION TO DISMISS
## INVOLUNTARY PETITION FOR CHAPTER 11

---

Harry A. Perrin                         Paul M. Basta, P.C. (*pro hac vice*)
Duston K. McFaul                        Marc Kieselstein, P.C. (*pro hac vice*)
VINSON & ELKINS LLP                     KIRKLAND & ELLIS LLP
1001 Fannin Suite 2500                  601 Lexington Avenue
Houston, Texas 77002                    New York, New York 10022
Telephone: (713) 758-2548               Telephone:  (212) 446-4800
Facsimile:  (713) 615-5016              Facsimile:  (212) 446-4900
hperrin@velaw.com                       paul.basta@kirkland.com
dmcfaul@velaw.com                       marc.kieselstein@kirkland.com

                                        Jeffrey S. Powell (*pro hac vice*)
                                        Thomas A. Clare, P.C. (*pro hac vice*)
                                        Elizabeth M. Locke (*pro hac vice*)
                                        KIRKLAND & ELLIS LLP
                                        655 Fifteenth Street, N.W.
                                        Washington, D.C. 20005
                                        Telephone: (202) 879-5000
                                        Facsimile:  (202) 879-5200
                                        jeff.powell@kirkland.com
                                        thomas.clare@kirkland.com
                                        elizabeth.locke@kirkland.com

October 7, 2013

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

    A.    The Astros Form The Network To Monetize Their Media Rights. ........................ 4

    B.    Comcast Acquires A Minority Interest In The Network. ...................................... 5

    C.    The Structure And Corporate Governance Of The Network. ................................ 5

    D.    The Limited Partnership Agreement, The General Partner Agreement, And The Astros' Media Rights Agreement All Contain Vital Protections To Protect The Astros' Media Rights. .......................................................................... 6

    E.    The Astros' Media Rights Agreement With The Network Contains Additional Provisions To Protect The Astros' Media Rights. ................................ 7

    F.    Comcast's Affiliation Agreement. ........................................................................ 8

    G.    Comcast Asks The Network To Accept Lower Base Rates. .................................. 9

    H.    The Network Fails To Make Two Media Rights Payments To The Astros, Providing The Astros The Right To Terminate The Astros' Media Rights Agreement. ........................................................................................................... 9

    I.    Four Comcast Affiliates File This Involuntary Petition In An Attempt To Eliminate The Astros' Right To Terminate The Media Rights Agreement. ......... 10

        1.    Comcast Media. .................................................................................... 11

        2.    Comcast California. .............................................................................. 11

        3.    Comcast Services. ................................................................................ 12

        4.    Comcast Lender. .................................................................................. 13

    J.    The Network Has Cash On Hand To Pay Third-Party Creditors. ......................... 14

ARGUMENT ...................................................................................................................... 14

I.    THE INVOLUNTARY PETITION SHOULD BE DISMISSED BECAUSE COMCAST CANNOT SATISFY BANKRUPTCY CODE SECTION 303. ................... 14

A.     Petitioning Creditors Cannot Demonstrate That There Are Three Holders Of Noncontingent, Undisputed Claims Under Section 303(b). ........................... 14

B.     Petitioning Creditors Cannot Demonstrate That The Network Is Not Generally Paying Its Debts As They Become Due As Required Under Section 303(h). ................................................................................................ 16

II.     THE INVOLUNTARY PETITION SHOULD BE DISMISSED FOR CAUSE BECAUSE IT IN BAD FAITH. ................................................................... 18

III.     THE PETITIONING CREDITORS CANNOT DEMONSTRATE THAT THERE IS A POSSIBILITY OF A SUCCESSFUL REORGANIZATION. ................................ 25

A.     The Limited Partnership Agreement Cannot Be Assumed Or Assigned Without The Astros' Consent. ........................................................... 26

1.     The Limited Partnership Agreement is a Personal Services Contract that Cannot be Assumed or Assigned Without the Astros' Consent. .................................................................... 26

2.     The Limited Partnership Agreement Must Be Accepted or Rejected in Its Entirety and Cannot Be Rewritten in Reorganization. .................... 28

B.     The Astros' Media Rights Agreement Cannot Be Assigned To A Purchaser Or A Trustee Without The Astros Consent. ......................................... 30

C.     The Astros May Immediately Terminate The Astros' Media Rights Agreement Pursuant To Section 365(e)(2)(A). ...................................................... 32

CONCLUSION ............................................................................................. 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Brennan's Inc. v. Dickie Brennan & Co.,*
   376 F.3d 356 (5th Cir. 2004) ...................................................................................... 31

*Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC,*
   No. 3718-VCP, 2010 WL 338219 (Del. Ch. Jan. 29, 2010).............................................. 26, 27

*In re Antelope Techs., Inc.,*
   431 F. App'x 272 (5th Cir. 2011) ...................................................................................... 19

*In re Brazos Emergency Physicians Ass'n, P.A.,*
   471 F. App'x 393 (5th Cir. 2012) ................................................................................ 19, 24

*In re Briggs,*
   Nos. 07-34533 & 07-34534, 2008 WL 190463 (N.D. Tex. Jan. 18, 2008) ............................. 17

*In re Catron,*
   158 B.R. 624 (Bankr. E.D. Va. 1992),
   *aff'd*, 158 B.R. 629 (E.D. Va. 1993),
   *aff'd*, 25 F.3d 1038 (4th Cir. 1994)...................................................................................... 28

*In re Ceiling Fan Distrib., Inc.,*
   37 B.R. 701 (Bankr. M.D. La. 1983) .................................................................................. 23

*In re East Hampton Sand & Gravel Co.,*
   25 B.R. 193 (Bankr. E.D.N.Y. 1982)................................................................................... 29

*In re Elmwood Dev. Co.,*
   964 F.2d 508,
   *reh'g denied*, 974 F.2d 1337 (5th Cir. 1992)........................................................................ 18

*In re Ewing,*
   147 B.R. 970 (Bankr. D.N.M. 1992) .................................................................................. 33

*In re Footstar, Inc.,*
   323 B.R. 566 (Bankr. S.D.N.Y. 2005)............................................................................ 28, 33

*In re Global Ship Sys., LLC,*
   391 B.R. 193 (Bankr. S.D. Ga. 2007)............................................................................ 20, 21

*In re Green Hills Dev. Co.,*
   445 B.R. 647 (S. D. Miss. 2011)........................................................................................ 17

*In re Harms*,
   10 B.R. 817 (Bankr. D. Colo. 1981) ............................................................................... 26, 33

*In re Humble Place Joint Venture*,
   936 F.2d 814 (5th Cir. 1991) .......................................................................................... 18, 24

*In re JER/Jameson Mezz Borrower II, LLC*,
   461 B.R. 293 (Bankr. D. Del. 2011) ............................................................................... 25, 34

*In re Lil' Things, Inc.*,
   220 B.R. 583 (Bankr. N.D. Tex. 1998) ...................................................................... 27, 28, 30

*In re Martin*,
   117 B.R. 243 (Bankr. N.D. Tex. 1990) ................................................................................ 26

*In re Mirant Corp.*,
   440 F.3d 238 (5th Cir. 2006) .......................................................................................... 28, 33

*In re Nikiski Partners, Ltd.*,
   Case No. 09-39332-H1-11 (Bankr. S.D. Tex. Dec. 30, 2009) ................................................ 21

*In re Norris*,
   114 F.3d 1182, 1997 WL 256808 (5th Cir. 1997) ............................................................ 15, 17

*In re O'Connor*,
   258 F.3d 392 (5th Cir. 2001) ............................................................................................... 27

*In re Ok Kwi Lynn Candles, Inc.*,
   75 B.R. 97 (Bankr. N.D. Ohio 1987) ................................................................................... 29

*In re Plum Run Service Corp.*,
   159 B.R. 496 (Bankr. S.D. Ohio 1993) ................................................................................ 29

*In re Rachels Indus.*,
   109 B.R. 797 (Bankr. W.D. Tenn. 1990) ............................................................................. 29

*In re Rimell*,
   946 F.2d 1363 (8th Cir. 1991) ............................................................................................ 15

*In re Sherwood Enters., Inc.*,
   112 B.R. 165 (Bankr. S.D. Tex. 1989),
   *judgment entered*, 4 Tex. Bankr. Ct. Rep. 116 (Bankr. S.D. Tex. Jan. 27, 1989) .................... 20

*In re Sunset Developers*,
   69 B.R. 710 (Bankr. D. Idaho 1987) ................................................................................... 28

*In re Synergistic Techs., Inc.*,
   No. 07-31733-SGJ-7, 2007 WL 2264700 (N.D. Tex. Aug. 6, 2007) ....................................... 23

*In re Taylor,*
    913 F.2d 102 (3d Cir. 1990) ............................................................................... 27, 28

*In re Travelot Co.,*
    286 B.R. 447, 455 (Bankr. S.D. Ga. 2002) ............................................................ 31

*In re Westerleigh Dev. Corp.,*
    141 B.R. 38 (Bankr. S.D.N.Y 1992) ................................................................ 23, 24

*In re Williams,*
    299 B.R. 684 (Bankr. S.D. Ga. 2003) ................................................................... 29

*JD Factors, LLC v. Freightco, LLC,*
    No. 1:09-CV-95, 2009 WL 3401965 (N.D. Ind. Oct. 16, 2009) ............................. 33

*N.L.R.B. v. Bildisco & Bildisco,*
    465 U.S. 513 (1984) ....................................................................................... 27, 29

*Sable v. Morgan Sangamon P'ship,*
    280 B.R. 217 (N.D. Ill. 2002) ............................................................................... 33

*Tap Publ'ns, Inc. v. Chinese Yellow Pages (N.Y.) Inc.,*
    925 F. Supp. 212 (S.D.N.Y. 1996) ........................................................................ 31

**Statutes**

11 U.S.C. § 1112 ................................................................................................ 18, 25, 34

11 U.S.C. § 303 .................................................................................................. 14, 15, 16

11 U.S.C. § 365 ......................................................................................................... passim

**Other Authorities**

3 Collier on Bankruptcy ¶ 365.03[3] (16th ed. 2013) ..................................................... 29

## INTRODUCTION

The Court should reject Comcast's attempt to put the Houston Regional Sports Network, L.P. ("the Network") into bankruptcy. The Astros and Comcast (along with the Rockets) are partners in the Network and they have a disagreement about how their partnership should be run. Comcast's Involuntary Petition serves no legitimate reorganization objective under chapter 11, and it benefits no class of unsecured creditors. The Involuntary Petition filed in this action is a transparent attempt to acquire the Network and gain control over the Astros' most valuable asset, the media rights to televise their own Major League Baseball games. Since the Astros provided the Network a license to televise Astros games and Comcast agreed to market the Network's programming to other cable distributors, Comcast has delivered only informal proposals to enter long-term affiliation agreements with undervalued rates that would jeopardize the Astros' future success in both baseball and business operations. Just three days before the Astros could terminate their media rights agreement with the Network and find a stronger media rights foundation for the Astros, Comcast orchestrated the bankruptcy to gain leverage over the Astros in their business dispute.

The Involuntary Petition should be dismissed for the following three separate and independent reasons. *First*, Comcast cannot satisfy Section 303(b) of the Bankruptcy Code because there are not three or more entities that have undisputed, bona fide claims. *Second*, Comcast orchestrated the filing in bad faith, to avoid termination of the Astros' media rights agreement with the Network and secure a tactical advantage over the Astros in their partnership dispute. *Third*, Comcast's plan, which also proposes the appointment of a trustee to facilitate the sale of the Network and its assets to a Comcast affiliate, runs afoul of well-settled bankruptcy and intellectual property law because it seeks the assumption and assignment of partnership and

media rights agreements, which are both personal services contracts and cannot be assigned as a matter of law.

There are no third-party creditors' interests at stake here. Each of the Petitioning Creditors is a subsidiary of Comcast and each is an affiliate of the Comcast entity, Houston SportsNet Holdings, LLC, that owns Comcast's interests in the Network. There are no bona fide liabilities that are owed to the Petitioning Creditors—and there are certainly not three distinct bona fide liabilities to satisfy Section 303(b) of the Bankruptcy Code. Two of the Petitioning Creditors' claims are based on unauthorized oral contracts to which the Astros did not consent— a requirement under the unanimous consent provisions of the parties' agreement. The other two Petitioning Creditors' claims were not due as of the date of this Petition, and were only coming due *after* the date the Astros could terminate the deal. The Network is regularly paying its debts to actual third parties. ███████████████████████████████████████ ████████████ Both the Astros and Comcast have agreed to backstop valid prepetition claims of third-party creditors.

Comcast seeks to use this Court's jurisdiction to accomplish indirectly what it is *expressly prohibited* from accomplishing directly under its agreements with the Astros. Specifically, Comcast devised the filing of the Involuntary Petition to circumvent the Astros' rights to: (1) withhold consent for the filing of a petition for bankruptcy; (2) terminate their media rights agreement with the Network; (3) withhold consent for the Network to enter into affiliation agreements with undervalued rates; and (4) withhold consent for a sale of the Network. These were bargained-for rights between highly sophisticated entities. Comcast threw the Network into bankruptcy to circumvent the Astros' rights and to gain an improper tactical advantage over the Astros in the ongoing partnership dispute.

The Court should also dismiss the chapter 11 proceedings as they are a road to nowhere. Comcast's vision appears to be that an independent trustee can be appointed and then Comcast could buy the Astros' media rights without the Astros' consent. The mechanics that Comcast seeks to use to implement its plan run afoul of well-settled bankruptcy and intellectual property law. The application for a trustee and the assumption and assignment of the Limited Partnership Agreement and the Astros' Media Rights Agreement, which are personal services contracts, cannot be accomplished as a matter of law. While the Astros certainly respect the equitable powers of the Bankruptcy Court, it is not appropriate for the Court to rewrite contracts and rights governed by state law, including the Astros' partner consent rights that form the foundation of their media rights—their most valuable and personal assets—by giving them to a third-party trustee who it does not control.

And it is especially inappropriate to facilitate a redetermination of those consent rights when those rights relate to the Astros' intellectual property. Intellectual property law and the Bankruptcy Code itself make crystal clear that a debtor-in-possession cannot transfer such intellectual property rights without the consent of the owner and emphatically rejects the notion that these rights can be vested in a trustee. As such, Comcast's strategy of using chapter 11 to strip the Astros of their rights is not a legally accomplishable strategy.

Comcast and its subsidiary Petitioning Creditors are attempting to use this Court to force the Astros to accept a longer-term, undervalued rate for the Astros' media rights. And now it has organized this collusive campaign in an effort to circumvent the terms of the deal it struck. As such, the Court should dismiss the Involuntary Petition.

3

## BACKGROUND

### A.    The Astros Form The Network To Monetize Their Media Rights.

In 2003, the Astros[1] and the Rockets[2] formed the Houston Regional Sports Network, L.P. (the "Network") to broadcast the teams' games and Houston professional sports programming on a single cable channel.  This arrangement allowed the Astros to monetize their most valuable asset—their media rights—by granting the Network a license to feature the Astros games as part of the Network's regional sports programming, in exchange for the payment of media rights fees.

A Major League Baseball team's media rights—and its ability to monetize those rights through television programming—are critical to the team's success both on and off the field. Because media rights fees are the largest source of revenue for a team, the terms of a long-term media rights deal can make or break a team.  A favorable media rights deal can support a higher payroll and—by extension—the ability to acquire and retain top talent.   By contrast, an undervalued media rights deal can suppress a team's payroll for ten to twenty years (the typical length of such deals), jeopardizing the team's long-term success in both baseball and business operations.[3]

---

[1]    Unless otherwise specified, "Astros" refers to Houston Astros, LLC and/or its affiliates and predecessors including McLane Company, LLC f/k/a Houston McLane Company, Inc. d/b/a the Houston Astros.

[2]    Unless otherwise specified, "Rockets" refers to Rockets Partner, L.P., JTA Sports, Inc., Rocket Ball, Ltd., and/or their affiliates and predecessors.

[3]    Recognizing the importance of a team's media rights — and the importance of maintaining the integrity of those rights — the MLB Constitution contains detailed provisions governing the ownership, licensing, and transfer of media rights to broadcast MLB games.  The Constitution provides that "each Club shall have, with respect to each game in which it participates, the right to authorize the telecast of such game ... within its home television territory."  MLB Const. Art. X § 3(a) (Ex. 1).  It also requires a vote of a majority of the MLB teams to approve any license of a team's media rights to a third party. *See id.* Art. V, Sec. 2(a)(5).

**B.      Comcast Acquires A Minority Interest In The Network.**

Comcast is the largest cable company in the United States and in the Houston metropolitan area.[4]  One of the largest and most sophisticated companies in the country, Comcast is a Fortune Fifty company with more than $62 billion in revenue reported last year.  It is an experienced and aggressive player in the mergers and acquisition market—and in the ownership and operation of sports television networks.  Through its various affiliates and subsidiaries, Comcast owns and operates a chain of regional sports networks around the country.

Comcast became interested in purchasing part of the Network in 2010.  After lengthy negotiations, the Astros and the Rockets agreed to admit Comcast as a third limited partner in the Network.  The contracts governing the rights and responsibilities of Comcast, the Astros, and the Rockets were negotiated at length and signed as part of an integrated transaction on October 29, 2010.[5]

**C.      The Structure And Corporate Governance Of The Network.**

The Network is organized as a limited partnership among the Astros, the Rockets, and Comcast. ███████████████████████████████████████████

---

[4]  Unless otherwise specified, "Comcast" refers to Comcast Corporation and/or its direct and indirect wholly-owned and partially-owned subsidiaries including but not limited to Houston SportsNet Holdings, LLC, Comcast Sports Management Services, LLC, Comcast Cable Communications, LLC, and Houston SportsNet Finance, LLC, National Digital Television Center, LLC, and Comcast SportsNet California, LLC.

[5]  The Transaction Agreements include, among others: (1) the Second Amended and Restated Agreement of Limited Partnership of Houston Regional Sports Network, L.P. ("Limited Partnership Agreement"); (2) the Second Amended and Restated Limited Liability Company Agreement of Houston Regional Sports Network, LLC ("General Partner Agreement") (collectively "Operating Agreements"); (3) the Comcast Network Service Agreement by and between Comcast Sports Management Services, LLC and the Network (the "Comcast Management Services Agreement"); (4) the Comcast California (Houston) Affiliation Agreement by and between Comcast Cable Communications, LLC and the Network (the "Comcast Affiliation Agreement"); and (5) the Credit Agreement by and between Houston SportsNet Finance, LLC and the Network, the Guarantee and Security Agreement by and between Houston SportsNet Finance, LLC and the General Partner, and the Security Agreement by and between Houston SportsNet Finance, LLC and the Network (collectively, the "Comcast Credit Agreement"); (6) the Amended and Restated Media Rights License Agreement by and between Houston McClane Company, LLC and the Network (the "Astros' Media Rights Agreement"); and (7) the Amended and Restated Media Rights License Agreement by and between Rocket Ball, Ltd. and the Network (the "Rockets' Media Rights Agreement," together with the Astros' Media Rights Agreement, the "Media Rights Agreements").

████████████████████████████████████████████████████████

██████████████████████████████   The rights and responsibilities of the three partners are

governed by the Network's Limited Partnership Agreement.

Pursuant to the Limited Partnership Agreement, the Network is managed by its general

partner, Houston Regional Sports Network, LLC ("General Partner"), a limited liability company

that is also owned by the Astros, the Rockets, and Comcast.  The board of the General Partner

("the Board") is comprised of one Astros director, one Rockets director, and two Comcast

directors. The corporate governance of the General Partner is set forth in the General Partner

Agreement.

### D.   The Limited Partnership Agreement, The General Partner Agreement, And The Astros' Media Rights Agreement All Contain Vital Protections To Protect The Astros' Media Rights.

The Limited Partnership Agreement and the General Partner Agreement were negotiated

by sophisticated parties represented by sophisticated counsel.  Together, these agreements detail

the corporate governance procedures that govern the ownership and operation of the Network.

Among other important provisions, the three partners expressly agreed that the following acts

require the *unanimous consent* from all of the directors of the General Partner:



These consent rights were critical terms of the deal that admitted Comcast to the Network

partnership.  They were indispensable to the protection of the Astros' media rights because,

---

[6]   Relevant sections of the General Partner Agreement are attached as Ex. 2.

without them, the Comcast and Rockets directors (voting together) could control the value of the Astros' most valuable asset—their media rights—by causing the Network to enter into undervalued affiliation agreements, modify the terms of the Astros' Media Rights Agreement, or file for bankruptcy.  The consent rights in the General Partner Agreement were designed to prevent precisely the kind of destructive action that Comcast now attempts to unilaterally impose on the Astros.

### E.    The Astros' Media Rights Agreement With The Network Contains Additional Provisions To Protect The Astros' Media Rights.

The Astros' Media Rights Agreement is an agreement between the Astros and the Network, in which the Astros granted the Network exclusive rights to exhibit team programming, in exchange for the payment of media rights fees.  In addition to the corporate governance protections in the General Partner Agreement, the Media Rights Agreement contains *additional* protections for the Astros:

- In exchange for the right to broadcast Astros baseball games, the Network is obligated to pay the Astros a media rights fee of approximately ███████ in 2013.[7] If the Network fails to make a required media rights payments, the Astros have the right to terminate the Media Rights Agreement upon written notice if the Network fails to cure the default within 60 days.  *See* Astros' Media Rights Agreement § 12.3(D)[8].

- The Astros have the right to terminate the Media Rights Agreement if the Network becomes insolvent or files for bankruptcy.  *See id.* § 12.5(C).[9]  In addition, the Media Rights Agreement expressly provides that a bankruptcy trustee "*shall [not] have any right to continue this Agreement or to in any way use the rights granted under this Agreement*" if the Astros exercise their right to terminate the agreement because of the bankruptcy.  *Id.*[10]

---

[7]    The media rights fee increases ███████████████ and is payable in six equal installments that are due on the last day of each month from April through September.

[8]    Relevant sections of the Astros' Media Rights Agreement are attached as Ex. 3.

[9]    As a personal services agreement as well as a trademark agreement, such rights continues to be fully enforceable in bankruptcy.

[10]    Emphasis added unless otherwise noted.

The Astros bargained for each of these protections in the Network's Limited Partnership Agreement, the General Partner Agreement, and the Astros' Media Rights Agreement, and they relied on the integrity of those protections.  For its part, Comcast, the nation's largest and most sophisticated cable company, agreed to honor each of these protections as a condition of its entry into the Network partnership.

**F.      Comcast's Affiliation Agreement.**

Comcast is not only a partner in the Network and member of the General Partner; it also carries the Network on its cable system in the region.  Pursuant to a separate Comcast Affiliation Agreement between the Network and Comcast Cable Communications, LLC ("Comcast Cable"), Comcast Cable carries the Network on its cable system in exchange for a monthly subscriber fee.



The Astros protected themselves against this scenario by requiring the unanimous consent of all the directors on the Board before the Network can enter into an affiliation agreement.  *See* General Partner Agreement § 5.10(a) & Schedule C(10).  The unanimous consent provisions were included so that Comcast and the Rockets could not impose unacceptably low base rates on the Astros in connection with affiliation agreements, ███████

████████████████████████████████████████████████████████████

████████████████████████████████

**G.      Comcast Asks The Network To Accept Lower Base Rates.**

Since joining the Network, Comcast, in its role as manager through the Management Services Agreement, has brought a handful of informal verbal proposals for affiliation agreements to the Network—and has pressured the Network to consider entering into affiliation agreements with substantially lower base rates than those contained in the Comcast Affiliation Agreement.  Those proposals significantly undervalued the Network's service ███████████

████████████████████████████████████████████████████████████

██████████████████████████████████

The Astros believed that accepting these informal verbal proposals for affiliation agreements with undervalued base rates would have undervalued the Network's service, depressing the value of the partners' interests in the Network ████████████████ ███████████████████████████ and crippling the Network's ability to pay the Astros under the Astros' Media Rights Agreement, jeopardizing the Astros' long-term prospects for improving the team.  Accordingly, the Astros informed Comcast that they would exercise their consent right to protect the Network and themselves from the discounted proposals Comcast had suggested.

**H.      The Network Fails To Make Two Media Rights Payments To The Astros, Providing The Astros The Right To Terminate The Astros' Media Rights Agreement.**

On July 31, 2013, the Network failed to make a media rights payment to the Astros required by the Astros' Media Rights Agreement.  That same day, the Astros sent a notice of default to the Network.  July 31, 2013 Default Letter (Ex. 4).  On August 30, 2013, the Network missed a second installment payment to the Astros under the Astros' Media Rights Agreement.

9

The Astros sent a second default notice to the Network on September 3, 2013. Sept. 3, 2013 Default Letter (Ex. 5). The second notice informed the Network that, under Section 12.3(D) of the Astros' Media Rights Agreement, the Network would have sixty days from the first missed payment—or until September 29, 2013—to cure the default. *Id.* If the defaulted payments remained uncured as of September 30, 2013, the Astros would have the right to immediately terminate the Astros' Media Rights Agreement by written notice. *See* Astros' Media Rights Agreement § 12.3(D).

### I.   Four Comcast Affiliates File This Involuntary Petition In An Attempt To Eliminate The Astros' Right To Terminate The Media Rights Agreement.

There is no dispute that the Astros had the right to terminate their Media Rights Agreement with the Network on September 30, 2013. Sept. 28, 2013 Emergency Mot. for Appointment of Interim Chapter 11 Trustee ("Trustee Mot.") [Dkt. 3] ¶ 41; Sept. 29, 2013 Jon D. Litner Decl. [Dkt. 5] ¶ 18.[11] On September 27, 2013, just days before that right would have accrued, four Petitioning Creditors—"each an affiliate of Comcast"—filed this Involuntary Petition against the Network under chapter 11 of the Bankruptcy Code. Trustee Mot. ¶ 5; *see* Sept. 30, 2013 Mot. Hr'g Tr. at 12. The Petitioning Creditors ask the Court to appoint a trustee so Comcast Lender can make a bid to acquire the Network or substantially all of its assets. Trustee Mot. ¶ 7.

Two of the Comcast affiliates that seek to qualify as Petitioning Creditors do so on the basis of alleged "verbal arrangement[s]" with the Network. Sept. 29, 2013 John C. Ruth Decl. [Dkt. 7] ¶ 2; Sept. 29, 2013 Bruce A. Davis Decl. [Dkt. 6] ¶ 2. The other two Comcast affiliates assert claims that were not due and owing as of the Petition Date. The Petitioning Creditors are:

---

[11]   Although the original affidavits filed by the Petitioning Creditors on September 29, 2013 in support of their Motion for An Order Appointing An Interim Trustee will be deemed withdrawn upon the filing of amended affidavits, Paragraph 1 of the Court's September 30, 2013 Order provides that those affidavits "remain the statements of the person making them for the purposes of evidence in a proceeding or case."

### 1.      Comcast Media.

National Digital Television Center, LLC ("Comcast Media") alleges that it had a "verbal arrangement" with the Network and it was owed $10,517.50 as of the date of the Involuntary Petition. Davis Decl. ¶¶ 2-3. The declarations submitted by the Petitioning Creditors provide no indication when this "verbal arrangement" was formed, what the terms were, or how the pricing was determined.

Comcast Media is a subsidiary of Comcast Corporation and an affiliate of Houston SportsNet Holdings, LLC ("Comcast Owner"), a limited partner in the Network. The Network was prohibited by the General Partner Agreement from entering into a "verbal arrangement" with Comcast Media without the unanimous consent of the directors of the Network's General Partner, including the Astros director. *See* General Partner Agreement at Schedule C(7). No such consent was provided. Oct. 7, 2013 Giles Kibbe Decl. ¶ 6.

Nor did Comcast Media make a demand for payment of $10,517.50 from the Network before the Involuntary Petition was filed. During meetings and teleconferences of the Board, in which the Comcast directors and the Astros director participated, there was never any mention of the "verbal arrangement" with—or outstanding debt owed to—Comcast Media. *See* Kibbe Decl. ¶ 7. Comcast Media first notified the Network of this alleged debt in the Involuntary Petition.

### 2.      Comcast California.

Comcast SportsNet California, LLC ("Comcast California") alleges that it had a "verbal arrangement" with the Network and was owed $43,129.02 as of the date of the Involuntary Petition. Ruth Decl. ¶¶ 2-3. The declarations submitted by the Petitioning Creditors provide no indication when this "verbal arrangement" was formed, what the terms were, or how the pricing was determined.

11

Like Comcast Media, Comcast California is a subsidiary of Comcast Corporation and an affiliate of Comcast Owner, a limited partner in the Network. The Network was prohibited by the General Partner Agreement from entering into a "verbal arrangement" with Comcast California without the unanimous consent of the directors of the Network's General Partner, including the Astros director. *See* General Partner Agreement at Schedule C(7). No such consent was provided. Kibbe Decl. ¶ 8.

Nor did Comcast California make a demand for payment of $43,129.02 from the Network before the Involuntary Petition was filed. During meetings and teleconferences of the Board, in which the Comcast directors and the Astros director participated, there was never any mention of a "verbal arrangement" with—or outstanding debt owed to—Comcast California. Kibbe Decl. ¶ 9. Again, Comcast California first notified the Network of this alleged debt in the Involuntary Petition.

### 3. Comcast Services.

Comcast Sports Management Services, LLC ("Comcast Services") is a subsidiary of Comcast Corporation and an affiliate of Comcast Owner, a limited partner in the Network. Comcast Services provides management oversight services and support to the Network pursuant to the Comcast Management Services Agreement. Comcast Services' most important responsibilities include the sales and marketing of the Network's service to other MVPDs. In exchange for services provided under the Comcast Management Services Agreement, the Network pays Comcast Services an annual fee of ███████ for the current year, in equal installments of approximately ███████ Litner Decl. ¶ 9.

The Network has paid Comcast Services all of the quarterly fee payments that became due and owing prior to the Petition Date—and Comcast Services does not allege otherwise.

Instead, Comcast Services seeks to invoke this Court's jurisdiction based on a claim for the quarterly interest payment for the third quarter of 2013, which "will become due and owing on October 15, 2013," more than two weeks after the Petition Date. *Id.*

### 4.  Comcast Lender.

Houston SportsNet Finance, LLC ("Comcast Lender") is a subsidiary of Comcast Corporation and an affiliate of Comcast Owner, a limited partner in the Network.  The Network and Comcast Lender entered into the Comcast Credit Agreement, pursuant to which the Network was permitted to borrow up to ████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████

The Network has made all of the quarterly interest payments that became due prior to the Petition Date—and Comcast Lender does not allege otherwise.  Instead, Comcast Lender seeks to invoke the Court's jurisdiction based on a claim for the quarterly interest payment for the third

quarter of 2013, which "will become due and owing on September 30, 2013," after the Petition

Date. *Id.* ¶ 11.

### J.   The Network Has Cash On Hand To Pay Third-Party Creditors.

The Network is regularly paying its debts to actual third parties.  Both the

Astros and Comcast have agreed to backstop valid prepetition claims of third-party creditors.[12]

## ARGUMENT

### I.   THE INVOLUNTARY PETITION SHOULD BE DISMISSED BECAUSE COMCAST CANNOT SATISFY BANKRUPTCY CODE SECTION 303.

Petitioning Creditors identify two grounds for the filing of the Involuntary Petition, 11

U.S.C. Section 303 (b)(1) and Section 303(h). Neither provision is satisfied. There are, at most,

only two Comcast entities that may have undisputed claims against the Network—not three or

more as required by Section 303(b)(1). And the Petitioning Creditors do not—and cannot—

demonstrate that Network was not generally paying its debts as they became due at the time the

Involuntary Petition was filed as required by Section 303(h) .

### A.   Petitioning Creditors Cannot Demonstrate That There Are Three Holders Of Noncontingent, Undisputed Claims Under Section 303(b).

Chapter 11 Section 303(b)(1)  of the Bankruptcy Code provides that an involuntary case

may be commenced:

> by *three or more entities*, each of which is either a holder of a claim against such
> person that is not contingent as to liability or the subject of a bona fide dispute as
> to liability or amount, … if such noncontingent, undisputed claims aggregate at
> least $15,325 more than the value of any lien on property of the debtor securing
> such claims held by the holders of such claims.

---

[12]   *See* Sept. 30, 2013 G. Kibbe to Network General Manager ("[T]he Astros Member is prepared to backstop the
payments of the prepetition claims of third-party creditors listed on the Company's accounts payable report
dated as of September 24, 2013 that are not affiliates, subsidiaries, or otherwise related to the Board Members."
(Ex. 6); Trustee Mot. ¶ 7 (stating that a Comcast buyout "would likely lead to prepetition creditors' claims and
all reasonably foreseeable administrative expenses being paid in full").

The test in Section 303(b)(1) is not whether three or more entities assert claims. The test is narrower. It is whether those entities assert claims that are not the subject of a ***bona fide dispute*** as to liability or amount. The Petitioning Creditors have the burden to establish a prima facie case that no bona fide dispute exists as to their claims. *In re Norris*, 114 F.3d 1182, 1997 WL 256808, at \*4 (5th Cir. 1997). This Court "must 'determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt.'" *Id.* (quoting *In re Rimell*, 946 F.2d 1363, 1365 (8th Cir. 1991)).

Petitioning Creditors cannot demonstrate that there are "three or more entities" that have bona fide claims against the Network. Although Comcast's Involuntary Petition is based on the purported claims of four Comcast affiliates, two of those four purported claims are based on undocumented, so-called "verbal arrangements" with the Network that are unauthorized under the terms of the General Partner Agreement. Comcast Media alleges that it is owed $10,517.50 for transmission-related services pursuant to a "verbal arrangement" with the Network. Davis Decl. ¶¶ 2-3. Comcast California alleges that it is owed $43,129.02 for production services provided to the Network pursuant to another "verbal arrangement." Ruth Decl. ¶¶ 2-3. However, the General Partner Agreement requires "unanimous director approval" of "entry into or consummation of any transaction between [the Network], on the one hand, and a Member, Partner or any of their respective Affiliates." General Partner Agreement Schedule C(7). Unanimous director approval was neither sought nor obtained for these alleged "verbal arrangements" with Comcast Media and Comcast California. Kibbe Decl. ¶¶ 6-9. Because two Petitioning Creditors do not have undisputed claims against the Network, the Involuntary Petition fails to satisfy Section 303(b)(1).

This is further demonstrated by the September 24, 2013 aging report prepared by Comcast Services that identifies all outstanding liabilities of the Network immediately before the filing of the Involuntary Petition. *See* Sept. 24, 2013 Weekly Aging Report (Ex. 7); Comcast Management Services Agreement, Attachment B ¶ 5(d) ("Comcast will provide [accounts payable processing and reporting] on Network's behalf.").[13] There is no reference in this report to any outstanding obligations to Comcast California. With respect to Comcast Media, the report shows an outstanding August 8, 2013 invoice for ▮▮▮▮▮ and an outstanding September 9, 2013 invoice for ▮▮▮▮▮ Those invoices total ▮▮▮▮▮—not $10,517.50—and in the comments field to the aging report, Comcast Services itself noted that the August invoice lacked proper coding, and the September invoice is "incorrect." Sept. 24, 2013 Weekly Aging Report. Thus, the Network's own aging report (prepared by Comcast Services) casts serious doubt on whether the Network was properly invoiced for either of these Petitioning Creditors' claims; and it demonstrates that, at the very minimum, the existence and amount of their purported claims are in dispute.[14]

### B.    Petitioning Creditors Cannot Demonstrate That The Network Is Not Generally Paying Its Debts As They Become Due As Required Under Section 303(h).

Section 303(h) permits the Court to order relief in an involuntary case "only if the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h)(1). The Petitioning

---

[13]    Relevant sections of the Comcast Management Service Agreement are attached as Ex. 8.

[14]    The Court should also disregard Comcast Lender as an entity who has a noncontingent, undisputed claim. Although some courts have held that an entity that has a secured claim may count toward Section 303(b)'s numerosity requirement provided the unsecured claims meet the minimum threshold amount, the Astros have not identified any case where, as here, the secured claim was: (1) based on a performing loan that was not in default, Pick Decl. ¶ 11 (conceding that Comcast Lender's claim rests on the Network's quarterly interest payment that would have become due three days after the petition); and (2) held by an affiliate of one of partners in the debtor.

Creditors have the burden of showing that the Network was not generally paying its debts as they became due at the time of the Involuntary Petition—and that such debts are not subject to a bona fide dispute as to liability or amount. *See, e.g., In re Briggs*, Nos. 07-34533 & 07-34534, 2008 WL 190463, at *2 (N.D. Tex. Jan. 18, 2008); *see In re Green Hills Dev. Co.*, 445 B.R. 647, 657 (S. D. Miss. 2011). "The determination of whether a debtor is generally paying his debts must be made as of the date the petition is filed." *In re Norris*, 1997 WL 256808, at *6; *In re Green Hills Dev. Co.*, 445 B.R. at 657 (petitioning creditors must prove that alleged debtor was not paying its debts "at the time the petition was filed"). A bankruptcy court may not "consider debts which have not [yet] become due"—*i.e.*, as of the date of the petition. *In re Norris*, 1997 WL 256808, at *6.

The Involuntary Petition should be dismissed because Comcast cannot show that the Network was generally not paying its debts as they became due. Comcast has not provided any evidence of any debts owed to third-party creditors at the time of the Petition. As Comcast concedes, Comcast Lender and Comcast Services do not have claims that were due and owing at the time of the Involuntary Petition. Pick Decl. ¶ 11; Litner Decl. ¶ 9. Comcast Media and Comcast California assert that they were owed funds at the time of the Involuntary Petition, but those purported claims are the subject of bona fide disputes as to both liability and amount, and do not fall within Section 303(h). Indeed, Comcast California's purported claim is not identified on the Network's September 24 aging report prepared by Comcast Services. Sept. 24, 2013 Weekly Aging Report. ███████████████████████████████████████ ███████████████████████████████████ Even assuming that Comcast Media's and Comcast California's purported claims of $53,000 are valid, there are serious questions as to whether Comcast Services' failure to pay those claims was due to unwillingness to pay, rather

than an inability to pay.  The only undisputed claims that Comcast identifies that were due and

owing at the time of the Involuntary Petition are the July 31 and August 30, 2013 payments owed

to the Astros under the Astros' Media Rights Agreement.  In short, Petitioning Creditors do

not—and cannot—demonstrate that the Network was "generally not paying" its debts as they

became due as required under Section 303(h).  And seen in its proper context, the "generally not

paying" test is meant to limit involuntary cases to those where third party creditors are genuinely

at risk. It would be perverse for the test to be a springboard to further injure the holder of the

only material unpaid claim—and the very basis of its assertion here—by setting in motion a

chapter 11 expressly designed to strip that holder of its contractual termination right.

## II.   THE INVOLUNTARY PETITION SHOULD BE DISMISSED FOR CAUSE BECAUSE IT IN BAD FAITH.

"Lack of good faith in the filing of a Chapter 11 bankruptcy petition constitutes cause for

dismissal under 11 U.S.C. § 1112(b)."  *In re Elmwood Dev. Co.*, 964 F.2d 508, 510, *reh'g*

*denied*, 974 F.2d 1337 (5th Cir. 1992); *In re Humble Place Joint Venture,* 936 F.2d 814, 816-17

(5th Cir. 1991) (affirming § 1112(b) dismissal of chapter 11 petition filed in bad faith).  The facts

here demonstrate that the Involuntary Petition was filed in bad faith — in order to circumvent

multiple partnership and contract provisions and gain a tactical advantage in a business dispute

between partners in the Network — and should be dismissed pursuant to Section 1112(b).  In

orchestrating the filing of this Involuntary Petition, Comcast seeks to accomplish indirectly, and

through this Court's jurisdiction, what it is *expressly prohibited* from accomplishing directly.

*First*, the collusive filing of the Involuntary Petition was designed to circumvent the

provision in the General Partner Agreement that expressly prohibits the "voluntary filing of a

petition for bankruptcy" without the Astros' consent.  *See* General Partner Agreement, Schedule

C(19).  *Second*, by its own admission, Comcast filed the Involuntary Petition to prevent the

18

Astros from exercising their undisputed contractual right to terminate the Media Rights Agreement. *See* Trustee Mot. ¶ 41. ***Third***, by its own admission, Comcast wants to use the bankruptcy proceedings to purchase all or substantially all of the Network's assets without the Astros' consent (or perhaps, impose affiliation agreements with other MVPDs to broadcast Astros games without the Astros' consent). *Id.* ¶ 7.

This case stems from a dispute between the Astros and Comcast over whether the Network should enter into certain affiliation agreements with other MVPDs to broadcast the Network's programming at undervalued base rates. The Astros bargained for, and Comcast agreed to, a provision in the General Partner Agreement in which the Astros were given the right to consent to any such proposed affiliation agreements. The Astros have indicated that they would withhold their consent with respect to a handful of informal verbal proposals conveyed by Comcast. And the Astros did so in the best interests of their baseball and business operations.

Comcast's actions are expressly prohibited by the General Partner Agreement and the Astros' Media Rights Agreement that the Astros bargained for and that Comcast agreed to. In short, Comcast orchestrated the filing of the Involuntary Petition by its affiliates for the indisputable purpose of circumventing the Astros' contract and consent rights and gaining an unfair and improper tactical advantage in a dispute between partners in the Network. The law does not permit such a bad faith filing.

Courts in the Fifth Circuit have repeatedly dismissed bankruptcy petitions filed for the bad faith purpose of gaining an advantage in disputes among business partners. *See, e.g., In re Brazos Emergency Physicians Ass'n, P.A.*, 471 F. App'x 393, 394 (5th Cir. 2012); *In re Antelope Techs., Inc.*, 431 F. App'x 272, 273 (5th Cir. 2011) (affirming dismissal of chapter 11 petition filed in bad faith where the debtor corporation filed the petition to gain an advantage in dispute

between minority shareholders and majority shareholders of the debtor corporation); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 169 (Bankr. S.D. Tex. 1989) (dismissing bad faith involuntary petition where the primary motivation was to re-litigate a dispute), *judgment entered*, 4 Tex. Bankr. Ct. Rep. 116 (Bankr. S.D. Tex. Jan. 27, 1989). Although bad faith filing cases about intra-partnership disputes typically involve pending litigation between the partners, the same principle that protects partners from bad faith petitions filed for the purpose of gaining a tactical advantage in a pending lawsuit must likewise protect partners from bad faith filings before litigation ensues.

When a debtor's operational agreement grants a stakeholder the express right to withhold consent to a bankruptcy, circumventing that right "through the ruse of soliciting an involuntary case" can constitute bad faith. *See In re Global Ship Sys., LLC*, 391 B.R. 193, 203 (Bankr. S.D. Ga. 2007) (dismissing bad faith involuntary petition because it was "a pure subterfuge for a voluntary petition, filed by creditors at the instigation of [the debtor] or its managers/members" to circumvent one stakeholder's right to withhold consent to a voluntary petition). When Comcast joined the partnership, it agreed that Astros must consent to any "voluntary filing of a petition for bankruptcy." General Partner Agreement, Schedule C(19). Comcast knew that the Astros would not consent to a bankruptcy, so it orchestrated the filing of the Involuntary Petition by its four affiliates as an end-run around the Astros' consent rights. Doing so violated both the spirit and the letter of the General Partner Agreement, which prohibits the "voluntary filing of a petition for bankruptcy." *Id.* Because "voluntary" modifies "filing" rather than "petition," the General Partner Agreement prohibits the filing of *any* petition for bankruptcy without unanimous consent, whether voluntary or involuntary. *Id.* Comcast's orchestration of the Involuntary

20

Petition "falls squarely within the parameters which classically define a bad faith filing." *Global Ship*, 391 B.R. at 203.

Comcast's own pleadings show that Comcast filed the Involuntary Petition on September 27 for the express purpose of invoking the automatic stay to prevent the Astros' from exercising their right to terminate the Astros' Media Rights Agreement on September 30. *See* Trustee Mot. ¶ 41 ("But for the automatic stay that came into effect upon the filing of this involuntary bankruptcy case, the Astros would be entitled, as early as this Sunday, to terminate their Media Rights Agreement for non-payment of the Astros Rights Fee installments."). Comcast specifically chose to file an involuntary bankruptcy because the automatic stay would provide additional leverage by stripping the Astros of their most important bargaining chips in negotiations between the partners.

As this Court has acknowledged, the good faith requirement does not permit a partner to throw his partnership into bankruptcy to secure a tactical advantage in disputes with his partners or to enrich himself at the partnership's expense. *See In re Nikiski Partners, Ltd.*, Case No. 09-39332-H1-11, Closing Arguments Tr. at 35, 45 (Bankr. S.D. Tex. Dec. 30, 2009) (dismissing bankruptcy petition filed in bad faith when "the actual motive was to benefit ... [the ultimate interest holder in the debtor's general partner]" and not to "protect [the debtor's] assets for an equitable distribution []or to further its rehabilitation.") (Ex. 9). Yet that is precisely what Comcast is trying to do. Comcast seeks to nullify the Astros' right to withhold consent for discount affiliation agreements. ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

████████████████████ Alternatively, Comcast proposes to use the bankruptcy to push the Astros out of the partnership altogether, and to acquire "substantially all of [the Network's] assets" for itself. Trustee Mot. ¶ 7. This too is a bad faith tactic designed to destroy the Astros' consent rights and to abuse the bankruptcy process to accomplish indirectly what Comcast is prohibited from doing directly under the Network's Operating Agreements.

The alleged deadlock between the partners does not excuse Comcast's bad faith. *See In re Westerleigh Dev. Corp.*, 141 B.R. 380 (Bankr. S.D.N.Y. 1992). *Westerleigh* involved a small real estate development corporation owned by two 50% shareholders. One of the shareholders sold a piece of land to the corporation in exchange for a mortgage, and the other shareholder was going to build homes on the land through his family-owned construction company. The shareholders became deadlocked in a dispute over the development of the land and were unable to execute any corporate decisions or take any corporate action as a result of their dispute. The contractor-shareholder sued the lender-shareholder on behalf of their jointly-held corporation, alleging that the lender-shareholder had taken actions which prevented the corporation from developing the land and claiming that he was owed a fee for construction work. In response, the lender-shareholder sought to foreclose upon the land. To stay the foreclosure, the contractor-shareholder's construction company filed an involuntary chapter 11 petition against the corporation. The court dismissed the petition, finding that "[t]he two feuding shareholders may … obtain appropriate relief without using the bankruptcy court as an additional weapon to resolve their disputes." *Id.* at 40-41. So too here. If they are not able to resolve their disagreement at the negotiating table, Comcast and the Astros can dissolve their partnership and liquidate its assets according to the specific procedures they bargained for when they became

22

partners.  *See* Limited Partnership Agreement Art. XVII.[15]  There is no legitimate reason why a bankruptcy court or trustee should referee and dictate the outcome of disputes governed by contract and state law or why the Astros should be forced to participate with their hands tied behind their back.  The Astros are entitled to try and resolve this partnership dispute using the leverage they bargained for when they agreed to let Comcast join the partnership—their consent rights with respect to bankruptcy, termination of the Astros' Media Rights Agreement, entry into affiliation agreements, and sales of the assets of the Network, among others.

The Comcast Credit Agreement was thoroughly negotiated.  Because the Astros' media rights are their most valuable asset, the Astros did not agree to contribute their media rights to the Network or to grant a security interest in them.  Instead, the Astros retained control over their media rights, and Comcast Lender agreed to receive a security interest only in the *Network's* and the *General Partner's* assets, *which do not include the Astros' media rights*.  Nor did Comcast Lender protect its loan against the so-called deadlock it now complains of.[16]  Instead, Comcast squarely agreed to a number of provisions the Astros required to protect their media rights.  By invoking the automatic stay to prevent the Astros from terminating their Media Rights Agreement, Comcast Lender seeks to use the bankruptcy process as a proxy for a secured interest in media rights that it failed to obtain at the negotiating table.

---

[15]   Relevant sections of the Limited Partnership Agreement are attached as Ex. 10.

[16]   Comcast seeks to use corporate deadlock as both a sword and a shield, claiming both that corporate deadlock led to the need for the filing, *see* Trustee Mot. ¶¶ 5, 24-25, 36, 47, 55, 59, but also apparently the Astros have no standing to contest the filing.  Comcast cannot have it both ways.  By arguing that the Network is deadlocked, Comcast has conceded that the Astros have standing to challenge the Involuntary Petition.  *In re Synergistic Techs., Inc.*, No. 07-31733-SGJ-7, 2007 WL 2264700, at *5 (N.D. Tex. Aug. 6, 2007) (shareholder had standing to contest bankruptcy filing by deadlocked corporation); *see In re Westerleigh Dev. Corp.*, 141 B.R. 38, 40 (Bankr. S.D.N.Y 1992) (same).  Furthermore, the Astros have standing for the additional and independent reason that the Involuntary Petition involves "a plan or scheme to achieve [some] other proscribed conduct," namely circumventing the Astros' bargained-for partnership rights, for the purpose of securing an improper advantage in the dispute between the partners.  *In re Ceiling Fan Distrib., Inc.*, 37 B.R. 701, 702 (Bankr. M.D. La. 1983).

The fact that Comcast entities are also creditors of the Network in addition to being partners in the Network does not negate Comcast's bad faith. *See, e.g.*, Brazos, 471 F. App'x at 394 (in intra-partner dispute where creditors were "mainly insiders and affiliates," petition was filed in bad faith and was properly dismissed); *Humble Place*, 936 F.2d at 816 (where real estate development partnership sought chapter 11 relief to avoid imminent foreclosure of its principal secured creditor, there were only two unsecured non-insider creditors, whose total claims were less than $7,000, and there was enough cash on hand at the date of bankruptcy to pay the non-insider unsecured creditors, petition was properly dismissed as having been filed in bad faith). This is because, as one court explained, "whether or not the [creditor-shareholder] has a bona fide claim against the debtor which is not in dispute is irrelevant" because "[t]he bankruptcy court should not be used by one shareholder to gain leverage over the other." *In re Westerleigh Dev. Corp.*, 141 B.R. at 41.

The Network also has sufficient funds to satisfy the prepetition claims of all unaffiliated third-party creditors. Moreover, the Network's ability to pay creditors is backstopped by the resources of the partners themselves. The Network and its General Partner have the right to request emergency funding. If Comcast refuses to contribute the funding the Network requires, the Astros are prepared to fund the payments of all prepetition claims of unaffiliated third-party creditors listed on the Network's accounts payable report dated as of September 24, 2013, provided that the Network verifies the accuracy of that report in a timely manner. If Comcast was truly concerned about the rights of the creditors, it would have brought the Petitioning Creditors' claims to the Astros' attention and asked for emergency funding ***before*** rounding up Comcast affiliates to unilaterally throw the partnership into bankruptcy.

24

There is no threat to the Network's unaffiliated third-party creditors.  There is only a partnership dispute and a petition describing a non-existent emergency manufactured by Comcast, for Comcast, for the bad faith purpose of stripping the Astros of their rights and negotiating leverage.  The Involuntary Petition should be dismissed.

## III.   THE PETITIONING CREDITORS CANNOT DEMONSTRATE THAT THERE IS A POSSIBILITY OF A SUCCESSFUL REORGANIZATION.

The Involuntary Petition should also be dismissed for cause under Section 1112(b) because there is not "reasonable likelihood" of a successful reorganization.  11 U.S.C. § 1112(b)(4)(A); *see also In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299, 302-304 (Bankr. D. Del. 2011) (dismissing bankruptcy petition pursuant to Section 1112(b) because the the debtor had "no possibility of a reorganization").  All potential exits from this chapter 11 proceeding—and both steps the Petitioning Creditors propose here, the appointment of a trustee and the sale of substantially all of the Network's assets—lead to a dead end.  *First*, the Limited Partnership Agreement is a personal services contract that cannot be assumed or assigned by a trustee under Section 365(c)(1) of the Bankruptcy Code; and even if it could be assumed, the Astros would continue to retain their consent rights to any transaction.  *Second*, the Astros' Media Rights Agreement is also a personal services contract and a trademark license that cannot be assumed or assigned by a trustee under Section 365(c)(1).  *Finally*, a trustee's assumption of the Astros' Media Rights Agreement or assignment of that agreement to a third party would trigger the Astros' right to terminate the agreement under Section 365(e)(2)(A).

Importantly, each of these outcomes makes sense.  Otherwise, four Comcast affiliates would be able to thrust the Network into bankruptcy for the sole purpose of staying the Astros' right to terminate the Astros' Media Rights Agreement—and then use the bankruptcy proceedings to acquire the Network's assets, including the Astros' Media Rights Agreement, and

circumvent the Astros' express consent requirement set forth in the General Partner Agreement. The law does not permit such brazen corporate conduct. This proposed reorganization is futile and therefore should be dismissed.

### A.   The Limited Partnership Agreement Cannot Be Assumed Or Assigned Without The Astros' Consent.

An agreement among partners, like the partnership here, is unique in the law. "It is not only a legal relationship, but it is also a personal relation or status, somewhat as marriage is a relation or status." *In re Harms*, 10 B.R. 817, 822 (Bankr. D. Colo. 1981). Because a partnership agreement is "a contract based upon personal trust and confidence," it cannot be assumed or assigned by a bankruptcy trustee and even if it could, the Astros would retain their consent rights—all of which underscores the futility of a bankruptcy proceeding. *See id.* at 821.

### 1.   The Limited Partnership Agreement is a Personal Services Contract that Cannot be Assumed or Assigned Without the Astros' Consent.

Section 365(c)(1) of the Bankruptcy Code provides that a "trustee may not assume or assign any executory contract" if "applicable law excuses [the non-debtor party] from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession," without receiving the non-debtor party's consent. 11 U.S.C. § 365(c). Under Delaware law—the "applicable law" that governs the Limited Partnership Agreement—an executory personal services contract is not assignable. *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, No. 3718-VCP, 2010 WL 338219, at *11 (Del. Ch. Jan. 29, 2010); *In re Martin*, 117 B.R. 243, 249 (Bankr. N.D. Tex. 1990) ("If the particular contract is personal in its character and calls for the personal services of either party or if it creates personalized relationships based on personal credit, confidence, and trust, or requires the exercise of knowledge, skill, or taste peculiar to either party, the duties under the contract may not be delegated (i.e. assigned) regardless of the skill or competence of the person to whom the

duties are proposed to be delegated."). Section 365(c) therefore exists "to prevent a trustee from forcing a party to accept performance from, or provide performance to, someone other than the party with whom it contracted in those situations where the identity of the party is central to the obligation itself. The paradigmatic example of such an agreement is the so-called 'personal services contract'...." *In re Lil' Things, Inc.*, 220 B.R. 583, 590 (Bankr. N.D. Tex. 1998) (internal quotations & citation omitted); *see also In re Taylor*, 913 F.2d 102, 106 (3d Cir. 1990).

The Limited Partnership Agreement is an executory personal services contract. It is executory because it contemplates ongoing and substantial performances by all parties, including the operation of a regional sports network and sublicensing of media rights. *See* Limited Partnership Agreement § 3.1; *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984) (executory contract is generally defined as a "contract on which performance is due to some extent on both sides") (internal quotations & citation omitted); *In re O'Connor*, 258 F.3d 392, 400 (5th Cir. 2001) (partnership agreement was executory contract). It is a personal services contract because the identity of the partners is material to the agreement. *See, e.g., In re Lil' Things*, 220 B.R. at 590-91. A change in the identity of any Network partner would impair the rights of the other partners, including the Astros. Indeed, the Astros selectively partnered with the Rockets and Comcast to create a one-of-a-kind regional sports television network in the Houston market to distribute the teams' games and programming year-round. The character, reputation, and skill of each partner is critical to this partnership, and therefore the Limited Partnership Agreement is a personal services contract. *See id.*

Because the Limited Partnership Agreement is an executory personal services contract, Delaware law excuses the Astros from rendering performance to anyone other than the pre-petition contract party. *See Great Am. Opportunities*, 2010 WL 338219, at *11. In order for

27

Section 365(c)(1) to apply, this Circuit further requires that there will be an actual—not merely hypothetical—assumption or assignment such that the contract will be performed by an entity other than the pre-petition contract party. *See In re Mirant Corp.*, 440 F.3d 238, 249-51 (5th Cir. 2006) (adopting actual, as opposed to hypothetical, test). The circumstances here satisfy that requirement, as set forth in detail below, and therefore Section 365(c)(1) prohibits a trustee from assuming or assigning the partnership agreement without the Astros' consent. *See In re Taylor*, 913 F.2d at 106 ("It is clear that contracts for personal services fall within [Section 365] (c)(1)(A), since 'applicable law' excuses the parties from accepting performance from, or rendering performance to, non-signatories."); *In re Lil' Things, Inc.*, 220 B.R. at 590; *In re Catron*, 158 B.R. 624, 627-28 (Bankr. E.D. Va. 1992) (noting that "the agreement or contract governing the partnership is essentially a contract for personal services, which renders it also nondelegable and nonassumable"), *aff'd*, 158 B.R. 629 (E.D. Va. 1993), *aff'd*, 25 F.3d 1038 (4th Cir. 1994); *In re Sunset Developers*, 69 B.R. 710, 713 (Bankr. D. Idaho 1987).[17]

The inability of a trustee to assume or assign the Limited Partnership Agreement ensures that there can be no viable reorganization here. Without the very agreement that governs the partnership, reorganization cannot be successful. The Involuntary Petition should be dismissed.

### 2. The Limited Partnership Agreement Must Be Accepted or Rejected in Its Entirety and Cannot Be Rewritten in Reorganization.

Even if a trustee could assume the Limited Partnership Agreement—which it cannot—it would have to assume the entire agreement, including the unanimous consent provisions.

---

[17] *See also In re Footstar, Inc.*, 323 B.R. 566, 573 (Bankr. S.D.N.Y. 2005) ("The basic objective of the limitation under Section 365(c)(1) is vindication of the right under applicable law of a contract counterparty to refuse to accept performance from or render performance to an entity '*other than* the debtor or the debtor in possession.' A trustee *is* an 'entity other than the debtor or the debtor in possession'—the trustee is an entirely different entity, who has succeeded by operation of the Bankruptcy Code to all the debtor's property including contracts.") (emphasis in original).

Section 365(a) permits a trustee to assume or reject any of the debtor's executory contracts, subject to court approval. *See* 11. U.S.C. § 365(a). However, it is black-letter law that if a debtor elects to assume an executory contract, it must assume the entire agreement with all of its benefits and burdens. *Bildisco*, 465 U.S. at 531; *see In re Williams*, 299 B.R. 684, 687 (Bankr. S.D. Ga. 2003) (denying motion to assume lease where "Debtor s[ought] to have the Court remove an onerous provision of the lease"); 3 Collier on Bankruptcy ¶ 365.03[3] (16th ed. 2013) ("An executory contract may not be assumed in part or rejected in part.").

This complete assumption requirement means that a trustee could not assume the Limited Partnership Agreement while avoiding the unanimous consent provisions of the General Partner Agreement that are expressly incorporated into the Limited Partnership Agreement. *See* Limited Partnership Agreement § 6.8. The unanimous consent provisions too must be assumed along with the partnership agreement. *See, e.g., In re Rachels Indus.*, 109 B.R. 797, 804 (Bankr. W.D. Tenn. 1990) (holding that when a debtor seeks to assume an agreement that incorporates another contract by reference, the debtor must also abide by the terms of that incorporated contract); *see also In re Ok Kwi Lynn Candles, Inc.*, 75 B.R. 97, 101 (Bankr. N.D. Ohio 1987). Moreover, because the Limited Partnership Agreement and the General Partner Agreement operate in tandem and are "clearly interrelated," *In re Plum Run Service Corp.*, 159 B.R. 496, 499 (Bankr. S.D. Ohio 1993), the terms of the General Partner Agreement cannot be excised from the Limited Partnership Agreement without impermissibly altering the parties' essential bargain and prejudicing the Astros, *see In re East Hampton Sand & Gravel Co.*, 25 B.R. 193, 198 (Bankr. E.D.N.Y. 1982) (holding that Section 365 does not permit a debtor "to relieve itself of conditions which are clearly vested by the contracting parties as an essential part of their bargain and which do not contravene overriding federal policy").