## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HOUSTON REGIONAL SPORTS | ) | Chapter 11 |
| NETWORK, L.P. | ) | |
| | ) | Case No. 13-35998 |
| Alleged Debtor. | ) | |
| | ) | |
| | ) | |

---

## HOUSTON ASTROS' CLOSING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

---

Harry A. Perrin
Duston K. McFaul
VINSON & ELKINS LLP
1001 Fannin Suite 2500
Houston, Texas 77002
Telephone: (713) 758-2548
Facsimile:  (713) 615-5016
hperrin@velaw.com
dmcfaul@velaw.com

Paul M. Basta, P.C. (*pro hac vice*)
Marc Kieselstein, P.C. (*pro hac vice*)
David S. Meyer (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
paul.basta@kirkland.com
marc.kieselstein@kirkland.com
david.meyer@kirkland.com

Jeffrey S. Powell (*pro hac vice*)
Thomas A. Clare, P.C. (*pro hac vice*)
John C. O'Quinn
Judson D. Brown (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200
jeff.powell@kirkland.com
thomas.clare@kirkland.com
john.oquinn@kirkland.com
judson.brown@kirkland.com

January 31, 2014

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 3

I.     The Network And Its Governance Structure ..................................................... 3

II.    The Network's Media Rights Agreement With The Astros ............................... 5

III.   Comcast's Varied Interests In The Network Incentivize It To Accept Unprofitable Affiliation Agreements ................................................................. 7

IV.   Comcast Attempts To Impose Unprofitable Affiliation Agreements On The Network and Its Partners................................................................................. 9

V.    The Network Fails To Pay The Astros' Media Rights Fees As The Partners Continue To Negotiate ................................................................................. 11

VI.   Four Comcast Affiliates File An Involuntary Petition To Prevent The Astros From Terminating Its Media Rights Agreement ......................................... 12

VII.  Comcast's Plan For The Bankruptcy Has Shifted Since The Filing................ 13

ARGUMENT .......................................................................................................... 14

I.     Appointing A Trustee Or An Examiner To Oversee A Sale Of The Network Would Trigger The Astros' Termination Rights ............................................ 14

        A.    This Court Cannot Eliminate The Astros' Consent Rights Within Houston Regional Sports Network LLC ........................................... 16

        B.    This Court Lacks Authority To Supplant Houston Regional Sports Network LLC As General Partner ...................................................... 18

               1.    This Court Lacks Authority To Supplant Houston Regional Sports Network LLC As General Partner Without Triggering An Event That Would Cause The Dissolution Of The Network .............................. 19

                      a.   Replacing The General Partner Will Trigger Dissolution ................. 19

                      b.   The Court Lacks Authority To Impose Another Entity Exercising The General Partner's Power On The Limited Partners ............................................................................................. 22

i

|   | 2. | Forcing An Examiner On The Network Would Trigger The Astros' Right To Terminate The Media Rights Agreement | 26 |
|---|---|---|---|
|   | C. | Comcast's Arguments That The Media Rights Agreement Is Assignable In Bankruptcy Are Without Merit | 30 |
|   | 1. | The Media Rights Agreement Is Protected By 11 U.S.C. § 365(c)(1) And (e) | 30 |
|   | 2. | The Astros Did Not Consent To The Assignment Of The Media Rights Agreement In Bankruptcy | 34 |
| II. | | There Is No Reasonable Likelihood Of A Successful Reorganization | 36 |
|   | A. | Any Successful Restructuring Requires The Astros' Consent Or For The Partnership Governance Rights To Be Unaffected | 36 |
|   | B. | The Network Cannot Propose a Confirmable Plan | 38 |
| III. | | The Involuntary Petition Was Filed In Bad Faith And Should Be Dismissed | 40 |
|   | A. | Comcast Corporation Orchestrated The Involuntary Petition In Bad Faith. | 41 |
|   | B. | The Rockets' And Landlord's Joinders Cannot Not Cure The Bad Faith By The Original Petitioning Creditors. | 47 |
| IV. | | The Involuntary Petition Does Not Satisfy Section 303. | 48 |
|   | A. | The Requirements Of Section 303(b) Are Not Satisfied. | 48 |
|   | B. | The Requirements Of Section 303(h) Are Not Satisfied Because The Network Was Generally Paying Its Debts As They Became Due. | 51 |
|   | C. | The Astros Have Standing To Challenge The Involuntary Petition. | 52 |
| CONCLUSION | | | 55 |

# TABLE OF CONTENTS

**Page(s)**

**Cases**

*Basin Elec. Power Co-op. v. Midwest Processing Co.*,
47 B.R. 903 (D.N.D. 1984),
*aff'd*, 769 F.2d 483 (8th Cir. 1985) ........................................................................... 52

*Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*,
No. 16863, 1999 WL 160148 (Del. Ch. Mar. 11, 1999) ........................................ 29

*Brennan's Inc. v. Dickie Brennan & Co.*,
376 F.3d 356 (5th Cir. 2004) ................................................................................... 30

*Butner v. United States*,
440 U.S. 48 (1979) ................................................................................ 17, 18, 25, 37

*CML V, LLC v. Bax*,
6 A.3d 238 (Del. Ch. 2010),
*aff'd*, 28 A.3d 1037 (Del. Super. Ct. 2011) .............................................................. 24

*Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*,
No. 3718-VCP, 2010 WL 338219 (Del. Ch. Jan 29, 2010) .................................... 32

*In re Adelphia Commc'ns Corp.*,
No. 02-41729, 2004 WL 2186582 (S.D.N.Y. Sept. 27, 2004) ............................... 17

*In re All Media Props., Inc.*,
5 B.R. 126 (Bankr. S.D. Tex. 1980),
*aff'd per curiam*, 646 F.2d 193 (5th Cir. 1981),
*overruled en banc by In re Trusted Net Media Holdings, LLC*,
550 F.3d 1035 (11th Cir. 2008) ............................................................................... 52

*In re Alta Title Co.*,
55 B.R. 133 (Bankr. D. Utah 1985) .................................................................... 47, 48

*In re Am. Home Mortgage Holdings, Inc.*,
390 B.R. 120 (Bankr. D. Del. 2008) ........................................................................ 36

*In re Antelope Techs., Inc.*,
431 F. App'x 272 (5th Cir. 2011) ............................................................................ 47

*In re Block Shim Dev. Co. Irving*,
113 B.R. 256 (Bankr. N.D. Tex. 1990),
*aff'd*, 939 F.2d 289 (5th Cir. 1991 .......................................................................... 25

iii

*In re Braten*,
   74 B.R. 1021 (Bankr. S.D.N.Y. 1987) ...................................................................... 48

*In re Brazos Emergency Physicians Ass'n, P.A.*,
   471 F. App'x 393 (5th Cir. 2012) ............................................................................ 47

*In re Cardinal Indus.*,
   116 B.R. 964 (Bankr. S.D. Ohio 1990) ...................................................... 23, 26, 29

*In re Catron*,
   158 B.R. 624 (Bankr. E.D. Va. 1992),
   *aff'd*, 158 B.R. 629 (E.D. Va. 1993),
   *aff'd,* 25 F.3d 1038 (4th Cir. 1994) ...................................................................... 23

*In re Chandler Airpark Joint Venture I*,
   163 B.R. 566 (Bankr. D. Ariz. 1992) ................................................................ 23, 37

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d. Cir 2004) .................................................................................... 40

*In re Cypresswood Land Partners, I*,
   409 B.R. 396 (Bankr. S.D. Tex. 2009) .................................................................... 38

*In re Footstar, Inc.*,
   323 B.R. 566 (Bankr. S.D.N.Y. 2005) ........................................................ 14, 26, 29

*In re Global Ship, Systems, LLC*,
   391 B.R. 193 (Bankr. S.D. Ga. 2007) ................................................................ 46, 47

*In re Harms*,
   10 B.R. 817 (Bankr. D. Colo. 1981) .................................................................. passim

*In re Ingleside Assocs.*,
   136 B.R. 955 (Bankr. E.D. Pa. 1992) ...................................................................... 25

*In re Int'l Teldata Corp.*,
   12 B.R. 879 (Bankr. D. Nev. 1981) ........................................................................ 52

*In re Jr. Food Mart of Ark., Inc.*,
   234 B.R. 420 (Bankr. E.D. Ark. 1999) .................................................................... 55

*In re Kazi Foods of Mich., Inc.*,
   473 B.R. 887 (Bankr. E.D. Mich. 2011) .................................................................. 31

*In re Kingston Square Associates*,
   214 B.R. 713 (Bankr. S.D.N.Y. 1997) .................................................................... 47

*In re Lil' Things, Inc.*,
220 B.R. 583 (Bankr. N.D. Tex. 1998)....................................................................... 33

*In re Mangia Pizza Invs., LP*,
480 B.R. 669 (Bankr. W.D. Tex. 2012)...................................................................... 40

*In re Manor Place Development Associates, L.P.*,
144 B.R. 679 (Bankr. D.N.J. 1992) ..................................................................... passim

*In re Map 1978 Drilling P'ship*,
95 B.R. 432 (Bankr. N.D. Tex. 1989)....................................................................... 26

*In re Martin*,
117 B.R. 243 (Bankr. N.D. Tex. 1990)..................................................................... 33

*In re Midway Airlines, Inc.*,
6 F.3d 492 (7th Cir. 1993) ...................................................................................... 36

*In re Midwest Processing Co.*,
41 B.R. 90 (Bankr. D.N.D. 1984) ............................................................................ 52

*In re Mirant Corp.*,
440 F.3d 23 (5th Cir. 2006) ..................................................................................... 14

*In re Mylotte, David & Fitzpatrick*,
No. 07-1186bif, 2007 WL 2033812 (Bankr. E.D. Pa. July 12, 2007) ...................... 48

*In re N.C.P. Mktg. Grp., Inc.*,
337 B.R. 230, 236 (D. Nev. 2005),
*aff'd*, 279 F. App'x 561 (9th Cir. 2008)............................................................... 31, 32

*In re Nizny*,
175 B.R. 934 (Bankr. S.D. Ohio 1994)..................................................................... 23

*In re Norris*,
114 F.3d 1182, 1997 WL 256808 (5th Cir. 1997) ............................................... 48, 51

*In re Norris*,
183 B.R. 437 (Bankr. W.D. La. 1995)...................................................................... 48

*In re O'Connor*,
258 F.3d 392 (5th Cir. 2001) .............................................................................. 22, 29

*In re Priestly*,
93 B.R. 253 (Bankr. D.N.M. 1988) .................................................................... 19, 23

*In re Prudential Ins. Co. of Am.*,
148 S.W.3d 124 (Tex. 2004).................................................................................... 35

v

*In re Schick*,
235 B.R. 318 (Bankr. S.D.N.Y. 1999) ................................................................. 22

*In re Sherwood Enters., Inc.*,
112 B.R. 165 (Bankr. S.D. Tex. 1989),
*judgment entered*, 4 Tex. Bankr. Ct. Rep. 116 (Bankr. S.D. Tex. Jan. 27, 1989) ................... 47

*In re Sovereign Grp. 1984-21 Ltd.*,
88 B.R. 325 (D. Colo. 1988) ............................................................ 17, 24, 25, 38

*In re St. George Island, Ltd.*,
137 B.R. 861 (Bankr. N.D. Fla. 1992) ................................................................. 19

*In re Sunrise Restaurant, Inc.*,
135 B.R. 149 (Bankr. M.D. Fla. 1991) ................................................................. 32

*In re Sunset Developers*,
69 B.R. 710 (Bankr. D. Idaho 1987) ................................................................. 23

*In re Supernatural Foods, LLC*,
268 B.R. 759 (Bankr. M.D. La. 2001) ................................................................. 36

*In re Swann Land LLC*,
Nos. 07-33181 & 07-33812, 2007 WL 4146680 (Bankr. E.D. Tenn. Nov. 20, 2007) ............ 15

*In re Synergistic Techs., Inc.*,
No. 07–31733–SGJ–7, 2007 WL 2264700 (Bankr. N.D. Tex. Aug. 6, 2007) .................. 53, 54

*In re The Food Gallery at Valleybrook*,
222 B.R. 480 (Bankr. W.D. Pa. 1998) ................................................................. 52

*In re Tom Stimus Chrysler-Plymouth, Inc.*,
134 B.R. 676 (Bankr. M.D. Fla. 1991) ................................................................. 32

*In re Travelot Co.*,
286 B.R. 447 (Bankr. S.D. Ga. 2002) ................................................................. 31

*In re Vortex Fishing Sys., Inc.*,
277 F.3d 1057 (9th Cir. 2002) ................................................................. 48

*In re Washington*,
137 B.R. 748 (Bankr. E.D. Ark. 1992) ................................................................. 17

*In re Wellington Vision, Inc.*,
364 B.R. 129 (S.D. Fla. 2007) ................................................................. 31

*In re Westerleigh Dev. Corp.*,
141 B.R. 38 (Bankr. S.D.N.Y. 1992) ................................................................. 47, 53, 54

*In re Williams*,
  299 B.R. 684 (Bankr. S.D. Ga. 2003) ................................................................ 21

*In re Williams*,
  850 F.2d 250 (5th Cir. 1988) ............................................................................. 38

*In re Windmill Durango Office, LLC*,
  481 B.R. 51 (BAP 9th Cir. 2012) ...................................................................... 40

*In re XMH Corp.*,
  647 F.3d 690 (7th Cir. 2011) ............................................................................. 31

*Kroblin Refrigerated Xpress, Inc. v. Pitterich*,
  805 F.2d 96 (3d Cir. 1986) ......................................................................... 28, 35

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*,
  56 A.3d 1072 (Del. Ch.),
  *aff'd*, 45 A.2d 148 (Del. Super. Ct. 2012) ....................................................... 28

*Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*,
  No. 5589-VCP, 2011 WL 1348438 (Del. Ch. Apr. 8, 2011) ............................ 27

*Miller v. Glenn Miller Prods., Inc.*,
  454 F.3d 975 (9th Cir. 2006) ............................................................................. 31

*N.L.R.B. v. Bildisco & Bildisco*,
  465 U.S. 513 (1984) ........................................................................................... 21

*See Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*,
  19 Del. J. Corp. L. 875, 892 (Del. Ch. 1993),
  *aff'd*, 647 A.2d 382 (Del. 1994) ............................................................. 27, 28, 29

*Sheila's Shine Prods., Inc. v. Shiela Shine, Inc.*,
  486 F.2d 114 (5th Cir. 1973) ............................................................................. 31

*Southern Ry. Co. v. Johnson Bronze Co.*,
  758 F.2d 137 (3d Cir. 1985) .............................................................................. 17

*Tenneco Auto Inc. v. El Paso Corp.*,
  No. 18810-NC, 2002 WL 453930 (Del. Ch. Mar. 20, 2002) ........................... 28

*Twin Bridges Ltd. P'ship v. Draper*,
  No. 2351-VCP, 2007 WL 2744609 (Del. Ch. Sept. 14, 2007) ......................... 24

**Statutes**

11 U.S.C. § 101 ........................................................................................................ 39

11 U.S.C. § 105 ............................................................................................. 17, 18, 37

11 U.S.C. § 1123 ............................................................................................. 37, 38

11 U.S.C. § 1124 ................................................................................................. 40

11 U.S.C. § 1129 ........................................................................................... passim

11 U.S.C. § 303 ............................................................................................. passim

11 U.S.C. § 365 ............................................................................................. passim

Del. Code Ann. tit. 6, § 17-101 ...................................................................... 20, 21

Del. Code Ann. tit. 6, § 17-401 ...................................................................... 19, 22

Del. Code Ann. tit. 6, § 17-402 ........................................................................... 20

Del. Code Ann. tit. 6, § 17-801 ................................................................ 1, 20, 21

Del. Code Ann. tit. 6, § 17-802 ........................................................................... 24

Del. Code Ann. tit. 6, § 18-802 ........................................................................... 25

Del. Code Ann. tit. 8, § 303 ................................................................................. 24

**Treatises**

1 Norton Bankruptcy Law and Practice 2d 21:8 (2007) ............................................. 48

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:43 ........... 31, 32

Restatement (Second) of Contracts § 214 ................................................................... 28

## INTRODUCTION

The Involuntary Petition must be dismissed because no reasonable possibility of a successful reorganization or sale of Houston Regional Sports Network, L.P. (the "Network") exists.  The sale or reorganization contemplated by Comcast depends on stripping the Astros of its consent rights—but that simply cannot be done without terminating the Media Rights Agreement between the Astros and the Network.  Comcast has acknowledged that the media rights are "critical" to any successful reorganization or sale.  However, the consent rights and media rights are inseparable.

As an initial matter, there is no basis for depriving the Astros of its bargained-for consent rights.  Those consent rights are embodied in the governing documents for the Network's general partner, not the governing documents for the Network itself.  No involuntary petition was filed against the general partner, and the Court does not have jurisdiction over the governance of the general partner.  As such, excising the Astros' consent rights would require rewriting a contract between third-party non-debtors, an action that is indisputably beyond this Court's authority.

Moreover, any attempt to supplant the general partner—whether through appointment of a trustee, as Comcast originally proposed, or appointment of an examiner with so-called "expanded powers," which is the same result with a different name—would trigger the automatic dissolution of the non-debtor general partner.  Dissolution of the general partner would automatically trigger the dissolution of the Network itself, under both the LP Agreement and Delaware law, as well as the Astros' rights under 11 U.S.C. §§ 365(c)(1) and (e) to terminate the Media Rights Agreement.

It is black-letter law that limited partnerships act by and through a general partner.  Delaware law, thus, clearly provides that withdrawing and replacing the general partner "dissolve[s]" the limited partnership.  Del. Code Ann. tit. 6, § 17-801.  Appointing a trustee or an

examiner, as requested by Comcast, would strip the general partner of its absolute right to control and effectuate a sale or reorganization of the limited partnership, triggering dissolution of the existing limited partnership.  Likewise, any entity that emerged from bankruptcy would be a new legal entity, with no rights to the Media Rights Agreement.  Make no mistake, the whole point of Comcast's Involuntary Petition is to circumvent the Astros' consent rights by supplanting the general partner.  But that cannot be done without forcing an impermissible assignment of the Media Rights Agreement to a wholly new entity, or so radically changing the partnership structure as to require an assignment.  Thus, there is no plausible path forward that circumvents the Astros' consent rights—and with good reason.  The plain text of 11 U.S.C. § 365(c)(1) and (e) is designed to prevent exactly what Comcast is attempting.

Indeed, the Media Rights Agreement is an unassignable trademark license and personal services contract provided special protection in Bankruptcy Code §§ 365(c)(1) & (e).  The parties here structured their agreements to further protect that special asset class.  That makes sense.  Because the Media Rights Agreement allows the Network to effectively become the Astros' alter ego and grants the Network unparalleled access to the Astros' players, management, and facilities, the agreement depends on a degree of skill, discretion, and trust that typify an unassignable personal service.  Thus, in entering the Media Rights Agreement, it was critical to the Astros that it retain a measure of control over the exercise of its media rights in order to ensure that they were used to enhance—and not to impair—the Astros' goodwill.  The Astros view its relationship with the Network under the Media Rights Agreement as the most important relationship the team has in the Houston area.  Because its media rights are critical to its success on and off the field, the Astros intend to exercise its termination rights if the Media Rights Agreement were to be assigned.  Any attempt to reorganize or sell the Network to an entity not

exclusively governed by the Network's current general partner is absolutely prohibited as a matter of law. The Involuntary Petition must be dismissed for that reason alone.

There are still other reasons to dismiss the Involuntary Petition. Comcast's desire to seize control of the Astros' media rights is so strong that it rushed to file this petition in bad faith. Houston SportsNet Holdings, LLC ("Comcast Owner"), which had no right to file this petition, directed four of its affiliates to file involuntary petitions even though none of those affiliates had outstanding amounts due from the Network. This transparent attempt to gain a tactical business advantage over the Astros by throwing the Network into bankruptcy solely so that the Astros could not exercise their contractual rights to terminate the Media Rights Agreement is precisely the type of bad faith that warrants dismissal. Comcast should not be able to achieve, and this Court cannot allow Comcast to achieve through the manipulation of the bankruptcy process, what is plainly prohibited under the Network's transactional documents. The late addition of the Rockets and the landlord cannot cure that initial bad faith.

The Involuntary Petition also does not satisfy the requirements of 11 U.S.C. § 303. It must be dismissed.

## BACKGROUND

## I.    THE NETWORK AND ITS GOVERNANCE STRUCTURE

In 2003, the Astros[1] and the Rockets[2] formed the Network, a Delaware limited partnership, to broadcast the teams' games and Houston professional sports programming on a single cable channel. After lengthy negotiations on October 29, 2010, the Astros (through the team's previous owner) and the Rockets agreed to admit Comcast as a third limited partner in the

---

[1]    Unless otherwise specified, "Astros" refers to Houston Astros, LLC and/or its affiliates and predecessors including McLane Company, LLC f/k/a Houston McLane Company, Inc. d/b/a the Houston Astros.

[2]    Unless otherwise specified, "Rockets" refers to Rockets Partner, L.P., JTA Sports, Inc., Rocket Ball, Ltd., and/or their affiliates and predecessors.

Network.[3]  Comcast, a Fortune 50 company with more than $62 billion in revenue reported in 2012, is the largest cable company in the United States and in the Houston metropolitan area. After Comcast's admission to the partnership, the Astros, directly and indirectly through their interest in the Network's general partner (as defined below), hold the largest equity stake in the Network (46.5%), followed by the Rockets (31%), and then Comcast (22.5%).  *See* Oct. 28, 2013 Hr'g Tr. (Crane) at 96:9-11.

The rights and responsibilities of the partners are governed by the Network's LP Agreement.[4]  The LP Agreement appoints Houston Regional Sports Network, LLC (the "General Partner") as the Network's sole general partner.  The General Partner is also owned by the Astros, the Rockets, and Comcast, with a board of directors comprised of one Astros director, one Rockets director, and two Comcast directors.  The corporate governance of the General Partner is set forth in the GP Operating Agreement.  Of particular relevance here, the General Partner cannot take acts that would affect the Astros' media rights without the unanimous consent of the directors.  The GP Operating Agreement also requires unanimous consent to:

- Modify the Media Rights Agreement, *see* GP Operating Agreement § 5.10, Schedule C(11);

---

[3]     Unless otherwise specified, "Comcast" refers to Comcast Corporation and/or its direct and indirect wholly-owned and partially-owned subsidiaries including but not limited to Comcast Owner, Comcast Sports Management Services, LLC ("Comcast Services"), Comcast Cable Communications, LLC ("Comcast Cable"), Houston SportsNet Finance, LLC ("Comcast Lender"), National Digital Television Center, LLC ("Comcast Media"), and Comcast SportsNet California, LLC ("Comcast California").

[4]     The Transaction Agreements include: (1) the Second Amended and Restated Agreement of Limited Partnership of Houston Regional Sports Network, L.P. (JX 3, the "LP Agreement"); (2) the Second Amended and Restated Limited Liability Company Agreement of Houston Regional Sports Network, LLC   (JX 2, the "GP Operating Agreement"); (3) the Comcast Network Service Agreement by and between Comcast Services and the Network (JX 5, the "Comcast Management Services Agreement"); (4) the Comcast Sportsnet (Houston) Affiliation Agreement by and between Comcast Cable and the Network (JX 6, the "Comcast Affiliation Agreement"); (5) the Amended and Restated Media Rights License Agreement by and between Houston McClane Company, LLC and the Network (JX 10),  the "Media Rights Agreement"); and (6) the Credit Agreement by and between Comcast Lender and the Network (JX 7), the Guarantee and Security Agreement by and between Comcast Lender and the General Partner (JX 8), and the Security Agreement by and between Comcast Lender and the Network (JX 9) (collectively, the "Comcast Credit Agreement").

- Modify the GP Operating Agreement or the LP Agreement, *id.* at Schedule C(13);

- Enter into any transaction pursuant to which the Network would merge with or into, or enter into a binding share exchange or a similar transaction, *id.* at Schedule C(4);

- Reorganize, recapitalize, or change the organizational structure of the Network, or establish any non-wholly owned subsidiary of the Network, or approve or enter into any joint venture or partnership on behalf of the Network, *id.* at Schedule C(24);

- Approve any agreement by which the management of the Network is delegated to any third party, *id.* at Schedule C(27);

- Admit any new member to the General Partner or any new partner to the Network, *id.* at Schedule C(1);

- Enter into an affiliation agreement with multi-channel video programming distributors ("MVPDs") to distribute the Network, *id.* at Schedule C(10);

- File a voluntary petition for bankruptcy, *id.* at Schedule C(19);

- Sell partnership interests or equity in the Network, *id.* at Schedule C(2); and

- Sell all or substantially all of the Network's assets, *id.* at Schedule C(8).

These consent rights were critical terms of the deal that admitted Comcast to the Network partnership.  Without these consent rights, the Comcast and Rockets directors (voting together) could impair the Astros' interest in the Network or seize control of the Astros' valuable media rights—by causing the Network to enter into unprofitable affiliation agreements, modifying the terms of the Media Rights Agreement, or filing for bankruptcy.

## II.    THE NETWORK'S MEDIA RIGHTS AGREEMENT WITH THE ASTROS

The creation of the Network allowed the Astros to monetize their most valuable asset—their media rights.  The Network and the Astros entered into a Media Rights Agreement that granted the Network an exclusive license to feature the Astros games as part of the Network's regional sports programming, in exchange for paying media rights fees to the Astros.  *See* Media Rights Agreement.  A Major League Baseball team's media rights fees are critical to the team's

5

success.  *See* Oct. 28, 2013 Hr'g Tr. (Crane) at 94:20-96:4, 99:2-19, 100:19-101:2, 106:21-107:1.

Because media rights fees are the primary source of revenue for a team, a favorable media-rights

deal can fund the payroll necessary to acquire and retain the best players and coaches.  *Id.*  A

competitive team, in turn, leads to increased revenues.  By contrast, an undervalued media rights

deal can suppress a team's payroll for twenty years (the typical length of such deals),

jeopardizing the team's long-term success in both baseball and business.  *Id.*

A team's ability to determine the network to which it licenses its media rights is critically

important.  Like the Media Rights Agreement here, such licenses grant networks unparalleled

access to a team's players and facilities.  *See* Media Rights Agreement; *see also* Oct. 28, 2013

Hr'g Tr. (Postolos) at 172:10-173:1 (testifying that a team's "telecast partner is going to have

access to [the team's] clubhouse…. all of [its] facilities …. [, and] on a plane with the team

during the season").  A team's fans perceive such networks "as an alter ego of the team … and

they view the two as interchangeable."  *Id.* at 170:1-18.  The connection between a network and

team—like the Network and Astros, here—"is really very much of a marriage" and therefore

requires "a relationship of trust and confidence."  *Id.* at 170:25-171:7, 174:21-175:16.  The MLB

Constitution recognizes the importance of a team's media rights to its image, revenues, and

payroll, and therefore contains detailed provisions governing the ownership, licensing, and

transfer of media rights to broadcast MLB games.  *See* Oct. 27, 2013 Statement of the Position of

the Office of the Commissioner of Baseball ("MLB Statement") [Dkt. 123] ¶ 2.  For example, it

requires a vote of a majority of the MLB teams to approve any license of a team's media rights

to a third party.  *See* Astros 81 Art. V, Sec. 2(a)(5).[5]

---

[5]    Astros 1-81, JX 1-82, and Comcast (PC) 1-108 are exhibits admitted into evidence during the October 28-29, 2013 hearings.  *See* Oct. 28, 2013 Hr'g Tr. at 24:15-22.

Because of the critical importance of media rights to the Astros—and the MLB—the Media Rights Agreement with the Network provides additional protections for the Astros. The Astros have the right to terminate the Media Rights Agreement if the Network becomes insolvent or files for bankruptcy, if it "makes an assignment for the benefit of its creditors," or if a "trustee is appointed for [the] Network." Media Rights Agreement § 12.5(C). And if the Network fails to make a required media rights payment, the Astros have the right to terminate the Media Rights Agreement upon written notice unless the Network cures the default within 60 days. *See id.* § 12.3(D).

## III. COMCAST'S VARIED INTERESTS IN THE NETWORK INCENTIVIZE IT TO ACCEPT UNPROFITABLE AFFILIATION AGREEMENTS

Comcast has "multiple economic interests in this Network." Oct. 28, 2013 Hr'g Tr. (Pick) at 437:12-14. Comcast is not only a partner in the Network and a member of the General Partner. It also carries the Network on its cable system, is a lender to the Network, and provides management and financial services to the Network. More specifically:

Comcast Cable is a subsidiary of Comcast Corporation and an affiliate of Comcast Owner, the Comcast limited partner in the Network. Pursuant to an affiliation agreement between Comcast Cable and the Network, Comcast Cable carries the Network on its cable system in exchange for monthly rates. *See* Comcast Affiliation Agreement; Oct. 28, 2013 Hr'g Tr. (Pick) at 436:1-7, 441:12-22. The Comcast Affiliation Agreement contains a most favored nations ("MFN") clause. *Id.* at 441:23-25; Thus, if the Network enters into an affiliation agreement with another MVPD for lower base rates than those contained in the Comcast Affiliation Agreement, the MFN requires that Comcast Cable receive those same lower rates as well. *Id.* at 442:1-6.

Comcast Lender is a subsidiary of Comcast Corporation and an affiliate of Comcast Owner.  Comcast Lender and the Network entered into the Comcast Credit Agreement which provided the Network with a $100 million term loan at a fixed interest rate.  *See* Comcast Credit Agreement; Oct. 28, 2013 Hr'g Tr. (Pick) at 437:22-24.  Under the Credit Agreement, interest was due and payable in arrears on the last day of each calendar quarter, and the principal was due and payable when the loan matured in 2017.  *Id.* at 437:24-438:14.  Comcast Lender has a security interest in substantially all of the Network's assets, but no direct lien on the Astros' media rights—and the Comcast Credit Agreement does not prohibit the Astros' from terminating the Media Rights Agreement upon a default by the Network.

Comcast Services is a subsidiary of Comcast Corporation and an affiliate of Comcast Owner.  Comcast Services provides management oversight, financial services and other support to the Network pursuant to the Comcast Management Services Agreement.  Oct. 29, 2013 Hr'g Tr. (Litner) at 24:9-25:2.  The Network pays Comcast Services more than $5 million a year, although it only costs Comcast Services approximately $250,000 to provide the services.  Oct. 28, 2013 Hr'g Tr. (Pick) at 439:9-17, 441:9-11.

As a result of its multiple interests in the Network, Comcast stands to benefit from undervalued—and even unprofitable—affiliation agreements, even though such affiliation agreements would harm the Astros.  While unprofitable agreements would dilute the partners' equity interests, they would provide revenue to service Comcast Lender's debt and pay Comcast Services' management fee and they would reduce the rates that Comcast Cable pays to the Network by virtue of its MFN—offsetting any impairment to Comcast's equity interest as a partner.  Unlike the Astros, then, Comcast is incentivized to accept undervalued and even unprofitable affiliation agreements that would impair the partners' equity interest in the Network.

However, to ensure that Comcast could not impose such unprofitable affiliation agreements on the Network, the GP Operating Agreement required that all partners must consent to the Network's entry into an affiliation agreement.

## IV. COMCAST ATTEMPTS TO IMPOSE UNPROFITABLE AFFILIATION AGREEMENTS ON THE NETWORK AND ITS PARTNERS

By virtue of its experience in the industry, Comcast took the lead in pursuing and negotiating additional affiliation agreements for the Network. Multiple MVPDs, including Dish Network, Charter Communications, and Cox Communications, indicated that they were not interested in carrying the Network at all. Oct. 28, 2013 Hr'g Tr. (Ruth) at 335:11-336:10, 396:13-17; Oct. 29, 2013 Hr'g Tr. (Bond) at 96:15-98:22. Other providers made proposals to carry the Network, but none of those proposals contained the rates in the Comcast Affiliation Agreement and, worse, none would have resulted in a profitable Network.

The best proposal—indeed, the only one that Comcast actually recommended that the partners approve—was submitted by DirecTV in April 2013, and even then, its proposed rates were still below the rates in the Comcast Affiliation Agreement. Oct. 28, 2013 Hr'g Tr. (Ruth) at 329:9-21; Oct. 29, 2013 Hr'g Tr. (Bond) at 95:24-96:5. After receiving that proposal, Comcast projected the Network's cash flow for the following ten years based on affiliation agreements with DirecTV and multiple other providers—those that Comcast deemed more likely than not to carry the Network—at the rates contained in DirecTV's proposal. Oct. 28, 2013 Hr'g Tr. (Ruth) at 330:7-332:9; *id.* (Pick) at 447:10-20; JX 14. Even under Comcast's projections, the Network would be unprofitable for the next ten years: its operating cash flow would be negative every year, by more than $200 million cumulatively; and its free cash flow—the Network's profit—would be even worse. *Id.* (Ruth) at 333:21-335:4; *id.* (Barradas) at 400:12-24; JX 14. On May 10, Comcast provided those projections to the partners and nevertheless recommended

accepting the DirecTV proposal even though doing so would indisputably have rendered their equity in the Network worthless. *Id.* (Ruth) at 329:22-25; Oct. 29, 2013 Hr'g Tr. (Bond) at 95:24-96:5; JX 14.

Before the Astros could even respond to the DirecTV proposal, Comcast sought to further impair the value of the Astros' interest in the Network and undermine the governance protections to which the partners had agreed. On May 17, Comcast sent the Astros and Rockets a proposal to restructure the terms of the partnership. Oct. 28, 2013 Hr'g Tr. (Ruth) at 336:11-337:14; *id.* (Pick) at 452:3-22; JX 15. Comcast proposed that the partners approve DirecTV's offer, and proposed two governance changes that would have stripped the Astros of their consent rights. *Id.* (Ruth) at 337:19-25, 338:5-340:3; *id.* (Pick) at 453:2-17; JX 15. First, Comcast proposed that affiliation agreements with providers on terms equivalent to the DirecTV proposal would not have to be approved by the Network's partners—meaning, as Comcast concedes, that "the Network would [ha]ve been able to enter into Affiliation Agreements on the same terms that DirecTV offered without any board oversight." *Id.* (Ruth) at 339:24-340:3; *see also id.* (Pick) at 453:22-454:13; JX 15. Second, Comcast proposed that only two partners—not all three—would have to approve affiliation agreements with carriage rates even lower than the proposed DirecTV rates. *Id.* (Ruth) at 340:4-19; JX 15. In other words, in the face of the indisputably unprofitable DirecTV offer, Comcast proposed that other affiliation agreements on equivalent terms did not require any board approval and that affiliation agreements containing even worse terms did not require unanimous consent—ensuring that Comcast could force unprofitable agreements on the Network without the Astros consent.

Comcast knew that this restructuring proposal would severely harm the Astros. *See* Oct. 28, 2013 Hr'g Tr. (Ruth) at 341:5-345:15; Astros 25. According to Comcast's internal financial

analyses produced in discovery, even under the most profitable scenario—the one with the most revenue and the least expenses—the Network would not be profitable until 2022; and even then it would only earn a $2 million profit after requiring more than $160 million in funding to stay afloat in the interim.  *Id.*; Astros 25.  The Network's funding needs would have required each partner to contribute its pro rata share of capital or have its equity interest in the Network entirely diluted.  *Id.* at 347:20-348:4.  While contributing its pro rata share of capital would have preserved the Astros' equity interest in the Network, as Comcast has conceded, doing so would have materially "reduce[d] the net payment to [the Astros] through their media rights fees."  *Id.* at 348:5-9. The Astros could not—and did not—agree to the DirecTV offer or Comcast's restructuring proposal.

## V. THE NETWORK FAILS TO PAY THE ASTROS' MEDIA RIGHTS FEES AS THE PARTNERS CONTINUE TO NEGOTIATE

When the Network failed to pay the media rights fee to the Astros on July 31, 2013, the Astros promptly sent the Network a default notice.  *See* PC 69.  On August 30, 2013, the Network missed a second media rights fee payment to the Astros.  The Astros sent a second default notice to the Network on September 3, 2013, noting that, under Section 12.3(D) of the Media Rights Agreement, the Network had 60 days to cure the default, or the Astros would have the right to terminate its Media Rights Agreement on September 30, 2013.  *See* JX 27; Media Rights Agreement § 12.3(D).

On August 5, 2013, principals of each partner met to discuss a resolution to their inability to generate revenue for the Network.  During that meeting, Comcast offered to buy out the Astros' 46.5% equity interest in the Network based on an implied enterprise value of ███████████ for the Network—resulting in an offer to the Astros of more than ███████████  *See* Jan. 28, 2014 Dep. of T. Brown at 49:20-53:24 (Ex. 1).  The Rockets—who had a contractual

consent right to approve or veto the Astros' sale of their equity—requested that they be offered the same deal. *See id.* at 54:9-21. Comcast declined. *See id.* at 55:20-56:21.

## VI.  FOUR COMCAST AFFILIATES FILE AN INVOLUNTARY PETITION TO PREVENT THE ASTROS FROM TERMINATING ITS MEDIA RIGHTS AGREEMENT

By mid-September, the partners had not identified a profitable path forward for the Network and were unable to reach a business resolution. However, Comcast was unwilling to let the Astros exercise its contractual right to terminate the Media Rights Agreement on September 30. Four Comcast executives therefore devised a strategy to file the Network for bankruptcy. Oct. 28, 2013 Hr'g Tr. (Ruth) at 324:21-326:9; *id.* (Pick) at 434:6-435:10. Because all partners, including the Astros, had to consent to voluntarily place the Network into bankruptcy, those Comcast executives decided to orchestrate the filing of an involuntary petition for bankruptcy by four affiliates of Comcast. Oct. 28, 2013 Hr'g Tr. (Ruth) at 312:9-11, 322:2-12; *id.* (Pick) at 434:2-435:10.

On September 23 or 24, Comcast representatives discussed the plan to involuntarily file the Network with the Rockets and asked the Rockets to join as petitioning creditors. *See* Dep. of T. Brown at 48:14-49:15. The Rockets responded that they would consider joining the Involuntary Petition only on the condition that Comcast's bid to buy the Network out of bankruptcy would be at an implied enterprise value of at least $500 million—the same value reflected in Comcast's offer to the Astros just a month earlier. *See id.* at 49:16-19, 61:21-63:6.

On September 27, the last business day before the Astros' termination right accrued, the four Comcast affiliates—and no other creditor—filed the Involuntary Petition. *See* Sept. 27, 2013 Involuntary Petition [Dkt. 1]. None of the four Comcast Petitioning Creditors would have filed the Involuntary Petition but for Comcast Corporation's direction to do so. *See id.* (Pick) at 432:4-7, 434:6-10; *id.* (Davis) at 267:20-25, 272:16-21, 276:5-9; *id.* (Ruth) at 322:5-8, 324:13-

18; Oct. 29, 2013 Hr'g Tr. (Litner) at 18:24-19:1.  None of the four declarants for the Comcast Petitioning Creditors even sought the approval of the management or board of directors for the entity that actually joined the Involuntary Petition.  *See* Oct. 28, 2013 Hr'g Tr. (Pick) at 433:1-10; *id.* (Davis) at 276:10-17; *id.* (Ruth) at 320:1-322:1; Oct. 29, 2013 Hr'g Tr. (Litner) at 19:2-20:1.  Three of the four declarants are officers of Comcast Owner, the partner contractually prohibited from voluntarily filing the Network for bankruptcy without the consent of all partners. *See* Oct. 28, 2013 Hr'g Tr. (Pick) at 433:15-434:5; *id.* (Ruth) at 311:7-312:11; Oct. 29, 2013 Hr'g Tr. (Litner) at 12:10-23.  And two of the declarants—Ruth and Litner—are Comcast Owner's representatives on the board of directors that manages the Network.  *See* Oct. 28, 2013 Hr'g Tr. (Ruth) at 311:7-312:11; Oct. 29, 2013 Hr'g Tr. (Litner) at 12:10-23.

None of the Comcast Petitioning Creditors had outstanding amounts due and owing from the Network at the time of filing on September 27.  *See* Oct. 28, 2013 Hr'g Tr. (Pick) at 431:16-18; *id.* (Davis) at 270:19-271:14; *id.* (Ruth) at 314:5-15, 316:7-15, 388:6-389:13; Oct. 29, 2013 Hr'g Tr. (Litner) at 15:13-16:3.  Three of the four were not even aware of the Network's financial situation, and the one that was—Comcast Services—knew that the Network had sufficient funds to pay all four Comcast Petitioning Creditors when their debts came due and owing.  Oct. 28, 2013 Hr'g Tr. (Pick) at 433:11-14; Oct. 29, 2013 Hr'g Tr. (Litner) at 18:11-23. And two of the Comcast Petitioning Creditors—Comcast Media and Comcast California—base their claims on alleged verbal arrangements that violate the terms of the consent provisions of the GP Operating Agreement.  *See* GP Operating Agreement § 5.10 Schedule C(7).

## VII.  COMCAST'S PLAN FOR THE BANKRUPTCY HAS SHIFTED SINCE THE FILING

At the time of the Involuntary Petition, Comcast sought the appointment of a trustee to oversee an auction of the Network and its assets.  *See* Sept. 28, 2013 Emergency Mot. for

Appointment of Interim Chapter 11 Trustee ("Trustee Motion") [Dkt. 3] ¶ 41.  Among other things, the Comcast Petitioning Creditors asked the Court to appoint a trustee so that Comcast could bid to acquire the Network or substantially all of its assets out of bankruptcy.  *See id.* ¶ 7.

Comcast has since changed its position—after the Astros demonstrated that the appointment of a trustee would trigger the Astros' right to terminate its Media Rights Agreement.  Now, Comcast asks the Court to hold its "motion to appoint a trustee in abeyance" and instead to appoint "an examiner with expanded powers"—including the power to conduct an auction.  *See* Jan. 10, 2014 Comcast Petitioning Creditors' Mot. to Terminate Exclusivity & to Appoint an Examiner with Expanded Powers ("Examiner Motion") [Dkt. 188] at 1, ¶¶ 11, 18.  And now, Comcast wants to buy the partners' equity interest in the Network—not the Network's assets.  *See* Jan. 6, 2014 Letter from R. Pick to T. Brown (Ex. 2).

## ARGUMENT

## I.    APPOINTING A TRUSTEE OR AN EXAMINER TO OVERSEE A SALE OF THE NETWORK WOULD TRIGGER THE ASTROS' TERMINATION RIGHTS

Comcast's newly-minted request for appointment of an examiner with "expanded powers" over the Network is just the latest attempt to recharacterize its effort to strip away the Astros' consent rights to facilitate a restructuring transaction that would repay Comcast's $100 million secured loan and could include Comcast acquiring the Network and its equity upside at a significant discount to its true value.  Recognizing that appointment of a trustee would allow the Astros to invoke its termination rights under the Media Rights Agreement,[6]

---

[6]     *See In re Mirant Corp.*, 440 F.3d 238, 248 (5th Cir. 2006) ("The actual test requires on a case-by-case basis a showing that the nondebtor party's contract will actually be assigned or that the nondebtor party will in fact be asked to accept performance from or render performance to a party—*including the trustee*—other than the party with whom it originally contracted.") (emphasis added); *In re Footstar, Inc.*, 323 B.R. 566, 573 (Bankr. S.D.N.Y. 2005) ("A trustee *is* an 'entity other than the debtor or the debtor in possession' — the trustee is an entirely different entity, who has succeeded by operation of the Bankruptcy Code to all the debtor's property including contracts.") (emphasis in original); *In re Harms*, 10 B.R. 817, 821 (Bankr. D. Colo. 1981) ("[A] trustee or a debtor-in-possession is not the same entity as a pre-bankruptcy debtor, but is a new entity with its own rights and duties, subject to the

Comcast pours new wine into old wineskins, but the result is the same.  However denominated—whether a trustee or an examiner—any effort to supplant the General Partner's control over the limited partnership leads to the termination of the Media Rights Agreement.[7]

To be clear, Comcast blames the Network's supposed financial difficulties on the Astros' exercise of its consent rights.  But as the evidence at the hearing made clear, the Astros did not unreasonably withhold consent to affiliation agreements.  They simply asked for a business plan or restructuring that showed a profitable network.  The Network's financial difficulties are a direct result of Comcast's failure to provide a profitable business plan to this day.  In any event, because the consent rights are set forth in the GP Operating Agreement, the Court simply has no jurisdiction to address them.

That leaves Comcast to advocate forcibly removing the General Partner (where the consent rights are lodged) as the Network's general partner and supplanting it with a trustee or an examiner with expanded powers (which is, in effect, the same thing with a different name).  Such a maneuver, however, would result in dissolution of the Network, giving the Astros the right to terminate the Media Rights Agreement.  And even if it somehow did not, it would be such a fundamental change to the Network's governance—one which relegates the Astros to bystanders

---

supervision of the Bankruptcy Court."); *see also In re Swann Land LLC*, Nos. 07-33181 & 07-33812, 2007 WL 4146680, at *4 (Bankr. E.D. Tenn. Nov. 20, 2007) ("When a Chapter 11 trustee is appointed, the trustee and the debtor are not the same party nor do they necessarily share the same interests.  In fact, the interests of a Chapter 11 trustee and debtors are often in opposition.").

[7]        Indeed, the difference between appointing a trustee and appointing an examiner with "expanded powers" is entirely semantic.  If granted, the Trustee Motion would replace the General Partner with an independent officer empowered to make decisions on the Network's behalf during the course of the Network's bankruptcy proceedings, including proposing a plan of reorganization and conducting an auction.  *See* Trustee Motion ¶¶ 7-8.  Unlike appointment of a chapter 11 trustee, a debtor's exclusivity is not automatically terminated upon appointment of an examiner.  To overcome this, the Examiner Motion seeks to grant an examiner "expanded powers," including the authority to act as the Network's "exclusive representative," negotiate a plan of reorganization, or conduct an auction, and to simultaneously terminate the debtor's exclusivity.  *See* Examiner Motion ¶ 11(b).  It further discloses Comcast's intent for the examiner to file a plan of reorganization, propose a sale of the Network therein, and serve as stalking horse bidder.  *See id.*  The trustee and examiner motions would achieve the same substantive result, and differ in name only.

rather than a party with significant management control—that it would trigger the Astros' termination rights. Comcast's proposal (whether for a trustee or an examiner with "expanded powers") is futile, because there is no result that would allow the Network to survive and retain the Astros' media rights.

Indeed, the agreements governing the General Partner and the Network itself were adopted precisely to *protect* the parties' interests in their marks, goodwill, and media portrayal— all critical to the success of the Astros franchise. Because the Media Rights Agreement is a trademark license and a personal services contract that cannot be assumed by a trustee or assigned under 11 U.S.C. § 365(c)(1), appointing an examiner with expanded powers or a trustee would immediately trigger the Astros' contractual termination rights under 11 U.S.C. § 365(e)(2). An asset sale that excludes the Network's most valuable asset would be a pointless exercise.

### A. This Court Cannot Eliminate The Astros' Consent Rights Within Houston Regional Sports Network LLC

As an initial matter, the Astros' consent rights—which Comcast boldly asserts are causing deadlock within the Network, making its current structure and operations unviable, and would make a bankruptcy administered by the debtor-in-possession impossible—are rights that govern Houston Regional Sports Network, LLC—*the General Partner of the Network*. Eliminating the Astros' consent rights would require modifying the *GP Operating Agreement*, not the partnership agreement for the Network. Under the terms of the GP Operating Agreement, that would require the unanimous consent of the General Partner's members— consent the Astros will not provide. *See* GP Operating Agreement §§5.10, 6.1, Schedule C(13). Comcast, however, did not file an involuntary petition seeking to place *the General Partner* in bankruptcy—nor could it. Eliminating the Astros' consent rights would thus require an order

from this Court modifying the governing document of a *non-debtor* to alter the agreement between the Astros, the Rockets, and Comcast, each of whom is also not a debtor before the Court.  This the Court cannot do.

The Court simply does not have the power to do what Comcast says is required for a successful reorganization.  It is well-established that a bankruptcy court cannot use its equitable powers to rewrite agreements between third-party non-debtors.  *See, e.g., In re Adelphia Commc'ns Corp.*, No. 02-41729, 2004 WL 2186582, at *12 (S.D.N.Y. Sept. 27, 2004) (holding a bankruptcy court cannot "rewrite contracts and reorder property relations among non-debtor entities"); *In re Washington*, 137 B.R. 748, 753 (Bankr. E.D. Ark. 1992) (holding a court "cannot alter or rescind a contract between" a non-debtor and that non-debtor's creditor).

Indeed, in *In re Manor Place Development Associates, L.P.*, 144 B.R. 679, 681-83, 687 (Bankr. D.N.J. 1992), the court refused to modify the partnership agreement of two non-debtor partnerships even though the debtor was a partner in each.  The rights and obligations created by a partnership or operating agreement are "'defined by state law,'" and the court saw nothing in state law that allowed a court to unilaterally rewrite a partnership agreement.  *Id.* at 687 (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)); *see In re Sovereign Grp. 1984-21 Ltd.*, 88 B.R. 325, 329 (D. Colo. 1988) ("As a matter of policy, the Bankruptcy Code is not intended to be used as a tool to restructure onerous partnership agreements.").  The *In re Manor Place* court also found it could not to use its equitable powers under 11 U.S.C. § 105 to rewrite the governing document of a non-debtor, holding that even a bankruptcy court's broad equitable powers did not authorize it to "create rights not otherwise available under [state] law."  144 B.R. at 687; *see Southern Ry. Co. v. Johnson Bronze Co.*, 758 F.2d 137, 141 (3d Cir. 1985).

The reasoning in these cases applies with equal force here.  Nothing in Delaware law allows a court to rewrite the terms of the GP Operating Agreement or any other valid contract negotiated by sophisticated parties absent fraud, duress, or mistake.  Nor are there any "federal interests present in this case" that would justify entering an order under 11 U.S.C. § 105 eliminating the Astros' consent rights despite the absence of any state authority for doing so.  *In re Manor Place*, 144 B.R. at 687.  As the Supreme Court has already held, the mere existence of a bankruptcy case is not a sufficient federal interest to cast aside state law.  *See Butner*, 440 U.S. at 55 ("[T]here is no reason why [property] interest should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *see also id.* at 55-57.  Any plan that attempted to eliminate the Astros' consent rights under the GP Operating Agreement would thus exceed this Court's authority and fail to satisfy the plan confirmation standards.  *See* 11 U.S.C. § 1129(a)(1).

### B.      This Court Lacks Authority To Supplant Houston Regional Sports Network LLC As General Partner

Since the Court cannot rewrite the governance provisions of a non-debtor, Comcast seeks to have the Court strip the General Partner of some or all of its duties in order to force a sale or other reorganization that does not require the Astros' consent.  Such a scheme is doomed to fail because, to the extent the Court even has such authority, the end-result would be a new entity— in form or effect.  Either way, it would trigger the Astros' termination rights.  A limited partnership that ceases to be controlled by the General Partner (with all the protections that the parties intentionally built into governance by the General Partner), is sufficiently different from the existing partnership that it would have no rights under the Media Rights Agreement absent an impermissible assignment of the Media Rights Agreement.

1.      **This Court Lacks Authority To Supplant Houston Regional Sports Network LLC As General Partner Without Triggering An Event That Would Cause The Dissolution Of The Network**

Comcast's requests, first for a trustee and now for an examiner, would strip the Network's General Partner of its authority as general partner. But the law is clear—the Court cannot do so, at least not without triggering an event that would otherwise cause the dissolution of the Network. Because the Media Rights Agreement would have to be transferred to a new legal entity, and such a transfer cannot be done without the Astros' consent, no successful restructuring of the Network is possible.

a.      **Replacing The General Partner Will Trigger Dissolution**

The Network's LP Agreement, including its management by the General Partner, plainly continues to govern its affairs post-petition. *In re St. George Island, Ltd.*, 137 B.R. 861, 863 (Bankr. N.D. Fla. 1992); *In re Priestly*, 93 B.R. 253, 258 (Bankr. D.N.M. 1988). And, under the terms of the *GP Operating Agreement*, which this Court lacks authority to modify, a sale of the Network's assets or equity, or any reorganization, requires unanimous consent by the Astros, the Rockets, and Comcast—consent the Astros legitimately intend to withhold. *See* GP Operating Agreement § 5.10, Schedules C(1) (requiring unanimous consent to admit new members), C(2) (requiring unanimous consent to issue or sell partnership or equity interests), C(8) (requiring unanimous consent to sell "all of substantially all of the assets of the Network"), C(24) (requiring unanimous consent for "any reorganization, recapitalization or other change to the organizational structure" of the General Partner or Network). Similarly, under the terms of the LP Agreement, removal of the General Partner requires "the unanimous written consent of the Limited Partners." LP Agreement § 5.3(a). Likewise, no "additional general partner" may be admitted without "the written consent of each partner." Del. Code Ann. tit. 6, § 17-401(b). The Astros, as a limited partner in the Network, would withhold their consent to either action and exercise their consent

19

rights in the General Partner to prevent it from consenting to the admission of an examiner as the new general partner for the Network. *See* GP Operating Agreement § 5.10, Schedule C(1). To strip the General Partner of its exclusive powers (albeit powers intentionally constrained by the parties' consent rights) to dispose of the assets of the estate, would mean it ceases to act as general partner of the Network.

Thus, any sale of the Network's assets by an examiner would first require effectively removing the General Partner as the Network's general partner. That would result in dissolution of the Network partnership under Delaware law. Under the Delaware Revised Uniform Limited Partnership Act (the "DRULPA"), "[a] limited partnership is dissolved and its affairs shall be wound up upon [a]n event of withdrawal of a general partner." Del. Code Ann. tit. 6, § 17-801(3). Supplanting the General Partner, as Comcast proposes, would itself be a withdrawal of the general partner, triggering dissolution. *See* Del. Code Ann. tit. 6, § 17-101 (defining "[e]vent of withdrawal of a general partner" as "an event that causes a person to cease to be a general partner as provided in § 17-402 of this title"). Simply put, a general partner cannot be stripped of its powers and still be a general partner. But even if that were not clear, Delaware law further provides that "[i]n the case of a general partner that is a limited liability company, the dissolution and commencement of winding up of the limited liability company" constitutes an event of withdrawal that causes the LLC to cease to be the general partner of the limited partnership. Del. Code Ann. tit. 6, § 17-402(a)(11). Here, the GP Operating Agreement is quite clear that if, for any reason, the General Partner "ceas[es] to act as general partner of the Network" without the consent of all of the members, then the General Partner shall dissolve, *see* GP Operating Agreement § 15.2 (c), which in turn, dissolves the Network partnership. *See* Del. Code Ann. tit. 6, § 17-402(11); *see also* LP Agreement § 17.2(c) ("The Network shall be dissolved and its

affairs shall be wound up upon the occurrence of any of the following events … (c) the dissolution or bankruptcy of the General Partner….").[8]

Indeed, the only way to prevent dissolution is through the partners' consent, under the terms specified in the partnership agreement.  *See* Del. Code Ann. tit. 6, § 17-801(3) ("A limited partnership is not dissolved [if] … the then-current percentage or other interest in the profits of the limited partnership *specified in the partnership agreement* owned by the remaining partners agree…to continue the business of the limited partnership and to appoint, effective as of the date of withdrawal, 1 or more additional general partners...").  Here, the LP Agreement specifies that the remaining partners must *unanimously* elect to continue the Network and select a new general partner.  *See* LP Agreement § 17.2(c).  The Astros will not consent here, and the appointment of a trustee or an examiner with expanded powers will cause dissolution.

Once the Network is dissolved, then any successful sale (or reorganization) requires the transfer of the Media Rights Agreement to a new legal entity.[9]  Such a result, however, is

---

[8]      Although Delaware limited partnership law does allow a limited partner to avoid dissolution upon withdrawal of a general partner in some circumstances, those provisions are inapplicable.  *See* Del. Code Ann. tit. 6, § 17-801(3) ("An event of withdrawal of a general partner [triggers dissolution] unless at the time there is at least 1 other general partner…").

[9]      Even if the appointment of an examiner with "expanded powers" (or a trustee) did not require supplanting the General Partner, any such appointment for purposes of avoiding the Astros' consent rights is doomed to fail.  The LP Agreement is an executory agreement and, under Delaware law, the Network itself is bound by the LP Agreement.  Del. Code Ann. tit. 6, § 17-101(12).  The Network must either continue to adhere to all of the terms of that Agreement in order to assume it, or reject it and breach the contract.  And a breach, of course, is a non-curable default that would result in dissolution of the partnership.  Section 365(a) permits a trustee or debtor to assume or reject any of the debtor's executory contracts, subject to court approval.  *See* 11 U.S.C. § 365(a) .  However, it is black-letter law that if a debtor elects to assume an executory contract, *it must assume the entire agreement with all of its benefits and burdens.  N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *see In re Williams*, 299 B.R. 684, 687 (Bankr. S.D. Ga. 2003) (denying motion to assume lease where "Debtor s[ought] to have the Court remove an onerous provision of the lease").  For a trustee or an examiner-controlled Network to assume the LP agreement, it must assume all of its terms, including terms incorporated by reference—most notably, the unanimous consent provisions of the General Partner Agreement that are expressly incorporated into the LP Agreement.  *See* LP Agreement § 6.8.  Simply put, an examiner must either accept the Astros' consent rights, which would prevent any further sale or restructuring activity without the Astros' consent, or reject the LP agreement, dissolving the partnership.  Once again, if the Network is dissolved, then any successful sale (or reorganization) requires the transfer of the Media Rights Agreement to a new legal entity, which cannot be done without the Astros' consent.

forbidden, because the Media Rights Agreement is a trademark license and personal services agreement that *cannot be assigned* against the Astros' wishes.

### b. The Court Lacks Authority To Impose Another Entity Exercising The General Partner's Power On The Limited Partners

If the limited partnership could somehow survive the radical surgery proposed by Comcast, replacing the General Partner with a *de facto* new general partner is inconsistent with the well-established principle that, under 11 U.S.C. § 365(c), a debtor partner cannot have a trustee assume his partnership interest or assign that interest to an examiner over the objection of the other partners.   Section 365(c)(1) bars any assignment of an executory contract where "applicable law excuses a party, other than the debtor, to such a contract … from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession."  11 U.S.C. § 365(c)(1)(A) .  Applying § 365(c)(1) in *In re O'Connor*, 258 F.3d 392, 394, 402 (5th Cir. 2001), the Fifth Circuit held a trustee could not assume a debtor-partner's Louisiana partnership agreement.   Louisiana law precluded a partner from "mak[ing] a third person a member of the partnership *without* his partners' consent," and the others partners "did *not* consent to substituting the Trustee for the debtor."  *Id.* at 402 (emphasis in original); *see* Del. Code Ann. tit. 6, § 17-401 (requiring consent to add a new general partner).  Applicable law thus excused the partners from accepting performance by the trustee, and "the district court correctly held the agreement was *not* assumable under § 365(c)(1)."  *In re O'Connor*, 258 F.3d at 402 (emphasis in original).  So too here.

Like the Fifth Circuit, numerous bankruptcy courts have also held a debtor's partnership interest cannot be assigned in bankruptcy.  *See, e.g.*, *In re Schick*, 235 B.R. 318, 325 (Bankr. S.D.N.Y. 1999) (finding § 365(c)(1) prevents assignment of partnership interest unless other partners agree to admit assignee as substitute limited partner); *In re Nizny*, 175 B.R. 934, 939

(Bankr. S.D. Ohio 1994) (stating partnership interest would not be assignable "to a separate third party" under § 365(c)(1)); *In re Catron*, 158 B.R. 624, 627 (Bankr. E.D. Va. 1992) (denying assumption of a general partnership interest and noting "the agreement or contract governing the partnership is essentially a contract for personal services, which renders it also nondelegable and nonassumable"), *aff'd*, 158 B.R. 629 (E.D. Va. 1993), *aff'd*, 25 F.3d 1038 (4th Cir. 1994); *In re Cardinal Indus.*, 116 B.R. 964, 979 (Bankr. S.D. Ohio 1990) (holding that limited partnership agreement was not assignable under § 365(c)(1)); *In re Priestley*, 93 B.R. at 260  (finding that debtor's rights to manage partnership were nonassignable under § 365(c)(1)); *In re Sunset Developers*, 69 B.R. 710, 713 (Bankr. D. Idaho 1987) (same); *In re Harms*, 10 B.R. at 821-22 (finding § 365(c)(1) prevented a trustee from assuming position of general partner).

If the general partnership interest of a debtor partner cannot be assigned under § 365(c)(1)  because "applicable law excuses" the other partners "from accepting performance" by the assignee, then a bankruptcy cannot force those same partners to accept performance by an examiner installed to replace the former, *non-debtor* general partner.  Nothing in the Bankruptcy Code suggests the Court has greater authority to forcibly impose a new general partner in place of a non-debtor—an imposition for which it has no explicit statutory authority—than it would have under its broad authority to approve the assignment of executory contracts.  *See* 11 U.S.C. § 365(a) ; *In re Chandler Airpark Joint Venture I*, 163 B.R. 566, 572 (Bankr. D. Ariz. 1992) ("While the Bankruptcy Code frequently modifies the contractual expectations of parties expressly, such should not be the result unless clearly provided in the Code.").  Recognizing this principle, the bankruptcy court in *In re Sovereign Group*, a case that involved a partnership reorganization, held that "a partnership relation requires a plan proponent to comply with the terms of a partnership agreement when seeking confirmation of a plan of reorganization wherein

23

the plan proposes to restructure the partnership by replacing or adding general partners." 88 B.R. at 329.

This is in stark contrast to applicable Delaware law governing corporations.  In the context of a Delaware corporation, any act in furtherance of a plan of reorganization or any order of a bankruptcy court may be taken by any officer of a debtor as if taken by unanimous action of the directors and shareholders of the corporation.  Del. Code Ann. tit. 8, § 303 ("Any corporation of this State, an order of relief with respect to which has been entered pursuant to the Federal Bankruptcy Code, ... may put into effect and carry out any decrees and orders of the court[.]").  The Delaware Limited Partnership Act and Delaware Limited Liability Company Act, in contrast, do not contain any such provisions and, combined with the policy of giving maximum effect to the principle of freedom of contract, that silence has significant meaning.  *See Twin Bridges Ltd. P'ship v. Draper*, No. 2351-VCP, 2007 WL 2744609, at *19 (Del. Ch. Sept. 14, 2007) ("Because the conceptual underpinnings of the corporation law and Delaware's [alternative entity] law are different, courts should be wary of uncritically importing requirements from the DGCL into the [alternative entity] context."); *see also CML V, LLC v. Bax*, 6 A.3d 238, 249 (Del. Ch. 2010) ("[T]here is nothing absurd about different legal principles applying to corporations and LLCs."), *aff'd*, 28 A.3d 1037 (Del. Super. Ct. 2011).

If the Network's business can no longer be carried on in conformity with the LP Agreement and the GP Operating Agreement, Delaware law authorizes the partners to dissolve their partnership and wind up the business—not to impose a third-party entity on the partnership and rewrite the partners' agreements without consent.  *See* Del. Code Ann. tit. 6, § 17-802 ("On application by or for a partner, the Court of Chancery may decree dissolution of a limited partnership whenever it is not reasonably practicable to carry on the business in conformity with

24

the partnership agreement."); *see also* Del. Code Ann. tit. 6, § 18-802 (same, with respect to limited liability companies); LP Agreement § 17.2; GP Operating Agreement § 15.2.

There is also no authority in the Bankruptcy Code for Comcast to override the partners' agreed-upon checks and balances to substantively modify the LP Agreement and the GP Operating Agreement.   The rights and obligations created by a partnership agreement are "defined by state law," and the bankruptcy court should not use its equitable powers to unilaterally rewrite a partnership agreement. *Butner*, 440 U.S. at 55; *see In re Sovereign Group*, 88 B.R. at 329 ("As a matter of policy, the Bankruptcy Code is not intended to be used as a tool to restructure onerous partnership agreements.").   An agreement among partners, like the partnership here, is "not only a legal relationship, but it is also a personal relation or status, somewhat as marriage is a relation or status." *Harms*, 10 B.R. at 822.   When courts have confirmed Chapter 11 plans that modify a partnership agreement, they have respected this unique relationship and such alterations have been limited to minor clarifications; substantial surgery to modify governance rights is not permitted. *See In re Ingleside Assocs.*, 136 B.R. 955, 962-63 (Bankr. E.D. Pa. 1992) (noting that the provisions modifying the partnership agreement in the record before the Court were "mere clarifications necessary to allow the Debtor to function" and not "so substantial as to justify denial of confirmation under 11 U.S.C. §§ 1129(a)(1) or (a)(3)").[10]   And Bankruptcy Courts have only sidestepped the negotiated terms of a partnership agreement when the provisions of the agreement directly conflict with the Bankruptcy Code. *See*

---

[10]        *In re Block Shim Development Co. - Irving*, 939 F.2d 289 (5th Cir. 1991), is not to the contrary.  In *Block Shim*, the appellants only challenged a Chapter 11 plan's redistribution of partnership interests to reflect the capital contributions of the partners during the restructuring, and it was only "[i]n a responsive pleading filed with the court, [that] appellants appear to request in the alternative that the court at least reverse the portions of the plan that modify the Block Shim partnership agreement." *In re Block Shim Dev. Co.  Irving*, 113 B.R. 256, 257 (Bankr. N.D. Tex. 1990), *aff'd*, 939 F.2d 289 (5th Cir. 1991).  Although the Fifth Circuit found that the bankruptcy court had not clearly erred in finding compliance with § 1129(b)(1) of the Bankruptcy Code in confirming the plan, because there was a reasonable basis for the different treatment of the partners, the Fifth Circuit *did not address the modifications to the partnership agreement itself*, because the appellant waived those arguments in the bankruptcy court.

*In re Map 1978 Drilling P'ship*, 95 B.R. 432, 435-36 (Bankr. N.D. Tex. 1989) (holding the plan voting requirement for considering the confirmation of a Chapter 11 plan under the Bankruptcy Code superseded the plan voting requirement of the partnership agreement).  By contrast, the substantive modifications to the LP Agreement and displacement of the GP Operating Agreement that Comcast seeks are unprecedented.  In short, any attempt to supplant the General Partner with an examiner with expanded powers would exceed this Court's authority.

**2.**      **Forcing An Examiner On The Network Would Trigger The Astros' Right To Terminate The Media Rights Agreement**

Even if this Court had authority to force an examiner (or, for that matter, a trustee) on the Network as its new general partner without causing dissolution of the Network, the introduction of a new agent acting as general partner and the elimination of the Astros' consent rights would be such fundamental change to the partnership that it would trigger the anti-assignment provisions of 11 U.S.C. § 365(e)(2)  and would allow the Astros to terminate the Media Rights Agreement.  *See, e.g.*, *In re Footstar, Inc.*, 323 B.R. at 573 (holding that "[a] trustee *is* an 'entity other than the debtor or the debtor in possession'—the trustee is an entirely different entity, who has succeeded by operation of the Bankruptcy Code to all of the debtor's property including contracts."); *In re Manor Place*, 144 B.R. at 685; *In re Cardinal*, 116 B.R. at 982; *In re Harms*, 10 B.R. at 821 ("[A] trustee or a debtor-in-possession is not the same entity as a pre-bankruptcy debtor…").  That makes sense.  Here, both the Bankruptcy Code and the partners' agreements serve the same goal:  the protection of a class of assets that the parties recognized were particularly sensitive precisely because they go to the heart of a partner's goodwill.  The Astros' consent rights give it a measure of control over how it is portrayed and how its marks are used by the Network, which is contractually given unparalleled access to the Astros and its players.  Yet, Comcast's end-game would have the Network sold, whether under a plan or otherwise—without

the Astros' consent—to an entity that by definition would not require any consent from the Astros.  Where, as here, the parties crafted extensive protections to prevent such an eventuality, the Court cannot strip those protections away to permit the effective transfer of assets that Congress itself gave special protection to in 11 U.S.C. §§ 365(c)(1) and (e).

The appointment of an examiner with expanded powers, accompanied by the forcible removal of the Astros' consent rights as a central component of the Network's governance, in substance works an assignment of the Media Rights Agreement.  Delaware courts enforcing contractual anti-assignment provisions have found that when a change in control causes a sufficiently fundamental change to the entity, the parties may enforce anti-assignment clauses. The Media Rights Agreement is governed by Delaware law.  *See* Media Rights Agreement § 13.2(A).  Here, § 365(e)(2) would similarly give the Astros the right to enforce their right to terminate.  *See* Media Rights Agreement § 12.5(C).

Delaware courts have recognized, for example, that a change in control accompanied by "*change[s] in business practices or policies that altered the parties' bargain in any significant way*" may violate an anti-assignment clause.  *See Star Cellular Tel. Co. v. Baton Rouge CGSA, Inc.*, 19 Del. J. Corp. L. 875, 892 (Del. Ch. 1993) (emphasis added), *aff'd*, 647 A.2d 382 (Del. 1994); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, No. 5589-VCP, 2011 WL 1348438, at *12-13 (Del. Ch. Apr. 8, 2011) (holding a change in control may have violated an anti-assignment provision because the plaintiffs alleged significant post-merger changes in personnel and policies).  Delaware courts, thus, have held that a change in control may violate an anti-assignment provision if (1) performance by the original contracting party is "a material premise of the contract" and (2) the transfer "creates [an] unreasonable risk for the other contracting parties."  *Star Cellular*, 19 Del. J. Corp. L. at 890-91; *see Tenneco Auto Inc. v. El*

*Paso Corp.*, No. 18810-NC, 2002 WL 453930 (Del. Ch. Mar. 20, 2002).  Both conditions are satisfied here.

The Media Rights Agreement is both a trademark license and a personal services contract, so performance by the original contracting party—the Network—is a material term of the agreement.  *See* Oct. 28, 2013 Hr'g Tr. (Postolos) at 167:6-175:16.  The key assumption underlying the Media Rights Agreement was that the Astros could protect the integrity of the trademarks and media rights through their consent rights over the General Partner's actions as sole general partner of the Network.  *See Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986) (holding agreements executed at the same time dealing with the same subject matter "should be construed together and interpreted as a whole"); *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1120 & n.192 (Del. Ch.) (applying similar rule "despite the two week time difference between [the agreements'] effective dates"), *aff'd*, 45 A.2d 148 (Del. Super. Ct. 2012); Restatement (Second) of Contracts § 214 (other, contemporaneous agreements should inform the meaning of and intention behind contractual provisions).  Removing that protection creates the risk to the Astros that its highly personal rights could be used in ways outside its control.

Unlike in *Star Cellular*, the persons who manage the Network today, and especially those who manage the portrayal of the Astros by the Network, would not manage it after replacement of the General Partner in bankruptcy.  The Astros will be eliminated from management, or at the least, have a significantly diminished role in which its consent is no longer required as it pertains to the Astros' media rights.  *See Star Cellular*, 19 Del. J. Corp. L. at 892 ("Those same persons who managed Baton Rouge Inc. before the Merger manage Louisiana Inc. today."); *Baxter Pharm. Prods., Inc. v. ESI Lederle Inc.*, No. 16863, 1999 WL 160148, at *3, 5 (Del. Ch. Mar. 11,

1999) (finding stock sale did not violate anti-assignment provision in part because after stock purchase the company "retained most of the top executives[,] sales managers," and other employees).  And, unlike in *Star Cellular*, "change[s] in business practices or policies" will "alter[] the parties' bargain in a[] significant way."  19 Del. J. Corp. L. at 892; *Baxter*, 1999 WL 160148, at *5 (finding stock sale did not violate anti-assignment provision in part because after stock purchase the company "maintains the same corporate policies").  Comcast's entire purpose is to change the Network's business model to one that differs significantly from what the parties agreed to when they entered into the Media Rights Agreement—and one with which the Astros disagree.

The concerns underlying Delaware's state-law anti-assignment rules are analogous to the requirements of 11 U.S.C. §§ 365(c)(1) and (e)(2), and courts already look to state law when determining whether an assignment excuses performance of an executory contract.  *See, e.g.*, *In re O'Connor*, 258 F.3d at 402; *In re Footstar, Inc.*, 323 B.R. at 573; *In re Manor Place*, 144 B.R. at 685 (holding that replacing a debtor general partner with a "Management Committee" would violate § 365(c)(1) because the Management Committee "is [not] the functional equivalent of the Debtor so that there is no material change in the identity of the person rendering performance under the contract."); *In re Cardinal*, 116 B.R. at 982 (similar); *In re Harms*, 10 B.R. at 821.

Because Delaware law would treat such a foundational change as an assignment, it follows that under 11 U.S.C. § 365(e)(2), the Astros would be allowed to terminate.  Forcibly removing the General Partner as the Network's general partner is such a significant change that it amounts to an impermissible assignment of an executory contract.  And the Astros have every intention to exercise its termination rights under the Media Rights Agreement and

11 U.S.C. § 365(e)(2) if their media rights are assigned to an examiner-run Network while their consent rights over how those media rights are used are destroyed.

But even if the appointment of an examiner would not trigger the Astros' immediate right to terminate the Media Rights Agreement, any restructuring transaction must create a new legal entity or materially change the identity of the Network, which would require an assignment of the Media Rights Agreement.   That is exactly what 11 U.S.C. §§ 365(c)(1) prohibits.  In fact, the assignment would prove pointless because the Astros would immediately exercise their rights under the Media Rights Agreement and 11 U.S.C. § 365(e)(2) to terminate the assigned agreement.

### C. Comcast's Arguments That The Media Rights Agreement Is Assignable In Bankruptcy Are Without Merit

#### 1. The Media Rights Agreement Is Protected By 11 U.S.C. § 365(c)(1) And (e)

Comcast has asserted that 11 U.S.C. § 365(c)(1) and (e) are inapplicable to the Media Rights Agreement.  But that is self-evidently wrong.  Both trademark and contract law excuse the Astros from accepting performance under the Media Rights Agreement from an assignee.

By its terms, the Media Rights Agreement is a trademark license that in exchange for a media-rights fee grants the Network extensive rights to use the Astros' trademarked "name, symbol, seal, emblem, logo, and insignia."   Media Rights Agreement § 5.5(A); *see also Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 364 (5th Cir. 2004) (defining a trademark license as "the right to use another party's mark ... generally in exchange for a royalty or other payment").   The license includes the right to display the mark throughout game telecasts, to use the mark to promote the Network and its advertisers, and to call the Network the "Astros' Network."  Media Rights Agreement § 5.5(A).  It also grants the Network the right to

create original programming—like Astros Bases Loaded, Pregame Live, and Postgame Live—
that trade on the Astros' name and goodwill.  *Id.* § 5.3; Astros 80.

None of those rights is transferrable under trademark law.  "[T]he universal rule is that
trademark licenses are not assignable in the absence of a clause expressly authorizing
assignment."  *In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011) (Posner, J.); *Miller v. Glenn
Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (per curiam); 3 J. Thomas McCarthy,
*McCarthy on Trademarks and Unfair Competition* § 18:43 (4th ed. 2013) ("[T]he licensee's right
to use the licensed mark is personal and cannot be sold or assigned to another.").  Recognizing
trademark licenses are not assignable absent consent from the mark's owner, bankruptcy courts
routinely deny the assignment of trademark licenses.  *See, e.g.*, *In re Kazi Foods of Mich., Inc.*,
473 B.R. 887, 889 (Bankr. E.D. Mich. 2011); *In re Wellington Vision, Inc.*, 364 B.R. 129, 136-37
(S.D. Fla. 2007); *In re N.C.P. Mktg. Grp., Inc.*, 337 B.R. 230, 236 (D. Nev. 2005), *aff'd*, 279 F.
App'x 561 (9th Cir. 2008); *In re Travelot Co.*, 286 B.R. 447, 455 (Bankr. S.D. Ga. 2002).
Sections 365(c)(1) and (e)(2)  similarly bar the assignment of the trademark license in the Media
Rights Agreement.

Comcast argues for an exception to the universal rule here, asserting that the Media
Rights Agreement provides "specific guidelines for using the Astros' trademarks."  Oct. 15, 2013
Petitioner Creditors' Opp. to Houston Astros' Mot. to Dismiss  ("Comcast Opp.") [Dkt 94] at 24.
But that makes no sense and is entirely unsupported by law.  Indeed, such an exception would
swallow the rule.  Because a trademark owner has a duty "to exercise control and supervision
over the licensee's use of the mark," most trademark licenses include usage guidelines.  *Sheila's
Shine Prods., Inc. v. Shiela Shine, Inc.*, 486 F.2d 114, 123-24 (5th Cir. 1973); *Miller*, 454 F.3d at
992.  Usage guidelines and the prohibition on licensing marks in fact serve a common purpose—

to protect "the good will, quality, and value of its product." *In re N.C.P. Mktg. Grp.*, 337 B.R. at 236. One of the reasons for restricting assignments is to give a trademark owner the opportunity "to pass on the abilities of new potential licensees" to follow contractual usage guidelines and to otherwise protect the value of the mark. 3 *McCarthy on Trademarks and Unfair Competition* § 18:43.

Comcast's argument that a trademark license does not foreclose assignment under § 365 if it is "ancillary to the main purpose of the contract" is equally misguided. Comcast Opp. at 24. Trademark law does not have an incidental-purpose exception, and §§ 365(c)(1) and (e)(2) do not authorize courts to decide on a case-by-case basis whether the interests served by the "applicable law" barring assignment are central enough to honor. If the applicable law bars assignment, that is the end of the inquiry. And the two cases Comcast cites to support its novel rule—*In re Sunrise Restaurant, Inc.*, 135 B.R. 149 (Bankr. M.D. Fla. 1991), and *In re Tom Stimus Chrysler-Plymouth, Inc.*, 134 B.R. 676 (Bankr. M.D. Fla. 1991)—do not mention trademark law or an incidental-purpose exception to §§ 365(c)(1) and (e)(2).

Contract law also prohibits the assignment of the Media Rights Agreement. Under Delaware law—the law the parties agreed would govern the Media Rights Agreement, *see* Media Rights Agreement § 13.2—contracts for *personal services* may not be assigned absent consent. *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, No. 3718-VCP, 2010 WL 338219, at *11 (Del. Ch. Jan 29, 2010). Indeed, the MLB Constitution recognizes that media rights are a special category of service and requires a vote of a majority of the MLB teams to approve any license of a team's media rights to a third party. *See* Astros 81 Art. V, Sec. 2(a)(5). As MLB has explained, "[o]ne of the principal means by which the Astros—and MLB's other

member Clubs—reach their fan bases is through the exploitation of their media rights."  MLB

Statement ¶ 5.[11]

Under the Media Rights Agreement, both the Astros and the Network bargained for

services that depend on the "character, reputation, taste, skill, or discretion of the party that is to

render performance."  *In re Lil' Things, Inc.*, 220 B.R. 583, 590 (Bankr. N.D. Tex. 1998)

(internal quotations & citation omitted); Oct. 28, 2013 Hr'g Tr. (Postolos) at 170:25-171:7.  The

Network bargained for the right to televise an elite level of local baseball that, as the only Major

League Baseball team in Houston, only the Astros could provide.  The Astros in turn view their

partnership with the Network as "the single most important relationship that [it] has in its local

market."  *Id.* at 167:9-10; *see id.* at 170:6-18.   Indeed, from the Astros' perspective, that

relationship "is really very much of a *marriage*."  *Id.* at 175:13-16 (emphasis added).  Fans view

the Network as "an alter ego of the team," *id.* at 167:6-13, and the Network is given a degree of

access to Astros' personnel, facilities, and aircraft that no one else has, *id.* at 172:10-173:1,

173:13-174:6; Media Rights Agreement §§ 5.3, 5.6, 6.3, 11.2.   Because the Network's

employees are with the team in the locker room, on its private plane, and at the team hotel

throughout the 162-game season, ensuring the Astros' manager and players are comfortable that

they can trust the Network is "one of the key issues" for the team.  Oct. 28, 2013 Hr'g Tr.

(Postolos) at 173:2-12 (testifying that trust is "absolutely essential for you to be able to put the

product that you want on the field"); *see In re Martin*, 117 B.R. 243, 249 (Bankr. N.D. Tex.

1990) (defining a personal services contract as one entered into "based on personal credit,

confidence, and trust").  The authority to simply re-assign the broadcast face of the Astros with

---

[11]     MLB also recognizes that the Media Rights Agreement includes a non-assignable trademark license.
"MLB has the responsibility to approve the use of Club trademarks by a third party," and did so here in approving
the Media Rights Agreement. *Id.* ¶ 3.  "MLB approved the Astros' Media Rights Agreement with the understanding
that the use of these trademarks could not be assigned to a third party without first obtaining both the consent of the
Club and, as required by the MLB rules and regulations, the approval of the League." *Id.* ¶ 5.

extensive access to the team is not something the team—or any Major League Baseball franchise—would accept. *See* Oct. 28, 2013 Hr'g Tr. (Postolos) at 167:22-168:12.

### 2.    The Astros Did Not Consent To The Assignment Of The Media Rights Agreement In Bankruptcy

While Comcast has backpedaled from its request to appoint a trustee to pursue a sale of substantially all of the Network's assets, Comcast continues to argue that the Media Rights Agreement "expressly contemplate[s] assumption or assignment" of the agreement in bankruptcy, thereby waiving the Astros' rights under 11 U.S.C. §§ 365(c) and (e).   The agreement does no such thing.  Section 12.5 of the Media Rights Agreement grants the Astros the unilateral right to terminate the agreement if the Network files for bankruptcy, if it "makes an assignment for the benefit of its creditors," or if a "custodian" or "trustee is appointed for [the] Network."   Media Rights Agreement § 12.5(C).   Under that section, "[f]or the avoidance of doubt," neither a trustee or any assignee in bankruptcy proceedings "shall have any right to continue this [Media Rights] Agreement or in any way use the rights granted under this Agreement if" the Astros exercise their termination rights.  *Id.*   These provisions are simply irreconcilable with Comcast's position that the Astros' consented to the assignment of their media rights.

Section 13.8(A) of the Media Rights Agreement, which Comcast cited in its opposition, does not help its position. *See* Comcast Opp. at 25.  That provision allows the Network to assign the Media Rights Agreement "to a purchaser of all or substantially all of the assets of the Network" without the Astros' consent.   Media Rights Agreement § 13.8(A).   But the appointment of a trustee or examiner with expanded powers and subsequent assignment of the Media Rights Agreement—a necessary step in any asset sale here—is not a purchase of the Networks' assets.   Moreover, Section 13.8(A) does not apply to sale of the Network's equity, the

structure Comcast is currently supporting.  *See* Jan. 31, 2014 Houston Astros' Opp. to the Petitioning Creditors' Mot. to Terminate Exclusivity & to Appoint An Examiner with Expanded Powers (filed contemporaneously herewith).

It makes perfect sense that Section 13.8(A) itself would not require consent to transfer the Media Rights Agreement when the Network sells substantially all of its assets outside bankruptcy because the Network's transaction agreements, including the LP Agreement, the GP Operating Agreement, and the Media Rights Agreement, are fully integrated agreements and therefore, in a non-bankruptcy sale, the Astros can exercise their consent rights *in the GP Operating Agreement* to protect their valuable media rights.

The Network's transaction documents are integrated for several reasons.  First, integration clauses contained in the GP Operating Agreement and the LP Agreement both explicitly state that they "together with the other Transaction Documents"—which includes the Astros' Media Rights Agreement—"[set] forth the entire understanding of the parties."  *See* LP Agreement § 19.9, GP Operating Agreement § 17.9.  Second, agreements made at the same time regarding the same subject should be construed together, and each of the transaction documents was executed on October 29, 2010 and address the same matter.  *See e.g.*, *Kroblin Refrigerated Xpress, Inc.*, 805 F.2d at 107 (holding interrelated contracts "should be construed together and interpreted as a whole"); *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135 (Tex. 2004) ("[A]greements executed at the same time, with the same purpose, and as part of the same transaction, are construed together.").  Third, courts consider integration clauses critical to the determination of whether agreements should be construed together, and the Media Rights Agreement does not contain such an integration clause, which means the documents should be

read together.  *See In re Am. Home Mortgage Holdings, Inc.*, 390 B.R. 120, 136 (Bankr. D. Del.

2008) (holding existence of integration clause clearly prevented construing agreements together).

Regardless, in addition to its consent rights in the GP Operating Agreement,

Section 12.5(C) of the Media Rights Agreement gives the Astros automatic termination rights in

the event of an assignment.  As Comcast's tactics here illustrate, the Astros wisely chose to

further protect their interests in bankruptcy and negotiated for the enhanced protections in

Section 12.5(C).   To say that at the same time it negotiated Section 12.5(C), the Astros

simultaneously waived its rights in agreeing to Section 13.8(A), makes no sense.

The two cases cited by Comcast in support of its waiver argument are easily

distinguishable.   In both cases, a court found a party had waived its rights under 11 U.S.C.

§§ 365(c)(1) and (e)(2) where contractual "language clearly contemplate[d] assignment in

bankruptcy."   *In re Midway Airlines, Inc.*, 6 F.3d 492, 497 (7th Cir. 1993); *see In re*

*Supernatural Foods, LLC*, 268 B.R. 759, 804 (Bankr. M.D. La. 2001) (holding a party waived its

§ 365(c) rights where the agreement "by its very terms carve[d] out an exception to [its] general

rule" prohibiting assignments "by allowing assignment incident to a liquidation of all or

substantially all of [the licensee's] assets").   The Media Rights Agreement clearly contemplates

that an assignment in bankruptcy cannot occur without the Astros' consent.   *See* Media Rights

Agreement § 12.5(C).

## II.   THERE IS NO REASONABLE LIKELIHOOD OF A SUCCESSFUL REORGANIZATION

### A.   Any Successful Restructuring Requires The Astros' Consent Or For The Partnership Governance Rights To Be Unaffected

For principally the same reasons discussed in Section I, the Involuntary Petition must be

dismissed because any proposed reorganization is futile.   Because Comcast blames the

Network's supposed financial difficulties on the Astros' consent rights, any comprehensive

restructuring of the Network would require eliminating those rights.  As discussed above, any standalone reorganization or sale of the Network removing the consent rights results in a new entity that is not managed by the General Partner, and transferring the assets of the current partnership to the new entity, would fail.  *See* 11 U.S.C. § 1123(a)(5)(B).  That requires an assignment of the Media Rights Agreement to a new entity which would trigger the Astros' right to terminate the agreement.  *See* 11 U.S.C. §§ 365(c)(1), (e)(2).  Any successor entity to the Network would thus emerge without the media rights "critical to [a] successful reorganization." Comcast Opp. at 21.

Likewise, replacing the General Partner with a new general partner post-reorganization will not result in a confirmable plan.  *See* 11 U.S.C. § 1129(a)(1).  As explained above, replacing the General Partner as the sole general partner of the Network is foreclosed by Delaware law and beyond this Court's authority.  Indeed, installing a successor general partner for the Network post-reorganization is even more problematic than appointing a trustee or an examiner.  The Bankruptcy Code at least contemplates assumption of agreements by a trustee in some circumstances.  *See* 11 U.S.C. § 365(a).  Nothing in the Bankruptcy Code contemplates running roughshod over state law to appoint a non-trustee general partner.  *In re Chandler Airpark Joint Venture I*, 163 B.R. at 572.  And this Court's equitable powers under 11 U.S.C. § 105 do not include the power to authorize an end-run around state law or a party's contractual rights.  *See Butner*, 440 U.S. at 56; *In re Manor Place*, 144 B.R. at 687.  Neither does the only other potentially relevant Bankruptcy Code provision, 11 U.S.C. § 1123(a)(5)(I).  Although that statute provides that "[n]otwithstanding any otherwise applicable bankruptcy law," a bankruptcy court may "amend[] … the debtor's charter" as necessary to implement a plan, the text and structure of § 1123(a) makes clear that it applies only to corporate charters, not partnership agreements.  *See*

37

*In re Sovereign*, 88 B.R. at 327-28. The term "debtor's charter" has historically referred to corporate charters, and there is no indication in the text of legislative history of § 1123(a)(5) that Congress intended to deviate from that historical meaning. *Id.* Indeed, the very next subsection uses "charter of the debtor" when specifically referring to corporate charters. *See* 11 U.S.C. § 1123(a)(6) (providing a plan must "provide for the inclusion in the charter of the debtor, if the debtor is a corporation, or of any corporation referred to in paragraph 5(B) or 5(C) of this subsection, of a provision prohibiting the issuance of nonvoting equity securities"). In any event, as discussed above, even if the Court had the power to run roughshod over the partnership's organic documents, doing so would result in a fundamentally different entity under Delaware law, which Delaware law would treat as an assignment. Even if such a replacement could nonetheless occur, it would result in a foundational change in the partnership that would amount to an impermissible assignment and thus trigger the Astros' termination rights. *See* 11 U.S.C. § 365(e)(2). Comcast's attempt to make an end-run around the Astros' consent rights will only result in termination.

### B.     The Network Cannot Propose a Confirmable Plan

In addition to being futile for the reasons explained above, the Network cannot propose a confirmable standalone plan of reorganization because the Network's existing debt structure does not contain a potential impaired accepting class as required by 11 U.S.C. § 1129(a)(10).

It is black-letter law that to confirm a plan of reorganization, a debtor must satisfy each of the elements of § 1129. *See e.g.*, *In re Williams*, 850 F.2d 250, 253 (5th Cir. 1988) (stating "the [bankruptcy c]ourt has a mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation") (internal quotations & citation omitted); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 421 (Bankr. S.D. Tex. 2009) ("This Court has an independent duty to ensure that all of the requirements of § 1129 are met."). Pursuant to

§ 1129(a)(10), if any class of creditors is impaired under the plan or reorganization, at least one *impaired* accepting class must vote to accept the proposed plan, and, for purposes of determining acceptance, votes by "insiders" are not counted.  *See* 11 U.S.C. § 1129(a)(10) .

The Network's capital structure divides its creditors into just three potential classes of claims and interests: (i) holders of secured claims under the Comcast Credit Agreement, consisting of Comcast Lender; (ii) holders of general unsecured claims; and (iii) holders of interests, *i.e.*, the Astros, the Rockets, and Comcast and their partnership interests in the Alleged Debtor.  None of these classes would be entitled to vote on a plan of reorganization, due either to its members' status as insiders or because its members' claims have been paid in full or are unimpaired.  *See id.*

Even if they were impaired (and therefore entitled to vote on the proposed plan of reorganization), the votes of the Astros, the Rockets, Comcast and Comcast Lender would not be counted because they are all "insiders" within the meaning of § 1129(a)(10).[12]  As affiliates of Comcast, each of the Petitioning Creditors are also insiders under § 101(31)(E).  *See* 11 U.S.C. § 101(31)(E). Therefore, Astros Member, Rockets Member, and Comcast Member, as well as each of the Petitioning Creditors, would not be entitled to have their votes counted for confirmation purposes.

Members of the remaining creditor class, the holders of prepetition general unsecured claims, do not exist as the Network has paid all such claims in the ordinary course of business, with the exception of those due to the Astros and the Rockets.  Even if they could exist, there is

---

[12]      Section 101(31)(C)(i) states that when the debtor is a partnership, an insider includes any "general partner of … the debtor."  11 U.S.C. § 101(31)(C)(i).  Section 101(31)(E) further extends the definition of "insider" to include an "affiliate, or insider of an affiliate as if such affiliate were the debtor."  *Id.* § 101(31)(E) .  The Astros, the Rockets, and Comcast control the Network through the GP Operating Agreement, each are Limited Partners of the Network and serve on the Board, and each are equity owners of the General Partner.   Moreover, as members of the General Partner, they are all "relatives" of the Network's General Partner — indeed, they control it.  As such, the Astros, the Rockets, and Comcast are plainly insiders under § 101(31)(C) .

no good faith basis for any proposed plan of reorganization to impair such claims. *See* 11 U.S.C. § 1124; *In re Mangia Pizza Invs., LP*, 480 B.R. 669, 690 (Bankr. W.D. Tex. 2012) ("A class of claims is deemed unimpaired if the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."); *In re Windmill Durango Office, LLC*, 481 B.R. 51, 68 (BAP 9th Cir. 2012) ("The creation of an impaired class in an attempt to gerrymander a voting class of creditors is indicative of bad faith.") (internal quotation & citation omitted); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 246 (3d. Cir 2004) ("[T]he good faith requirement [of § 1129(a)(3)] provides an additional check on a debtor's intentional impairment of claims.").

Because there are no creditors entitled to vote on a proposed plan of reorganization, a standalone plan of reorganization cannot be confirmed.

## III.   THE INVOLUNTARY PETITION WAS FILED IN BAD FAITH AND SHOULD BE DISMISSED.

The Involuntary Petition should also be dismissed because Comcast orchestrated the filing of the Involuntary Petition in bad faith.  Comcast Owner was precluded from putting the Network into bankruptcy without the Astros' consent, so Comcast did an end-run around that prohibition.   As the evidence adduced at the hearing confirmed, four Comcast Corporation executives made the decision to file the Network for bankruptcy.  Three of those executives were officers of Comcast Owner.  To implement their strategy, they directed four affiliates of Comcast Owner to file the Involuntary Petition even though none had an outstanding amount due and owing from the Network at the time of the filing.

Comcast put the Network into bankruptcy in order to gain a tactical advantage over the Astros in a business issue concerning the Network.   The partners had been unable to unanimously approve the Network's entry into affiliation agreements with other providers.  The

Astros, in the proper exercise of their contractual rights, refused to approve such agreements because none would have resulted in a profitable Network.  The Network ultimately failed to pay the media rights fee to the Astros on July 31, triggering the Astros' contractual right to terminate its Media Rights Agreement on September 30.  The last business day before that termination right accrued, Comcast directed its four affiliates to file the Involuntary Petition to prevent the Astros from terminating its Media Rights Agreement with the Network.  Now, through a potential bankruptcy, Comcast seeks to strip the Astros of its contractual consent rights—and Comcast is trying to buy the Network on the cheap, all for its own benefit.

Comcast's conduct is precisely the bad faith warranting dismissal of the Involuntary Petition—and neither the Rockets' joinder nor the landlord's joinder, even if filed in good faith, can cure that defect.  The Involuntary Petition should be dismissed as a result.

### A.    Comcast Corporation Orchestrated The Involuntary Petition In Bad Faith.

As one of Comcast's executives admitted, "Comcast Corporation decided to file the Involuntary Petition against the Network."  Oct. 28, 2013 Hr'g Tr. (Pick) at 434:6-8.  Four Comcast executives made that decision: Michael Angelakis, Vice Chairman and CFO of Comcast Corporation; David Cohen, Executive Vice President of Comcast Corporation; Robert Pick, Senior Vice President of Corporate Development for Comcast Corporation; and Marc Rockford, in-house counsel for Comcast Corporation.  *Id.* at 434:6-435:6, 428:22-24.  Three of these executives—Angelakis, Cohen, and Pick—are officers of Comcast Owner.  *See* Astros 67. These Comcast executives decided that four affiliates of Comcast Owner would file the Involuntary Petition against the Network.  Oct. 28, 2013 Hr'g Tr. (Ruth) at 435:7-10; *id.* (Pick) at 435:7-10.

Comcast made that decision after it was unable to achieve its business objectives outside of court.  Comcast first pushed the partners to approve affiliation agreements that would have

benefited Comcast in multiple ways—by providing revenue for the Network to continue servicing the debt owed to Comcast Lender and paying the management services fee due to Comcast Lender, and by saving money for Comcast Cable as a result of its MFN protection. However, none of those proposed affiliations agreements would have resulted in a profitable Network.

For example, the most recent and best proposal was submitted by DirecTV in April 2013, but the proposed carriage rates would have still left the Network unprofitable. Oct. 28, 2013 Hr'g Tr. (Ruth) at 329:9-21. Comcast's own projections of the Network's cash flow forecast that the Network would lose more than $200 million over the next ten years, even assuming the Network entered into affiliation agreements with DirecTV and numerous other providers at the same carriage rates. *Id.* at 330:7-335:4; JX 14. Comcast sent those projections to the partners on May 10 and recommended approving the DirecTV proposal although doing so would indisputably have rendered their equity in the Network worthless. *Id.* at 329:22-25; JX 14.

On the heels of providing those projections, Comcast further sought to harm the Astros' interest in the Network. On May 17, Comcast proposed to restructure the partnership's governance provisions to strip the Astros' consent rights regarding affiliation agreements. *See* Oct. 28, 2013 Hr'g Tr. (Ruth) at 336:11-337:14; JX 15. In particular, Comcast proposed that the Network be able to enter affiliation agreements on the same terms as the DirecTV proposal without any consent by the Network's partners, and more importantly, that the Network could enter into affiliation agreements with even worse terms, and lower carriage rates, on the approval of only two partners. *See id.* at 337:15-340:19; JX 15. Comcast knew that proposal, too, was sure to lose money: even under Comcast's most profitable projection, the Network would require more than $160 million in capital to stay afloat before turning its first profit—of $2 million—in

2022.  *See id.* at 341:5-345:15, 347:20-348:9; Astros 25.  Comcast's proposal would have severely harmed the Astros: if the team did not make its pro rata contributions of capital, its equity would have been completely wiped out; if the team made those capital contributions, the net economic effect of its media rights fees would have been materially reduced.  *See id.* at 347:17-348:9.  The Astros could not—and did not—agree to Comcast's proposal.

Unable to reach a resolution by restructuring the partnership's governance provisions, Comcast then sought to purchase the Astros' equity interest in the Network.  In August, Comcast offered to purchase the Astros' equity interest based on an implied enterprise value of ▮▮▮▮.  *See* Dep. of T. Brown at 49:20-53:24.  The Rockets—who had to approve the Astros' sale of their equity interest to the Network under the GP Operating Agreement—requested that they be offered the same deal.  *See id.* at 54:9-21.  Comcast refused, and that proposal fell apart.  *See id.* at 55:20-56:21.

After Comcast failed to achieve its objectives through a business transaction, Comcast decided to file the Network for bankruptcy to prevent the Astros from exercising the contractual right to terminate its Media Rights Agreement on September 30.  Comcast Owner was required to obtain the consent of all partners to file the Network for a voluntary bankruptcy—so Comcast instead enlisted four affiliates to do indirectly what Comcast Owner was contractually prohibited from doing directly: file the Involuntary Petition against the Network on September 27.  Oct. 28, 2013 Hr'g Tr. (Ruth) at 312:9-11, 322:2-12; *id.* (Pick) at 434:2-435:10.

None of the Comcast Petitioning Creditors would have filed the Involuntary Petition but for Comcast Corporation's direction to do so.  The declarant for Comcast Lender, Robert Pick, admitted that "Comcast Lender is not the entity that made the decision to file the Involuntary Petition," Oct. 28, 2013 Hr'g Tr. (Pick) at 432:4-7—Comcast Corporation made that decision, *id.*

at 434:6-10.  The declarant for Comcast California, John Ruth, testified that "[i]t was Comcast Corporation that decided its subsidiaries would file an Involuntary Petition against Comcast SportsNet Houston," *id.* (Ruth) at 322:5-8, and he "knew to file a petition on behalf of Comcast California against the Network [] based on [his] discussion with Comcast in-house counsel," *id.* at 324:12-18.  The declarant for Comcast Services, Jon Litner, "learned of the bankruptcy filing from in-house counsel at NBC Universal."  Oct. 29, 2013 Hr'g Tr. (Litner) at 18:24-19:1.  The declarant for Comcast Media, Bruce Davis, "knew that Comcast Corporation had decided that some number, maybe [just] Comcast Media, but some number of Comcast affiliates would file Involuntary Petitions" against the Network, Oct. 28, 2013 Hr'g Tr. (Davis) at 276:5-9, and "learned of Comcast Corporation's decision to file Involuntary Petitions against the Network" from Marc Rockford, one of the four Comcast executives who made the decision and who had no position or role at Comcast Media, *id.* at 272:16-273:4.

None of the four declarants sought or obtained the approval of the management or board of directors for the entity that filed the Involuntary Petition.  *See* Oct. 28, 2013 Hr'g Tr. (Pick) at 433:1-10; *id.* (Davis) at 276:10-17; *id.* (Ruth) at 320:1-322:1; Oct. 29, 2013 Hr'g Tr. (Litner) at 19:2-20:1.  Three of the four declarants—Pick, Ruth, and Litner—are not even employed by the Comcast affiliate for which they submitted declarations.  *See* Oct. 28, 2013 Hr'g Tr. (Pick) at 428:25-429:1 (employee of Comcast Corporation, not Comcast Lender); *id.* (Ruth) at 309:12-14, 310:7-311:6 (employee of NBC Universal, not Comcast California); Oct. 29, 2013 Hr'g Tr. (Litner) at 12:10-23 (employee of NBC Universal, not Comcast Services).  However, they are all officers of Comcast Owner, the partner contractually prohibited from voluntarily filing the Network for bankruptcy without the consent of all partners.  Oct. 28, 2013 Hr'g Tr. (Pick) at 433:15-434:5; *id.* (Ruth) at 311:7-312:11; Oct. 29, 2013 Hr'g Tr. (Litner) at 12:10-23.  And two

of them—Ruth and Litner—are Comcast Owner's representatives on the board of directors that manages the Network.  Oct. 28, 2013 Hr'g Tr. (Ruth) at 311:7-312:11; Oct. 29, 2013 Hr'g Tr. (Litner) at 12:10-23.

Since its launch, the Network had paid all of debts to the Comcast Petitioning Creditors, and none had outstanding amounts due and owing from the Network at the time of filing on September 27.  Oct. 28, 2013 Hr'g Tr. (Ruth) at 327:8-14, 372:11-14.  The interest payment to Comcast Lender was not due until September 30, 2013.  *Id.* (Pick) at 431:16-18.  The management services fee to Comcast Services was not due and owing until October 15, 2013.  Oct. 29, 2013 Hr'g Tr. (Litner) at 15:13-16:4.  None of the approximately $10,000 amount allegedly due to Comcast Media was due and owing on September 27, given the parties' course of conduct.  Oct. 28, 2013 Hr'g Tr. (Davis) at 268:16-271:14.  None of the approximately $43,000 amount allegedly owed to Comcast California was due and owing on September 27, as four of the six invoices were generated that very day and the other two were not received until after the Involuntary Petition was filed.  *Id.* (Ruth) at 314:5-15, 315:12-316:15, 388:6-389:13; JX 32.  In fact, three of the Comcast Petitioning Creditors had no independent knowledge of the Network's finances, and the only one that did—Comcast Services—knew that the Network had sufficient cash to pay all of these amounts as they became due.  *Id.* (Pick) at 433:11-14; Oct. 29, 2013 Hr'g Tr. (Litner) at 18:11-23.

At bottom, Comcast directed four affiliates to file the Involuntary Petition, circumventing the contractual prohibition on a voluntary filing without consent.  As Comcast admitted, "the only reason that the Involuntary Petitions were filed on September 27th was to prevent the Astros from terminating its Media Rights Agreement with the Network" on September 30.  Oct. 28, 2013 Hr'g Tr. (Ruth) 326:17-21; *id.* (Pick) at 435:14-25.  Comcast seeks, through the

bankruptcy, to strip the Astros of their contractual consent rights—and worse, it is trying to buy the Network on the cheap.

Comcast's attempt to invoke the jurisdiction of this Court to override the Astros bargained-for contractual rights for its own economic gain is contrary to the Bankruptcy Code and precisely the bad faith that led the court to dismiss an involuntary petition in *In re Global Ship*, *Systems, LLC*, 391 B.R. 193 (Bankr. S.D. Ga. 2007). In that case, Global Ship was the alleged debtor. An equity holder in Global Ship, Drawbridge, was also the major lender to Global Ship. Global Ship defaulted on its loan, and Drawbridge issued a notice of foreclosure. *Id.* at 197. Like here, Global Ship's operating agreement prohibited Global Ship from "commencing a Voluntary Bankruptcy" without obtaining the consent of Drawbridge, as an equity holder. *Id.* at 199. Unable to file a voluntary bankruptcy petition, Global Ship, through its CEO, then "solicited, encouraged or perhaps urged" three alleged creditors of Global Ship to file an involuntary petition against it—in order to prevent Drawbridge from foreclosing on the loan. *Id.* The court found that the "involuntary case [wa]s a pure subterfuge for a voluntary petition" and that Global Ship's conduct—"the ruse of soliciting an involuntary case" to "circumvent[] the rights of Drawbridge"—constituted bad faith. *Id.* at 203-204. The court, therefore, dismissed the involuntary petition. *Id.* at 204.

So too here. As in *Global Ship*, Comcast was contractually prohibited from voluntarily filing the Network for bankruptcy without the Astros' consent. To circumvent that provision, and for the admitted purpose of preventing the Astros from terminating the Media Rights Agreement, Comcast directed four affiliates to file the Involuntary Petition against the Network—although none of those four entities had any amounts due and owing from the Network as of the Petition Date. Comcast circumvented the Astros' bargained-for consent rights

and caused its subsidiaries to do indirectly what it could not do directly.  It did so to prevent the Astros from terminating the Media Rights Agreement and thus to give Comcast a tactical advantage in the partners' business dispute.

This case presents precisely the bad faith that warrants dismissal.  *See In re Global Ship*, 391 B.R. at 203-204; *see also In re Brazos Emergency Physicians Ass'n, P.A.*, 471 F. App'x 393, 394 (5th Cir. 2012) (per curiam) (affirming dismissal of Chapter 11 petition filed to gain advantage in business dispute among partners) *In re Antelope Techs., Inc.*, 431 F. App'x 272, 274-75 (5th Cir. 2011) (per curiam) (affirming dismissal of Chapter 11 petition filed to gain advantage in dispute between minority and majority shareholders); *In re Sherwood Enters., Inc.*, 112 B.R. 165, 169 (Bankr. S.D. Tex. 1989) (dismissing involuntary petition where primary motivation was to re-litigate dispute), *judgment entered*, 4 Tex. Bankr. Ct. Rep. 116 (Bankr. S.D. Tex. Jan. 27, 1989); *In re Westerleigh Dev. Corp.*, 141 B.R. 38, 41 (Bankr. S.D.N.Y. 1992).[13]

### B.   The Rockets' And Landlord's Joinders Cannot Not Cure The Bad Faith By The Original Petitioning Creditors.

The joinders by the Rockets entities and the landlord do not save the Involuntary Petition from dismissal because, as a matter of law, they cannot cure the defect caused by Comcast's bad faith.  "[C]ourts have consistently held that an essential prerequisite for allowing joinder of additional creditors to cure a defective petition is that the original petition was filed in good faith."  *In re Alta Title Co.*, 55 B.R. 133, 137 (Bankr. D. Utah 1985).  Where, as here, the original petition was filed in bad faith, subsequent joinders under § 303(c), even if themselves in

---

[13]     Comcast's reliance on *In re Kingston Square Associates*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997) to absolve its bad faith behavior is misplaced.  Comcast Opp. at 18.  In *Kingston Square*, the petitioning creditors included unaffiliated third-party creditors, not wholly-owned subsidiaries acting at the direction of a parent corporation seeking to gain an edge in an intra-partnership dispute.  Further, the contract documents here—the partnership and media rights agreements—were designed precisely so that the Astros' media rights would not be directed by the other partners without the Astros' consent.  Finally, unlike in *Kingston Square*, this proposed bankruptcy would serve no legitimate purpose, because Delaware partnership law and trademark law prohibit a reorganization without the Astros' consent.  *See* Section I.

good faith, do not cure the original defect.  *See In re Mylotte, David & Fitzpatrick*, No. 07-1186bif, 2007 WL 2033812, at *8 (Bankr. E.D. Pa. July 12, 2007); *In re Braten*, 74 B.R. 1021, 1022 (Bankr. S.D.N.Y. 1987); *In re Alta Title*, 55 B.R. at 137.  "'The rationale is that public policy prohibits entertaining any case commenced upon a petitioner's conduct which amounts to fraud upon the court.'"  *In re Mylotte,* 2007 WL 2033812, at *8 (quoting 1 Norton Bankruptcy Law and Practice 2d 21:8 (2007)).  Thus, because the Comcast Petitioning Creditors' filing was in bad faith, the belated joinders of the Rockets and landlord do not cure the original bad faith—and the Involuntary Petition should be dismissed.

## IV.   THE INVOLUNTARY PETITION DOES NOT SATISFY SECTION 303.

### A.   The Requirements Of Section 303(b) Are Not Satisfied.

In addition to the fatal defect in the Involuntary Petition caused by Comcast's bad faith, the requirements of § 303(b) are not satisfied.  Section 303(b) requires at least three petitioning creditors with undisputed claims that are not "the subject of a bona fide dispute as to liability or amount."  11 U.S.C. § 303(b)(1).  A bona fide dispute exists where, as here, "there is an objective basis for either a factual or a legal dispute as to the validity of the debt."  *In re Norris*, 114 F.3d 1182, 1997 WL 256808, at *4 (5th Cir. 1997) (per curiam).  "[I]f there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, the petition must be dismissed."  *In re Norris*, 183 B.R. 437, 452 (Bankr. W.D. La. 1995).  In this regard, the Court does not "evaluate the potential outcome of a dispute, but merely … determine[s] whether there are facts that give rise to a legitimate disagreement over whether money is owed, or, in certain cases, how much."  *In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057, 1064 (9th Cir. 2002).

Two of the four Comcast Petitioning Creditors—Comcast Media and Comcast California—have alleged claims that, at the very least, are subject to bona fide disputes.  As set

forth in the Astros' Motion to Dismiss, the GP Operating Agreement requires "unanimous director approval" of the "entry into or consummation of any transaction between [the Network], on the one hand, and a Member, Partner or any of their respective Affiliates."  Oct. 10, 2013 Houston Astros' Mot. to Dismiss Involuntary Petition for Chapter 11 [Dkt. 97] at 15; GP Operating Agreement, Schedule C(7).  It is undisputed that the Network's board did not approve the Network's agreement with Comcast Media or Comcast California in violation of that provision.  Comcast Opp. at 8; Oct. 28, 2013 Hr'g Tr. (Ruth) at 312:21-24.  Instead, Comcast argues that Comcast Media's and Comcast California's claims are based on transactions that do not involve $100,000 or more in aggregate, and therefore director approval was not required. Comcast Opp. at 8.  As the evidence at the hearing confirmed, however, the Network's transactions with both Comcast Media and Comcast California involve more than $100,000 in the aggregate.

Comcast Media: Comcast Media provided transmission services—recording live events to tape and making duplicate copies—for the Network since the Network was first launched in October 2012.  Oct. 28, 2013 Hr'g Tr. (Buchanan) at 254:16-22; *id.* (Davis) at 283:23-25. Comcast Media has provided those services continuously since that time—on multiple days every month.  *Id.* (Buchanan) at 259:11-22; *see also* JX 23.  In 2012, Comcast Media provided more than $22,700 in services to the Network, and it has provided more than $48,000 in services since the Network's launch.  *See id.* (Davis) at 272:4-15; JX 13.  Moreover, as of the hearing, Comcast Media was forecasting more than $90,000 in revenue from services provided to the Network in 2013 alone.  *Id.* (Buchanan) at 262:21-24.  The verbal arrangement was unlimited in duration, and the Network never gave any indication that it will stop requesting services from the Comcast affiliate.  *See id.* at 257:17-258:16.  With more than $48,000 billed as of the Involuntary

Petition, Comcast Media's forecast of more than $90,000 in revenue from the Network in 2013, and the expectation that this arrangement will continue indefinitely in the future, at a minimum there is a genuine dispute as to whether the purported verbal arrangement involves more than $100,000 in the aggregate. Because the Network's board did not unanimously approve of the arrangement, there is a bona fide dispute regarding Comcast's Media's claim. Comcast Media, therefore, is not a qualifying creditor under Section 303(b).

Comcast California: Comcast California provided dual feed transmission services to the Network for Astros-Athletics games in Oakland, so that both networks could simultaneously telecast the game using one production truck. Oct. 28, 2013 Hr'g Tr. (Washington) at 294:1-295:10. The Network provided Comcast California with a reciprocal service for Athletics-Astros games in Houston. *Id.* at 299:9-19. These services were provided pursuant to the same alleged "verbal arrangement." *Id.* at 301:6-9. These dual feed services were provided for 15 games during the 2013 baseball season—eight games in Oakland and seven games in Houston. *Id.* at 295:21-296:5, 301:25-303:7. At approximately $7,000 per game, the aggregate total revenue for 15 games exceeds the $100,000 threshold. Accordingly, unanimous director consent was required but not obtained. At a minimum, there is a bona fide dispute regarding Comcast California's claim, and it therefore is not a qualifying creditor under § 303(b).

Bona fide disputes concerning two of the four Comcast Petitioning Creditors' claims means that there are less than three original petitioning creditors. The joinders by the Rockets and the landlord under § 303(c) do not satisfy the three-creditor requirement of § 303(b). As set forth above, *see* Section III.A, because the Involuntary Petition was filed in bad faith, subsequent joinders—even if in good faith—do not satisfy the numerosity requirement of § 303(b). Without three qualifying creditors, the requirements of § 303(b) are not satisfied.

50

### B.     The Requirements Of Section 303(h) Are Not Satisfied Because The Network Was Generally Paying Its Debts As They Became Due.

The Involuntary Petition should also be dismissed because, as the evidence in October confirmed, the requirements of Section 303(h) are not satisfied.  Section 303(h) allows the Court to order relief in an involuntary case "only if the debtor is generally not paying [its] debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."   11 U.S.C. § 303(h).   As the Fifth Circuit has held in considering whether the requirements of Section 303(h) are satisfied, a bankruptcy court may not "consider debts which have not [yet] become due" as of the date of the involuntary petition.  *In re Norris*, 1997 WL 256808, at *6.

The evidence at the October hearing demonstrated that the Network was generally paying its debts as they became due as of the Involuntary Petition.  The Network's total annual expenses were approximately $150 million: $50 million to operate the Network; $45 million in media rights fees to the Rockets; and $55 million in media rights fees to the Astros.  Oct. 28, 2013 Hr'g Tr. (Ruth) at 328:14-329:8.   In the year between the Network's launch and the Involuntary Petition, the Network paid nearly all of these expenses: it paid the $50 million in operational expenses; it paid all of the $45 million in media rights fees to the Rockets during the 2012-2013 basketball season; and it paid the first three media rights fees to the Astros, totaling $27.5 million, during the 2013 baseball season.  *Id.*  In fact, as of the Involuntary Petition on September 27, the Network had paid all of its debts except two media rights fees to the Astros, totaling $18 million.  *Id.* at 327:8-14.  None of the Petitioning Creditors—neither the four Comcast petitioners, the Rockets entities, nor the landlord—had any debts that were due and owing as of the petition date.  As Comcast's John Ruth testified: "The only payment problem at

51

the time [of the Involuntary Petition] was the Network was not able to pay its rights fees to the Astros." *Id.* at 328:8-11.

Comcast's response—that the timely payment of debts to the Petitioning Creditors "is not the issue," Comcast Opp. at 9—is unavailing.  Comcast does not cite a single case in which the requirements of Section 303(h) were satisfied where, as here, the only party with a debt due and owing as of the Petition Date is the movant seeking dismissal of the Involuntary Petition.  Three of the four cases that Comcast cites involved missed payments to unaffiliated third-party creditors.  *See In re Int'l Teldata Corp.*, 12 B.R. 879, 881 (Bankr. D. Nev. 1981); *In re All Media Props., Inc.*, 5 B.R. 126, 136-38 (Bankr. S.D. Tex. 1980), *aff'd per curiam*, 646 F.2d 193 (5th Cir. 1981), *overruled en banc by In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035 (11th Cir. 2008); *In re Midwest Processing Co.*, 41 B.R. 90, 93 (Bankr. D.N.D. 1984).  And the third decision—*In re Midwest Processing*—was reversed by the district court, which held that the petition should have been dismissed for the failure to comply with the three-creditor requirement and based on the petitioning creditor's bad faith.  *See Basin Elec. Power Co-op. v. Midwest Processing Co.*, 47 B.R. 903, 908, 911 (D.N.D. 1984), *aff'd*, 769 F.2d 483 (8th Cir. 1985).  The fourth case cited by Comcast involved a bankruptcy petition that was filed—not opposed—by the insider to whom the debt was owed.  *See In re The Food Gallery at Valleybrook*, 222 B.R. 480, 486-87 (Bankr. W.D. Pa. 1998).

Because there are no third-party creditors or even petitioning creditors with debts due and owing as of the petition date, the requirements of Section 303(h) are not satisfied.

## C.      The Astros Have Standing To Challenge The Involuntary Petition.

Non-debtor entities such as the Astros have standing to contest an Involuntary Petition when the circumstances so require.  *See* 11 U.S.C. § 303(d).  Where, as Comcast asserts here, there is a corporate governance deadlock that prevents an alleged debtor from responding to an

involuntary petition, equity holders in the debtor, like the Astros, have standing to contest the petition. *See, e.g.*, *In re Westerleigh Dev. Corp.*, 141 B.R. at 40; *In re Synergistic Techs., Inc.*, No. 07–31733–SGJ–7, 2007 WL 2264700, at *4-5 (Bankr. N.D. Tex. Aug. 6, 2007).

The decisions in *In re Westerleigh* and *In re Synergistic* are instructive. *In re Westerleigh* involved two 50% shareholders who were deadlocked as to how to operate their corporation. One caused his family-owned company to file an involuntary petition against the corporation, in order to gain an advantage in the ongoing dispute between the shareholders. The court held that the other shareholder had standing to challenge the involuntary petition in a motion to dismiss, explaining that when shareholders are deadlocked, "either shareholder should be afforded standing to contest an involuntary Chapter 11 petition filed against the corporation, especially when the petitioner is the family owned corporation of the other 50% shareholder." *In re Westerleigh*, 141 B.R. at 40.

*In re Synergistic* involved three 33.33% shareholders, one of which had filed an involuntary petition against the corporation based on his claim to be an unsecured creditor. *In re Synergistic,* 2007 WL 2264700, at *1. Another shareholder, Mandel, moved to dismiss the petition and for damages under Bankruptcy Code § 303(i). *Id.* at *1, 3. The court held that the fact that Mandel only held 1/3 of the equity in the corporation "did not deprive Mandel of continuing to prosecute the Motion to Dismiss and Motion for 303(i) damages." *Id.* at 5. The court explained "that, when there is a corporate governance deadlock that prevents a corporate debtor from taking a position with regard to an involuntary bankruptcy petition, the court should allow shareholders to assert positions on behalf of the alleged debtor." *Id.*

So too here. Comcast complains that the three partners are deadlocked, and the Network cannot respond to the Involuntary Petition as a result. Indeed, Comcast concedes that the

53

"Network lacks the practical ability to propose a plan."  Examiner Motion ¶ 7.  As a result, the Astros, as a partner in the Network, have standing to challenge the validity of the Involuntary Petition.

Comcast incorrectly claims that *Westerleigh* and *Synergistic* are "inapposite," because "neither case would authorize … a minority of the board of the alleged debtor to silence the will of the majority of the board, and then to substitute its minority voice for that of the now-silent alleged debtor."  Comcast Opp. at 5-6.  Neither *Westerleigh* nor *Synergistic* turned on whether the party contesting the petition was "a minority of the board" or a 50% owner.  *See Westerleigh*, 141 B.R. at 40; *Synergistic*, 2007 WL 2264700, at *5.  More importantly, the court in *Synergistic* expressly found that a minority board member had standing to challenge the petition in a case where unanimous consent was required and the shareholders were deadlocked.  *See Synergistic*, 2007 WL 2264700, at *5.

The Rockets also incorrectly claim that *Synergistic* stands for the proposition that the Astros "clearly do not have standing to challenge the Petition for their *own* benefit."  Oct. 21, 2013 Statement of the Rockets Entities in Supp. of Entry of an Order for Relief Under Chapter 11 [Dkt. 106] at 7.  Both *Synergistic* and *Westerleigh* involved shareholders who were working for their own benefit in disputes with other shareholders, and in neither case was the moving shareholder required to show that it was seeking to challenge the petition for the benefit of the debtor.

Finally, given that Comcast is attempting to circumvent the Astros' bargained-for right to prevent the General Partner from putting the Network into bankruptcy, it cannot be seriously disputed that the Astros are a party in interest with standing to prosecute the Motion to Dismiss, even if they are found not to have standing to contest the Involuntary Petition on the Network's

behalf.  *See In re Jr. Food Mart of Ark., Inc.*, 234 B.R. 420, 421-22 (Bankr. E.D. Ark. 1999) (as a party in interest, creditor had standing to move to dismiss involuntary petition even though it could not contest the petition on behalf of the debtor under Section 303).

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Astros' Motion to Dismiss and Reply In Support of Motion to Dismiss, the Astros respectfully request that the Court dismiss the Involuntary Petition.

Dated:  January 31, 2014

/s/  Paul M. Basta, P.C.

Harry A. Perrin
Duston K. McFaul
VINSON & ELKINS LLP
1001 Fannin Suite 2500
Houston, Texas 77002
Telephone: (713) 758-2548
Facsimile:  (713) 615-5016
hperrin@velaw.com
dmcfaul@velaw.com

Paul M. Basta, P.C. (*pro hac vice*)
Marc Kieselstein, P.C. (*pro hac vice*)
David S. Meyer (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
paul.basta@kirkland.com
marc.kieselstein@kirkland.com
david.meyer@kirkland.com

Jeffrey S. Powell (*pro hac vice*)
Thomas A. Clare, P.C. (*pro hac vice*)
John C. O'Quinn
Judson D. Brown (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile:  (202) 879-5200
jeff.powell@kirkland.com
thomas.clare@kirkland.com
john.oquinn@kirkland.com
judson.brown@kirkland.com

*Counsel for Houston Astros, LLC, Astros HRSN GP Holdings LLC and Astros HRSN LP Holdings LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Houston Astros' Closing

Brief in Support of Its Motion to Dismiss pleading was filed electronically on this 31st day of

January, 2014.  Notice of this filing is being served via ECF system on all parties except those

listed below:

**US Mail:**
Houston Regional Sports Network, L.P.
  d/b/a Octane Sports, LP
c/o its Registered Agent CT Corporation
System
350 N. St. Paul Street, Suite 2900
Dallas, Texas 75201

*Alleged Debtor*

**US Mail:**
Houston Regional Sports Network, L.P.
  d/b/a Octane Sports, LP
1201 San Jacinto, Suite 200
Houston, Texas 77002
Fax No. (713) 457-9105
Email: legal@comcastsportsnet.com

*Alleged Debtor*

  */s/  Paul M. Basta, P.C.*
  /s/  Paul M. Basta, P.C. (*pro hac vice*)