

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
02/12/2014

| | | |
|---|---|---|
| IN RE: | § | |
| **HOUSTON REGIONAL SPORTS** | § | **CASE NO: 13-35998** |
| **NETWORK, L.P.** | § | |
| Debtor. | § | |
| | § | **CHAPTER 11** |

## MEMORANDUM OPINION

Five creditors, each holding a claim not subject to a bona fide dispute, joined in an involuntary bankruptcy petition against the Houston Regional Sports Network, L.P. The Network did not answer the petition. The Houston Astros, a partner and creditor of the Network, alleges that the petition should be dismissed for bad faith and because of the futility of the Network's reorganization. Because the five creditors acted to preserve the Network's value, and because the Astros have shown no bad faith motive in the filing, the Court finds an absence of bad faith. Because the futility argument is based on a theory that a director appointed by the Astros has no fiduciary duty to the Estate, the futility argument also fails. If the Network does not proceed in chapter 11, it is certain to fail. An order for relief is appropriate.

### Background

**Network's Formation and Structure**

In 2003, the Astros and the Rockets formed the Network to broadcast the teams' games and other Houston professional sports programming on a single cable channel. ECF No. 64 at 10. In 2010, Comcast expressed interest in purchasing a part of the Network. Houston SportsNet Holdings, LLC (the "Comcast Partner") was subsequently admitted as a third limited partner in the Network. ECF No. 64 at 11. Comcast is the largest cable company in the United States and in the Houston metropolitan area. ECF No. 64 at 11. Through its various affiliates and

subsidiaries, Comcast owns and operates several regional sports networks around the country. ECF No. 64 at 11.

The Network is organized under Delaware law as a limited partnership among the Astros, the Rockets and the Comcast Partner.  ECF No. 64 at 11.  Pursuant to the Network's Limited Partnership Agreement, the Network is managed by its general partner, Houston Regional Sports Network, LLC.  The General Partner is also owned by the Astros, the Rockets and Comcast. ECF No. 64 at 12.

The board of the General Partner is comprised of four individual directors.  One is selected by the Astros, one is selected by the Rockets, and two are selected by Comcast.  ECF No. 64 at 12.

**The Media Rights Agreements**

The Astros' Media Rights Agreement is an agreement between the Astros and the Network.  It grants the Network exclusive rights to broadcast team programming in exchange for the payment of media rights fees.  ECF No. 64 at 13.  If the Network fails to make a required media rights payment, the Astros may terminate the Media Rights Agreement if the Network does not cure the default within 60 days.  ECF No. 64 at 13.  Pursuant to the Comcast Affiliation Agreement between Comcast and the Network, Comcast carries the Network on its cable system in exchange for a monthly subscriber fee.  ECF No. 64 at 14.  The Comcast Affiliation Agreement contains a most favored nations clause, requiring the Network to offer Comcast the lowest "base rate" offered to any other provider.  Hearing Transcript, ECF No. 140 at 343.  The director's unanimous consent is required before the Network can enter into new affiliation agreements.  ECF No. 64 at 14.

Although not the direct focus of the evidentiary hearings, the Network also has a Media Rights Agreement with the Rockets.

It is undisputed that the Network's principal assets are the Astros Media Rights Agreement and the Rockets Media Rights Agreement.

On July 31, 2013, the Network failed to make a required media rights payment to the Astros. ECF No. 64 at 15. On the same day, the Astros sent the Network a notice of default. ECF No. 64 at 15. The Network also failed to make the August 30, 2013 media rights payment and the Astros sent a second notice of default on September 3, 2013. ECF No. 64 at 15-16. The second notice of default stated that the Network had until September 29, 2013 to cure the default or the Astros would have the right to terminate the Media Rights Agreement. ECF No. 64 at 16.

## The Involuntary Petition and the Petitioning Creditors

On September 27, 2013, Comcast Sports Management Services LLC ("Comcast Services"), acting with National Digital Television Center, LLC ("Comcast Media"), Comcast SportsNet California, LLC ("Comcast California"), and Houston SportsNet Finance LLC ("Comcast Lender"), filed an involuntary chapter 11 petition against Houston Regional Sports Network, L.P.

On October 7, 2013, the Astros filed a Motion to Dismiss the involuntary petition. ECF No. 64. The evidentiary hearing on the Motion to Dismiss began on October 28, 2013 and was continued to October 29, 2013.

On October 28, 2013, Clutch City Sports & Entertainment, L.P. and Rocket Ball, Ltd. (two Rockets affiliated entities), filed Joinders to Involuntary Petition. ECF Nos. 130 & 132. On October 29, 2013, HP Fannin Properties (the Network's landlord), filed its Joinder to Involuntary Petition. ECF No. 133.

The final portion of the evidentiary hearing on the Astros' motion to dismiss was scheduled for February 4, 2014.  The sole purpose of the continued evidentiary hearing was to determine whether the additional petitioning creditors (i.e., the two Rocket's entities and the landlord) had joined the involuntary petition in good faith.  The Astros waived any evidentiary presentation, and stipulated that the additional petitioning creditors had not joined the involuntary petition in bad faith.

**Principal Events During the Involuntary Period**

At the close of the October 31, 2013 hearing, the Court issued its Order Regarding Third Party Negotiations.  ECF No. 137.  Because the principal owner of the Astros (Jim Crane) had persuasively testified that he could find profitable business deals for the Network, the Court designated the Astros to serve as lead negotiator on behalf of the Network in order to investigate and negotiate terms of carriage and other agreements pertaining to the formulation of a viable business plan for the Network.

The Astros never reported any substantial progress in the negotiations.  Immediately following a November 21, 2013 status conference at which the Astros indicated that they had nothing significant to report, an Astros' affiliate filed a major state court lawsuit against both Comcast and the Astros' former owners.  Among other things, the lawsuit alleges fraudulent conduct.  It is fair to say that the filing of the lawsuit raised understandable concerns as to whether the Astros should continue as lead negotiator.

On December 12, 2013, by agreement of the parties, the Court substituted the Rockets as the lead negotiator.

**Oral Ruling and Entry of Order for Relief**

The Court heard closing arguments on the motion to dismiss and whether involuntary relief should be granted on February 4, 2014.  Following argument, the Court orally issued preliminary findings of fact and conclusions of law.

An order for relief was issued against the Houston Regional Sports Network on February 4, 2014.

This Memorandum Opinion now substitutes for the oral findings and conclusions.

## Jurisdiction and Venue

This Court has jurisdiction over this involuntary petition under 28 U.S.C. § 1334.  Venue is proper under 28 U.S.C. § 1408.

## Statutory Application

**11 U.S.C. § 303**

11 U.S.C. § 303 provides as follows:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> > (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,325.00 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims
>
> (c) After the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section.

(d) The debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to the petition under this section.

(h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against this debtor in an involuntary case under the chapter under which the petition was filed, only if—

> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; or

> (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

**The Seven Putative Petitioning Creditors**

Seven entities filed or joined in the involuntary bankruptcy petition:

- Comcast Services

- Comcast Lender

- Comcast Media

- Comcast California

- Clutch City Sports & Entertainment, L.P.

- Rocket Ball, Ltd.

- HP Fannin Properties

An involuntary petition must be filed by three or more entities with non-contingent claims that are not subject to a bona fide dispute and aggregate at least $15,325.00. For the reasons set forth in detail below, the Court concludes that five of the creditors hold claims that are not subject to bona fide dispute, and that these claims aggregate far in excess of $15,325.00.

The five creditors are Comcast Services, Comcast Lender, Clutch City Sports & Entertainment, L.P., Rocket Ball, Ltd., and HP Fannin Properties.

**Comcast Services**

Comcast Services serves as the Network's manager pursuant to the Management Services Agreement executed October 29, 2010. ECF No. 64 at 15. Comcast Services provides these services in exchange for a fee, payable in quarterly payments of $1,293,750.00. Hearing Transcript, ECF No. 142 at 15. As of the Petition Date, the Network was current on its quarterly Management Fee payments, with the next payment due October 15, 2013. Hearing Transcript, ECF No. 142 at 15.

Jon Litner, the President of Comcast Services, testified that he made the decision to participate in the involuntary bankruptcy on behalf of Comcast Services. Hearing Transcript, ECF No. 142 at 47. Mr. Litner testified that he made the decision because he was concerned about the payment of the quarterly management fee owed to Comcast Services. Hearing Transcript, ECF No. 142 at 47. He was also aware that the Network defaulted on the Astros Media Rights Agreement and was concerned about the damage to the Network if the Media Rights Agreement were terminated. Hearing Transcript, ECF No. 142 at 47.

No party disputes that Comcast Services holds a non-contingent claim that is not subject to bona fide dispute. Subject to the "bad faith analysis" set forth below, Comcast Services is qualified as a petitioning creditor.

**Comcast Lender**

On October 29, 2010, Comcast Lender agreed to lend up to $100,000,000.00 to the Network. Hearing Transcript, ECF No. 140 at 463. As of the Petition Date, the loan was fully drawn. Hearing Transcript, ECF No. 140 at 463. The aggregate principal balance of the loan is

due on September 30, 2017.  Hearing Transcript, ECF No. 140 at 438.  As of the petition date, the Network was current on its quarterly interest payments with the next payment due on September 30, 2013.  Hearing Transcript, ECF No. 140 at 431.

Robert Pick, the Senior Vice President of Corporate Development for Comcast Corporation, testified that four Comcast executives made the decision to file the involuntary petition against the Network.  Hearing Transcript, ECF No. 140 at 434.  He testified that the reason for the filing was to protect the assets of the Network.  Hearing Transcript, ECF No. 140 at 435.  Mr. Pick testified that he was concerned, given the state of the Network, that it might not be able to make future interest payments and ultimately pay the $100,000,000.00 loan balance owing to Comcast Lender.  Hearing Transcript, ECF No. 140 at 465.  Mr. Pick further testified that he was aware of the default on the Astros Media Rights Agreement and that if the default were not cured and the Astros terminated the Media Rights Agreement, the Network would lose a valuable asset.  Hearing Transcript, ECF No. 140 at 465.

Without the Astros Media Rights, the Network will be unable to generate sufficient funds to repay the $100,000,000.00 that it owes to Comcast Finance.  Without the involuntary petition, the Astros Media Rights Agreement will be valueless to the Network.

Subject to the "bad faith analysis" set forth below, Comcast Lender is qualified as a petitioning creditor.

**Comcast Media**

Comcast Media records live programming for the Network.  Hearing Transcript, ECF No. 140 at 281.  Comcast Media charges the Network an hourly rate for performing these services. Hearing Transcript, ECF No. 140 at 282 & 284.  The services are provided based on oral agreements.  Hearing Transcript, ECF No. 140 at 284.  As of the petition date, Comcast Media

had not been paid for $10,517.50 worth of services provided to the Network. Hearing Transcript, ECF No. 140 at 285. The payment was not yet due as of the petition date. Pursuant to Schedule C (7) of the General Partner Agreement, the Network was prohibited from entering into certain types of contracts with Comcast Media without the unanimous consent of the directors of the Network's General Partner.

Bruce Davis, the Vice President of Finance and Accounting for Comcast Media, testified that he learned of Comcast Corporation's decision to file the involuntary petition from Comcast's in-house counsel, Mark Rockford. Hearing Transcript, ECF No. 140 at 272. Mr. Davis reviewed what was owed to Comcast Media from the Network and made the decision that it was in Comcast Media's best interest to be a petitioning creditor. Hearing Transcript, ECF No. 140 at 287. Mr. Davis testified that he felt that filing the petition was Comcast Media's best opportunity to receive payment for services that had been previously rendered to the Network. Hearing Transcript, ECF NO. 140 at 289.

As set forth above, the claims held by a petitioning creditor must not be subject to bona fide dispute. *See, e.g. In re Sims*, 944 F.2d 210, 221 (5th Cir. 1993) (citing *B.D.W. Assoc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989) (a bona fide dispute exists if there are "substantial' factual and legal questions raised by the debtor" bearing upon the debtor's liability)).

To determine whether the Comcast Media oral agreements run afoul of Schedule C of the General Partner Agreement, a court would be required to conduct evidentiary hearings and resolve factual disputes between the parties. These include the expected term of the services, the expected value of the services, and whether the provisions of Schedule C were waived through

various budgetary approvals.   The Court concludes that the claim is subject to a bona fide dispute.

Accordingly, Comcast Media does not qualify as a petitioning creditor.

**Comcast California**

Comcast California provides dual feed services to the Network when the Astros play the Oakland A's in Oakland.   Hearing Transcript, ECF No. 140 at 294.   This dual feed service allows one production team to telecast the game on both networks, Comcast California and the Network.   Hearing Transcript, ECF No. 140 at 294.   There is an oral agreement between Comcast California and the Network for this service.   Hearing Transcript, ECF No. 140 at 293. As of the petition date, the Network had a liability to Comcast California of $43,129.02.   Hearing Transcript, ECF No. 140 at 313.   Payment was not past due. Pursuant to Schedule C (7) of the General Partner Agreement, the Network was prohibited from entering into certain types of contracts with Comcast California without the unanimous consent of the directors of the Network's General Partner.

John Ruth testified that as an officer of Comcast California, he decided to file the involuntary petition against the Network.   Hearing Transcript, ECF No. 140 at 319.   Mr. Ruth testified that he knew to make the decision on behalf of Comcast California based on his discussion with Comcast's in-house counsel.   Hearing Transcript, ECF No. 140 at 322.   Mr. Ruth further testified that to his knowledge, the only reason the involuntary petition was filed was to prevent the Astros from terminating its Media Rights Agreement with the Network.   Hearing Transcript, ECF No. 140 at 326.   Mr. Ruth testified that he thought filing the involuntary petition was in the best interest of Comcast California given the cash position of the Network and the

potential termination of the Astros Media Rights Agreement.  Hearing Transcript, ECF No. 140 at 383.

To determine whether the Comcast California oral agreements run afoul of Schedule C of the General Partner Agreement, a court would be required to conduct evidentiary hearings and resolve factual disputes between the parties.  These include the expected term of the services, the expected value of the services, and whether the provisions of Schedule C were waived through various budgetary approvals.  The Court concludes that the claim is subject to a bona fide dispute.

Accordingly, Comcast California does not qualify as a petitioning creditor.

**Clutch City Sports & Entertainment, L.P.**

Clutch City, a Rockets affiliate, leases a suite at Toyota Center to the Network.  In its October 28, 2013 joinder to the involuntary petition, Clutch City alleges that the annual rent due on the lease is $312,965.50.

No party has suggested that any dispute exists regarding Clutch City's claim.  Clutch City qualifies as a petitioning creditor.

**Rocket Ball, Ltd.**

Rocket Ball is also a Rockets affiliate.  It is the counter-party party to the Rockets Media Rights Agreement with the Network.  Based on the testimony at the hearing, multi-million dollar annual fees are payable under the Rockets Media Rights Agreement.

No party has suggested that any dispute exists regarding Rocket Ball's claim.  Rocket Ball qualifies as a petitioning creditor.

**HP Fannin Properties.**

HP Fannin is the Network's landlord at its principal location. In its October 29, 2013 joinder to the involuntary petition, HP Fannin alleges that future rent due under its lease with the Network will exceed $12,000,000.00.

No party has suggested that any dispute exists regarding HP Fannin's claim. HP Fannin qualifies as a petitioning creditor.

**Standing to Contest Petition**

Although the Astros seek to contest the involuntary petition filed against the Network, only the alleged debtor or its general partner may contest an involuntary petition. 11 U.S.C. § 303(d). Accordingly, creditors lack standing to contest an involuntary petition. *In re Global Ship Systems, LLC*, 391 B.R. 193, 201 (Bankr. S.D. Ga. 2007); *see also In re QDN, LLC*, 363 F. App'x. 873, 876 (3d Cir. 2010).

The Astros cite to case law that holds that a shareholder may contest an involuntary petition when there is corporate deadlock that prevents the debtor from answering the petition. *See In re Synergistic Technologies, Inc.*, 2007 WL 2264700, at *4 (Bankr. N.D. Tex. Aug. 6, 2007).

However, the Network does not suffer from a corporate deadlock problem as it relates to answering the involuntary bankruptcy petition. Schedule C to the General Partner Agreement enumerates the actions for which unanimous consent of the directors is required—answering an involuntary bankruptcy petition does not require unanimous consent. The Network was not prevented from answering the petition due to corporate deadlock; it merely chose not to answer the petition.

The General Partner has four directors.  Three of the four are affiliated with entities that filed or joined the involuntary petition.  There is no deadlock.  Indeed, there is no evidence that the Astros ever asked the General Partner or the Network to oppose the petition.  Had the Astros asked for the General Partner to oppose the petition (directly or through the putative debtor), the majority of directors would have voted against the opposition.  Accordingly, no exception to the requirement set forth in § 303(d) (if such an exception even exists) can be invoked by the Astros.

Because the petition was not contested by the Network, and because no other party has standing to contest the allegations in the petition, the allegations in the involuntary petition are deemed admitted and relief must ordinarily be issued.  11 U.S.C. § 303(h).

### Bad Faith Allegations

While the Court finds that the Astros do not have standing to contest the involuntary petition under § 303, the Astros also assert that the involuntary petition was filed in bad faith. The Court will thoroughly consider the bad faith allegations.   In analyzing the bad faith allegations, the Court will consider both the Astros allegations of subjective bad faith and the allegations of objective bad faith.

The subjective bad faith allegations center on whether Comcast acted in derogation of the General Partner Agreement when it orchestrated the filing of the involuntary petition.  The objective bad faith allegations center on whether the attempt to reorganize the Network's finances is futile.

### Subjective Bad Faith

Before analyzing Comcast's conduct, the Court notes that the parties stipulate that HP Fannin, Clutch City and Rocket Ball did not act in bad faith when they joined the petition. Accordingly, the "subjective" bad faith analysis will be outcome determinative only if HP

Fannin, Clutch City and Rocket Ball can be barred from filing a joinder if the original involuntary petition was filed in bad faith.

Under 11 U.S.C. § 303(c), the additional petitioning creditors "may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section."   Nevertheless, some bankruptcy courts have incorrectly decided not to utilize the statutory relation back requirement.   Instead, those Courts have held that an additional petitioning creditor, acting in good faith, may not cure a petition originally filed in bad faith.   *See In re Alta Title, Co.,* 55 B.R. 133, 137 (Bankr. D. Utah 1985); *In re Mylotte, David & Fitzpatrick,* 2007 WL 2033812, at *8 (Bankr. E.D. Pa. July 12, 2007); *In re Braten*, 74 B.R. 1021, 1022 (Bankr. S.D.N.Y. 1987).

Respectfully, those opinions miss the point.   If involuntary relief is appropriate, then additional petitioning creditors, acting in good faith, must be allowed to preserve their rights to maximize a recovery through a bankruptcy case.   The only Circuit Court to have ruled on the issue agrees.   *Fetner v. Haggerty,* 99 F. 3d 1180 (D.C. Cir. 1996) ("[T]here is a panoply of weapons in a court's arsenal to deal with bad faith petitioners without depriving valid creditors of their statutory right to join the bankruptcy petition.")   Other courts have similarly held that later-joining creditors are not tainted by the alleged bad faith of the original petitioners.   *See In re FKF Madison Park Grp. Owner,* LLC, 435 B.R. 906, 908 (Bankr. D. Del. 2010); *In re Trans-High Corp.,* 3 B.R. 1, 4 (Bankr. S.D.N.Y. 1980).

Accordingly, the Court concludes that the three additional petitioning creditors' uncontroverted joinders were not filed in bad faith and are not tainted with any allegations against the Comcast entities.

Nevertheless, for the purpose of completeness, the Court considers whether Comcast Lender and Comcast Services (the two original petitioning creditors whose debts are not subject to a bona fide dispute) acted in bad faith. Although the Court finds the factual issue to be a close one, the Court concludes that Comcast Lender and Comcast Services did not act in bad faith.

The evidentiary record demonstrates what would have occurred if an involuntary petition had not been filed. In that instance, the Astros would have (quite properly) terminated the Network's rights under the Media Rights Agreement. The Network would have had continuing losses, and no meaningful opportunity to become profitable. The Network would have failed, and Comcast Lender and Comcast Services would not have been repaid.

Comcast Partner (an affiliate of Comcast Lender and of Comcast Services) was bound by the organizational documents. The Network was managed by its General Partner. The General Partner could only place the Network into bankruptcy by the unanimous consent of its directors. *See Section 5.10 and Schedule C(19) to LLC Agreement.*

There is a minor skirmish between the parties concerning whether the filing of an involuntary bankruptcy petition was governed by the unanimous consent provision. Paragraph 19 of Schedule C of the LLC Agreement requires unanimous approval for "Any liquidation, dissolution, winding up or voluntary filing of a petition for bankruptcy or receivership of the Company, the Network or any of their respective Subsidiaries."

The natural reading of paragraph 19 only bars a voluntary petition. The Court is unaware of any involuntarily filed involuntary petition in reported history. The language must naturally be read to deal with a voluntary petition by the company rather than a voluntarily filed involuntary petition against it. Moreover, the prohibition deals with the management of the Network. It does not purport to deal with the conduct of the individual members acting on their

own behalf.  The Court concludes that the filing of an involuntary petition was not barred by this paragraph.

The Astros alternatively argue that the collusion between the Comcast entities was so pervasive that the Court should impute bad faith.  The Astros argue that since Comcast Partner was barred from invoking a voluntary bankruptcy filing without the Astros' consent, the orchestration of an involuntary filing should be deemed a bad faith "end run" around the unanimity provisions in the General Partner agreement.

The Court concludes that an end run of the provision does not necessarily lead to a conclusion that Comcast acted in bad faith.  Not every contractual breach is done in bad faith.  If Comcast Partner made an end run around the contract (or even breached it), then Comcast Partner may be liable for damages.  That is a far cry from bad faith.

The evidence reflects that the original involuntary petition was orchestrated by Comcast for the purposes of preserving value and rehabilitating the Network.  The filing of the involuntary petition was not an act of the Network.  It was the act of the Comcast petitioning creditors.  Even if done in breach of the spirit of the governance documents, and in collusion with Comcast Partner, the filing was not done in bad faith.  A thoughtful opinion in a similar situation was issued by the United States Bankruptcy Court for the Southern District of New York.  *In re Kingston Square Associates,* 214 B.R. 713 (Bankr. S.D.N.Y. 1997).  In sum, when the petitioning creditors act with the intention of preserving the Estate, the sole fact that a voluntary filing was precluded by state-law organizational documents will not make the involuntary petition one filed in bad faith.

Indeed, at the heart of the "bad faith" cases cited by the Astros, the petitioning creditors did not intend to promote a legitimate reorganization.  This case is different.  The purpose of the

involuntary petition was to preserve value and give a meaningful opportunity for the Network to reorganize.  There is no bad faith.

**Objective Bad Faith**

The Astros argue that an order for relief against the Network should not be issued because any attempt at reorganization would be futile.  The futility argument arises both as part of the alleged bad faith and under 11 U.S.C. § 1112(b)(4)(A) (providing for dismissal or conversion if there are continuing losses combined with an absence of a "reasonable likelihood of rehabilitation.")  The syllogism of the futility argument is:

- Based on the Network's partnership agreement, the Astros must consent to any plan of reorganization.

- The Network's partnership agreement allows the Astros to vote in its own best interest, without regard to any fiduciary duty to the partnership.

- The Astros will veto any plan of reorganization.

It is true that the Network was created in a manner to disclaim any state-law fiduciary responsibilities by the partners.  The Network is a limited partnership.  The limited partnership has a single general partner.  The General Partner is operated through four directors.  Two directors are selected by Comcast, one is selected by the Rockets and one is selected by the Astros.

Although many routine decisions are made by majority vote, many significant decisions require a unanimous vote.  Accordingly, absent a bankruptcy case, the Astros allege that its selected director can vote against any significant change that might be incorporated in a chapter 11 plan of reorganization.[1]

---

[1] The Court expresses no view on the validity of the disclaimers under applicable State law.

The Network holds valuable media rights agreements from both the Astros and the Rockets.  Moreover, Mr. Crane (the Astros' principal owner) testified that Comcast had failed to enable the partnership to capitalize on opportunities.  Importantly, Mr. Crane testified that the Network could be run profitably.  Although this newly formed entity has never turned a profit, the Court concludes that the Network can be run profitably.  The undisputed testimony is that the Network holds extremely valuable media rights.  Those media rights only have value if they can produce revenue.

It is certainly true that the historical operations of the Network have been problematic. Comcast Services brought several formal or informal proposals for affiliation agreements to the Network.  ECF No. 64 at 15.  The Astros, believing that these proposals would have undervalued the Network's services, rejected each proposal.  ECF No. 64 at 15.  Although Comcast has complained about the Astros' rejection, the proposals made by Comcast would not have led to a profitable network.  The proposals were appropriately rejected by the Astros.

The Court largely accepts the Astros' version of pre-petition events and the Astros' view of the Network's potential.  In summary:

- Comcast Services never presented a business plan that would be profitable.

- The Network, if properly operated, will be profitable.

- With the right management, the Network can expand its revenues and contract its expenses to be a viable entity.

The issue is whether the Network's state-law structure renders a bankruptcy estate incapable of taking advantage of its own profitability potential.  The Astros argue that—even in bankruptcy—the Astros' selected director will veto business deals that are profitable for the

Network so that the Astros will be relieved of their obligations under the Media Rights Agreement.[2]

For a number of reasons, the Court rejects the Astros' futility argument.

**Evidence Does Not Support Astros' Veto Threat**

Although the Astros argue that they will veto any arrangement that might be proposed, that argument is simply not supported by the evidentiary record.  Indeed, the thrust of Mr. Crane's testimony was:

- He had historically exercised his veto rights when Comcast had presented unprofitable business plans; and

- He would not have exercised his veto rights if he had been presented with a business plan that made economic sense.

At trial, the Astros confronted allegations made against them by Comcast.  Comcast alleged that the Astros would veto any proposal, even if it was profitable for the Network.  That allegation was contrary to the evidentiary record.  The evidence reflects that the Astros would have supported a business plan for a viable Network.  A memo from the Astros' representative contained the following:

> In order for HRSN to conduct its business appropriately, the owners of the company and its representatives must know what plan they are trying to achieve, and what deals are required to make HRSN financially viable.  Continuing to proceed without a legitimate business plan places HRSN's future in jeopardy.  We are available to work on a new plan to discuss this future further at your convenience.  We disagree with you regarding your reading of the documents, but we prefer to focus on fixing the plan.

Petitioning Creditors Ex. 22.

---

[2] At oral argument on the Astros' motion for a stay pending appeal, the Astros equivocated on whether the Astros would actually exercise veto rights.  The Astros were unequivocal in their argument that they possess veto rights even after the entry of the order for relief.

When asked about whether the memo was consistent with the Astros' position, Mr. Crane responded "Yes." Hearing Transcript, ECF No. 140 at 139.

The Court then inquired as to whether Mr. Crane believed that the business could be profitable. He responded "Yes, it can make money." Hearing Transcript, ECF No. 140 at 147. However, despite his repeated requests to Comcast to receive an alternative business plan, Comcast failed to propose one. Hearing Transcript, ECF No. 140 at 140. The fact that Comcast would not propose a plan is a fact that the Estate may address in its bankruptcy case. The fact that a viable business plan is available is a fact that disproves futility of the reorganization process. Indeed, when the four directors act in unison to implement their fiduciary responsibilities, history is unlikely to be repeated.

Based on the undisputed evidence of Mr. Crane's past intention to support a business plan that was viable, and Mr. Crane's statement that a viable business plan can be formulated, the Court rejects the theory that the Astros will not support a profitable business plan in the future.

### Directors Will Serve as Fiduciaries

With the entry of the order for relief, management became duty-bound to meet fiduciary responsibilities.[3] As fiduciaries, the Court expects that the four directors will act in the best interest of the Network. Although the Astros threaten to have their appointed director veto any arrangement (with the intention of terminating the Astros' Media Rights Agreement),

---

[3] The parties have not fully briefed the issue of the director's fiduciary responsibilities. Although the Court strongly believes that the directors have fiduciary responsibilities, the Court is not reaching a final conclusion on this matter until and unless an alleged breach of the duty occurs. Instead, the Court describes the reasons why it has concluded—on a preliminary basis—that fiduciary responsibilities exist. At this very early stage, the issue is whether the case is futile. Accordingly, the Court describes why it presently believes that fiduciary duties exist. If they do exist, the case is not futile. This opinion is not a final determination on the extent of the director's fiduciary responsibilities.

implementation of such a wholesale threat would be a breach of the Astros-appointed-director's fiduciary duty.

When an order for relief is issued in an involuntary bankruptcy case, an estate is formed. 11 U.S.C. § 541(a).  In a chapter 7 bankruptcy case, the estate is administered by a trustee.  11 U.S.C. § 323; 11 U.S.C. § 701 et seq.  The chapter 7 trustee is a fiduciary to the Estate. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343 (1985).  Although state-law established duties exist prior to entry of an order for relief, "bankruptcy causes fundamental changes in the nature of corporate relationships."  *Id.* at  355.

In a chapter 11 case in which no trustee is appointed, the fiduciary duties to the Estate rest with a debtor-in-possession's directors.  "Respondents also ignore that if a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession."  *Id.*  "*Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee."  Id., citing Wolf v. Weinstein,* 372 US 633, 651 (1963).

When a chapter 11 case is commenced, the chapter 11 debtor-in-possession assumes the fiduciary duties of the chapter 7 trustee.  11 U.S.C. § 1107.  *Cunningham v. Healthco, Inc.,* 824 F.2d 1148, 1459 (5th Cir. 1987).

It is no surprise that the Fifth Circuit (and every Circuit opinion located by the Court) treats the debtor-in-possession as a fiduciary.  "A *sine qua non* in restructuring the debtor-creditor relationship is the court's ability to police the fiduciaries, whether trustees or debtors-in-possession …, who are responsible for managing the debtor's estate in the best interest of

creditors." *In re Southmark Corp.,* 163 F.3d 925, 931 (5th Cir. 1999).   Indeed, in *Southmark,* Judge Jones emphasizes the need to assure that the "managers of the debtors are performing their work conscientiously and cost-effectively." *Id.*

The Astros would have the Court accept a unique proposition.   The Astros argue that because the Network is a partnership whose governance is determined by state law, the Estate has no fiduciary.   The Court will not turn decades of bankruptcy law on its head to allow the Astros to pre-empt the reorganization process by having this case dismissed.   As in *Weintraub,* this Court holds that the fiduciary duties to a bankruptcy estate may not be absolved by any state-law concepts to the contrary.

Comcast and the Rockets acknowledge that their selected directors will act as fiduciaries to the Estate.   The Astros argue that the parties have created a bankruptcy remote structure that absolves its director's fiduciary responsibilities. The Court rejects the concept.   The Network is run by a general partner, and the Astros' director serves as a director of the non-debtor general partner.   The individuals who manage the Estate's affairs—whether "officers and managing employees" (*See Weintraub* at 355) or puppeteers acting through a general partner—must respect the fiduciary sanctity of the operation of a bankruptcy estate.

In connection with the Astros' motion for a stay pending appeal, the Court required the Astros to file a list of federal court cases holding that the individuals making decisions for a chapter 11 debtor-in-possession would not be required to act in the Estate's best interest.   In response, the Astros acknowledge that no such cases exist.

The "lead case" cited by the Astros fails to provide any meaningful support for the Astros' proposition.   *In re Manor Place Development Associates, L.P.,* 144 B.R. 679 (Bankr. D.N.J. 1992).   *Manor Place* principally deals with the ability to alter a partnership agreement

under the executory contracts provisions of the Bankruptcy Code.  Notably, the Court described

what it was *not holding*:

> Likewise, the citation to *In re Hospitality Association of Tappen Zee, Ltd.,* 102 B.R. 369 (Bankr.S.D.N.Y.1989) is not on point. This case was cited by the Creditors' Committee for the proposition that a general partner, under New York law, can be removed by a court notwithstanding the language of a partnership agreement. **Even though this citation is to a bankruptcy court case, it is clear that it was in the United States District Court of New York where a limited partner obtained an order removing the general partner because the general partner had breached his fiduciary obligations to the partnership.** There are no such allegations before this court.
>
> This Court perceives from a review of the pertinent case law that **where bankruptcy courts have modified partnership agreements their holdings have been on narrow grounds, and essentially to preserve the partnership Debtors' economic interests. But here the economic interests of the partnerships are not an issue.**

*In re Manor Place Development Associates, L.P.,* 144 B.R. 679, 686-687 (Bankr. D.N.J.

1992) (emphasis added).

To be sure, the Astros need not continue to appoint an individual to serve on the board of

the General Partner.  The Astros may leave a seat vacant, may appoint a third party who will

serve as a fiduciary, or may determine an alternative course of action.  But, individuals who

choose to serve on the board of the General Partner must honor fiduciary responsibilities.

Moreover, the fiduciary duties described in this Memorandum Opinion are not owed by

the Astros.  The duties are owed by the director selected by the Astros.  If the Network chooses a

course of action that is against the Astros' interests, the Astros may fully participate in hearings

and oppose the actions.  The Astros do not leave their armor at the Courthouse door.  In

particular, the Astros argue that certain actions may be precluded by the Astros' Media Rights

Agreement.  The Astros will have the full opportunity to defend those rights.

**Astros May Not Cause Alleged Futility**

The Astros' futility argument turns "bad faith" law on its head.  It is true that the petitioning creditors may not sustain an involuntary chapter 11 bankruptcy petition if a chapter 11 case would be futile.  In this case (and contrary to the evidentiary record), the Astros now argue that the Astros, by exercising veto rights through its appointed director, can render any hope of reorganization to be futile.  In this case, the alleged "futility" arises only because of the Astros' unsupported threats to cause a director to breach his duties.  The Court is unaware of any case law that would support a dismissal based on futility that is engineered by the party seeking the dismissal.

**Conclusion**

For the reasons set forth in this Memorandum Opinion, the Court concludes:

- The Network owns valuable assets.

- There is a reasonable possibility that the Network can operate profitably.

- The Network's managers have fiduciary duties to the Estate.

- In exercising their fiduciary duties, the Network's managers will act to promote the Debtor's long-term profitable operation.

- The Network's reorganization is far from futile, and there are substantial financial interests to protect.

- The original involuntary petition was not filed in bad faith.

- The three creditors who later joined the involuntary petition did not join in bad faith.

Under these circumstances, the Court must enter relief against the Houston Regional Sports Network, L.P.

SIGNED **February 12, 2014.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE