## EXHIBIT B

## INVESTMENT AGREEMENT

*Execution Copy*

# INVESTMENT AGREEMENT

among

AT&T TELEHOLDINGS, INC.

DIRECTV SPORTS NETWORKS, LLC

ASTROS HRSN LP HOLDINGS LLC

HOUSTON ASTROS, LLC

ROCKETS PARTNER, L.P.

ROCKET BALL, LTD.

HOUSTON REGIONAL SPORTS NETWORK, L.P.

and

HOUSTON REGIONAL SPORTS NETWORK, LLC,


**AUGUST 6, 2014**

## TABLE OF CONTENTS

ARTICLE 1        DEFINITIONS........................................................................ 2
    Section 1.01        Definitions................................................................. 2
    Section 1.02        Other Definitional and Interpretative Provisions................................ 10

ARTICLE 2        CONVERSION OF HRSN AND ISSUANCE AND PURCHASE OF COMMON UNITS .................................................................... 11
    Section 2.01        Reorganization of HRSN .................................................. 11
    Section 2.02        Issuance and Purchase of Common Units.......................... 11
    Section 2.03        Closing .......................................................................... 12

ARTICLE 3        REPRESENTATIONS AND WARRANTIES RELATING TO HRSN....... 13
    Section 3.01        Bankruptcy Court Orders ............................................... 13
    Section 3.02        Capitalization ................................................................ 13
    Section 3.03        Organization and Authority of Majority Owners and HRSN-GP..... 14
    Section 3.04        Organization; Authority and Qualification of HRSN ....................... 14
    Section 3.05        Compliance with Laws; Permits .................................... 15
    Section 3.06        No Conflicts; Consents.................................................. 15
    Section 3.07        Financial Advisors and Brokers .................................... 16
    Section 3.08        Foreign Corrupt Practices Act ...................................... 16
    Section 3.09        Financial Statements and Reports.................................. 16
    Section 3.10        Absence of Certain Changes or Events........................... 17
    Section 3.11        Ownership of Property; Real Estate; Liens..................... 17
    Section 3.12        Condition and Sufficiency of Assets.............................. 17
    Section 3.13        Labor and Employment Matters .................................... 18
    Section 3.14        Taxes ............................................................................. 20
    Section 3.15        ERISA ........................................................................... 22
    Section 3.16        No Litigation ................................................................. 25
    Section 3.17        Intellectual Property...................................................... 25
    Section 3.18        Insurance ....................................................................... 26
    Section 3.19        Contracts ....................................................................... 26
    Section 3.20        Books and Records ........................................................ 28
    Section 3.21        Exemption from Registration......................................... 28
    Section 3.22        HRSN-GP Actions ........................................................ 28

ARTICLE 4        REPRESENTATIONS AND WARRANTIES OF THE INVESTORS........ 29
    Section 4.01        Organization and Authority .......................................... 29
    Section 4.02        Authorization of Agreements......................................... 29
    Section 4.03        Consents; No Conflicts ................................................. 29
    Section 4.04        Financial Advisors and Brokers.................................... 29
    Section 4.05        Ownership of Equity Interests; Purpose of Investment ................... 30
    Section 4.06        Sufficient Cash for Each Investor ................................. 30
    Section 4.07        No Other Representations .............................................. 30

ARTICLE 5        PRE-CLOSING COVENANTS ........................................................ 30
    Section 5.01        Bankruptcy Filings, Covenants and Agreements............................ 30
    Section 5.02        No Solicitation of Alternative Transactions ...................... 32

Section 5.03        Accounting Policies ............................................ 34
Section 5.04        Postpetition Transactions and Settlements.......................... 34
Section 5.05        Taxes ........................................................ 34
Section 5.06        No Title IV Liability .......................................... 35
Section 5.07        Claims ....................................................... 35
Section 5.08        Conduct of Business .......................................... 35
Section 5.09        Data Room Documentation...................................... 36

ARTICLE 6        ADDITIONAL COVENANTS ................................. 37

Section 6.01        Information Rights and Access .................................. 37
Section 6.02        Publicity .................................................... 37
Section 6.03        Transaction Court Documents ................................... 38
Section 6.04        Tax Matters .................................................. 38
Section 6.05        Confidentiality ............................................... 40
Section 6.06        Release ...................................................... 41
Section 6.07        Liquidation of HRSN-GP ....................................... 41
Section 6.08        Comcast Benefit Plans ........................................ 41

ARTICLE 7        CONDITIONS ........................................... 42

Section 7.01        Conditions to the Investors', HRSN's, HRSN-GP's and the
                    Majority Owners' Obligations ................................... 42
Section 7.02        Conditions to the Investors' Obligations ........................... 42
Section 7.03        Conditions to HRSN's Obligations................................ 44

ARTICLE 8        TERMINATION .......................................... 44

Section 8.01        Termination of Agreement...................................... 44
Section 8.02        Effect of Termination.......................................... 46

ARTICLE 9        INDEMNIFICATION ...................................... 47

Section 9.01        Survival of Representations and Warranties........................ 47
Section 9.02        Indemnification By the Majority Owners, Astros Team and
                    Rockets Team................................................. 48
Section 9.03        Indemnification By the Investors................................. 49
Section 9.04        Indemnification Procedures; Matters Involving Third Parties.......... 49
Section 9.05        Limitations on Liability/Exclusive Remedies....................... 51

ARTICLE 10        MISCELLANEOUS ...................................... 51

Section 10.01        Specific Performance .......................................... 51
Section 10.02        Notices ...................................................... 52
Section 10.03        Entire Agreement; Amendment ................................. 54
Section 10.04        Counterparts ................................................. 54
Section 10.05        Governing Law; Jurisdiction.................................... 54
Section 10.06        Successors and Assigns........................................ 55
Section 10.07        No Third-Party Beneficiaries ................................... 55
Section 10.08        HRSN Disclosure Schedules.................................... 55

- ii -

EXHIBITS

| EXHIBIT A | HRSN Disclosure Schedules |
| EXHIBIT B | Investor Disclosure Schedules |
| EXHIBIT C | Form of Disclosure Statement |
| EXHIBIT D | Form of Plan |
| EXHIBIT E-1 | Form of Rockets Media Rights Agreements |
| EXHIBIT E-2 | Form of Astros Media Rights Agreements |
| EXHIBIT F | Form of Certificate of Formation |
| EXHIBIT G | Form of Certificate of Conversion |

SCHEDULES

| Schedule 1.01(a) | HRSN Knowledge Group |
| Schedule 7.02(e) | Material Contract Consents |
| Schedule 7.02(g) | Closing Approvals |

40797198
US_ACTIVE:\44521177\14\53356.0124

# INVESTMENT AGREEMENT

THIS INVESTMENT AGREEMENT (together with all exhibits and schedules hereto and as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof, the "**Agreement**"), dated as of August 6, 2014 (the "**Execution Date**"), is by and among AT&T TELEHOLDINGS, INC., a Delaware corporation ("**ATT**"), DIRECTV SPORTS NETWORKS, LLC, a Delaware limited liability company ("**DTV**" and, together with ATT, the "**Investors**"), ASTROS HRSN LP HOLDINGS LLC, a Delaware limited liability company ("**Astros**"), ROCKETS PARTNER, L.P., a Delaware limited partnership ("**Rockets**," and, together with Astros, the "**Majority Owners**"), HOUSTON REGIONAL SPORTS NETWORK, L.P., a Delaware limited partnership and, as applicable, such entity reorganized pursuant to the Plan ("**HRSN**"), HOUSTON REGIONAL SPORTS NETWORK, LLC, a Delaware limited liability company ("**HRSN-GP**"), and for the limited purposes set forth below HOUSTON ASTROS, LLC, a Delaware limited liability company ("**Astros Team**"), and ROCKET BALL, LTD., a Texas limited partnership ("**Rockets Team**"). ATT, DTV, Astros, Astros Team, Rockets, Rockets Team, HRSN and HRSN-GP are sometimes referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

**WHEREAS**, HRSN-GP is the sole general partner of HRSN;

**WHEREAS,** Astros, Rockets and Houston SportsNet Holdings, LLC, a Delaware limited liability company ("**Comcast Owner**"), are collectively the record and beneficial owners of all of the outstanding limited partner interests of HRSN;

**WHEREAS**, on September 27, 2013 (the "**Commencement Date**"), Houston SportsNet Finance, LLC, Comcast Sports Management Services, LLC, National Digital Television Center, LLC, and Comcast SportsNet California, LLC filed an involuntary petition under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") against HRSN in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") captioned as In re Houston Regional Sports Network, L.P., Case No 13-35998 (the "**Case**");

**WHEREAS**, on February 4, 2014, the Bankruptcy Court entered an Order for Relief and Case Management Order in the Case;

**WHEREAS**, HRSN has continued in the possession of its assets and in the management of its businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, pursuant to the Plan (as defined below), HRSN shall convert its organizational form to being a limited liability company, cancel the existing outstanding Equity Interests of HRSN upon the Effective Date (as defined below) and admit the Investors as the sole members of HRSN and issue a number of common units of HRSN (the "**Common Units**"), representing 100% of the total outstanding limited liability company membership interests of HRSN to the Investors in exchange for the Investment Price (as defined below) (the "**Investment**");

**WHEREAS**, the Parties intend that the transactions contemplated hereby will be implemented by, and take effect on or promptly following the Effective Date (or such other time as provided in Section 2.03), subject to the satisfaction of the conditions set forth herein; and

**WHEREAS**, HRSN, the Majority Owners and the Investors desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated herein;

**WHEREAS**, Astros is an Affiliate of the Astros Team which is the owner and holder of Major League Baseball's Houston Astros franchise;

**WHEREAS**, Rockets is an Affiliate of the Rockets Team which is the owner and holder of the National Basketball Association's Houston Rockets franchise;

**NOW, THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants and agreements contained herein, the Parties agree as follows, in the case of HRSN, subject to Bankruptcy Court approval of this Agreement:

Article 1

**DEFINITIONS**

Section 1.01   **Definitions**.   As used in this Agreement, the following terms shall have the meanings set forth below:

"**Affiliate**" means, with respect to any specified Person, a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the specified Person, where "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Agreement**" has the meaning set forth in the preamble hereto.

"**Alternative Transaction**" means (a) a merger, consolidation, share exchange, recapitalization or other business combination or similar transaction involving HRSN or any of its assets, (b) any sale, lease or transfer of assets or other disposition of assets of HRSN pursuant to Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization, (c) any sale or issuance of Equity Interests of HRSN, (d) any Stand Alone Plan, or (e) the announcement of an intention to do any of the foregoing or any agreement to engage in any of the foregoing.  For the avoidance of doubt, any transaction expressly required to be taken by HRSN under this Agreement or any transaction to which the Investors consent shall not be an Alternative Transaction.

"**Approvals**" has the meaning set forth in Section 7.02(g).

"**Assumed Material Contracts**" means the Material Contracts assumed by HRSN pursuant to the Plan or in connection with the Case.

- 2 -

"**Astros**" has the meaning set forth in the preamble hereto.

"**Astros Team**" has the meaning set forth in the preamble hereto.

"**ATT**" has the meaning set forth in the preamble hereto.

"**Bankruptcy Code**" has the meaning set forth in the recitals hereto.

"**Bankruptcy Court**" has the meaning set forth in the recitals hereto.

"**Bankruptcy Schedules**" means the Schedules of Assets and Liabilities filed with the Bankruptcy Court by HRSN at docket no. 329, as amended at docket nos. 370 and 371.

"**Board**" means the board of directors/managers of HRSN or HRSN-GP, if applicable, or similar governing authorities (including, with respect to periods following the Effective Date).

"**Books and Records**" means any books and records of HRSN relating to the period prior to the Closing.

"**Business Day**" means any day other than a Saturday, Sunday or a day on which commercial banking institutions of the State of Texas are authorized by law or executive order to close.

"**Case**" has the meaning set forth in the recitals hereto.

"**Claim**" means any demand, claim, complaint, notice, or any other assertion of liability of any nature whatsoever whether written or oral.

"**Commencement Date**" has the meaning set forth in the recitals hereto.

"**Commitment**" means, with respect to any Person, (a) options, warrants, convertible securities, exchangeable securities, subscription rights, conversion rights, exchange rights, or other contracts that could require such Person to issue any Equity Interests, or any other securities convertible into, exchangeable for, or representing the right to subscribe for any Equity Interest for such Person, or to sell any Equity Interests it owns in another Person; (b) statutory pre-emptive rights or pre-emptive rights granted under a Person's Governing Documents; (c) stock appreciation rights, restricted stock units, phantom stock, profit participation, calls or other similar rights with respect to a Person; (d) registration rights or contractual information rights and (e) any securities convertible into or exchangeable for any of the foregoing.

"**Common Units**" has the meaning set forth in the recitals hereto.

"**Closing**" means the closing of the transactions contemplated by this Agreement.

"**Closing Date**" has the meaning set forth in Section 2.03(a).

"**Computer Software**" means all computer software and databases (including source code, object code and all related documentation).

- 3 -

"**Comcast Affiliation Agreement**" means that certain Affiliation Agreement dated October 29, 2010 by and between HRSN and Comcast Communications, LLC, a Delaware limited liability company.

"**Comcast Owner**" has the meaning set forth in the recitals hereto.

"**Confidentiality Agreement**" means that certain Amended and Restated Non-Disclosure Agreement dated July 25, 2014 by and between AT&T Services, Inc., DTV, Rocket Team and Houston Baseball Partners, LLC.

"**Confirmation Order**" means the order in form and substance satisfactory to the Investors entered by the Bankruptcy Court confirming the Plan.

"**Contracts**" means all legally binding (but for the effect of the Case) contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other legally binding (but for the effect of the Case) commitments and arrangements, whether written or oral, and any other arrangements that create legally binding rights or obligations.

"**Disclosure Statement**" means a disclosure statement with respect to the Plan, substantially in the form of Exhibit C attached hereto with such changes as are approved by the Investors or are required to be described by events occurring after the date hereof, subject to Section 6.03.

"**Drop Dead Date**" has the meaning set forth in Section 8.01(c).

"**DTV**" has the meaning set forth in the preamble hereto.

"**Effective Date**" means the effective date of the Plan.

"**Employee Plans**" has the meaning set forth in Section 3.15(a).

"**Enhanced Investor Proposal**" has the meaning set forth in Section 5.02(e).

"**Equity Interests**" means (i) with respect to a corporation, any and all shares of capital stock of such corporation, (ii) with respect to a partnership, limited liability company, trust, or similar Person, any and all units, interests, or other partnership/limited liability company interests, (iii) any other direct or indirect equity, ownership or participation in a Person or rights convertible thereto or exchangeable therefor, or (iv) options, warrants or other rights to acquire, sell or exchange the securities described in clauses (i) through and (iii), whether fixed or contingent, matured or unmatured, contractual, legal, equitable or otherwise.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any regulations promulgated thereunder.

"**ERISA Affiliate**" has the meaning set forth in Section 3.15(a).

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"**Execution Date**" has the meaning set forth in the preamble hereto.

"**Financial Statements**" has the meaning set forth in Section 3.09.

"**Foreign Corrupt Practices Act**" has the meaning set forth in Section 3.08(a).

"**Fundamental Representations**" has the meaning set forth in Section 9.01(a)(ii).

"**GAAP**" means U.S. generally accepted accounting principles as in effect at the relevant time or for the relevant period.

"**Governmental Authority**" means any legislature, agency, bureau, branch, department, division, commission, board, bureau, agency, court, arbitrator, tribunal, multi-national organization, quasi-governmental body, or other similar recognized organization or body of any federal, state, county, municipal, local, tribal, or foreign government or other similar recognized organization or body exercising similar powers or authority, including any magistrate, officer, official, justice or other representative of any of the foregoing.

"**Governing Documents**" means, as applicable, the articles of incorporation, certificate of incorporation, charter, bylaws, articles or certificate of formation, regulations, limited liability company agreement, operating agreement, certificate of limited partnership, partnership agreement, and all other similar documents, instruments or certificates executed, adopted, or filed in connection with the formation, organization or governance of a Person, including any amendments thereto.

"**HRSN**" has the meaning set forth in the preamble hereto. For the avoidance of doubt, references to "HRSN" shall be deemed to include any Person that merged with or was liquidated or converted into HRSN.

"**HRSN Disclosure Schedules**" has the meaning set forth in Article 3.

"**HRSN-GP**" has the meaning set forth in the preamble hereto.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

"**Indemnified Party**" has the meaning set forth in Section 9.04(a).

"**Indemnifying Party**" has the meaning set forth in Section 9.04(a).

"**Intellectual Property**" means all material (i) trademarks, service marks, brand names, logos, certification marks, trade dress, domain names and URLs, web addresses, web pages, websites, social media accounts, trade names and fictitious names, and other indications of origin, the goodwill associated with the foregoing and applications and registrations in any jurisdiction of the foregoing, any extension, modification or renewal of any such registration, (ii)

40797198.10

patents, applications for and registration of patents (including divisions, continuations, continuations in part and renewal applications), and any renewals, extensions or reissues thereof, in any jurisdiction, (iii) Trade Secrets, (iv) copyright rights and works of authorship, whether registered or not, and registrations or applications for registration of copyrights in any jurisdiction, and any renewals or extensions thereof, and (v) any similar intellectual property rights.

"**Investment**" has the meaning set forth in the recitals hereto.

"**Investment Price**" has the meaning set forth in <u>Section 2.02</u>.

"**Investors**" has the meaning set forth in the preamble hereto.

"**Investor Disclosure Schedules**" has the meaning set forth in <u>Article 4</u>.

"**Investor Indemnitees**" has the meaning set forth in <u>Section 9.02</u>.

"**Investor Pre-Closing Reorganization**" has the meaning set forth in <u>Section 5.05(b)</u>.

"**IP Agreements**" means a material agreement relating to the license, development, use or disclosure of any Intellectual Property to which HRSN is a party or a beneficiary.

"**IRC**" means the Internal Revenue Code of 1986, as amended from time to time.

"**IT Assets**" means computers, Computer Software, firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines and all other information technology equipment and elements and all associated documentation.

"**Knowledge of HRSN/Majority Owners**" means the actual knowledge after due inquiry of any of the individuals listed on <u>Schedule 1.01(a)</u>.

"**Law**" means any applicable federal, state and local law, treaty, statute, ordinance, code (including the IRC), principle of common law, rule or regulation of a Governmental Authority or judgment, decree, order, writ, award, injunction or determination of an arbitrator or court or other Governmental Authority, now or hereafter in effect, including any judicial and administrative interpretations thereof.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever intended for security (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"**LLC Conversion**" has the meaning set forth in <u>Section 2.01(a)</u>.

"**Losses**" means any and all damages, losses, liabilities, payments, Obligations, penalties, fines, assessments, charges, costs, Taxes, disbursements or expenses (including interest, awards,

judgments, settlements, costs of redemption, fees, reasonable disbursements and expenses of attorneys, accountants and other professional advisors and of expert witnesses and costs of investigation and preparation of any kind or nature whatsoever) and court costs.

"**Majority Owners**" has the meaning set forth in the preamble hereto.

"**Majority Owner Indemnitees**" has the meaning set forth in <u>Section 9.03</u>.

"**Material Adverse Effect**" means one or more changes, effects, events, facts, circumstances, or developments that, individually or in the aggregate, has had, or would reasonably be expected to have, a material adverse effect on the business, properties, assets, liabilities, financial condition, operations or results of operations of HRSN; *provided, however*, that in determining whether a Material Adverse Effect has occurred, there shall be excluded any effect on HRSN relating to or arising in connection with (a) any change, effect or circumstance that results from any action required to be taken or prohibited from being taken pursuant to the terms and conditions of this Agreement; (b) any change or development in general economic, political, business, industry or market conditions (whether as a result of acts of terrorism, war (whether or not declared), armed conflicts or otherwise (other, in each case, to the extent that such changes do not have a unique or materially disproportionate impact on HRSN)); and (c) any effect arising from or relating to any changes in GAAP or Law.

"**Material Contract**" has the meaning set forth in <u>Section 3.19(a)</u>.

"**Material Permits**" has the meaning set forth in <u>Section 3.05(b)</u>.

"**Media Rights Agreement**" has the meaning set forth in <u>Section 7.02(f)</u>.

"**Most Recent Financial Statement**" has the meaning set forth in <u>Section 3.09</u>.

"**Multiemployer Plans**" has the meaning set forth in <u>Section 3.15(b)</u>.

"**Objection Notice**" has the meaning set forth in <u>Section 9.04(c)</u>.

"**Obligations**" means, with respect to any Person, any debts, duties, liabilities, commitments, covenants and obligations of such Person, whether vested or unvested, absolute or contingent, conditional or unconditional, primary or secondary, direct or indirect, known or unknown, asserted or unasserted, disputed or undisputed, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due and whether contractual, statutory or otherwise.

"**Party**" has the meaning set forth in the preamble hereto.

"**Pass-Through Tax Return**" means any income Tax Return filed by or with respect to HRSN to the extent that (i) HRSN is treated as a pass-through entity for purposes of such Tax Return and (ii) the results of operations reflected on such Tax Returns are also reflected on the Tax Returns of the Majority Owners or the direct or indirect owners of any Majority Owner.

"**Permits**" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"**Person**" means any individual, corporation (including non-profit corporation), company, association, general or limited partnership, limited liability company, joint venture, trust, unincorporated organization or other entity or Governmental Authority.

"**Plan**" means a plan of reorganization in the form attached hereto as <u>Exhibit D</u> or with such changes that are in form and substance acceptable to the Investors and the Majority Owners (including all plan supplements, exhibits, schedules and plan documents).

"**Policy**" has the meaning set forth in <u>Section 3.18</u>.

"**Postpetition**" means, when used with respect to any indebtedness, agreement, instrument, claim, proceeding or other matter, indebtedness pursuant to any agreement or instrument first entered into or becoming effective, or claim, proceeding that first arose or was first instituted, or another matter that first occurred, after the commencement of the Case.

"**Preference Right**" means any right or agreement that enables or may enable any Person to purchase or acquire any asset or any interest therein or portion thereof as a result of or in connection with the sale, assignment, encumbrance or other transfer of any asset or any interest therein or portion thereof other than any such right or agreement which enables any Person to purchase or acquire any asset or any interest therein or portion thereof as a result of or in connection with the sale of the Common Units to the Investors as contemplated by this Agreement.

"**Proceeding**" means any action, suit, hearing, investigation, audit, examination, litigation, arbitration, review or other proceeding of any nature whatsoever, at law or in equity, before any Governmental Authority including any regulatory or administrative proceeding.

"**Real Estate**" means the real property owned, leased or subleased by HRSN, together with all buildings, structures and facilities located thereon.

"**Regulatory Approvals**" means, to the extent necessary in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated by the Transaction Documents, any and all certificates, permits, clearances, licenses, franchises, concessions, grants, consents, approvals, orders, registrations, authorizations, waivers, exemptions, variances or clearances from, or filings or registrations with, Governmental Authorities (and shall not include waiting periods under the HSR Act or otherwise imposed by Law).

"**Representatives**" means, with respect to any Person, such Person's officers, directors, managers, employees, agents, attorneys, accountants, consultants, equity financing partners or financial advisors or other Person associated with, or acting on behalf of, such Person.

"**Rockets**" has the meaning set forth in the preamble hereto.

"**Rockets Team**" has the meaning set forth in the preamble hereto.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Stand Alone Plan**" means any plan of reorganization or plan of liquidation for which the Investors or an Affiliate of the Investors is not the sponsor or that is not premised upon the Investment, including any such plan for which HRSN is the sponsor or there is no sponsor.

"**Subsidiary**" means as to any Person, any other Person of which more than fifty percent (50%) of the shares of the voting stock or other Equity Interests are owned or controlled, or the ability to select or elect more than fifty percent (50%) of the directors or similar managers is held, directly or indirectly, by such first Person or one or more of its Subsidiaries.

"**Superior Proposal**" has the meaning set forth in Section 5.02(b).

"**Superior Proposal Notice**" has the meaning set forth in Section 5.02(e).

"**Tax**" (and with correlative meaning "**Taxes**" and "**Taxable**") means (i) any foreign, federal, state or local income, gross receipts, capital, franchise, registration, profits, import, goods and services, estimated, alternative minimum, add on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, escheat, unclaimed property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing, (ii) any liability for the payment of any amounts of the type described in (i) as a result of being a member of a consolidated, combined, unitary or aggregate group for any Taxable period, and (iii) any liability for the payment of any amounts of the type described in (i) or (ii) payable by reason of contract, assumption, operation of Law, or as a result of being a transferee or successor to any person (including as a result of Treasury Regulation §1.1502-6(a) or any similar provision of Law) or as a result of any express or implied Obligation to indemnify any other person.

"**Tax Contests**" has the meaning set forth in Section 6.04(e).

"**Tax Return**" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting schedule, statement or information, and any amendment thereof) filed or required to be filed with any Governmental Authority in connection with the determination, assessment or collection of any Tax of any party or the administration of any laws, regulations or administrative requirements relating to any Tax.

"**Termination Fee**" has the meaning set forth in Section 8.02(a).

"**Third-Party Claim**" has the meaning set forth in Section 9.04(b).

"**Threshold**" has the meaning set forth in Section 9.02(b).

- 9 -

"**Title 49**" means Title 49 of the United States Code, as amended and in effect from time to time, and the regulations promulgated pursuant thereto.

"**Trade Secrets**" has the meaning set forth in Section 3.17(b).

"**Transaction Documents**" means this Agreement, the Media Rights Agreements, the Plan, and the Confirmation Order.

"**Transaction Court Documents**" means the Disclosure Statement, the order approving the Disclosure Statement, the Plan and the Confirmation Order.

"**Transaction Expenses**" means all amounts, if any, payable with respect to legal, accounting, advisory, consulting or investment banking fees or expenses rendered to, for or on behalf of HRSN on or before the Closing Date to the extent not paid pursuant to the Plan.

"**Treasury Regulation**" means the regulations promulgated under the IRC by the Department of Treasury.

"**Willful Breach**" has the meaning set forth in Section 8.02(a).

Section 1.02   **Other Definitional and Interpretive Provisions**.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, any references to a Party's "judgment", "satisfaction" or words of a similar import shall mean in such Party's sole judgment.  The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.   All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  If a word or phrase is defined, its other grammatical forms have a corresponding meaning. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. The words "shall" and "will" are used interchangeably and have the same meaning. The word "or" will have the inclusive meaning represented by the phrase "and/or" unless the context requires otherwise.  "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.   The phrase "to the extent" means the degree by which. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder.   References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  References to "law", "laws" or to a particular statute or law shall be deemed also to include any Law. Time periods within or following which any payment is to be made or act is to be done shall be calculated by excluding the day on which the time period commences and including the day on which the time period ends and by extending the period to the next Business Day following if the

- 10 -

last day of the time period is not a Business Day. References herein to actions of or by the Investors (including actions of approval or consent of the Investors) shall be deemed to require the actions of both of the Investors unless expressly provided otherwise.

Article 2

**CONVERSION OF HRSN AND ISSUANCE AND PURCHASE OF COMMON UNITS**

Section 2.01   **Reorganization of HRSN**.

(a)     Simultaneously with the Effective Date, or as promptly thereafter as possible, HRSN shall convert its organizational form to a Delaware limited liability company (the "**LLC Conversion**") pursuant to Section 17-219 of the Delaware Revised Uniform Limited Partnership Act (6 <u>Del. C.</u> § 17-101, <u>et seq.</u>) and Section 18-214 of the Delaware Limited Liability Company Act (6 <u>Del. C.</u> § 18-101, <u>et seq.</u>) and immediately after the LLC Conversion, HRSN will be a limited liability company duly organized and in good standing under the Laws of the State of Delaware.

(b)     Simultaneously with the Effective Date, or as promptly thereafter as possible, HRSN shall deliver to the Investors a certified copy of the recorded Certificate of Amendment of the Certificate of Formation of HRSN filed with the Secretary of State of the State of Delaware to effect a change in HRSN's legal name to a name that is substantially different from its current name including the deletion of the words "Houston Regional Sports" from HRSN's legal name.

(c)     HRSN, HRSN-GP and the Majority Owners shall, as applicable, designate and cause, simultaneously with the Effective Date, or as promptly thereafter as possible, an "authorized person" to execute and file with the Secretary of State of the State of Delaware: (i) a Certificate of Formation in the form set forth in <u>Exhibit F</u>, (ii) a Certificate of Conversion in the form set forth in <u>Exhibit G</u> and (iii) such other documents and instruments necessary to consummate the LLC Conversion.

(d)     All documents and instruments of HRSN used to consummate the LLC Conversion shall be in form and content reasonably acceptable to the Investors, including the form of the limited liability company agreement which shall govern HRSN effective as of the LLC Conversion. HRSN shall provide to the Investors true, correct and complete copies of all documents and instruments recorded with any Governmental Authority to evidence or consummate the LLC Conversion.

Section 2.02   **Issuance and Purchase of Common Units**.  Upon the terms and subject to the conditions set forth in this Agreement, and in reliance upon the representations and warranties hereinafter set forth, at the Closing, simultaneously with the Effective Date, or as promptly thereafter as possible, each of the Investors shall be admitted as members of HRSN which will issue, sell and deliver to the Investors, and the Investors will purchase from HRSN, 1,000 Common Units for an aggregate purchase price of One Thousand Dollars ($1,000) (the "**Investment Price**") to be allocated  between the Investors as follows:

(i)     ATT:  400 Common Units for $400; and

(ii)      DTV:  600 Common Units for $600.

Such Common Units shall be free and clear of all Liens and shall represent 100% of the total outstanding Equity Interests of HRSN at the time they are issued to the Investors.  Without limiting the generality of the preceding sentence, upon the Closing and after giving effect to the Confirmation Order, the Equity Interests of HRSN owned by HRSN-GP, the Majority Owners and the Comcast Owner shall be irrevocably cancelled and terminated and such Persons shall not own any right, title or interest in or to any Equity Interest of HRSN.

Upon the Closing all of the Common Units to be issued and delivered to the Investors pursuant to this Section 2.02 shall have been duly authorized and validly issued, fully paid, nonassessable when issued, and shall not be subject to preemptive or similar rights of third parties.

Section 2.03    **Closing**.

(a)      Subject to the satisfaction or, if permissible, waiver of the conditions set forth in Section 7.01, Section 7.02 and Section 7.03, the Closing shall take place at the offices of Norton Rose Fulbright, 1301 McKinney, Suite 5100, Houston, Texas, at 10:00 a.m., Houston time, on the third (3rd) Business Day following satisfaction or, if permissible, waiver, of such conditions (other than those conditions that by their nature are to be satisfied by actions to be taken at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other time and place as the Parties may agree (the date on which the Closing occurs, the "**Closing Date**"); provided that the Parties shall use all commercially reasonable efforts to have the Closing take place on the Effective Date.

(b)      At the Closing, HRSN, HRSN-GP and the Majority Owners shall deliver to the Investors:

(i)      the certificate required pursuant to Section 7.02(a);

(ii)      the certificates of Governing Documents from each of HRSN, HRSN-GP and the Majority Owners as described in Section 7.02(b); and

(iii)      the documents and instruments to evidence the LLC Conversion pursuant to Section 7.02(c);

(iv)      the Media Rights Agreements, each executed by HRSN and the Astros Team and the Rockets Team, as applicable; and

(v)      such other documents or instruments as the Investors reasonably request and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(c)      At the Closing, each of the Investors shall deliver to HRSN:

(i)      such Investor's applicable portion of the Investment Price in immediately available funds by wire transfer to the account or accounts designated by

HRSN, or by such other means as may be agreed between the Parties as payment for the Common Units to be issued to the Investors pursuant to <u>Section 2.02</u>; and

      (ii)      the certificate required pursuant to <u>Section 7.03(a)</u>.

Article 3
**REPRESENTATIONS AND WARRANTIES RELATING TO HRSN**

Except as set forth in the disclosure schedules attached hereto as <u>Exhibit A</u> (the "**HRSN Disclosure Schedules**"), HRSN, HRSN-GP and the Majority Owners hereby represent and warrant to the Investors that the statements contained in this <u>Article 3</u> are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (unless any such representation or warranty expressly speaks to another date, then as of such other date):

Section 3.01    **Bankruptcy Court Orders**.    HRSN and the Majority Owners have complied and are complying with the terms of all orders of the Bankruptcy Court in respect of the Investment and this Agreement upon and after the entry of any such order.

Section 3.02    **Capitalization**.

      (a)      HRSN-GP is the sole general partner of HRSN and <u>Section 3.02(a)</u> of the HRSN Disclosure Schedules sets forth each partner of HRSN and the respective percentage partnership interest in HRSN owned by each partner of HRSN.

      (b)      Except as set forth on <u>Section 3.02(a)</u> of the HRSN Disclosure Schedules, no other Equity Interests of HRSN exist, including any Commitments or Preference Rights with respect to any Equity Interest of HRSN.

      (c)      Upon the Closing and after giving effect to the Confirmation Order, the Plan, the LLC Conversion and the Investment, the outstanding Equity Interests of HRSN shall consist solely of the Common Units issued to the Investors. Without limiting the generality of the preceding sentence, upon the Closing and after giving effect to the Confirmation Order and the LLC Conversion, the Equity Interests of HRSN owned by HRSN-GP, the Majority Owners and the Comcast Owner shall be irrevocably cancelled and terminated and such Persons shall not own any right, title or interest in or to any Equity Interest of HRSN.

      (d)      Upon the Closing Date, all of the Common Units to be issued and delivered to the Investors pursuant to the terms hereof shall have been duly authorized and validly issued, fully paid, nonassessable, free and clear of all Liens, and not subject to preemptive or similar rights of third parties.

      (e)      Upon the Closing and after giving effect to the Confirmation Order and the Plan, (i) there shall be no voting trusts, voting agreements, proxies, first refusal rights, first offer rights, co-sale rights, options, transfer restrictions or other Commitments, agreements, instruments, understandings or Liens (whether written or oral, formal or informal) with respect to the voting, transfer or disposition of Equity Interests of HRSN to which HRSN, except as set forth in this Agreement, and (ii) except by and through the Investors as approved by the Investors, there shall be no Commitments of any character to which HRSN is a party, or by

- 13 -

which HRSN is bound, calling for the issuance of Equity Interests of HRSN or for settlement in cash based upon the value of any such Equity Interests, or other arrangement to which HRSN is a party or by which HRSN is bound to acquire, at any time or under any circumstance, Equity Interests of HRSN.

        (f)      HRSN does not own, directly or indirectly, any Equity Interest in any Person.

        Section 3.03   **Organization and Authority of Majority Owners and HRSN-GP**. Astros, Astros Team and HRSN-GP are each limited liability companies, and Rockets and Rockets Team are each limited partnerships and each is duly organized, validly existing and in good standing under the laws of the State of Delaware or Texas, as applicable. Each Majority Owner, Astros Team, Rockets Team and HRSN-GP has full power and authority to enter into this Agreement and the other Transaction Documents to which such Person is a party, to carry out its Obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each Majority Owner, Astros Team, Rockets Team and HRSN-GP of this Agreement and any other Transaction Document to which it is a party, the performance by such Person of its Obligations hereunder and thereunder and the consummation by such Person of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of such Person. This Agreement has been duly executed and delivered by each Majority Owner, Astros Team, Rockets Team and HRSN-GP, and (assuming due authorization, execution and delivery by the Investors) this Agreement constitutes a legal, valid and binding obligation of each Majority Owner, Astros Team, Rockets Team and HRSN-GP enforceable against each such Person in accordance with its terms. When each other Transaction Document to which each Majority Owner, Astros Team, Rockets Team and HRSN-GP is or will be a party has been duly executed and delivered by such Majority Owner, Astros Team, Rockets Team and HRSN-GP, as applicable (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of each Majority Owner, Astros Team, Rockets Team and HRSN-GP enforceable against it in accordance with its terms except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium, receivership, or similar Laws or judicial decisions now or hereafter in effect relating to, limiting, or affecting the rights of creditors generally or by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

        Section 3.04   **Organization; Authority and Qualification of HRSN**.  HRSN (a) is a limited partnership duly organized, validly existing and in good standing under the Laws of the State of Delaware; (b) is duly qualified to conduct business and is in good standing in each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a Material Adverse Effect; (c) has the requisite power and authority to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now conducted.  HRSN has full power and authority, subject to the approval of the Bankruptcy Court, to enter into this Agreement and the other Transaction Documents to which it is a party, to carry out its Obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by HRSN of this Agreement and any other Transaction Document to which it is a party, the performance by

- 14 -

HRSN of its Obligations hereunder and thereunder and the consummation by HRSN of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of HRSN, subject to the approval of the Bankruptcy Court.  Each Transaction Document to which HRSN is or will be a party has been duly executed and delivered by HRSN, subject to the approval of the Bankruptcy Court, and is and will constitute a legal and binding obligation of HRSN enforceable against it in accordance with its terms except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium, receivership, or similar Laws or judicial decisions now or hereafter in effect relating to, limiting, or affecting the rights of creditors generally or by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). HRSN has made available to the Investors a true, correct and complete copy of the Governing Documents of HRSN, as amended to date and each of which is in full force and effect.

Section 3.05    **Compliance with Laws; Permits**.

(a)    Except as set forth in <u>Section 3.05(a)</u> of the HRSN Disclosure Schedules, HRSN has materially complied, and is now materially complying, with (i) all Laws applicable to it or its business, properties or assets and (ii) its Governing Documents, in each case except to the extent permitted by the Bankruptcy Code.  Except as set forth in <u>Section 3.05(a)</u> of the HRSN Disclosure Schedules, HRSN has not received any written notice, action or assertion from any Governmental Authority that is unresolved, nor, to the Knowledge of HRSN/Majority Owners, has any such notice, action or assertion been filed or commenced against HRSN alleging that HRSN is not in material compliance with any applicable Law.

(b)    All material Permits required for HRSN to conduct its business (the "**Material Permits**") have been obtained by it and are valid and in full force and effect. All fees and charges with respect to such Material Permits as of the date hereof have been paid in full. <u>Section 3.05(b)</u> of the HRSN Disclosure Schedules lists all current Material Permits issued to HRSN, including the names of the Material Permits and their respective dates of issuance and expiration. No action is pending or, to the Knowledge of HRSN/Majority Owners, threatened nor, to the Knowledge of HRSN/Majority Owners, has any event occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Material Permit set forth in <u>Section 3.05(b)</u> of the HRSN Disclosure Schedule.

Section 3.06    **No Conflicts; Consents**.  Except as contemplated by and provided for under the Bankruptcy Code and, if applicable, subject to the occurrence of the Effective Date, the execution, delivery and performance by HRSN, HRSN-GP, the Majority Owners, Astros Team and Rockets Team of the Transaction Documents to which each is a party do not: (a) contravene any provision of such Person's Governing Documents; (b) violate any Law; (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Material Contract or any Material Permit; (d) result in the creation or imposition of any Lien upon any of the property of such Person other than those in favor, or for the benefit, of the Investors, their successors and assigns; (e) give rise to any preemptive rights, rights of first refusal or other similar rights on behalf of any Person under

- 15 -

any applicable Law or any provision of any certificate of incorporation or bylaws or any agreement or instrument applicable to HRSN; and (f) require an Approval of any Governmental Authority or any other Person, except those referred to on <u>Section 3.06</u> of the HRSN Disclosure Schedules.

Section 3.07   **Financial Advisors and Brokers**.  No broker, finder or financial advisor is entitled to any brokerage, finder's or other fee in connection with the transactions contemplated in the Transaction Documents based upon arrangements made by or on behalf of HRSN, HRSN-GP or the Majority Owners.

Section 3.08   **Foreign Corrupt Practices Act.**  Except for such matters as would not result in a Material Adverse Effect:

(a)   HRSN has developed and implemented a compliance program which includes corporate policies and procedures that provide reasonable assurance of compliance with the Foreign Corrupt Practices Act, as amended (the "**Foreign Corrupt Practices Act**").

(b)   In connection with its compliance with the Foreign Corrupt Practices Act, there are no adverse or negative past performance evaluations or ratings by the U.S. Government, or any voluntary disclosures under the Foreign Corrupt Practices Act, any enforcement actions or threats of enforcement actions, or any facts to the Knowledge of HRSN/Majority Owners that, in each case, could result in any adverse or negative performance evaluation related to the Foreign Corrupt Practices Act.

(c)   Neither the U.S. Government nor any other Person has notified HRSN in writing of any actual or alleged violation or breach of the Foreign Corrupt Practices Act.

(d)   HRSN has not undergone and is not undergoing any audit, review, inspection, investigation, survey or examination of records relating to HRSN's compliance with the Foreign Corrupt Practice Act, and, to the Knowledge of HRSN/Majority Owners, there is no basis for any such audit, review, inspection, investigation, survey or examination of records.

(e)   HRSN has not been and is not now under any administrative, civil or criminal investigation, charge or indictment involving alleged false statements, false claims or other improprieties relating to HRSN's compliance with the Foreign Corrupt Practices Act, nor, to the Knowledge of HRSN/Majority Owners, is there any basis for any such investigation or indictment.

Section 3.09   **Financial Statements and Reports**.  The (i) audited consolidated balance sheet of December 31, 2012 of HRSN and the related statements of operations, partners' deficiency and cash flows for the fiscal year then ended, reported on by Deloitte & Touche LLP, (ii)  the unaudited financial statements consisting of the balance sheet of HRSN as of December 31, 2013 and the related statements of operations, changes in members' equity and cash flow for the twelve (12) month period then ended, and (iii) the unaudited financial statements consisting of the balance sheet of HRSN as of May 31, 2014 and the related statements of operations, changes in members' equity and cash flow for the five (5) month period then ended (collectively, the "**Financial Statements**" and such financial statement as of May 31, 2014 being the "**Most Recent Financial Statement**") have each been delivered to the Investors on or prior to the

- 16 -

Execution Date, and have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to the Most Recent Financial Statement, for the absence of footnotes and normal year-end audit adjustments) and present in all material respects the consolidated financial position of HRSN as of the dates thereof and the consolidated results of its operations and cash flows for the periods then ended. HRSN maintains a system of accounting established and administered in accordance with GAAP.

Section 3.10    **Absence of Certain Changes or Events**.  Since December 31, 2013 and as of the Execution Date, (a) there has not been a Material Adverse Effect (excluding any effect resulting from any matter to the extent disclosed in the Disclosure Statement) and (b) except for the transactions contemplated by the Transaction Documents or as otherwise disclosed in this Agreement, HRSN has in all material respects conducted its businesses in the ordinary course of business consistent with past practice.

Section 3.11    **Ownership of Property; Real Estate; Liens**.

(a)    HRSN has good and valid (and, in the case of owned Real Estate, good and marketable fee simple) title to, a valid leasehold interest in, or otherwise has the legal right to use, all Real Estate and tangible personal property and other assets reflected in the Most Recent Financial Statement or acquired after the date thereof. Section 3.11(a) of the HRSN Disclosure Schedules sets forth a description of each Lien arising from, secured by or related to the assets of HRSN other than Liens contemplated by the Transaction Documents.

(b)    Section 3.11(b) of the HRSN Disclosure Schedules lists all of the Real Estate and includes (i) the street address of each parcel of Real Estate; (ii) if such property is leased or subleased by HRSN, the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease for each leased or subleased property; and (iii) the current use of such property. With respect to owned Real Estate, HRSN has delivered or made available to Investors true, correct and complete copies of the deeds and other instruments (as recorded) by which HRSN acquired such Real Estate, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of the Majority Owners or HRSN and relating to the Real Estate. With respect to leased Real Estate, HRSN has delivered or made available to the Investors true, correct and complete copies of any leases affecting the Real Estate. HRSN is not a sublessor or grantor under any sublease or other instrument granting to any other Person any right to the possession, lease, occupancy or enjoyment of any leased Real Estate. The use and operation of the Real Estate in the conduct of HRSN's business does not violate in any material respect any Law, covenant, condition, restriction, easement, license, permit or agreement. No material improvements constituting a part of the Real Estate encroach on real property owned or leased by a Person other than HRSN. There are no Claims or Proceedings pending nor, to the Knowledge of HRSN/Majority Owners, threatened against or affecting the Real Estate or any portion thereof or interest therein in the nature or in lieu of condemnation or eminent domain proceedings.

Section 3.12    **Condition and Sufficiency of Assets**.  The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of HRSN are structurally sound, are in good operating condition and repair, and are adequate for

- 17 -

the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property owned or leased by HRSN, together with all other tangible and intangible properties and assets of HRSN, are sufficient for the continued conduct of HRSN's business after the Closing in substantially the same manner as conducted immediately prior to the Closing and constitute all of the rights, property and assets that HRSN has reasonably determined to be necessary to conduct the business of HRSN as conducted as of the Execution Date and as conducted immediately prior to the Closing (assuming compliance with the Obligations contained in this Agreement), excluding any Contracts rejected pursuant to <u>Section 5.07</u>.

Section 3.13   **Labor and Employment Matters**.

(a)      <u>Section 3.13(a)(i)</u> of the HRSN Disclosure Schedules (i) sets forth a true, correct and complete list of each person currently employed by HRSN (the "**Employees**") and with respect to each such Employee the following information: (i) the amount of salary currently being paid on a gross annualized basis, the hourly pay rate (if applicable) of such Employee and the amount of compensation paid in 2013; (ii) the nature and amount of all compensation proposed to be paid during calendar year 2014, (iii) the material terms of any employment or similar agreement with such Employee; (iv) accrued and unused vacation as of the Execution Date and (v) the nature and amount of any perquisites or personal benefits currently being provided to or for the account of such Employee, other than the employee benefit plans of general application described herein. Also set forth in <u>Section 3.13(a)</u> of the HRSN Disclosure Schedules is a list of individuals who are (A) "leased employees" within the meaning of Section 414(n) of the IRC that are "leased" by HRSN or (B) "independent contractors" to HRSN within the meaning of the IRC and the rules and regulations promulgated thereunder, and in each case, the amount paid by HRSN during calendar year 2013 and the hourly pay rate or other compensatory arrangements with respect to each such individual. <u>Schedule 3.13(a)(ii)</u> sets forth a true, correct and complete list of individuals who are currently providing services to, for the benefit of, or on behalf of HRSN but are employed by HRSN-GP, either of the Majority Owners, the Comcast Owner or their respective Affiliates.

(b)      No Employee is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition, or proprietary rights agreement, between such Employee and HRSN or, to the Knowledge of HRSN/Majority Owners, any other Person that in any way adversely affects or will affect (i) the performance of his duties for HRSN or (ii) the ability of HRSN to conduct its business subsequent to the Closing.

(c)      HRSN has complied in all material respects with all Laws relating to the employment of labor, including provisions thereof relating to wages, hours, equal opportunity, collective bargaining, nondiscrimination, harassment, and the payment of social security and other Taxes.  There are no pending or, to the Knowledge of HRSN/Majority Owners, threatened charges (pending internal review or filed with any state or federal government agency) of unfair labor practices or employment discrimination or other wrongful action with respect to any aspect of employment of any person employed or formerly employed by HRSN.  All persons who have

- 18 -

performed services for HRSN and have been classified as independent contractors have satisfied the requirements of all Laws to be so classified, and as applicable HRSN have fully and accurately reported their compensation on IRS Forms 1099 or other applicable tax forms for independent contractors when required to do so.

(d)     There are no proceedings pending or, to the Knowledge of HRSN/Majority Owners, threatened between HRSN, on the one hand, and any current or former employees thereof, on the other hand, including any claims for actual or alleged harassment or discrimination based on any protected class including race, national origin, age, sex, sexual orientation, religion, disability, veteran status or similar tortuous conduct, wage and hour claims, joint employer or co-employment claims, breach of contract, wrongful termination, defamation, intentional or negligent infliction of emotional distress, interference with contract or interference with actual or prospective economic advantage or violation of Laws relating to employment. There are no Claims pending or, to the Knowledge of HRSN/Majority Owners, threatened against HRSN under any workers' compensation or long term disability plan or policy applicable to any current or former employees.

(e)     HRSN has not engaged in any reduction of force or plant closings affecting the Employees which trigger any notice obligation under the Worker Adjustment and Retraining Notification Act (WARN) from and after July 1, 2013 that remain unsatisfied, excluding any employee terminations made pursuant to Section 5.08(c).

(f)     HRSN is not a party to or bound in any manner by, any collective bargaining agreement contract, or other agreement of understanding with a labor or trade union, labor organization, staff association or works council, or similar grouping of employee representations, and, to the Knowledge of HRSN/Majority Owners, there have been no activities or proceedings of any labor union to organize HRSN's employees by any Person, unit or group seeking to act as their bargaining agent.  To the Knowledge of HRSN/Majority Owners, no union representation elections relating to HRSN's employees have been scheduled by any Governmental Authority and no investigation of the employment policies or practices of HRSN by any Governmental Authority is pending or threatened.  There has not been over the last three (3) years any labor strike, slowdown or work stoppage or lockout by employees of HRSN.

(g)     HRSN has provided all of its employees with all wages, benefits, relocation benefits, stock options, bonuses and incentives and all other compensation which became due and payable through the Execution Date.  HRSN has not instituted any "freeze" of, or delayed or deferred the grant of, any cost-of-living or other salary adjustments for any of its employees.  Neither the execution or delivery of this Agreement, nor the continuing conduct of the business of HRSN as currently conducted or contemplated, will conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default of, any contract under which the Employees are now obligated.

(h)     Neither the execution and delivery of the Transaction Documents nor the consummation of the transactions contemplated thereby will result in the breach of, constitute a default or a change in control under, or otherwise provide any Person with a right to terminate, rescind, amend, renegotiate or be released from any labor agreement or collective bargaining agreement, or any provisions thereof, to which HRSN is a party.

- 19 -

Section 3.14    **Taxes**.

(a)      Except as disclosed in <u>Section 3.14(a)</u> of the HRSN Disclosure Schedules, HRSN has duly and timely filed with the appropriate taxing authorities all Tax Returns that were required to be filed by it.  Except as disclosed in <u>Section 3.14(a)</u> of the HRSN Disclosure Schedules, HRSN has timely paid all Taxes required to be paid by it (whether or not shown on any Tax Return). There are no Liens on any of the assets of HRSN that arose in connection with any failure (or alleged failure) to pay any Tax, other than in those instances in which such Taxes are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP in respect of all such Taxes in the Most Recent Financial Statement.  Except as disclosed in <u>Section 3.14(a)</u> of the HRSN Disclosure Schedules, there is no Tax liability proposed in writing by any taxing authority for which there is not an adequate reserve in accordance with GAAP in the Most Recent Financial Statement.  HRSN has provided all required information reporting, including all Schedule K-1s (or their equivalents) for each applicable jurisdiction, to each of its partners for all Tax periods.

(b)      Except as disclosed in <u>Section 3.14(b)</u> of the HRSN Disclosure Schedules, no audits, investigations or proceedings relating to any Taxes for which HRSN may be liable are pending or threatened in writing by any taxing authority.  Except as disclosed in <u>Section 3.14(b)</u> of the HRSN Disclosure Schedules, there are no agreements or applications by HRSN for the extension of the time for filing any Tax Return or paying any Tax nor have there been any extensions or waivers of any statutes of limitation for the assessment of any Taxes.

(c)      HRSN (i) has never filed a Tax Return on an affiliated, consolidated, unitary, combined or similar basis with another entity, (ii) is not a party to any Tax sharing agreement or similar arrangement (including an allocation or indemnification agreement or arrangement), and (iii) has no liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee, successor, by contract or otherwise.

(d)      HRSN has withheld and timely paid, and complied with all information reporting and back-up withholding requirements, and has maintained all required records with respect thereto, all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, partner, independent contractor, creditor, stockholder, or other third party.

(e)      No jurisdiction in which HRSN does not file a Tax Return (i) has asserted in writing that HRSN is or may be subject to Tax in that jurisdiction (including any liability for any Taxes on a "nexus" basis) or (ii) has sent notices or written communications of any kind requesting information relating to HRSN's nexus with such jurisdiction.

(f)      HRSN has not agreed, nor will it be required, to make any adjustment for any period after the Execution Date pursuant to Section 481(a) of the IRC or any similar provision of other Law by reason of any change in any accounting method made prior to the Execution Date.  There is no application pending with any Governmental Authority requesting permission for any such change in any accounting method of HRSN, and the Internal Revenue

- 20 -

Service has not issued in writing any pending proposal regarding any such adjustment or change in accounting method.

(g)     HRSN is not a stockholder of a "controlled foreign corporation" as defined in Section 957 of the IRC, or a stockholder of a "passive foreign investment company" as defined in Section 1296 of the IRC.  HRSN does not have, and has not previously had, a permanent establishment in any foreign country.

(h)     HRSN has not invested in any entity or entered into any arrangement that is a "tax shelter" within the meaning of Section 6662(d)(2)(C) of the IRC.  HRSN has not been a participant in or material advisor to any transaction that is a "reportable transaction" as defined by Treasury Regulations Section 1.6011-4(b).  HRSN has disclosed on its Tax Returns all positions taken therein that could give rise to a substantial understatement of Tax within the meaning of section 6662 of the IRC.

(i)     Except as disclosed in Section 3.14(i) of the HRSN Disclosure Schedules, HRSN will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing Date as a result of any closing agreement as described in Section 7121 of the IRC (or any corresponding or similar provision of state, local or foreign Tax law) executed on or prior to the Closing Date.  HRSN will not be required to include in taxable income for any period (or any portion thereof) ending after the Closing Date any income as a result of any installment sale or other open transaction disposition made on or prior to the Closing Date or prepaid amount received on or prior to the Closing Date, or by reason of Section 108(i) of the IRC.  None of the Companies has applied for a ruling relative to Taxes.

(j)     None of the assets of HRSN directly or indirectly secures any debt the interest on which is tax-exempt under Section 103(a) of the IRC.

(k)     Except as disclosed in Section 3.14(k) of the HRSN Disclosure Schedules, HRSN (A) has never participated in an international boycott as defined in Section 999 of the IRC, and (B) is not a party to a gain recognition agreement under Section 367 of the IRC.

(l)     HRSN has made available to the Investors complete copies of (A) all Tax Returns of HRSN relating to Taxable periods ending on or after December 31, 2009 and (B) any notices of administrative proceedings, final partnership administrative adjustments, audit reports, settlement agreements, examination reports and statements of deficiencies issued within the last three years relating to any amount of Tax due from or with respect to HRSN, its income, assets or operations.

(m)     At all times since the date it was formed, HRSN has been treated and classified as a partnership for federal, state and local Tax purposes, and HRSN has not been subject to entity-level federal, state or local income Taxes.  No election has been filed by or with respect to HRSN to be treated as a corporation for federal, state or local Tax purposes.

(n)     No property owned by HRSN is (i) property required to be treated as being owned by another Person pursuant to the provisions of Section 168(f)(8) of the Internal

- 21 -

Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986, (ii) "tax-exempt use property" within the meaning of Section 168(h)(1) of the IRC, (iii) "tax-exempt bond financed property" within the meaning of Section 168(g) of the IRC, (iv) "limited use property" within the meaning of Rev. Proc. 2001-28, (v) subject to Section 168(g)(1)(A) of the IRC, or (vi) subject to a "section 467 rental agreement" as defined in Section 467 of the IRC.

(o)    HRSN does not have in effect an election under Section 754 of the IRC.

Section 3.15    **ERISA**.

(a)    Section 3.15(a) of the HRSN Disclosure Schedules lists each Employee Plan.  "**Employee Plan**" means any employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) and any other employment, consulting, bonus, incentive, retirement, deferred compensation, stock option or other equity based, severance, termination, change in control, retention, salary continuation, vacation, sick leave, fringe benefit or other compensatory arrangement, agreement, plan, program or policy (i) for the benefit of, or relating to, any present or former director, officer, employee or consultant of HRSN, (ii) which is maintained, sponsored or contributed to by HRSN or by any trade or business, whether or not incorporated, that together with HRSN would be deemed a "single employer" under Section 414(b), (c), (m) or (o) of the IRC or Section 4000(b)(i) of ERISA (an "**ERISA Affiliate**"), or (iii) to which HRSN or an ERISA Affiliate is or has been obligated to contribute or with respect to which any such Person has, or may have, any liability or Obligation.  HRSN has furnished to the Investors true, correct and complete copies of the governing documents for each Employee Plan (or, in the case of any unwritten Employee Plan, a written description thereof) and a copy of the current employee handbook(s) provided to employees of HRSN and, where applicable with respect to an Employee Plan, true, correct and complete copies of the trust agreement or other funding instrument, the most recent determination or opinion letter from the Internal Revenue Service, the most recent summary plan description(s) and any summaries of material modification, the three most recent Form 5500 filings, the three most recent actuarial valuation reports, the three most recent Forms PBGC-1, and any material filings, correspondence or other communication with, to or from any Person, including the plan actuaries or other consultants, the Internal Revenue Service, the Pension Benefit Guaranty Corporation or the Department of Labor. For purposes of the preceding sentence, any filing, correspondence or communication relating to a plan's funded status shall be deemed to be material.

(b)    Except as identified on Section 3.15(b) of the HRSN Disclosure Schedules, neither HRSN nor any ERISA Affiliate has now or at any time sponsored, maintained or contributed to, or has or had any liability, direct or indirect, under or with respect to, (i) any "multiemployer plan" as defined in Section 3(37) of ERISA (all such identified plans being the "**Multiemployer Plans**"), (ii) any single employer defined benefit pension plan (within the meaning of Section 3(2) of ERISA) that is or was subject to Title IV of ERISA, (iii) any "multiple employer plan" within the meaning of Section 413(c) of the Code, or (iv) any "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(c)    Except as set forth on Section 3.15(c) of the HRSN Disclosure Schedules, neither HRSN nor any ERISA Affiliate has an express or implied commitment (i) to

- 22 -

create or incur liability with respect to or cause to exist any new employee benefit plan, program, agreement or arrangement other than the Employee Plans or (ii) except for amendments necessary to comply with applicable Law, to modify, change or terminate any Employee Plan.

(d)    Except as set forth in <u>Section 3.15(d)</u> of the HRSN Disclosure Schedules, neither the execution and delivery of this Agreement or the other the Transaction Documents nor the consummation of the transactions contemplated herein or thereby will (either alone or in conjunction with any other event) (i) entitle any employee, officer or consultant of HRSN to severance, change of control, retention, bonus or similar pay or benefits, (ii) accelerate the time of payment, vesting or funding of, or increase or modify the amount or terms of, any compensation or benefits that are or may become payable, directly or indirectly, from or by HRSN to or in respect of any current or former employee, officer or consultant of HRSN or (iii) result in payments which would be subject to the excise Tax under Section 4999 of the IRC.

(e)    All employer and employee contributions, and material premiums and expenses due and payable to or in respect of any Employee Plan or required by Law or any Employee Plan or labor agreement or arrangement have been timely paid, or, if not yet due, have been fully and adequately accrued as a liability on the Most Recent Financial Statement in accordance with applicable Law.

(f)    Except as set forth on <u>Section 3.15(f)</u> of the HRSN Disclosure Schedules, (i) no trade or business, whether or not incorporated, is or has been treated as a single employer together with HRSN for any purpose under ERISA or Section 414 of the IRC, (ii) no liability under Sections 406, 409, 502(i), 502(l) or Part 6 of Title I, of ERISA or the penalty or excise tax provisions of the IRC relating to employee benefit plans or employee compensation has been incurred (directly or indirectly, including as a result of any indemnification obligation or agreement) by HRSN or any ERISA Affiliate and is still outstanding, and no event, transaction or condition has occurred or exists which could reasonably be expected to result in any such liability, and (iii) no reportable event, within the meaning of Section 4043 of ERISA and the regulations of the PBGC promulgated thereunder (other than a reportable event as to which notice is waived) has occurred, or could be reasonably expected to occur, in connection with the consummation of the transactions contemplated by this Agreement or the other Transaction Documents or otherwise, with respect to any Employee Plan.  Neither HRSN or any ERISA Affiliate has any employee stock ownership plan or equivalent.

(g)    Each Employee Plan has been established, funded, maintained, operated and administered in accordance with its terms and in compliance with the applicable provisions of ERISA, the IRC and all applicable Laws.  Each Employee Plan that is intended to qualify under Section 401(a) of the IRC has received a favorable determination from the Internal Revenue Service as to its qualification or an initial application for a determination letter is pending with the Internal Revenue Service and, to the Knowledge of HRSN/Majority Owners, no event or condition has occurred or exists since the date of such letter that could reasonably be expected to have an adverse effect on the qualified status of such Employee Plan. Except as set forth on <u>Section 3.15(g)</u> of the HRSN Disclosure Schedules each Employee Plan may be unilaterally amended or terminated by the sponsoring employer without additional liability or penalty.

- 23 -

(h)     No liability under Title IV of ERISA has been incurred with respect to any Employee Plan that has not been satisfied in full, and, with respect to any Multiemployer Plan, no condition exists that presents a material risk to HRSN or any ERISA Affiliate of incurring a liability under such Title.  Except for Multiemployer Plans, no Employee Plan is subject to Sections 412, 430, 431 or 432 of the IRC or Title IV or Sections 302, 303, 304 or 305 of ERISA.  No Multiemployer Plan has incurred an accumulated funding deficiency, whether or not waived. None of the assets of HRSN or any ERISA Affiliate are subject to any Lien arising under ERISA or Subchapter D of Chapter 1 of the IRC, and no condition exists that presents a material risk of any such Lien arising.

(i)     With respect to any Multiemployer Plan, (i) as of the Execution Date, neither HRSN nor any ERISA Affiliate has made or suffered a "complete withdrawal" or a "partial withdrawal" (as respectively defined in Sections 4203 and 4205 of ERISA), (ii) as of the Execution Date, no event has occurred that presents a material risk of a complete or partial withdrawal other than in connection with the commencement of the Case, (iii) neither HRSN nor any ERISA Affiliate has any contingent liability under Section 4204 of ERISA, and, to the Knowledge of HRSN/Majority Owners, no circumstances exist that present a material risk that any such Multiemployer Plan will go into reorganization, and (iv) as of the Execution Date and as of the Closing Date, neither HRSN nor any ERISA Affiliate would or may be reasonably expected to incur withdrawal liability in excess of $25,000 in the aggregate if a complete withdrawal by HRSN and the ERISA Affiliates occurred under each Multiemployer Plan as of such date, and (v) as of the Closing Date, neither HRSN nor any ERISA Affiliates will have incurred withdrawal liability that, together with withdrawal liability incurred with respect to all other Multiemployer Plans, exceeds $10,000 in the aggregate.  No Multiemployer Plan is, or is reasonably expected to be, in "endangered status" or "critical status" within the meaning of Section 432 of the IRC.

(j)     No payment or benefit paid or provided, or to be paid or provided, to current or former employees, directors, managers or other service providers of or to HRSN (including pursuant to, or in connection with, any of the Transaction Documents or any of the transactions contemplated thereby) will fail to be deductible for federal income tax by reason of Section 280G of the IRC. HRSN has no Obligation to gross up, indemnify or otherwise reimburse any individual for any taxes, interest or penalties incurred pursuant to Sections 409A, 280G or 4999 of the IRC.

(k)     Except as disclosed on Section 3.15(k) of the HRSN Disclosure Schedules, neither HRSN nor any ERISA Affiliate has any liability for life, health, medical or other welfare benefits for former employees or beneficiaries or dependents thereof with coverage or benefits under the Employee Plans, other than (i) as required by Section 4980B of the IRC or Part 6 of Title I of ERISA, (ii) death benefits or retirement benefits under any funded "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is intended to be a qualified plan within the meaning of Section 401(a) of the IRC, or (iii) deferred compensation benefits accrued as liabilities in the Most Recent Financial Statement).  Except as disclosed on Section 3.15(k) of the HRSN Disclosure Schedules, no Employee Plan is funded through a "welfare benefit fund" as defined in Section 419 of the IRC.  Each Employee Plan that is intended to satisfy the requirements of Section 501(c)(9) of the IRC satisfies such requirements in all material respects.

- 24 -

(l)      There are no pending or, to the Knowledge of HRSN/Majority Owners, threatened Claims or Proceedings asserted or instituted against any Employee Plan, any fiduciary (as defined by Section 3(21) of ERISA) thereto, HRSN, any of its Affiliates or any employee or administrator thereof in connection with the existence, operation or administration of an Employee Plan, other than routine claims for benefits.

Section 3.16   **No Litigation**.  Other than the Case and proofs of claim filed in the Case and those matters set forth on <u>Section 3.16</u> of the HRSN Disclosure Schedules, there is no (a) action, claim, lawsuit, demand, investigation or other Proceeding pending or, to the Knowledge of HRSN/Majority Owners, threatened by or against HRSN or HRSN-GP, before any Governmental Authority (collectively, "**Litigation**") or (b) judgments, orders or decrees of any Governmental Authority imposed against HRSN or HRSN-GP, their properties and assets or any of their respective directors, managers or officers.  Except as set forth on <u>Section 3.16</u> of the HRSN Disclosure Schedules, there was no other Litigation at any time during the past two (2) years that resulted in liability to HRSN or HRSN-GP and which resulted in a settlement or judgment in excess of $100,000.

Section 3.17   **Intellectual Property**.

(a)      Except as set forth in <u>Section 3.17(a)</u> of the HRSN Disclosure Schedules, HRSN owns or has rights to use all Intellectual Property necessary to continue to conduct its business in all material respects as now conducted by it, free and clear of all Liens. Except as disclosed on <u>Section 3.17(a)</u> of the HRSN Disclosure Schedules, to the Knowledge of HRSN/Majority Owners, all required filings and fees related to the Intellectual Property have been timely filed with and paid to the relevant governmental authorities and authorized registrars, and all Intellectual Property applications or registrations are otherwise in good standing, and will not be subject to any required maintenance fees, eligibility for small entity status, or taxes or actions falling due within ninety (90) days after the Closing Date. To the Knowledge of HRSN/Majority Owners, HRSN conducts its business and affairs without infringement of or interference with any Intellectual Property of any other Person. Except as set forth in <u>Section 3.17(a)</u> of the HRSN Disclosure Schedules, HRSN is not aware of any infringement claim by any other Person against HRSN with respect to any Intellectual Property.

(b)      HRSN has taken reasonable measures to protect the confidentiality of all trade secrets and confidential information and know-how, including confidential processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "**Trade Secrets**"), that are owned, used or held by HRSN and, to the Knowledge of HRSN/Majority Owners, such Trade Secrets have not been used by, disclosed to or discovered by any Person except pursuant to valid and appropriate non-disclosure or license agreements which have not been breached.

(c)      To the Knowledge of HRSN/Majority Owners, the IT Assets of HRSN operate and perform in accordance with their documentation and functional specifications and otherwise as required by HRSN for the operation of their respective businesses as conducted immediately prior to the Closing.  To the Knowledge of HRSN/Majority Owners, no Person has gained unauthorized access to such IT Assets.  HRSN has implemented and maintains reasonable and sufficient backup and disaster recovery technology consistent with industry practices and has

- 25 -

not experienced any material failures or outages during the three (3) years preceding the Effective Date.

(d)      HRSN may contract with individuals who, in the scope of their services to HRSN, may have contributed to or participated in the creation or development of Intellectual Property on behalf of HRSN. Such individuals have executed written Contracts with HRSN that assign to HRSN all rights permitted by Law to any inventions, improvements, discoveries, or information relating HRSN. To the Knowledge of HRSN/Majority Owners, no employee of HRSN has entered into any Contract that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his or her work to any person other than HRSN.

Section 3.18  **Insurance**. Section 3.18 of the HRSN Disclosure Schedules sets forth a list as of the Execution Date that is correct and complete in all material respects of the name of insurer, coverage, policy number and term of each material insurance policy (collectively, the "**Policies**") to which HRSN is a party or by which any of their assets or any of their employees, officers or directors (in such capacity) are covered by property, fire and casualty, professional liability, public and product liability, workers' compensation, extended coverage, business interruption, directors' and officers' liability insurance and other forms of insurance provided to HRSN in connection with their respective businesses. All Postpetition premiums required to be paid with respect to the Policies covering all periods up to and including the Execution Date have been paid. Except as set forth on Section 3.18 of the HRSN Disclosure Schedules, to the Knowledge of HRSN/Majority Owners, all such Policies are in full force and effect and will remain in full force and effect after the Closing, in accordance with their respective terms. Except as set forth on Section 3.18 of the HRSN Disclosure Schedules, HRSN has not received any notice of default, cancellation or termination with respect to any provision of any such Policies, or any notice that the insurer is unwilling to renew any such Policy following the currently scheduled expiration of such Policy or intends to materially modify any term of any such renewed Policy as compared to the existing Policy. With respect to its directors' and officers' liability insurance policies, HRSN has not failed to give any notice or present any claim thereunder in due and timely fashion or as required by any such Policies so as to jeopardize full recovery under such Policies. Except as set forth on Section 3.18 of the HRSN Disclosure Schedules, HRSN has no claims pending under the Policies.

Section 3.19  **Contracts**.

(a)      Section 3.19(a) of the HRSN Disclosure Schedules lists all of the Contracts of HRSN to which it is a party or by which any of its assets or properties may be bound as of the Execution Date (such Contracts, being "**Material Contracts**"), including the following:

(i)      each Contract of HRSN involving payments to or by HRSN in excess of $50,000 in any calendar year and which, in each case, cannot be cancelled by HRSN without penalty and without more than thirty (30) days' notice;

(ii)      all Contracts that require HRSN to purchase its total requirements of any product or service from a third party or that contain "take or pay" provisions;

- 26 -

(iii)    all Contracts that relate to the indemnification by HRSN of any Person or the assumption of any Tax, environmental or other liability of any Person;

(iv)    all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(v)    all Contracts that relate to the Real Estate;

(vi)    all Contracts that relate to distribution of the programming for the regional sports network known as "Comcast Sportsnet (Houston)" (including programming backdrop) and media rights with rights-holders;

(vii)    all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts to which HRSN is a party that provide for payments to or by HRSN in excess of $50,000 in any calendar year and which, in each case, cannot be cancelled by HRSN without penalty and without more than thirty (30) days' notice;

(viii)    all IP Agreements;

(ix)    all employment agreements and Contracts with independent contractors or consultants (or similar arrangements, including talent agreements) to which HRSN is a party and which are not cancellable without material penalty or without more than 30 days' notice;

(x)    except for Contracts relating to trade receivables, all Contracts relating to indebtedness of borrowed money (including guarantees) of HRSN;

(xi)    all Contracts with any Governmental Authority to which HRSN is a party;

(xii)    all Contracts that limit or purport to limit the ability of HRSN to compete in any line of business or with any Person or in any geographic area or during any period of time;

(xiii)    any Contracts to which HRSN is a party that provide for any joint venture, partnership or similar arrangement by HRSN;

(xiv)    all Contracts between or among HRSN and (A) either of the Majority Owners or the Comcast Owner, (B) HRSN-GP, or (C) any officer, director, manager, member, partner, employee or Affiliate of HRSN, HRSN-GP, the Majority Owners or the Comcast Owner (other than employment agreements set forth in Section 3.13(a)(i) of the HRSN Disclosure Schedules);

(xv)    all collective bargaining agreements or Contracts with any union, works council or labor organization to which HRSN is a party; and

- 27 -

(xvi)   any other Contract that is material to HRSN and not previously disclosed pursuant to this Section 3.19(a).

(b)   As of the Effective Date, each Assumed Material Contract shall be valid and binding on HRSN in accordance with its terms and in full force and effect.  As of the Effective Date, neither HRSN nor, to the Knowledge of HRSN/Majority Owners, any other party thereto shall be in breach or violation of, or in default under or with respect to, any Material Contract.  As of the Effective Date, no event or circumstance shall have occurred that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder.

(c)   As of the Execution Date, HRSN is not a party to or is bound by any non-competition Contract or other Contract the assumption of which has been approved by the Bankruptcy Court or that is a Postpetition Contract that (i) purports to limit in any material respect either the type of business in which HRSN may engage or the manner or locations in which any of them may so engage in any business, or (ii) other than in the ordinary course of business consistent with past practice, could require the disposition of any material assets or line of business of HRSN.

(d)   A true, correct and complete copy of each Material Contract to which HRSN is a party as of the Execution Date has previously been delivered or made available to the Investors (including summaries of the material terms of any oral Material Contracts).

(e)   As of the Execution Date, since the commencement of the Case, HRSN has not rejected and failed to replace, on terms that are no less favorable to HRSN, any Contract that is necessary to conduct the business of HRSN in substantially the same manner as presently conducted and as proposed to be conducted.

Section 3.20   **Books and Records**.  The minute books and stock record books of HRSN, all of which have been made available to Investors, are complete and correct and have been maintained in accordance with sound business practices.  At the Closing, all of those books and records will be in the possession of HRSN.

Section 3.21   **Exemption from Registration**.  The offering and issuance by HRSN of the Common Units pursuant to the Plan is exempt from registration pursuant to Section 1145 of the Bankruptcy Code (except with respect to an entity that is an underwriter as defined in Section 1145(b) of the Bankruptcy Code) or Section 4(2) of the Securities Act, as applicable (assuming the accuracy of each Investor's representations and warranties).

Section 3.22   **HRSN-GP Actions**.  All representations and warranties of HRSN set forth in this Article 3 shall be deemed to include all actions taken by, circumstances or conditions of, and events occurring with HRSN-GP on behalf of or for the benefit of HRSN.  Any reference to HRSN with respect to actions taken or required to be taken by HRSN pursuant to this Agreement shall be deemed to include HRSN-GP.

- 28 -

Article 4
## REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

Except as set forth in the disclosure schedules attached hereto as <u>Exhibit B</u> (the "**Investor Disclosure Schedules**"), each Investor hereby severally (and not jointly) represents and warrants to HRSN that the statements contained in this <u>Article 4</u> are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (unless any such representation or warranty expressly speaks to another date, then as of such other date):

Section 4.01   **Organization and Authority**.  Such Investor is (a) a corporation or a limited liability company, as applicable, duly organized, validly existing and in good standing under the Laws of the State of its formation and has all requisite power and authority to enter into this Agreement and the other Transaction Documents to which it is a party, to carry out its Obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

Section 4.02   **Authorization of Agreements**.  The execution, delivery and performance by such Investor of its Obligations under the Transaction Documents, to the extent that such documents have been delivered as of such date, and the consummation of the transactions contemplated by the Transaction Documents, are within such Investor's corporate or limited liability company powers, as applicable, and have been duly authorized by all necessary corporate  or limited liability company action, as applicable, and do not and will not contravene the terms of its Governing Documents. Each Transaction Document when delivered will constitute a legal, valid and binding obligation of the Investor, enforceable against such Investor in accordance with its terms except as such enforceability may be subject to the effects of bankruptcy, insolvency, reorganization, moratorium, receivership, or similar Laws or judicial decisions now or hereafter in effect relating to, limiting, or affecting the rights of creditors generally or by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 4.03   **Consents; No Conflicts**.  No Approval (other than approval by the Bankruptcy Court) is necessary or required in connection with the execution, delivery or performance by, or enforcement against, such Investor of this Agreement or any other Transaction Document, or for the consummation of the transactions contemplated hereby and thereby, except for such Approvals listed on <u>Section 4.03</u> of the Investor Disclosure Schedules or that could not, individually or in the aggregate, reasonably be expected to prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement or materially impair the ability of such Investor to consummate the Investment and the transactions contemplated hereby, and all of which have been duly obtained, taken, given or made and are in full force and effect, except as indicated on <u>Section 4.03</u> of the Investor Disclosure Schedules. The execution, delivery and performance by such Investor of the Transaction Documents to which it is a party do not and will not require any consent or other action by any Person under or constitute a default under any provision of any agreement or other instruments binding upon it.

Section 4.04   **Financial Advisors and Brokers**.  No broker, finder or financial advisor is entitled to any brokerage, finder's or other fee in connection with the transactions

- 29 -

contemplated in the Transaction Documents based upon arrangements made by or on behalf of such Investor.

Section 4.05   **Ownership of Equity Interests; Purpose of Investment**.  Such Investor is acquiring the Common Units under this Agreement solely for the purpose of investment and not with a view to, or for sale in connection with, any distribution thereof in violation of the Securities Act and applicable state securities or "blue sky laws."  Such Investor is an "Accredited Investor" as such term is defined in Regulation D of the Securities Act.  Such Investor has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Common Units, and such Investor is capable of bearing the economic risks of such investment, including a complete loss of its investment in the Common Units.  Such Investor has been given the opportunity to ask questions of and receive answers from HRSN concerning HRSN, the Common Units and other related matters.

Section 4.06   **Sufficient Cash for Each Investor**.  Each Investor at all times has sufficient cash on hand to pay the Investment Price and its other obligations hereunder and under the Transaction Documents when required.

Section 4.07   **No Other Representations.**  Each Investor acknowledges and agrees that it is relying solely on the representations and warranties set forth in <u>Article 3</u> in electing to enter this Agreement and consummate the transactions contemplated hereby and hereby disclaims reliance on any and all other representations and warranties.  Without limiting the foregoing, HRSN is being transferred "as-is, where-is" without further reliance of any representation or warranty from any Person but subject to the provisions of the Plan.

Article 5
**PRE-CLOSING COVENANTS**

Section 5.01   **Bankruptcy Filings, Covenants and Agreements**.

(a)   HRSN, HRSN-GP and the Majority Owners shall use all commercially reasonable efforts to obtain Bankruptcy Court approval of this Agreement and the transactions contemplated by this Agreement on or before October 1, 2014.

(b)   HRSN, HRSN-GP and the Majority Owners shall not solicit inquiries, proposals, offers and bids from, and negotiate with, any Person regarding an Alternative Transaction. Notwithstanding anything herein to the contrary, in connection with any proposed acquisition of or investment in HRSN, HRSN-GP and the Majority Owners shall not agree to, or seek approval from the Bankruptcy Court for, any break-up fee, work fee, expense reimbursement or any other benefit or protection for any Person other than amounts payable to the Investors hereunder.

(c)   HRSN, HRSN-GP and the Majority Owners shall use all commercially reasonable efforts to (i) obtain the approvals of the Plan by the Bankruptcy Court, (ii) cause the Confirmation Order to be entered and the Effective Date to occur no later than October 1, 2014 and (iii) prevent or approve any material modification or waiver of the terms and conditions of this Agreement.

(d)      The Parties shall cooperate with each other and shall use (and shall cause their respective Subsidiaries to use) all commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on its part under this Agreement and applicable Laws to consummate the transactions contemplated by this Agreement, including preparing and filing all documentation to effect all necessary notices, reports and other filings and to obtain all consents, registrations, approvals, permits and authorizations necessary to be obtained from any third party or any Governmental Authority in order to consummate the Investment or any of the other transactions contemplated by this Agreement in accordance with the timelines provided in this Agreement.  Subject to applicable Laws, HRSN, HRSN-GP and the Majority Owners shall provide copies in advance and consult with the Investors on all filings made with, or written materials submitted to, any Governmental Authority in connection with the Investment and the Transaction Documents and shall act reasonably and as promptly as reasonably practicable in doing so. In furtherance and not in limitation of the foregoing, each of the Parties shall make any filings required pursuant to the HSR Act with respect to the transactions contemplated hereby as promptly as practicable (and in any event within ten (10) days after the Execution Date) and to supply as promptly as reasonably practicable any additional information and documentary material that may be requested by any Governmental Authority pursuant to the HSR Act and to take all other actions necessary to cause the expiration or termination of the applicable waiting periods under the HSR Act as soon as reasonably practicable thereafter.  Each of the Parties will furnish to the other Parties such necessary information and reasonable assistance as such other Parties may reasonably request in connection with the foregoing.  Each Party shall (i) have the right to review in advance and consult on, any written materials submitted to any Governmental Authority pursuant to the HSR Act in connection with the transactions contemplated by this Agreement, and (ii) consult with and consider in good faith the views of the other Parties, prior to making any oral or written submission, providing any material correspondence or entering into any agreement with any Governmental Authority pursuant to the HSR Act with respect to the transactions contemplated hereby.

(e)      HRSN, HRSN-GP and the Majority Owners further covenant and agree, with respect to any threatened or pending preliminary, temporary or permanent injunction or other order, decree or ruling or statute, rule, regulation or executive order that would adversely affect the ability of the Parties to consummate the transactions contemplated hereby, to respectively use all commercially reasonable efforts to prevent the entry, enactment or promulgation thereof, as the case may be.

(f)      Notwithstanding the foregoing, nothing in this Agreement shall obligate the Investors or any of their Affiliates to take any action, or agree, (i) to limit in any manner whatsoever or not to exercise any rights of ownership of any securities, or to sell, divest, dispose of or hold separate any securities or all or a portion of their respective businesses, assets or properties or of the business, asset or properties of HRSN, (ii) to accept any conditions relating to, or changes or restrictions in, the operations of any such assets, businesses or interests, or (iii) to limit in any manner whatsoever the abilities of such entities (A) to conduct their respective businesses or own such assets or properties or to conduct the business or own the properties or assets of HRSN or (B) to control their respective businesses or operations or the business or operations of HRSN. HRSN, HRSN-GP and the Majority Owners shall not agree to any actions, restrictions or conditions that adversely affect HRSN or its business, assets, operations or

- 31 -

liabilities with respect to obtaining any required consents, registrations, approvals, permits or authorizations in connection with the transactions contemplated by this Agreement without the prior written consent of the Investors.

Section 5.02    **No Solicitation of Alternative Transactions**.

(a)    Each of HRSN, HRSN-GP and the Majority Owners agree that neither it nor any of its officers or directors of its board (or equivalent governing body) or its Representatives shall, directly or indirectly, initiate, respond to, solicit or knowingly encourage or facilitate any inquiries or the making of any proposal or offer with respect to an Alternative Transaction, or enter into negotiations in respect of, take any actions in furtherance of or enter into an Alternative Transaction. Each of HRSN, HRSN-GP and the Majority Owners further agrees that neither it nor any of its officers or directors of its board (or equivalent governing body) or its Representatives shall, directly or indirectly, provide any confidential information or data to, or engage in any negotiations with, any Person relating to an Alternative Transaction, or otherwise knowingly encourage or facilitate any effort or attempt by any Person to make or implement an Alternative Transaction.

(b)    Notwithstanding Section 5.02(a) and subject to Section 5.02(d) and Section 5.02(e), if at any time prior to the Effective Date, HRSN receives a bona fide, unsolicited written proposal with respect to an Alternative Transaction in circumstances not involving a breach of this Section 5.02, and the Board determines in good faith, after consultation with its financial advisor and outside legal counsel that the failure to take such action would constitute a breach of its fiduciary duties and that such Alternative Transaction is reasonably likely to lead to a Superior Proposal, HRSN, directly or indirectly through advisors, agents or other intermediaries, may, upon prompt written notice (and, in any event, within 24 hours) given to, and received by, the Investors, engage in negotiations or discussions with the Person that has made such proposal, and furnish to such Person and its representatives confidential information or data relating to HRSN (but only after such Person enters into a customary confidentiality agreement with HRSN which is no less favorable to HRSN than the Confidentiality Agreement, provided that such confidentiality agreement may not include any provision calling for an exclusive right to negotiate with HRSN and may not restrict HRSN from complying with this Section 5.02); provided that HRSN concurrently delivers to the Investors all such information not previously provided to the Investors. For purposes of this Agreement, "**Superior Proposal**" means any bona fide, unsolicited written proposal with respect to an Alternative Transaction on terms that the Board determines in good faith, after considering the advice of its financial advisor and outside legal counsel and taking into account the economic, regulatory, legal and other terms and conditions of such proposal (including the conditions to and expected timing of closing and third party carriage agreements, if any) and after giving effect to all adjustments to the terms hereof resulting from any binding proposal made by the Investors pursuant to Section 5.02(e), are more favorable and provide greater value to HRSN and its estate and creditors and equity holders than that which would be provided by the transactions contemplated by this Agreement and the Plan taken together as a whole, which the Board determines is reasonably likely to be consummated in accordance with its terms and for which financing, if a cash transaction (whether in whole or in part), is then fully committed or reasonably determined to be available by the Board.

- 32 -

(c)    Each of HRSN, HRSN-GP and the Majority Owners agrees that it will, and will cause its Representatives to, cease and cause to be terminated any existing activities, discussions or negotiations with any Person with respect to any Alternative Transaction, except as provided in Section 5.02(b).

(d)    Each of HRSN, HRSN-GP and the Majority Owners agrees that it will notify the Investors, orally and in writing, as promptly as reasonably practicable  if any inquiries, proposals or offers with respect to any Alternative Transaction are received by, any such information is requested from, or any such discussions or negotiations are sought to be initiated or continued with, it or any of its Representatives, indicating, in connection with such written notice, the name of such Person and a summary of the material terms and conditions of any proposal or offer (including a copy of any written proposal or offer where applicable), and thereafter shall promptly keep the Investors reasonably informed of all material developments affecting the status and terms of any such Alternative Transaction (and to provide the Investors with copies of any additional material written materials received that relate to such Alternative Transaction).

(e)    HRSN and HRSN-GP agree not to accept or enter into any definitive documentation (other than the confidentiality agreement referred to in Section 5.02(b)) with respect to a Superior Proposal unless and until: (i) HRSN has provided written notice (a "**Superior Proposal Notice**") to the Investors of HRSN's intention to accept or enter into definitive documentation regarding such Superior Proposal at least five (5) Business Days prior to HRSN taking such actions, which notice shall provide a summary of the material terms and conditions of such Superior Proposal and include a copy of the then-current forms of all of the relevant proposed transaction documents related thereto, (ii) after providing such Superior Proposal Notice and prior to taking such actions, HRSN has negotiated with the Investors in good faith (to the extent that the Investors desire to negotiate) during such five (5) Business Day period to make such adjustments in the terms and conditions of this Agreement and the Plan as would permit HRSN or the Board to reject or not to accept such Alternative Transaction and (iii) the Board has considered in good faith any changes to this Agreement and the Plan that may be offered in writing by the Investors by 11:59 PM Central Time on the fifth (5th) Business Day of such five (5) Business Day period (an "**Enhanced Investor Proposal**") and the Board shall have determined in good faith after consultation with outside counsel and independent financial advisors that the Alternative Transaction would continue to constitute a Superior Proposal even if such Enhanced Investor Proposal were given effect. In the event of any material revisions to the Superior Proposal (it being agreed that material revisions shall include any change in the purchase price, form of consideration, transaction timing, transaction financing or transaction structure for such Superior Proposal), HRSN shall be required to deliver a new Superior Proposal Notice to the Investors pursuant to the foregoing clause (i) and to comply again with the five (5) Business Day and other requirements of this Section 5.02(e) with respect to such new Superior Proposal Notice.

(f)    HRSN, HRSN-GP, and the Majority Owners shall use all commercially reasonable efforts to implement this Agreement and the Plan (as sponsors thereof), including obtaining Bankruptcy Court approvals of this Agreement and the Plan.  In the event that one or more Alternative Transactions are proposed by any other Person that is not a Superior Proposal, HRSN and HRSN-GP shall use all commercially reasonable efforts to (i) object to and seek to

- 33 -

deny approval of such Alternative Transactions by the Bankruptcy Court, and (ii) obtain the approval of the Plan by the Bankruptcy Court.

Section 5.03    **Accounting Policies**.  HRSN shall not make any changes with respect to accounting policies or procedures, except as required by changes in GAAP or by applicable Law or with the written consent of the Investors.

Section 5.04    **Postpetition Transactions and Settlements**.  Prior to the Closing, HRSN shall not enter into any Postpetition transaction, settlement agreement, contract or financing (other than settlements of prepetition claims that do not require monetary payments and de minimis ordinary course contracts) and any assumption, rejection or renegotiation of a pre-petition agreement if such transaction, agreement, contract or financing would constitute a Material Contract unless approved by the Investors.

Section 5.05    **Taxes**.

(a)        Except as required by Law, HRSN shall not (i) make any Tax election or revoke or change any currently or previously effective Tax election, (ii) take any position on any Tax return filed on or after the Execution Date or adopt or change any accounting method relating to Taxes that is inconsistent with positions taken or accounting methods used in preparing or filing such Tax returns in prior periods, (iii) enter into any closing agreement relating to Taxes, (iv) settle or consent to any claim or assessment relating to Taxes, (v) waive or extend the statute of limitations for any such claim or assessment, or (vi) file any amended Tax Return.

(b)        The Majority Owners and HRSN-GP agree that, upon request by the Investors and at the expense of the Investors, the Majority Owners and HRSN-GP shall, and shall cause HRSN to: (i) use their commercially reasonable efforts to effect, prior to the Closing Date, such reorganizations of the business, operations and assets of HRSN or such other transactions as the Investors may request, including changes to the acquisition structure described in this Agreement and also including making or revoking any election with regard to Taxes (each, an "**Investor Pre-Closing Reorganization**"); and (ii) reasonably cooperate with the Investors and their advisors in order to determine the nature of the Investor Pre-Closing Reorganizations that might be undertaken and the manner in which they might most effectively be undertaken; provided that the Investor Pre-Closing Reorganizations (A) are not prejudicial to the Majority Owners or HRSN-GP in any material respect, (B) do not result in any breach by the Majority Owners or HRSN of any applicable Law or any existing contract, (C) would not reasonably be expected to impede or delay the Investor's ability to perform their obligations hereunder or the consummation of the transactions contemplated herein and (D) all costs and expenses relating to the Investor Pre-Closing Reorganization (or the unwinding thereof, if applicable) shall be paid by and for the account of the Investors. The Investors shall provide written notice to the Majority Owners and HRSN-GP of any proposed Investor Pre-Closing Reorganization at least ten (10) Business Days prior to the Closing Date. Upon receipt of such notice, the Parties shall work co-operatively and use commercially reasonable efforts to prepare prior to the Closing Date all documentation necessary and do all such other acts and things as are necessary, in each case, at the expense of the Purchaser, to give effect to such Investor Pre-Closing Reorganization.

- 34 -

Section 5.06    **No Title IV Liability**.  Neither HRSN nor any ERISA Affiliate shall incur any Obligation in respect of any plan subject to Title IV of ERISA except for the Multiemployer Plan liabilities and Obligations identified and described on Section 5.06 of the HRSN Disclosure Schedules.

Section 5.07    **Claims**.

(a)    On or before three (3) Business Days after the Execution Date, HRSN and HRSN-GP shall provide to the Investors, (i) the then current and projected allowed claims estimate for each of the classes described in the Plan and (ii) a list of all of HRSN's unexpired real and personal property leases, executory contracts, secured financings and other agreements, together with an estimate of known cure amounts, where relevant, and any known and pending disputes related thereto, in each case broken down by the applicable creditor where reasonably practicable. HRSN shall take (and HRSN-GP and the Majority Owners shall cause HRSN to take) all such actions as necessary, pursuant to the Plan, for the assumption of all Contracts and Obligations of HRSN that are approved in writing by the Investors for assumption by HRSN to be effective as of the Effective Date and all other Contracts and Obligations of HRSN (including Obligations related to employment agreements and Employee Plans) shall be rejected by HRSN effective as of the Effective Date unless otherwise approved in writing by the Investors.

(b)    Subject to the occurrence of the Effective Date, Astros and Rockets shall agree to fund to the extent required by the Plan (i) any allowed secured claims, allowed unsecured claims, allowed equity interests and amounts required to be paid on account of any agreements of the Comcast Owner or its Affiliates and (ii) all payments required to be made to parties in interest and all costs associated with the Plan and the reorganization of HRSN (including any cure payments), except the direct expenses of the Investors.

Section 5.08    **Conduct of Business**.

(a)    From the Execution Date until the Closing Date, HRSN shall, and HRSN-GP and the Majority Owners shall take such actions reasonably within their respective control in an effort to cause HRSN to, (i) carry on HRSN's business diligently and in the ordinary course of business consistent with past practice, (ii) preserve HRSN's business and properties intact in all material respects, including present operations, physical facilities, and working conditions, (iii) use all commercially reasonable efforts to preserve HRSN's current relationships with agents, lessors, vendors, suppliers, service providers, customers and prospective customers, employees, and other Persons having business relations with the HRSN, (iv) operate and maintain its material assets and conduct its business in material compliance with all applicable Laws, (v) maintain its assets in at least as good order and condition as existed on the Execution Date, normal wear excepted, and continue all required repair and maintenance of HRSN's assets, (vi) timely comply with the terms of all Material Contracts, (vii) timely obtain, maintain in full force and effect, and comply with all provisions of all Material Permits, and (viii) use all commercially reasonable efforts to preserve the goodwill and reputation of HRSN.

(b)    Without limiting the generality of the preceding clause (a), from the Execution Date until the Closing Date and except as consented to in writing by the Investors, HRSN shall not, and HRSN-GP and the Majority Owners shall take such actions reasonably

- 35 -

within their respective control in an effort to cause HRSN not to, (i) conduct HRSN's business other than in its ordinary course of business consistent with past practice, except as necessary to effectuate the LLC Conversion, (ii) effect any recapitalization or reclassification or like change in its capitalization or pay any distribution with respect to its Equity Interests, (iv) amend any of its Governing Documents (other than to effect the LLC Conversion), (v) mortgage, pledge or subject to any Lien, any portion of the tangible assets of HRSN, (vi) sell, assign or transfer any portion of the tangible assets of HRSN other than in the ordinary course of business consistent with past practice, (vii) except for licenses in the ordinary course of business consistent with past practice, sell, assign, license or transfer any of HRSN's Intellectual Property, (viii) make any loan, advance or capital contribution to or investment in, or issue any guarantee for the benefit of, any Person, (ix) settle or compromise any action, suit, litigation or other proceeding, whether administrative, civil or criminal, in law or in equity, or before any Governmental Authority, in each case which requires payment in excess of $100,000 for any individual Proceeding, (x) enter into, materially amend, terminate or transfer, in whole or in part, HRSN's rights or interests in or under any Material Contract, (xi) acquire any Equity Interests of any Person or other business organization or division thereof, (xii) (A) adopt, establish, enter into, amend or terminate any Employee Plan or any arrangement, agreement, plan, program or policy that would be an Employee Plan if it were in existence as of the Execution Date (except for amendments required to comply with applicable Law), (B) increase the compensation or benefits of, or grant any bonus to, any current or former employee, director or officer of HRSN (except for increases in compensation required pursuant to any Employee Plan as in effect on the Execution Date and increases in base salary in the ordinary course of business consistent with past practice), (C) grant any severance or termination pay to any present or former director, officer or employee of HRSN (except for severance or termination pay required pursuant to any Employee Plan as in effect on the Execution Date), (D) loan or advance any money or other property to any present or former director, officer or employee of HRSN, (E) hire or offer employment to any individual or (F) terminate the employment of any employee other than for cause as reasonably determined by HRSN in good faith, consistent with past practice, or (xiii) authorize or enter into any agreement in furtherance of any of the foregoing.

(c)     Notwithstanding the provisions of <u>Section 5.08(b)(xii)(F)</u> to the contrary, one (1) day following the entry of the Confirmation Order or on such later date designated in writing by the Investors, HRSN shall terminate, effective as of immediately prior to the Effective Date, the employment or engagement of, and any employment or contractor arrangements with, all Employees, "leased employees," and "independent contractors" who are not designated in writing by the Investors on or before such date to be retained following the Effective Date by the reorganized HRSN. In addition, within one (1) Business Day after written notice from the Investors, HRSN shall, and HRSN-GP and the Majority Owners shall take such efforts reasonably in their control to cause HRSN to, provide all notices of potential termination to such Employees, "leased employees," "independent contractors," and any Governmental Authority as required by Law including pursuant to the Worker Adjustment Retraining Notification Act (WARN).

Section 5.09  **Data Room Documentation**.   As promptly as practicable after the Closing Date (and in any event within five (5) Business Days after the Closing Date), the Majority Owners shall, at their expense, cause to be copied to DVDs all documents posted to the

virtual data room as of the Execution Date and deliver ten (10) copies, in the aggregate, of such DVDs to the Investors.

Article 6
**ADDITIONAL COVENANTS**

Section 6.01    **Information Rights and Access**.

(a)    From and after the Execution Date, each of the Majority Owners shall cause HRSN to, and HRSN and HRSN-GP shall (and shall cause their respective Representatives and Affiliates to) afford to the Investors, their Affiliates and their respective Representatives reasonable access, upon reasonable notice and in such manner as will not unreasonably interfere with the conduct of their respective businesses, to HRSN's facilities, properties, books, contracts, commitments, records (including information regarding any pending or threatened Proceeding to which HRSN is, or reasonably expects to be, a party), personnel, officers, independent accountants and legal counsel to assist in matters with respect to the transition of the business of HRSN to the Investors.  In addition, upon reasonable notice by the Investors, HRSN shall use all commercially reasonable efforts to facilitate access to the Comcast Owner to assist in matters with respect to the transition of the business of HRSN to the Investors as of the Closing.

(b)    HRSN and HRSN-GP, as applicable, shall send or otherwise make available to the Investors, within two (2) Business Days after each meeting of the Board, all written materials sent to Board members by, or on behalf of, HRSN or HRSN-GP.

(c)    Notwithstanding anything herein to the contrary, HRSN, HRSN-GP and the Majority Owners shall not be required to deliver to the Investors any information or materials that such Person determines in good faith, in its sole discretion, (i) are subject to a claim of legal privilege, (ii) relate to the relationship or agreements between the Investors and HRSN, or (iii) would result in a violation of applicable Law.

(d)    Any information and materials made available to the Investors and their Representatives by HRSN, HRSN-GP and the Majority Owners and their Representatives under this Agreement are to be held by the Investors and their Representatives in confidence, in accordance with the terms of the Confidentiality Agreement.

(e)    HRSN, HRSN-GP and the Majority Owners and the Investors unanimously agree that, in the event of any disclosure of privileged and confidential information by HRSN to the Investors, HRSN and the Investors have a joint and common interest and accordingly such disclosure shall not constitute waiver of any applicable privilege or publication of any confidence.

Section 6.02    **Publicity**.  Except as required by Law or pursuant to any listing agreement with or requirement of any relevant national exchange or national quotation system or authorized or permitted pursuant to the Confidentiality Agreement, neither HRSN, HRSN-GP, the Majority Owners (nor any of their Affiliates or Representatives) nor the Investors (nor any of their Affiliates or Representatives) shall, without the prior written consent of each other Party, which consent shall not be unreasonably withheld, conditioned or delayed, make any public announcement, issue any press release or make any other announcement or communication to the

- 37 -

employees of HRSN with respect to this Agreement or the transactions contemplated by this Agreement.  Prior to making any public disclosure in conjunction with the filing of the Plan or as required by Law or pursuant to any listing agreement with or requirement of any relevant national exchange or national quotation system, the disclosing Party shall consult with the other Parties, to the extent feasible, as to the content and timing of such public announcement or press release.

Section 6.03   **Transaction Court Documents**.  (i) HRSN, HRSN-GP and the Majority Owners shall provide to the Investors copies of all Transaction Court Documents and all motions, objections, pleadings, notices, proposed orders and other documents seeking the approval of the any Transaction Court Document or which are primarily related to the Transaction Court Documents as soon as reasonably practicable prior to filing the same with the Bankruptcy Court and (ii) the Investors shall provide to HRSN, HRSN-GP and the Majority Owners copies of all motions, objections, pleadings, notices, proposed orders and other documents that are to be filed by or on behalf of the Investors in the Case that are primarily related to the Transaction Court Documents as soon as reasonably practicable prior to filing the same with the Bankruptcy Court, *provided* that the obligations under this Section 6.03 shall not apply to Transaction Court Documents and motions that are the same as the drafts of such Transaction Court Documents and motions attached as exhibits hereto.  If, after delivering the same to the Investors, HRSN, HRSN-GP or the Majority Owners modifies any draft Transaction Court Document in any respect, including at the hearing scheduled to consider such Transaction Court Document, HRSN, HRSN-GP and the Majority Owners shall provide the modified version to the Investors as soon as reasonably practicable following such modification. HRSN, HRSN-GP and the Majority Owners shall cooperate and consult with the Investors at all Bankruptcy Court hearings with respect to all matters related to any Transaction Court Documents and related documents. Notwithstanding anything herein to the contrary, HRSN, HRSN-GP and the Majority Owners shall not submit, file, amend, modify or alter (including any proposed amendments, modifications or alterations of) any Transaction Court Documents and related documents without the prior written consent of the Investors.

Section 6.04   **Tax Matters**.

(a)      The Parties agree that the Investors, in their sole discretion, shall be entitled to make a timely, valid and effective election under Section 754 of the IRC with respect to HRSN (or its predecessor) for the first tax year in which the Closing occurs.

(b)      The Parties shall, unless prohibited by Law, close the taxable year of HRSN as of the end of the Closing Date. If, however, as a result of the transactions contemplated by this Agreement, the taxable year of HRSN does not close as of the end of the Closing Date, then HRSN shall adopt and use the interim closing of the books method as of the end of the Closing Date for purposes of allocating all of HRSN's items of income, gain, deductions and loss among the members for all Tax purposes for the taxable year.  For purposes of the preceding sentence, exemptions, allowances or deductions that are calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the period ending on the Closing Date and the period after the Closing Date in proportion to the number of days in each such period, and property Taxes and ad valorem Taxes attributable to a taxable period ending

- 38 -

after but including the Closing Date shall be allocated between such two periods in proportion to the number of days in each such period.

(c)     HRSN shall prepare and file, or cause to be prepared and filed, all Tax Returns of or relating to HRSN for all taxable periods ending on or prior to the Closing Date that are due on or prior to the Closing Date, and HRSN shall pay or cause to be paid any Taxes shown due thereon. Any such Tax Returns shall be prepared in a manner consistent with any applicable past practices of HRSN for taxable periods ending on or prior to the Closing Date, except as required by applicable Law.  At least twenty (20) Business Days prior to the due date for any such Tax Return, HRSN will provide to the Investors a copy of such Tax Return and shall incorporate therein all reasonable comments provided in writing by the Investors on or before the earlier to occur of (i) twenty (20) Business Days after delivery of such Tax Return by HRSN to the Investors, and (ii) five (5) Business Days prior to the due date for any such Tax Return.

(d)     HRSN shall prepare and file, or cause to be prepared and filed, all Tax Returns of HRSN for all taxable periods ending on or prior to the Closing Date that are due after the Closing Date. Each such Tax Return shall be prepared in a manner consistent with any applicable past practices of HRSN except as required by Law.  At least twenty (20) Business Days prior to the due date for any such Tax Return, HRSN will provide to HRSN-GP a copy of such Tax Return together with a statement setting forth the amount of Taxes for which the Majority Owners are liable, and HRSN shall incorporate therein all reasonable comments provided in writing by HRSN-GP on or before the earlier to occur of (i) twenty (20) Business Days after delivery of such Tax Return by HRSN to HRSN-GP, and (i) five (5) Business Days prior to the due date for any such Tax Return.  Not later than five (5) days before the due date for the payment of Taxes with respect to any Tax Return covered by this Section 6.04(d), and notwithstanding any dispute, the Majority Owners shall pay to HRSN an amount equal to the Taxes shown on the Tax Return as being the responsibility of the Majority Owners under Section 9.02.   In the event that a Majority Owner fails to timely make such payment, the relevant Majority Owner shall be required to pay to the Investors interest at the applicable statutory rate for underpayment of Taxes with respect to the amount of such Tax from the date the payment was required to be made until the date such Majority Owner actually pays such amount HRSN. No payment pursuant to this Section 6.04(d) shall excuse the Majority Owners from their indemnification obligations pursuant to Article 9 if the amount of Taxes, as ultimately determined (on audit or otherwise) for the periods covered by such Tax Returns that are the responsibility of the Majority Owners, exceeds the amount of any payments by the Majority Owners under this Section 6.04(d).

(e)     Each Party shall each promptly notify the other Parties in writing upon receipt by such party or any of their Affiliates of a written notice of any pending or threatened audit, investigation, information request or similar action with respect to Taxes for which the Majority Owners may have liability pursuant to this Agreement or that relate to income Tax Returns of HRSN for taxable periods ending on or before the Closing Date ("**Tax Contests**"); provided, however, that the failure to give such prompt written notice will not relieve the Majority Owners of their indemnification obligations, except and only to the extent that the Majority Owners forfeit rights or defenses by reason of such failure.  The Parties shall cooperate with each other in good faith in the conduct of any Tax Contest.  HRSN-GP shall have the right,

- 39 -

at the Majority Owners' expense, to represent the interests of HRSN in any Tax Contest relating to any Pass-Through Tax Return for any taxable period ending on or prior to the Closing Date; provided that HRSN-GP shall keep HRSN informed regarding the progress and substantive aspects of any such Tax Contest and shall not settle such Tax Contest if such settlement could adversely affect the Investors, HRSN or their respective Affiliates for any taxable year, or portion thereof, beginning after the Closing Date without obtaining each Investor's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  HRSN shall have the right to control the conduct of any other Tax Contest, at the Majority Owners' expense; provided that: (i) HRSN shall keep HRSN-GP informed regarding the progress and substantive aspects of any such Tax Contest; (ii) HRSN shall provide to HRSN-GP copies of all correspondence, notices and other written material received from any Governmental Authority with respect to any such Tax Contest; (iii) HRSN shall provide to HRSN-GP a copy of, and an opportunity to review and comment on, all submissions made to a Governmental Authority in connection with such Tax Contest; and (iv) HRSN shall not compromise or settle any Tax Contest without obtaining HRSN-GP's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(f)     The Parties shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of all Tax Returns and any audit, litigation, or other proceeding with respect to Taxes. Such cooperation shall include the retention and the provision of records and information reasonably relevant to any such audit, litigation or other proceeding, provided, however, that the party retaining such records may destroy such records after seven years with the consent of the other party (and if such other party does not consent, such other party shall pay the costs of delivering such records to such other party and the costs of further retention).  The Parties further agree to use all commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any other Person as may be necessary to reduce or eliminate any Tax that could be imposed on transactions contemplated by this Agreement.

(g)     Any dispute as to any matter covered by this Section 6.04 shall be resolved by an independent accountant.  The fees and expenses of the independent accountant shall be borne equally by the Majority Owners, on the one hand, and the Investors, on the other. If any dispute with respect to a Tax Return is not resolved prior to the due date of such Tax Return, such Tax Return shall be filed in the manner that the party responsible for preparing such Tax Return deems correct, without prejudice to the other party's rights hereunder.

Section 6.05   **Confidentiality**.  The Confidentiality Agreement shall continue in full force and effect following the execution of this Agreement and shall terminate as of the Closing. From and after the Closing, HRSN-GP and the Majority Owners shall, and shall cause their respective Affiliates and Representatives to hold, in confidence any and all confidential information, whether written or oral, concerning HRSN, except to the extent that HRSN-GP or the Majority Owners can show that such information (a) is generally available to and known by the public through no fault of such Person, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by such Person, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation; *provided, however*, that nothing herein shall prohibit HRSN-GP or the Majority Owners (or their respective

Representatives) from (i) providing such information to its Representatives who have a need to know such information; (ii) providing such information to the National Basketball Association or Major League Baseball, as applicable, as required pursuant to the rules of such respective organizations; or (iii) disclosing any such information pursuant to any judicial or administrative process or other requirements of Law. If HRSN-GP or the Majority Owners or any of their respective Representatives are compelled or are required to disclose any such information pursuant to any judicial or administrative process or under the rules of the National Basketball Association or Major League Baseball, as applicable, then such Person shall promptly notify HRSN in writing and shall disclose only that portion of such information which such Person is advised by its legal counsel in writing is required to be disclosed under Law or the rules of the National Basketball Association or Major League Baseball, as applicable, provided that such Person shall use all commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

Section 6.06  **Release**.  Simultaneously with the Closing and to the extent not released pursuant to the Plan, each of HRSN-GP, Astros and Rockets, on behalf of itself and its respective Affiliates, hereby unconditionally and irrevocably RELEASES AND FOREVER DISCHARGES, effective as of and forever after the Closing Date, to the fullest extent permitted by Law, HRSN from any and all Obligations, Claims, Proceedings, Losses or controversies of any kind whatsoever that HRSN-GP, Astros and Rockets and their respective Affiliates, may possess, if any, against HRSN to the extent arising out of or based upon any Contract or understanding or act or failure to act (INCLUDING ANY ACT OR FAILURE TO ACT THAT CONSTITUTES ORDINARY OR GROSS NEGLIGENCE OR RECKLESS OR WILLFUL, WANTON MISCONDUCT), misrepresentation, omission, transaction, fact, event or other matter occurring prior to the Closing Date (whether based at law or in equity or otherwise, foreseen or unforeseen, matured or unmatured, known or unknown, accrued or not accrued) including: (a) Claims with respect to repayment of loans or other indebtedness; and (b) any rights, titles and interests in, to or under any agreements, arrangements or understandings to which HRSN-GP, Astros and Rockets or any of their respective Affiliates is a party; *provided, however*, this Section 6.06 shall not apply to any Claim or Obligation arising pursuant to this Agreement or the other Transaction Documents. Each of HRSN-GP, Astros and Rockets, on behalf of itself and its respective Affiliates, hereby further agrees, from and after the Closing Date, not to file, initiate or participate in any Proceeding before any Governmental Authority on the basis of or respecting any Claim concerning any matter that is released pursuant to this Section 6.06.

Section 6.07  **Liquidation of HRSN-GP**.  HRSN-GP and the Majority Owners agree that within thirty (30) days after the Closing, to take (or cause their respective Affiliates to take), at their expense, all actions necessary for the dissolution, liquidation and cancellation of HRSN-GP including the filing of a Certificate of Cancellation with the Secretary of State of the State of Delaware.

Section 6.08  **Comcast Benefit Plans**.  HRSN shall take all actions necessary and appropriate to ensure that, effective as of immediately prior to the Effective Date, (a) HRSN shall cease to be a participating employer in any Employee Plan sponsored or maintained by the Comcast Owner or any Affiliate of the Comcast Owner (any such Employee Plan, being a "**Comcast Benefit Plan**"), and (b) each Employee who is an active participant in or is eligible to

- 41 -

participate in a Comcast Benefit Plan shall, as applicable, cease to be an active participant in or eligible to participate in such Comcast Benefit Plan.

Article 7
**CONDITIONS**

Section 7.01   **Conditions to the Investors', HRSN's, HRSN-GP's and the Majority Owners' Obligations**.   The obligation of the Investors to make the Investment pursuant to Section 2.02, the obligation of HRSN to issue and sell the Common Units pursuant to Section 2.02 at the Closing and the obligations of HRSN-GP and the Majority Owners are subject to satisfaction or waiver of each of the following conditions precedent:

(a)    *Transaction Court Documents*.   The Bankruptcy Court shall have confirmed the Plan (including assumption by HRSN of the Comcast Affiliation Agreement, without amendment), approved the Disclosure Statement and entered all orders included in the Transaction Court Documents, each of which orders shall not have been subsequently modified without the Investors' and HRSN's prior written consent, reversed or vacated, and each such Transaction Court Document shall be in effect and not be stayed.

(b)    *Effective Date*.  The Effective Date shall have occurred.

(c)    *HSR Act*.  Any applicable waiting or review period under the HSR Act shall have expired or been earlier terminated.

(d)    *Compliance with Laws, No Adverse Action or Decision*.  No Law shall have been promulgated, enacted, issued, entered or enforced by any Governmental Authority having jurisdiction over the Parties which shall be in effect or that restrains, enjoins (whether temporary, preliminary or permanent), prevents, materially delays, prohibits or otherwise makes illegal the consummation of the transactions contemplated by this Agreement.

Section 7.02   **Conditions to the Investors' Obligations**.   The obligations of the Investors to make the Investment pursuant to Section 2.02 is subject to satisfaction or waiver of each of the following conditions precedent:

(a)    *Representations and Warranties; Covenants*.  (i) The representations and warranties set forth in Article 3 (excluding the Fundamental Representations) shall be true and correct (without regard to any Material Adverse Effect, materiality or similar qualifier) on and as of the Execution Date and at the Closing Date as if made on the Closing Date (except where such representation and warranty speaks by its terms of an earlier date, in which case it shall be true and correct as of such earlier date), except where the failure to be so true and correct, individually or in the aggregate, has not had or would not reasonably be expected to have a Material Adverse Effect and (ii) the Fundamental Representations shall be true and correct in all respects on and as of the Execution Date and at the Closing Date as if made on the Closing Date (except where such representation and warranty speaks by its terms of an earlier date, in which case it shall be true and correct as of such earlier date).  HRSN, HRSN-GP, and the Majority Owners shall have performed and complied in all material respects with all Obligations and agreements required to be performed by such Persons hereunder at or prior to the Closing, and HRSN, HRSN-GP, and the Majority Owners shall have delivered to the Investors at the Closing

- 42 -

a certificate dated the Closing Date and signed by a duly authorized officer of HRSN and HRSN-GP, as applicable, and each of the Majority Owners to the effect that the conditions set forth in this Section 7.02(a) have been satisfied.

(b)      *Certificate of Governing Documents.*  The Investors shall have received a certificate of the Secretary or Assistant Secretary (or equivalent officer) of HRSN, HRSN-GP, and the Majority Owners certifying that attached thereto are true, correct and complete copies of all resolutions adopted by the board of directors (or equivalent governing body) of such Person authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(c)      *LLC Conversion.*  The LLC Conversion shall have been completed in accordance with Section 2.01 and the Investors shall have received true, correct and complete copies of all documents and instruments recorded with any Governmental Authority to evidence or consummate the LLC Conversion.

(d)      *Litigation*.  There shall be no Proceedings instituted by or before any Governmental Authority that remain pending and seek to restrain, enjoin, prevent, prohibit or otherwise make illegal the consummation of the transactions contemplated by this Agreement.

(e)      *Consents Under Material Contracts*.  HRSN shall have obtained the consent or approval of each Person whose consent or approval shall be required under any Material Contract set forth on Schedule 7.02(e), except for (i) Material Contracts as to which consent or approval is unnecessary under Section 365 of the Bankruptcy Code, or (ii) Material Contracts with a party that received actual, written notice in the Case and failed to object to the treatment of such Contract thereunder prior to the Effective Date.

(f)      *Media Rights Agreements*.  Rockets Team shall have entered into a media rights agreement with HRSN in the form set forth in Exhibit E-1 and Astros Team shall have entered into a media rights agreement with HRSN in the form set forth in Exhibit E-2 (collectively, the "**Media Rights Agreements**").

(g)      *Consents and Approvals*.  HRSN shall have received (i) all approvals, clearances, consents and authorizations set forth on Schedule 7.02(g) required to be obtained for the consummation of the Investment and the other transactions contemplated hereby, which approvals, clearances, consents and authorizations have not been stayed or vacated and (ii) all Regulatory Approvals shall have become final and unappealable, and (iii) all other material approvals, permits, authorizations, exemptions, consents, licenses and agreements from other third parties that are necessary to permit the transactions contemplated hereby and to permit HRSN to carry on its business after such transactions in a manner not materially inconsistent with the manner in which it was carried on prior to the Effective Date (together with the Regulatory Approvals (the approvals described in clauses (i), (ii) and (iii), the "**Approvals**"), which Approvals shall have been obtained without the imposition of any term, condition or consequence that would reasonably be likely to result in any of the obligations described in Section 5.01(e).

(h)      *No Material Adverse Effect*.  Since the Execution Date, there has not occurred a Material Adverse Effect.

Section 7.03   **Conditions to HRSN's Obligations**.  The obligation of HRSN to issue and sell the Common Units pursuant to Section 2.02 at the Closing is subject to satisfaction or waiver of each of the following conditions precedent:

(a)      *Representations and Warranties; Covenants*.  The representations and warranties set forth in Article 4 (without giving effect to any Material Adverse Effect, materiality or similar qualifier) shall be true and correct in all respects, on and as of the Execution Date and at the Closing Date as if made on the Closing Date (except where such representation and warranty speaks by its terms as of an earlier date, in which case it shall be true and correct as of such earlier date), except to the extent that such inaccuracies have not had, and would not, individually or in the aggregate, reasonably be expected to have a material and adverse effect on the Investors' ability to consummate the Investment.  The Investors shall have performed and complied in all material respects with all Obligations and agreements required to be performed by them at or prior to the Closing, and the Investors shall have delivered to HRSN at the Closing a certificate dated the Closing Date and signed by a duly authorized officer of each of the Investors to the effect that the conditions set forth in this Section 7.03(a) have been satisfied with regards to such Investor.

(b)      *Media Rights Agreements*.  The Rockets Team and Astros Team shall have each entered into their respective Media Rights Agreement with HRSN.

Article 8
**TERMINATION**

Section 8.01   **Termination of Agreement**.  Subject to Section 8.02, this Agreement may be terminated by notice in writing identifying the clause pursuant to which this Agreement is being terminated at any time prior to the Closing by:

(a)      HRSN, if HRSN enters into definitive documentation with respect to or otherwise accepts a Superior Proposal after complying with all provisions of Section 5.02 and only after payment of the Termination Fee in accordance with Section 8.02(b);

(b)      HRSN or the Majority Owners, if there has been a breach by the Investors of any representation, warranty, covenant or agreement contained in this Agreement which breach would result in the failure to satisfy any condition set forth in Section 7.03 to HRSN's obligations and that cannot or has not been cured within thirty (30) days following receipt by the Investors of written notice from HRSN of such breach;

(c)      the Investors, the Majority Owners or HRSN, if the Closing shall not have occurred on or before March 1, 2015 (the "**Drop Dead Date**"); provided that the right to terminate this Agreement hereunder shall not be available to any Party whose breach of this Agreement results, *inter alia*, in the failure of the Closing to occur prior to such time;

(d)      the Investors, if:

- 44 -

(i)        there shall have been a material breach by HRSN, HRSN-GP or the Majority Owners of <u>Section 5.02</u>; or

(ii)        there shall have been a breach by HRSN, HRSN-GP or the Majority Owners of any representation, warranty, covenant or agreement contained in this Agreement, which breach would result in the failure to satisfy any condition set forth in <u>Section 7.02</u> to the Investors' obligations and that cannot or has not been cured within thirty (30) days following receipt by HRSN of written notice from the Investors of such breach;

(e)        the Investors, HRSN or the Majority Owners, if the Case shall have been converted into a Chapter 7 Case under the Bankruptcy Code or shall have been dismissed, or a trustee or examiner with expanded powers relating to HRSN's business shall have been appointed, prior to the Effective Date;

(f)        the Investors, HRSN or the Majority Owners, if the Bankruptcy Court denies approval of the Plan; *provided, however*, that if this Agreement is terminated by HRSN or the Majority Owners pursuant to this <u>Section 8.01(f)</u> and within the period of time until the Drop Dead Date, HRSN or the Majority Owners consummate or enter into an agreement for (i) a merger, consolidation, share exchange, recapitalization or other business combination or similar transaction involving HRSN or any of its assets, (ii) any sale, lease or transfer of assets or other disposition of assets of HRSN pursuant to Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization, (iii) any sale or issuance of Equity Interests of HRSN, or (iv) any Stand Alone Plan (any such transactions being a "**Subsequent Transaction**"), then the Majority Owners, Astros Team and Rockets Team shall pay to the Investors an amount equal to the Termination Fee upon consummation of such Subsequent Transaction (whether or not consummated within the period of time prior to or after the Drop Dead Date), unless such Subsequent Transaction is materially less favorable to HRSN and the Majority Owners than the transactions contemplated by this Agreement and the Plan, taken together as a whole;

(g)        the Investors, if the Bankruptcy Court or any court of competent jurisdiction to which a decision relating to the Case has been appealed modifies, in a manner adverse to the Investors, the Plan or the Confirmation Order without the prior written consent of the Investors, or reverses, vacates or stays such order following its entry;

(h)        mutual agreement in writing by HRSN, HRSN-GP, the Majority Owners and the Investors;

(i)        the Investors, if there shall have been a Material Adverse Effect after the Execution Date but prior to the Closing; or

(j)        the Investors, five (5) Business Days after receipt of a Superior Proposal Notice or immediately if HRSN or the Majority Owners enter into definitive documentation with respect to or otherwise accept a Superior Proposal.

- 45 -

Section 8.02    **Effect of Termination**.

(a)        If this Agreement is terminated pursuant to the terms herein and the transactions contemplated hereby are not consummated, the terms and provisions of this <u>Section 8.02</u>, <u>Section 6.02</u>, <u>Section 6.05</u>, <u>Section 9.05(a)</u> and <u>Article 10</u> shall remain in full force and effect and any such termination shall not relieve any Party from liability for any Willful Breach occurring prior to such termination unless otherwise provided in the sentence immediately below. If this Agreement is terminated pursuant to <u>Section 8.01(a)</u>, <u>Section 8.01(d)(i)</u> or <u>Section 8.01(j)</u>, the Investors' sole and exclusive remedy shall be as set forth in <u>Section 8.02(b)</u> and the Investors shall have no further remedy against HRSN, HSRN-GP or the Majority Owners, or any of their Affiliates or Representatives. For the purposes of this <u>Section 8.02(a)</u>, "**Willful Breach**" means any action or failure to act by one of the Parties that constitutes a breach of this Agreement, where such action was taken or such failure occurred with such Party's knowledge and intention that such action or failure to act would reasonably be expected to constitute or result in a breach of this Agreement.

(b)        Notwithstanding the foregoing, in the event that HRSN terminates this Agreement pursuant to <u>Section 8.01(a)</u> or the Investors terminate this Agreement pursuant to <u>Section 8.01(d)(i)</u> or <u>Section 8.01(j)</u>, then the Majority Owners, Astros Team and Rockets Team shall pay to the Investors a termination fee of $3,750,000 (the "**Termination Fee**"). The Termination Fee payable pursuant to this <u>Section 8.02(b)</u> shall be paid upon such termination; provided that payment of the Termination Fee shall be a condition to the right of HRSN to terminate this Agreement pursuant to <u>Section 8.01(a)</u>.

(c)        60% of the amounts payable by the Majority Owners, Astros Team and Rockets Team pursuant to <u>Section 8.01(f)</u> or <u>Section 8.02(b)</u> shall be paid to DTV and 40% of such amounts shall be paid to ATT, by wire transfer of same day funds to accounts designated by the Investors, and such amounts shall be payable by the Majority Owners, Astros Team and Rockets Team in the following percentage amounts:

Astros and Astros Team (jointly and severally):    60%

Rockets and Rockets Team (jointly and severally): 40%.

(d)        HRSN, HRSN-GP, the Majority Owners, Astros Team and Rockets Team acknowledge that the agreements contained in <u>Section 8.02(b)</u> are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the Investors would not enter into this Agreement; accordingly, if HRSN, HRSN-GP, the Majority Owners, Astros Team or Rockets Team fail to promptly pay any amount due pursuant to <u>Section 8.02(b)</u>, and, in order to obtain such payment, the Investors commence a suit which results in a judgment against HRSN, HRSN-GP, the Majority Owners, Astros Team or Rockets Team for the fee, charges or expenses to which reference is made in <u>Section 8.02(b)</u>, then HRSN, HRSN-GP and the Majority Owners, Astros Team and Rockets Team, as applicable, shall pay to the Investors their costs and expenses (including attorneys' fees) in connection with such suit, together with interest on the amount of the fee at the prime rate of Citibank, N.A. in effect on the date such payment was required to be made.

- 46 -

Article 9
**INDEMNIFICATION**

Section 9.01    **Survival of Representations and Warranties**.

(a)        *Survival of Representations and Obligations of HRSN, HRSN-GP and the Majority Owners*. All of the representations and warranties of HRSN, HRSN-GP and the Majority Owners contained in this Agreement shall survive the Closing and continue thereafter in full force and effect for one (1) year after the Closing Date; *provided, however*,

(i)        the representations and warranties in Section 3.14 (Taxes) shall survive the Closing until thirty (30) days following the expiration of the statute of limitations applicable to the underlying matter giving rise to that Claim;

(ii)        the representations and warranties in Section 3.02 (Capitalization), Section 3.03, (Organization/Authority of Majority Owners and HRSN-GP), and Section 3.04 (Organization/Authority of HRSN) (collectively, the "**Fundamental Representations**") shall survive the Closing and continue thereafter in full force and effect for two (2) years after the Closing Date;

(iii)        the covenants and agreements set forth in this Agreement to be performed by HRSN, HRSN-GP or the Majority Owners prior to the Closing shall survive the Closing and continue thereafter in full force and effect for nine (9) months after the Closing Date;

(iv)        the covenants and agreements set forth in this Agreement which by their terms are to be performed by HRSN-GP or the Majority Owners at or following the Closing shall survive the Closing until fully performed in accordance with their terms; and

(v)        none of the time limits contained in this Section 9.01(a) shall apply to claims for actual fraud by HRSN, HRSN-GP or the Majority Owners in the making of their respective representations or warranties in this Agreement.

(b)        *Survival of Representations and Obligations of the Investors*.  All of the representations and warranties of the Investors contained in this Agreement shall survive the Closing and continue thereafter in full force and effect for one (1) year after the Closing Date; *provided, however*,

(i)        the representations and warranties in Section 4.01 (Organization) Section 4.02 (Authority) shall survive the Closing and continue thereafter in full force and effect for two (2) years after the Closing Date;

(ii)        the Obligations set forth in this Agreement to be performed by the Investors prior to the Closing shall survive the Closing and continue thereafter in full force and effect for nine (9) months after the Closing Date;

- 47 -

40797198.10

(iii)     the Obligations set forth in this Agreement which by their terms are to be performed by the Investors at or following the Closing shall survive the Closing until fully performed in accordance with their terms; and

(iv)     none of the time limits contained in this Section 9.01(b) shall apply to claims for actual fraud by any Investor in the making of their respective representations or warranties in this Agreement.

(c)     The definitions set forth in Section 1.01 or in any other provision of this Agreement which are used in the representations and warranties shall survive the Closing to the extent necessary to give operative effect to such representations and warranties.

(d)     A claim shall be deemed to have been properly brought upon delivery of written notice to the other Parties within the applicable time periods provided above pursuant to the notice provisions set forth in Section 9.04.  For the avoidance of doubt, the initial date of delivery of a written claim notice, and not the expiration of any cure period, shall be deemed to be the date a claim is made. Any claim required to be made within an applicable time period provided above that is not so timely made shall be forever barred.

Section 9.02   **Indemnification By the Majority Owners, Astros Team and Rockets Team**.

(a)     From and after the Closing Date, the Majority Owners, Astros Team and Rockets Team shall (subject to Section 9.02(b)(ii)) indemnify, defend and hold harmless the Investors, Affiliates of the Investors (including HRSN after the Closing) and each of their respective past, present and future directors, managers, partners, members, officers, employees, consultants, agents, successors and permitted assigns (the "**Investor Indemnitees**"), from and against all Claims and all Losses to the extent such relate to, arise out of, or result from, any of the following:

(i)     the breach of any representation or warranty of HRSN, HRSN-GP or the Majority Owners in this Agreement or in any certificate or instrument delivered by or on behalf of HRSN, HRSN-GP or the Majority Owners;

(ii)     any breach of any covenant or agreement of HRSN, HRSN-GP or the Majority Owners contained in this Agreement or arising pursuant to the Plan;

(iii)     any Transaction Expenses to the extent not paid as of the Closing Date; and

(iv)     any Taxes (A) of the existing partners of HRSN for any taxable period (including, for the avoidance of doubt, any Tax attributable to the transactions contemplated by this Agreement), (B) of HRSN for any taxable period or portion thereof ending on or prior to the Closing Date (allocated, with respect to a taxable period beginning before and ending after the Closing Date, as provided in Section 6.04(b)), (C) imposed on HRSN by reason of HRSN being or having been a member of a consolidated, combined, unitary, or similar Tax group prior to the Closing pursuant to Treasury

- 48 -

Regulation Section 1.1502-6 (or any similar provision of Law), or (D) associated with income or gain allocable to the existing partners of HRSN pursuant to Section 6.04(b).

(b)        Notwithstanding anything herein to the contrary,

(i)        no claims for indemnification under Section 9.02(a)(i) may be brought by the Investors unless and until the Losses claimed by the Investors exceed $500,000 in the aggregate (the "**Threshold**"), after which the Investors may seek to recover only such Losses that exceed the Threshold; *provided*, that the Threshold shall not apply with respect to Losses arising under Section 9.02(a)(i) with respect to a breach of a Fundamental Representation or Section 3.14 (Taxes); and

(ii)        the liability of each Majority Owner, Astros Team and Rockets Team for any indemnified Losses hereunder shall be limited to following percentage amounts:

Astros and Astros Team (jointly and severally):      60%

Rockets and Rockets Team (jointly and severally): 40%

and in no event shall the aggregate liability of the Majority Owners, Astros Team and Rockets Team pursuant to Section 9.02(a) exceed $27,500,000 in the aggregate.

Section 9.03    **Indemnification By the Investors**.  From and after the Closing Date, each Investor shall severally (and not jointly) indemnify, defend and hold harmless the Majority Owners, Affiliates of the Majority Owners (excluding HRSN after the Closing) and each of their respective past, present and future directors, managers, partners, members, officers, employees, consultants, agents, successors and permitted assigns (the "**Majority Owner Indemnitees**"), from and against all Claims and all Losses to the extent such relate to, arise out of, result from or are attributable to, directly or indirectly, any of the following:

(i)        the breach of any representation or warranty of the Investor in this Agreement or in any certificate or instrument delivered by or on behalf of the Investor; and

(ii)        any breach of any covenant or agreement of the Investor or HRSN contained in this Agreement and requiring performance at or following the Closing.

Section 9.04    **Indemnification Procedures; Matters Involving Third Parties**.

(a)        A Majority Owner Indemnitee or Investor Indemnitee, as the case may be (for purposes of this Section 9.04, an "**Indemnified Party**"), shall give the indemnifying party under Section 9.02 and Section 9.03, as applicable (for purposes of this Section 9.04, an "**Indemnifying Party**"), prompt written notice of any matter which it has determined has given or could give rise to a right of indemnification under this Agreement stating the nature of the Claim and an estimated or actual amount of the Loss, and method of computation thereof, containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises (an "**Indemnification Notice**"); *provided, however*, that the

- 49 -

failure to provide such notice shall not release the Indemnifying Party from its obligations under this <u>Article 9</u> except to the extent, and only to the extent, the Indemnifying Party is prejudiced by such failure or to the extent the survival period, if applicable, expires pursuant to <u>Section 9.01</u> prior to the giving of such notice.

(b)     If any third party shall notify an Indemnified Party with respect to any matter (a "**Third-Party Claim**") that may give rise to a claim for indemnification against the Indemnifying Party under this <u>Article 9</u>, then the Indemnified Party shall promptly (and in any event within twenty (20) days after receiving notice of the Third-Party Claim) deliver an Indemnification Notice to the Indemnifying Party regarding such Third-Party Claim; *provided, however*, that the failure to provide such notice shall not release the Indemnifying Party from its Obligations under this <u>Article 9</u> except to the extent, and only to the extent, the Indemnifying Party is prejudiced by such failure or to the extent the survival period, if applicable, expires pursuant to <u>Section 9.01</u> prior to the giving of such notice.

(c)     In the event that the Indemnifying Party shall object in good faith to the indemnification of a Indemnified Party in respect of any claim or claims specified in an Indemnification Notice, the Indemnifying Party shall, within thirty (30) days after receipt of such Indemnification Notice, deliver to the Indemnified Party a notice to such effect (an "**Objection Notice**"), setting forth in reasonable detail the basis for such objection. In the event that an Objection Notice is not sent, the Indemnifying Party is deemed to accept the Claim.

(d)     The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party, to assume and thereafter conduct the defense of any Third-Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel (such right to assume and conduct the defense shall be limited to issues that are not subject to an unresolved Objection Notice), and the Indemnified Party shall cooperate in good faith in such defense; *provided, however,* that the Indemnified Party shall have the right to retain defense of the following Third-Party Claims if: (i) in the opinion of counsel of the Indemnified Party, there is a material conflict of interest between the Indemnifying Party and the Indemnified Party, (ii) such Third-Party Claim seeks non-monetary relief applicable to HRSN or its operations or the Indemnified Party, (iii) the Third-Party Claim relates to or arises in connection with any criminal or regulatory Proceeding involving HRSN or the Indemnified Party or (iv) the Third Party-Claim is by a supplier, service provider or customer of HRSN.  In the event that the Indemnifying Party assumes the defense of any Third-Party Claim, subject to <u>Section 9.04(e)</u>, the Indemnifying Party shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third-Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right to participate in the defense of any Third-Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel shall be at the expense of the Indemnified Party. The Parties shall cooperate in a manner to preserve in full (to the extent possible) the attorney-client and work-product privileges.

(e)     The Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnified Party unless the judgment or proposed settlement (i) involves only the payment of money damages and does not impose an injunction or other equitable relief upon the

- 50 -

Indemnified Party and (ii) includes as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a complete release from all liability in respect of such Third-Party Claim and does not involve any admission of wrongdoing by the Indemnified Party or any of its Affiliates.

(f)     Unless and until the Indemnifying Party assumes the defense of the Third-Party Claim as provided in Section 9.04(c), the Indemnified Party may defend against the Third- Party Claim in any manner it may reasonably deem appropriate.

(g)     In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnifying Party (not to be unreasonably withheld, conditioned or delayed but the existence of any issue that is subject to an unresolved Objection Notice shall not, in itself, be reason to withhold such consent).

(h)     The provisions of Section 9.04(b) through (g) shall not apply to Third-Party Claims pertaining to Taxes, which shall be governed exclusively by Section 6.04(e).

Section 9.05     **Limitations on Liability/Exclusive Remedies**.

(a)     NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NO PARTY SHALL BE ENTITLED TO RECOVER UNDER THIS AGREEMENT FROM ANY OTHER PARTY OR ANY OF SUCH PARTY'S AFFILIATES ANY AMOUNT IN RESPECT OF EXEMPLARY, PUNITIVE, SPECIAL, INDIRECT OR  CONSEQUENTIAL DAMAGES, INCLUDING LOST PROFITS; EXCEPT, HOWEVER, WITH RESPECT TO ANY OF THE FOREGOING DAMAGES PAID OR OWING TO A THIRD PARTY WITH RESPECT TO A THIRD-PARTY CLAIM, WHICH DAMAGES SHALL THEN BE CONSIDERED PART OF THE DEFINED TERM  "LOSSES" AND MAY BE COVERED BY THE INDEMNIFICATIONS SET FORTH IN ARTICLE 9, IF APPLICABLE.

(b)     Except as otherwise specifically provided in Section 10.01 or elsewhere under this Agreement, the Parties acknowledge and agree that their respective sole and exclusive remedy for monetary damages after the Closing for any breach of this Agreement shall be pursuant to the indemnification provisions set forth in this Article 9 (except that no such limitation shall apply to fraud or intentional misrepresentation, and this limitation shall not affect any Party's rights to seek equitable remedies).

Article 10
**MISCELLANEOUS**

Section 10.01 **Specific Performance**.  The Parties specifically acknowledge that monetary damages may not be an adequate remedy if any of the terms or provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached, and that each Party shall be entitled to seek an injunction or injunctions in order to enforce this Agreement or prevent any violation hereof.  Any requirements for securing or posting of any bond with such remedy are waived.  Subject in all respects to Article 9, the equitable remedies described in this Section 10.01 shall be in addition to, and not in lieu of, any other remedies at law or in equity that the Parties may elect to pursue.

- 51 -

Section 10.02 **Notices**.  All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made if delivered in person or by courier or mailed by registered or certified mail (postage prepaid, return receipt requested) or by a national overnight delivery service to the relevant Party at the following addresses or sent by facsimile (with transmission confirmation) to the following numbers (or at such other address or fax number for a Party as shall be specified by like notice):

> If to DTV, to:
> DIRECTV Sports Networks, LLC
> 601 Union Street, Suite 3020
> Seattle, Washington 98101
> Attention:  President
> Fax: (___) ___
>
> With a copy to (which shall not constitute notice):
>
> DIRECTV LLC
> 2260 E. Imperial Highway
> El Segundo, California 90245
> Attention: General Counsel
> Fax: (___) _____
>
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Michael E. Lubowitz
> Fax: (212) 310-8007
>
>
> If to ATT, to:
> AT&T Teleholdings, Inc.
> c/o AT&T Services, Inc.
> 208 S. Akard, 32nd Floor
> Dallas, TX 75202
> Attention: Peter Knag
> Fax: (___) _____
>
> With a copy to (which shall not constitute notice):
>
> AT&T Teleholdings, Inc.
>
> c/o AT&T Services, Inc.
> 208 S. Akard, 32nd Floor
> Dallas, TX 75202
> Attention: David Welsch
> Fax: (___) _____

- 52 -

Norton Rose Fulbright
1301 McKinney St., Suite 5100
Houston, Texas 77010
Attention: Daniel L. Mark
Facsimile No.: (713) 651-5246


If to HRSN or HRSN-GP, to:
Houston Regional Sports Network, L.P.
1201 San Jacinto, Suite 200
Houston, TX 77002
Attention: Thaddeus B. Brown
Fax: (713) 758-7313


With a copy to (which shall not constitute notice):
Haynes and Boone, LLP
1221 McKinney Street
Suite 2100
Houston, TX 77010
Attention: Charles A. Beckham Jr.
Fax: (713) 236-5638


If to Astros or Astros Team, to:
Houston Astros, LLC
Minute Maid Park
501 Crawford Street, Suite 400
Houston, TX 77001
Attention:  General Counsel
Fax: (___) _____

With a copy to (which shall not constitute notice):

Kirkland & Ellis, LLP
601 Lexington Avenue
New York, NY 10022
Attention:  Paul M. Basta, Esq. and David S. Meyer, Esq.
Fax: (212) 446-6460

If to Rockets or Rockets Team, to:
Rocket Ball, Ltd.
The Toyota Center
1510 Polk Street
Houston, TX 77002
Attention:  General Counsel
Fax (713) 758-7404

- 53 -

With a copy to (which shall not constitute notice):

White & Case LLP
1155 Avenue of the Americas
New York, NY 10036
Attention:  Alan S. Gover, Esq.
Fax (212) 354-8113

Any such notice or communication shall be effective (i) if delivered in person or by courier, upon actual receipt by or on behalf of the intended recipient, (ii) if sent by facsimile transmission, upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next Business Day after receipt if not received during recipient's normal business hours, or (iii) if mailed in accordance with the foregoing provisions, upon the earlier of the third (3rd) Business Day after deposit in the mail or the date of delivery as shown by the return receipt therefor.

Section 10.03  **Entire Agreement; Amendment**.

(a)      This Agreement (including the exhibits and schedules hereto) and the documents described herein (including the Plan) or attached or delivered pursuant hereto (including the other Transaction Documents) and the Plan Sponsorship Agreement, as of the Execution Date by and among ATT, DTV, Astros and Rockets, set forth the entire agreement between the Parties with respect to the transactions contemplated by this Agreement.  For the avoidance of doubt, this Agreement shall not alter, modify, amend, supersede or replace the Confidentiality Agreement. Any provision of this Agreement may only be amended, modified, waived or supplemented in whole or in part at any time by an agreement in writing among the Parties executed in the same manner as this Agreement.  No failure on the part of any Party to exercise, and no delay in exercising, any right shall operate as waiver thereof, nor shall any single or partial exercise by any Party of any right preclude any other or future exercise thereof or the exercise of any other right.  No investigation by a Party of any other Party prior to or after the Execution Date shall stop or prevent the exercise of any right hereunder or be deemed to be a waiver of any such right.

Section 10.04  **Counterparts**.   This Agreement may be executed in two or more counterparts (including by means of facsimile or .pdf signature pages), each of which shall be deemed to constitute an original, but all of which together shall constitute one and the same document.

Section 10.05  **Governing Law; Jurisdiction**.   To the extent not governed by the Bankruptcy Code, all matters relating to the interpretation, construction, validity and enforcement of this Agreement shall be governed by, and interpreted in accordance with, the Laws of the State of Delaware applicable to contracts made and to be performed in that State without reference to its conflict of laws rules. The Parties agree that the appropriate and exclusive forum for any disputes arising out of this Agreement shall be the Bankruptcy Court, or if such court will not hear any such dispute, any federal or state court located in Houston, Texas, and, the Parties irrevocably consent to the exclusive jurisdiction of such courts, and agree to

- 54 -

comply with all requirements necessary to give such court's jurisdiction.  The Parties further agree that the Parties will not bring suit with respect to any disputes arising out of this Agreement except as expressly set forth below for the execution or enforcement of judgment, in any jurisdiction other than the above specified courts.  Each of the Parties irrevocably consents to the service of process in any action or proceeding hereunder by the mailing of copies thereof by registered or certified airmail, postage prepaid, to the address specified in Section 10.02.  The foregoing shall not limit the rights of any Party to serve process in any other manner permitted by the Law or to obtain execution of judgment in any other jurisdiction.   THE PARTIES AGREE TO WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY AND ALL RIGHTS THAT THEY MAY HAVE TO A JURY TRIAL WITH RESPECT TO ANY DISPUTES DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTIES HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.05.

Section 10.06 **Successors and Assigns**.  Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon, the Parties and their respective successors and permitted assigns.  Neither this Agreement nor any rights hereunder shall be assignable by any Party without the prior written consent of the other Parties; *provided, however*, that each of the Investors may assign, without the consent of the other Parties, all or part of its interest in this Agreement and all or part its rights hereunder to any of its Affiliates; provided, that any such assignment by an Investor shall not relieve such Investor of any of its obligations hereunder.  In the case of an assignment to an Affiliate of an Investor in compliance with the provisions of this Section 10.06, the term "Investor" shall include, following such assignment, any such Affiliate to the extent of such assignment and shall mean the assigning Investor and such Affiliate taken collectively; provided that if such Affiliate ceases to be an Affiliate of the Investor, the term "Investor" shall no longer include such Person.

Section 10.07 **No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except for the sections of this Agreement that are specifically for the benefit of the Investor Indemnitees and the Majority Owner Indemnitees.

Section 10.08 **HRSN Disclosure Schedules**.   HRSN, HRSN-GP and the Majority Owners have set forth information in the HRSN Disclosure Schedules in a section thereof that corresponds to the section of this Agreement to which it relates.  A matter set forth in one section of the HRSN Disclosure Schedules need not be set forth in any other section so long as its applicability to such other section of the HRSN Disclosure Schedules or section of the Agreement is reasonably apparent from the listing of such document.  The Parties acknowledge

40797198.10

and agree that (i) the HRSN Disclosure Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of the Investors and may not be required to be disclosed pursuant to this Agreement and (ii) the disclosure by HRSN, HRSN-GP and the Majority Owners of any matter in the HRSN Disclosure Schedules shall not be deemed to constitute an acknowledgment by HRSN, HRSN-GP or the Majority Owners that the matter is required to be disclosed by the terms of this Agreement or that the matter is material, nor shall such information be deemed to establish a standard of materiality, nor shall it be deemed an admission of any liability of, or concession as to any defense available to, HRSN, HRSN-GP or the Majority Owners, as applicable.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, this Agreement has been executed on behalf of the Parties by their respective duly authorized officers, all as of the date first above written.

**AT&T TELEHOLDINGS, INC.**

By: _____

Name: Rick Moore

Title: Senior Vice President - Corporate Development

**DIRECTV SPORTS NETWORKS, LLC**

By: _____

Name:

Title:

**ASTROS HRSN LP HOLDINGS LLC**

By: _____

Name:

Title:

**ROCKETS PARTNER, L.P.**

By: _____

Name:

Title:

IN WITNESS WHEREOF, this Agreement has been executed on behalf of the Parties by their respective duly authorized officers, all as of the date first above written.

**AT&T TELEHOLDINGS, INC.**

By: _____

    Name:

    Title:

**DIRECTV SPORTS NETWORKS, LLC**

By: _____

    Patrick W. Crumb

    President

**ASTROS HRSN LP HOLDINGS LLC**

By: _____

    Name:

    Title:

**ROCKETS PARTNER, L.P.**

By: _____

    Name:

    Title:

*Signature Page to Investment Agreement*

IN WITNESS WHEREOF, this Agreement has been executed on behalf of the Parties by their respective duly authorized officers, all as of the date first above written.

**AT&T TELEHOLDINGS, INC.**

By: _____

      Name: _____

      Title: _____


**DIRECTV SPORTS NETWORKS, LLC**

By: _____

      Name: _____

      Title: _____


**ASTROS HRSN LP HOLDINGS LLC**

By: _____

      Name:   James R. Crane

      Title:   President


**ROCKETS PARTNER, L.P.**

By: _____

      Name: _____

      Title: _____


*Signature Page to Investment Agreement*

IN WITNESS WHEREOF, this Agreement has been executed on behalf of the Parties by their respective duly authorized officers, all as of the date first above written.

**AT&T TELEHOLDINGS, INC.**

By: _____

Name:

Title:


**DIRECTV SPORTS NETWORKS, LLC**

By: _____

Name:

Title:


**ASTROS HRSN LP HOLDINGS LLC**

By: _____

Name:

Title:


**ROCKETS PARTNER, L.P.**

By: _____

Name: _Tad Brown_

Title: _8/6/14    CEO_


*Signature Page to Investment Agreement*

**HOUSTON REGIONAL SPORTS NETWORK, L.P.**

By: _____

Name: _____

Title:    Authorized Representative


**HOUSTON REGIONAL SPORTS NETWORK, LLC**

By: _____

Name: _____

Title:    Authorized Representative


**HOUSTON ASTROS, LLC**

By: _____

Name: _____

Title:


**ROCKET BALL, LTD.**

By: _____

Name: _____

Title:


*Signature Page to Investment Agreement*

**HOUSTON REGIONAL SPORTS NETWORK, L.P.**

By: _____

Name: _____

Title: _____


**HOUSTON REGIONAL SPORTS NETWORK, LLC**

By: _____

Name: _____

Title: _____


**HOUSTON ASTROS LLC**

By: _____

Name:     James R. Crane

Title:     Chairman


**ROCKET BALL, LTD.**

By: _____

Name: _____

Title: _____

*Signature Page to Investment Agreement*