IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br>HOUSTON REGIONAL SPORTS NETWORK, L.P.,<br><br>           Debtor. | Chapter 11<br>Case No. 13-35998 |

COMCAST CLAIMANTS' EMERGENCY
MOTION FOR STAY PENDING APPEAL

**BLR 9013-1(i) NOTICE:  EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**BLR 9013-1(b) NOTICE:  THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.  REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

The Comcast Claimants[1] hereby move this Court, pursuant to Federal Rule of Bankruptcy Procedure 8005, for an emergency stay pending appeal of this Court's order [Dkt. No. 778] (the "Confirmation Order") confirming the Third Amended Chapter 11 Plan of Reorganization of Debtor Houston Regional Sports Network, L.P. [Dkt. No. 774] (the "Plan"). Specifically, the Comcast Claimants request that the Court extend, pending appeal, the existing 14-day stay of the effectiveness of the Confirmation Order on the same terms the Court indicated would apply during the 14-day period: The Proponents and Buyers are free to take any action to consummate the Plan during the stay so long as they do not later argue equitable mootness based on any such action, thereby preserving Comcast Claimants' appeal rights.

The Comcast Claimants further respectfully request that the Court direct the Proponents to file any opposition to this motion by noon on Monday, November 3, 2014, and that the Court consider and resolve this motion by Wednesday, November 5, 2014. The Court's entry of the Confirmation Order began a 14-day clock for Comcast Claimants to seek and obtain relief pending appeal. Comcast Claimants will have a realistic opportunity to seek such relief in the district court and, if necessary, in the court of appeals only if this motion is resolved on an expedited basis.

---

[1] Comcast Claimants are Houston SportsNet Finance, LLC; Comcast Sports Management Services, LLC; National Digital Television Center LLC d/b/a Comcast Media Center; NBCUniversal Media LLC; SportsChannel New England LLC; SportsChannel Pacific Associates; and Houston SportsNet Holdings, LLC. "Comcast Lender" refers to Houston SportsNet Finance, LLC, one of the Comcast Claimants. "Astros" refers collectively to Houston Astros, LLC; Astros HRSN GP Holdings LLC; Astros HRSN LP Holdings LLC; and their affiliates. "Rockets" refers to Rocket Ball, Ltd. and Rockets Partner, L.P. The "Teams" refers collectively to the Astros and Rockets. "AT&T" refers to AT&T Teleholdings, Inc. and its affiliates. "DirecTV" refers to DirecTV SportsNetworks, LLC and its affiliates. "Buyers" refers collectively to AT&T and DirecTV. Houston Regional Sports Network, L.P. is referred to as "the Debtor" or "the Network." "Proponents" refers to the Debtor and the Teams.

**BACKGROUND**

The Court is familiar with the background of this case.  Earlier today, the Court entered the Confirmation Order [Dkt. # 778].  At that time, the Court declined to shorten the automatic 14-day stay of effectiveness of the Confirmation Order pursuant to Federal Rule of Bankruptcy Procedure 3020(e).  The Court indicated, however, that the Proponents and Buyers could take any and all steps necessary to implement the Plan during the 14-day period so long as they did not argue that the Comcast Claimants' appeal had been rendered equitably moot by any such actions.  The Court declined to entertain an oral motion for a further stay pending appeal pursuant to Federal Rule of Bankruptcy Procedure 8005 and directed the Comcast Claimants to file this written motion.  The Comcast Claimants have noticed an appeal from the Confirmation Order [Dkt. # 779].

**ARGUMENT**

Bankruptcy Rule 8005 authorizes the Court to grant "a stay … or … other relief pending appeal" of the Confirmation Order.  Fed. R. Bankr. P. 8005.  A moving party is entitled to a stay if it establishes: "(1) likelihood of success on the merits, (2) irreparable injury if the stay is not granted, (3) absence of substantial harm to the other parties from granting the stay, and (4) service to the public interest from granting the stay."  *Hunt v. Bankers Trust Co.*, 799 F.2d 1060, 1067 (5th Cir. 1986); *see In re Tex. Equip. Co.*, 283 B.R. 222, 226-27 (Bankr. N.D. Tex. 2002) ("The Fifth Circuit has instructed lower courts … to apply this [four-factor] test in the exercise of their discretion whether or not to grant a stay pending appeal.").  Each of these factors weighs decisively in favor of a stay here.

**I.     THE COMCAST CLAIMANTS ARE LIKELY TO SUCCEED ON APPEAL**

The Comcast Claimants appreciate that this Court has considered and rejected their arguments against confirmation of the Plan.  Nonetheless, the Comcast Claimants believe that they are likely to prevail on appeal of this Court's ruling that Comcast Lender was not entitled to make the § 1111(b) election to have its claim treated as fully secured for several reasons:  (1) the Court chose the wrong date on which to value Comcast Lender's intangible collateral; (2) even if the petition date were the correct date, it was incorrect to deduct the value of the Teams' unpaid administrative claims from the value of Comcast Lender's collateral; and (3) the contrived "sale" of Comcast Lender's tangible collateral under the Plan should not have barred Comcast Lender from exercising its § 1111(b) rights.[2]

**A.     Comcast Lender's Intangible Collateral Should Have Been Valued As Of The Effective Date Rather Than The Petition Date**

When valuation is performed to determine the treatment of secured creditors under a corporate chapter 11 plan of reorganization, the text, structure, and purposes of the Bankruptcy Code require that collateral be valued as of the plan's effective date.  In ruling to the contrary, this Court broke with decisions both outside and within this Circuit.

Section 506(a) of the Bankruptcy Code directs that the value of a secured creditor's collateral "shall be determined in light of the purpose of the valuation and of the *proposed … use* of such property."  11 U.S.C. § 506(a)(1) (emphasis added).  As matter of plain English, the phrase "proposed … use" directs the court to look to the manner in which the debtor will *use* an asset—here, to generate value as part of the reorganized  business.  *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702, 1706 (2012) (undefined statutory term should be given "the word's

---

[2] The Comcast Claimants believe they have other strong arguments on appeal, but for purposes of this motion focus on the arguments set out in the text.

3

ordinary meaning"). The Supreme Court's decision in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), confirms that understanding of § 506(a). In that case, the issue was whether, for the purpose of valuing secured collateral in the cramdown context, a foreclosure-sale or replacement-value standard should be used. *Id.* at 955-56. In deciding that question, the Court explained that the "'proposed disposition or use'" language in § 506(a) was of "paramount importance to the valuation question." *Id.* at 962. It concluded that because § 506(a) "t[ies] valuation to the actual 'disposition or use' of the property," when a debtor keeps a secured creditor's collateral it is appropriate to value that collateral at its replacement value, a standard that "accurately gauges the debtor's 'use' of the property," accounting for the debtor's prospective "use [of] the collateral to generate an income stream." *Id*. at 962-63.

*Rash* thus holds that valuation of collateral under § 506(a) must be keyed to the *actual use* of the property contemplated by the reorganized debtor. In the chapter 11 context, that means that, for purposes of determining a secured creditor's treatment under a plan, valuation must take into account the reorganized debtor's "use of the [creditor's] collateral to generate an income stream." And that use is properly assessed as of the effective date of the Plan. When Comcast's intangible collateral—which this Court found would generate nearly half a billion dollars (in present value terms) of revenue for the reorganized Network—is properly valued under that standard, it has substantial, not inconsequential, value. *See, e.g.*, CCX163, Jefferies Expert Report at 28 (Sept. 29, 2014).

This reading of § 506(a) is bolstered by the related cramdown protections in § 1129(b)(2)(A). Under that provision, a secured creditor whose collateral is retained by the debtor is entitled to keep its lien and receive future cash payments "totaling at least the allowed amount of [its secured] claim, of a value, *as of the effective date of the plan*, of at least the value

4

of" the creditor's collateral. 11 U.S.C. § 1129(b)(2)(A)(i) (emphasis added). It would be odd indeed to read the statute to require that a secured creditor receive the present value, "as of the effective date of the plan," of the value of its collateral on the petition date. This case vividly illustrates the incongruity: Proponents seek to defeat Comcast's § 1111(b) election on the theory that Comcast's intangible collateral has inconsequential value when it is that same collateral that will play a key role in generating value for the reorganized debtor going forward. Indeed, retention of the collateral is a *condition* to closing the deal. Proponents cannot have it both ways. *Cf.* 7 *Collier on Bankruptcy* ¶ 1111.03[3][a] (16th ed.) ("[I]f the collateral is the equity interest of the reorganizing debtor, the plan proponent cannot have it both ways: since the basis of the reorganization is that the reorganized business will have some consequence, it cannot simultaneously argue that the value of what is being reorganized is inconsequential.").

For these reasons, "the majority of courts agree that for purposes of determining the amount of a secured creditor's claim in the context of plan confirmation, the relevant collateral should be valued as of the effective date of the plan." *In re Dheming*, No. 11-56798, 2103 WL 1195652, at *1 (Bankr. N.D. Cal. Mar. 22, 2013) (collecting authority). That conclusion, the court in *Dheming* explained, is commanded by the "plain language of § 506(a)," which makes clear that "when the purpose of the valuation is to determine the treatment of the creditor's secured claim under a plan … the value should be set" as of the effective date. *Id.* at *3.

The leading treatise recognizes that this is the majority position. *See* 4 *Collier on Bankruptcy* ¶ 506.03[10] ("[C]ourts generally agree that, for purposes of determining the amount of a secured creditor's claim in the cramdown context, the relevant collateral should be valued as of the effective date of the plan."). The Third Circuit's decision in *In re Heritage Highgate, Inc.*, 679 F.3d 132 (3d Cir. 2012), is illustrative. Applying the Supreme Court's decision in *Rash*, the

court explained that the "proper measure under § 506(a) must … be the collateral's fair market value"—a determination made "as of the confirmation date." *Id.* at 141-42, 143. The court reasoned that "[t]he discounted fair market value of the property as of the confirmation date … best approximated just how secure the liens held by the creditors … were at the relevant point in Debtors' bankruptcy." *Id.* at 143 & n.9.

This Court valued Comcast's collateral as of the petition date based on *In re Stembridge*, 394 F.3d 383 (5th Cir. 2004). *Stembridge* is inapposite for at least two reasons. *First*, it is not controlling in the chapter 11 context. Indeed, what the *Stembridge* court said about the text and purposes of chapter 13 strongly weighs *against* applying its reasoning here. *Stembridge* made clear that its outcome was driven primarily by the policy concern of ensuring that secured creditors are protected against the risk of asset *depreciation* from the time of the petition date to the time of plan confirmation. The court reasoned that "the [C]ode specifically ensures the protection of a secured creditor's assets against any decrease in value from the beginning of the automatic stay…. [T]he creditors' present value is preserved throughout the reorganization through adequate protection…. It follows that this protection extends to the debtor's proposed plan itself." 394 F.3d at 387. "A later valuation date [than the petition date] would," the court explained, "eviscerate [the] value of the secured creditor's claim for a depreciating asset," and the court was concerned that in such circumstances adequate protection would not capture the deficiency. *Id.*

These policy considerations are inapplicable and, in fact, cut in the opposite direction here. In this case, there is no concern that valuation as of the effective date would deprive any secured creditor of protection against the depreciation of its collateral. To the contrary, it is the Proponents who are attempting to use valuation pegged to the petition date as a weapon to

prevent Comcast Lender from realizing the full value of its secured claim through the protections of §§ 1111(b) and 1129(b)(2)(A).

For those reasons, *Stembridge* does not and should not control here. Chapter 13 "case[s] involv[ing] depreciating collateral" are simply not "dispositive" in the Chapter 11 cram-down context. *Dheming*, 2013 WL 1195652, at *3. In *Dheming*, for example, the court explained that "a rule that unilaterally fixes the value of the collateral at the time of the filing of the bankruptcy only protects creditors whose collateral depreciates and who have failed to take advantage of the remedies [such as adequate protection] available to them … but leaves creditors whose collateral appreciates remediless," contrary to the overarching structure of chapter 11. *Id.* (citing *In re Eblen*, No. 585-01087, 1991 WL 284108, at *2 (Bankr. N.D. Cal. Apr. 8, 1991)).

Indeed, other lower courts within this Circuit have not followed *Stembridge* with respect to timing of valuation in the chapter 11 context. *See In re Good*, 428 B.R. 235, 242, 243-45 (Bankr. E.D. Tex. 2010) (citing *Stembridge*, but using a date other than the petition date to value the secured creditor's collateral); *In re LMR, LLC*, 496 B.R. 410, 424-425 (Bankr. W.D. Tex. 2013) (not citing *Stembridge*, and using a date other than the petition date to value the secured creditor's collateral).

*Second*, in 2005, Congress added § 506(a)(2) to the Code, which provides that "[i]f the debtor is an individual in a case under chapter 7 or 13, [the] value [of] personal property securing an allowed claim shall be determined based on the replacement value of such property *as of the date of the filing of the petition*." 11 U.S.C. § 506(a)(2) (emphasis added). Congress's decision to specify a date-of-filing benchmark for Chapter 7 and 13 plans, but not for Chapter 11 plans, is strong textual evidence that Chapter 11 valuation is *not* fixed at the petition date. *See In re SW Boston Hotel Venture, LLC*, 748 F.3d 393, 406 (1st Cir. 2014) ("The fact that Congress

7

mandated particular measuring dates in the exception in [§ 506(a)(2)] without mandating a particular measuring date in the general rule suggests that it intended flexibility under § 506(a)(1)."). That subsequent statutory development thus provides an even stronger basis for not extending *Stembridge*'s analysis to the chapter 11 reorganization context.

More broadly, the central concern animating both *Rash* and *Stembridge* is the principle that, if the debtor will obtain a benefit from the use of the secured creditor's collateral, then the valuation of that collateral must take account of the benefit the debtor will obtain. Here, this Court's own factual findings make clear that the reorganized Debtor will benefit enormously from its use of Comcast Lender's collateral, which is critical to the reorganized Debtor's business. 10/08/2014 Hearing Tr. 85:8-11 ("I find that the Comcast contract, over its life, its remaining life, will throw off a huge amount of gross revenues, in the range of half a billion dollars of gross revenues."). The Teams' own expert admitted as much. *See* 10/7/2014 Hearing Tr. 189:3-4 (in the absence of the Comcast Affiliation Agreement, "I don't think there would be cash flow for a reorganized network"). No plausible reading of *Rash* and *Stembridge* could lead to the outcome reached here: that a debtor can keep a creditor's collateral, use it to generate revenue with a present value of nearly half a billion dollars, but give the secured creditor nothing on account of that collateral.

      **B.**    **The Teams' Unpaid Administrative Claims Should Not Have Been Deducted From The Value Of Comcast Lender's Collateral**

Even if the petition date were the proper date on which to value the Comcast Affiliation Agreement, the Teams' approximately $107 million in unpaid administrative claims for media rights fees incurred post-petition should not have been deducted from the agreement's value, for two reasons.

*First*, that decision effectively reordered the statutory order of priority—an outcome inconsistent with first principles of the Bankruptcy Code. The effect was that Comcast, as a secured creditor, had its secured claim essentially subordinated to the administrative claims held by the Teams for the unpaid media rights. The Teams, who are obligated to pay Comcast's allowed claim under the Plan, were relieved of that obligation because their own administrative claims were, in essence, put ahead of Comcast's claim. That outcome flips the priority scheme Congress enacted on its head: The basic rule is that "administrative expenses" of the estate "are satisfied out of unencumbered assets in the bankruptcy estate." *In re Skuna River Lumber, LLC*, 564 F.3d 353, 355 (5th Cir. 2009). "Administrative expenses … do *not* have priority over secured claims." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000) (citing 11 U.S.C. §§ 506, 725-726, 1129(b)(2)(A)) (emphasis added). Yet, by deducting these losses from Comcast's intangible collateral, the court's valuation methodology effectively subordinated Comcast's right to payment to that of the Teams.

*Second*, the Teams voluntarily waived their right to cash payment of those fees—the Network did not actually pay $107 million. As a matter of economics and simple common sense, such an imaginary cost should not be charged against Comcast Lender's collateral. Indeed, the Proponents' own valuation expert acknowledged on cross-examination that he was not aware of *any* other case in which administrative claims that were not going to be paid in cash on the effective date were nonetheless deducted from the value of collateral. *See* 10/07/14 Hearing Tr. 146:22-147:16. Particularly given that the Bankruptcy Code directs courts to value secured collateral based on the "proposed disposition or use" of the property, 11 U.S.C. § 506(a)(1)—language that connotes a real-world assessment of how property will be used—it

9

was error to engage in valuation analysis that rests on admittedly counterfactual assessments of the actual economics of the Comcast Affiliation Agreement.

Accordingly, even if the petition date were the correct date on which to value Comcast Lender's intangible collateral, a proper discounted cash flow analysis beginning on the petition date would give that collateral substantial—not "inconsequential"—value that would plainly support the § 1111(b) election. Indeed, this Court expressly found that if the Teams' administrative claims were not subtracted from the value of Comcast Lender's intangible collateral, that collateral would have a "consequential" value of $24 million. 10/08/14 Hearing Tr. 94:19-24.

    **C.    The Plan's Treatment Of Comcast's Tangible Collateral Improperly Seeks To Evade The Requirements Of § 1111(b) and § 1129(b)**

Finally, the "sale" of Comcast Lender's tangible collateral under the Plan was not a true "sale" that bars Comcast Lender from making the § 1111(b) election. As an initial matter, the cash and accounts receivable in which Comcast Lender has a security interest are not being sold at all. The Plan provides that, at Comcast Lender's election, those assets will be surrendered to Comcast Lender. And that is the only sensible way to treat those assets. The Plan's alternative scenario—in which cash and receivables with a value of $18.7 million will be put up for "auction," with bidders other than the Teams required to place minimum bids of $18.8 million— is absurd on its face. Because the cash and receivables will not be sold, and are indisputably of consequential value, they alone permit Comcast Lender to make the § 1111(b) election.

Nor is the "sale" of the furniture, fixtures, and equipment a true sale. As to the FF&E, the Plan provides that the Teams will make a stalking-horse bid of $7.5 million. Third parties may make cash bids that exceed the stalking-horse bid by at least $100,000. Comcast Lender is

permitted to credit-bid; again, it must outbid the Teams by at least $100,000. If the Teams prevail at the sale, they will donate the FF&E back to the reorganized Debtor, as in prior iterations of the Plan. (Plan § 7.7.) If another party submits the highest bid for the FF&E, the winning bidder has no right to obtain the FF&E until at least 120 days after the effective date, "because the complete and uninterrupted operation of the FF&E Collateral is critical to the successful operation of the business of the Reorganized Debtor." (*Id.*) Even then, if the winning bidder has not received the FF&E by the end of the 120-day period, the bidder may file a motion with the bankruptcy court seeking turnover of the FF&E, "but shall have no other remedies." (*Id.*) Those provisions ensure that there are very unlikely to be any third-party bidders, since they have no certainty that they will ever acquire the assets for which they are bidding. The upshot is that, as before, the Teams are simply round-tripping the FF&E back to the reorganized Debtor, who will keep it free and clear of Comcast's lien.

The problem with this Plan cannot be cured by contrivances like these. The true economic substance of the Plan is that the reorganized Debtor is keeping Comcast Lender's most significant collateral, its affiliation agreement, and using it to generate enormous value for the reorganized business. It is likewise effectively keeping the FF&E, which is necessary to the operation of the business. But a debtor is simply not permitted to keep and use a secured lender's collateral, strip off its lien, and cash the creditor out at less than the full value of its claim. That is what has happened here, and that is the precise outcome § 1111(b) and § 1129(b)(2)(A) are designed to prevent. *See, e.g.*, *In re Century Glove, Inc.*, 74 B.R. 958, 962 (Bankr. D. Del. 1987) ("Debtors do not present any support from the Bankruptcy Code, legislative history, or case decisions to suggest that a debtor can create an inconsequential value situation under § 1111(b)(1)(B)(i) after a creditor has already elected to have its claim treated as

11

fully secured. The purpose of § 1111(b)(2) is to give the creditor power to decide how it will be treated and prevent a 'cash out' situation."); *In re River East Plaza, LLC*, 669 F.3d 826, 829 (7th Cir. 2012) (rejecting debtor's attempt to undermine the secured creditor's § 1111(b) election and "avoid the requirement in a [clause] (i) cramdown of maintaining the … lien on the debtor's property by transferring [the creditor's] lien to different collateral").

## II. IF THE PLAN IS CONSUMMATED AND THE COMCAST CLAIMANTS' APPEAL IS DEEMED EQUITABLY MOOT, THEY WILL SUFFER IRREPARABLE HARM

If this Court does not extend the 14-day stay provided by Bankruptcy Rule 3020(e), the Proponents will argue that the Comcast Claimants' appeal will be equitably moot and that neither the district court nor the court of appeals will have the authority to grant any relief. That would unquestionably constitute irreparable injury sufficient to warrant a stay pending appeal.

Equitable mootness may arise when: "(i) the plan of reorganization has not been stayed, (ii) the plan has been 'substantially consummated,' and (iii) the relief requested by the appellant would 'affect either the rights of parties not before the court or the success of the plan.'" *In re Tex. Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 327-28 (5th Cir. 2013). Proponents here have refused to disclaim an intent to argue equitable mootness. *See* 10/10/14 Hearing Tr. 14:9-12 ("I think … the Proponents … probably are prejudiced by the addition of the limitation that equitable mootness could not be available").

To be clear, the Comcast Claimants do not believe that consummation of the Plan would equitably moot its appeal as it pertains to the treatment of Comcast Lender's secured claim. But the Comcast Claimants' potential loss of the right to seek recovery of tens of millions of dollars because of equitable mootness is quintessential irreparable injury, as the case law recognizes. *See Tex. Equip.*, 283 B.R. at 228 (finding irreparable injury where, "if [plaintiffs] are denied a

stay, a sale of the property … would be irreversible, even if the court is found to have erred in its judgment," leaving plaintiffs "without effective remedies"); *In re Westwood Plaza Apartments, Ltd.*, 150 B.R. 163, 169 (Bankr. E.D. Tex. 1993) (holding that "consummation of the Plan may render any challenge to the confirmation moot" and granting stay); *In re Herrera*, No. 09-52974, 2010 WL 148182, at *3 (Bankr. W.D. Tex. Jan. 8, 2010) (risk of equitable mootness would "satisfy the requirement of showing some irreparable injury").

### III. NO PARTY WILL SUFFER INJURY IF A STAY IS GRANTED

In contrast, Proponents will suffer no injury if the existing 14-day stay of effectiveness of the confirmation order, on the terms set out by this Court, is extended through the resolution of the Comcast Claimants' appeal. Under this Court's ruling, the Proponents are free to consummate the transactions contemplated by the Plan, operate the Network, and otherwise proceed as they would in the ordinary course. The stay merely bars the Proponents from arguing that the Comcast Claimants' appeal is equitably moot on account of actions undertaken to implement the Plan during the stay. Extending that stay can cause the Proponents no cognizable injury.

### IV. A STAY IS IN THE PUBLIC INTEREST

Finally, the public interest weighs in favor of issuing a stay. The questions of law presented in the Comcast Claimants' appeal are important to the administration of chapter 11 cases broadly. For example, this Court broke with the established majority view that, at least in the corporate reorganization context, bankruptcy courts should value a secured creditor's collateral as of the petition date. Indeed, this Court's decision is, as far as the Comcast Claimants have been able to determine, the *only* one to reach that conclusion in a corporate reorganization case. The Court's extension of *Stembridge* to a chapter 11 reorganization context

conflicts with decisions of other lower courts in this Circuit that have valued secured collateral as of the confirmation date, risking confusion and inconsistent resolution of this important question. There is a strong public interest in having that question resolved in an orderly and efficient manner.

## CONCLUSION

The Court should grant the motion for stay pending appeal.

Dated:  October 30, 2014

|  |  |
|---|---|
|  | /s/ *Vincent P. Slusher* |
| Howard M. Shapiro | Vincent P. Slusher |
| Craig Goldblatt | Andrew Zollinger |
| WILMER CUTLER PICKERING | DLA PIPER LLP (US) |
|   HALE AND DORR LLP | 1717 Main Street, Suite 4600 |
| 1875 Pennsylvania Avenue N.W. | Dallas, Texas  75201-4629 |
| Washington, D.C. 20006 | (214) 743-4500 |
| (202) 663-6000 |  |
|  |  |
| Sanket J. Bulsara | Arthur J. Burke |
| WILMER CUTLER PICKERING | Timothy Graulich |
|   HALE AND DORR LLP | Elliot Moskowitz |
| 7 World Trade Center | Dana M. Seshens |
| 250 Greenwich Street | DAVIS POLK & WARDWELL LLP |
| New York, New York  10007 | 450 Lexington Avenue |
| (212) 230-8800 | New York, New York  10017 |
|  | (212) 450-4000 |