## IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| HOUSTON REGIONAL SPORTS NETWORK, L.P. | Case No. 13-35998 |
| Reorganized Debtor. | |

## TEAMS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF WITHHOLDING PAYMENTS UNDER THE COMCAST SERVICES AGREEMENT

The Court invited parties to file supplemental briefing regarding Comcast Services' obligation to provide the Transition Services if not paid the full amount of allegedly outstanding service fees. The Teams file this supplemental brief in response. For the reasons set forth below, the law does not require the Network to pay the $2,279,059.53 demanded by Comcast Services as a prerequisite to its provision of Transition Services and the Court should hold an evidentiary hearing to determine what amount, if any, is owing to Comcast Services on account of the Comcast Services Agreement.

## RESPONSE

Pursuant to the Comcast Services Agreement, Comcast Services was obligated to provide the Network with certain operational and management services (collectively, the "**Services**").[1] The Services were to include, among other things, guidance and oversight of the Network's operations, affiliate sales services,[2] and financial services.[3] Comcast Services Agreement,

---

[1] The Plan went effective on November 17, 2014, and, pursuant to the terms of the Plan and the Comcast Services Agreement, on that date the Comcast Services Agreement terminated. Plan, § 7.3; Comcast Services Agreement, § 4.2. Section 4.4 of the Comcast Services Agreement (relating to the provision of Transition Services) survived termination. *Id.* at § 4.5.

[2] "Affiliate sales services" include, among other things, development and implementation of an affiliate sales distribution strategy, recommendation of a distribution "footprint" and applicable rate-based zones, and negotiation of distribution agreements with MVPDs. Comcast Services Agreement, Attachment B ¶ 9.

[3] "Financial services" include, among other things, accounts payable processing and reporting on behalf of the Network. Comcast Services Agreement, Attachment B ¶ 5(d).

Attachment B.  In exchange for the Services, Comcast Services was entitled to maximum annual service fees in excess of $5 million.  *See id.* at § 3.1.

There can be no real dispute that Comcast Services failed to provide all of the contracted-for Services during the Chapter 11 Case.  Representatives of the Comcast Claimants have admitted as much under oath.   For instance, with respect to affiliate sales services, Mr. Bond testified that he could not recall having any meaningful postpetition discussions with MVPDs.[4]

Perhaps even more troubling, however, are recent revelations that Comcast Services has not provided all of the required financial services.  After the Confirmation Hearing, the Network reviewed its books and records and determined that $1,263,845 in outer-market fees payable to NBA Media Ventures ("NBA Media") had not yet been paid.  Of that amount, $500,000 constitutes a Trade Claim payable under the Plan.  The remaining $763,845 is a Priority Claim that (1) was approved for payment pursuant to the Court's order approving the Non-Insider Gap Period Claims Motion and (2) was budgeted to be paid pursuant to a June 2, 2014 consensual extension of the cash collateral order.[5]  Based on the Comcast Claimants' representations to the Court, the Proponents believed that only the $500,000 Trade Claim remained due to NBA Media and that the Priority Claim had been paid.  For instance, in September 2014, the Comcast Claimants (one of which is Comcast Services) objected to NBA Media's right to vote on the Plan; their objection indicated that only $500,000 in unpaid postpetition claims remained due to NBA Media.[6]  Additionally, at the confirmation hearing, the Comcast Claimants' counsel

---

[4] Bond Dep. Sept. 23, 2014 at 37-44, 52-54.  Mr. Bond attempted to blame the Network for this.  He claimed that Comcast Services did not provide affiliate sales services because the Network did not give him acceptable deal parameters and because the Teams were appointed the Network's lead negotiators.  *Id.* at 38-39, 48-49.  However, those are not conditions to the provision of or valid excuses for failing to provide affiliate sales services.

[5] *See* Order Authorizing Payment of Gap Period Expenses [D.I. 398]; Notice of Extension of Budget Period Pursuant to Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection, Exhibit A (Revised Budget) [D.I. 405].

[6] *See* Comcast Claimants' (I) Objection Under Section 502(a) of the Bankruptcy Code for Voting Purposes Only to Proof of Claim Number 16 Filed NBA Media Ventures, LLC and (II) Motion to Designate Vote of NBA Media Ventures, LLC, at 5 n. 4 ("On information and belief, the actual outstanding balance of the Claim [i.e., any amount

2

explained to the Court that the difference between the $500,000 Trade Claim figure so frequently mentioned with respect to NBA Media and the $2.291 million indicated on NBA Media's proof of claim "has already been paid" or "presumably will be paid in the ordinary course."[7]

On November 14, 2014, consistent with past practice and the parties' understandings,[8] the Network instructed Comcast Services to pay $763,845 to NBA Media so as to leave only the $500,000 Trade Claim outstanding upon the Effective Date.  Almost immediately, Comcast Lender learned of the Network's instruction to Comcast Services and, potentially in violation of the automatic stay, countermanded the instruction and directed Comcast Services to *not* make the payment to NBA Media.  *See* 11 U.S.C. § 362(a)(3) (staying acts to "exercise control over property of the estate.").[9]  Comcast Lender had no right to give such direction; Comcast Lender is not a party to the Comcast Services Agreement and the cash collateral orders do not give Comcast Lender the right to stop payment of a budgeted item or to interfere with the Network's contractual relationship with Comcast Services.  Presumably, Comcast Lender unlawfully interfered with the Debtor's use of property of the estate and the Debtor's ability to pay allowed claims in order to shift additional costs to the Teams.  Though it was to act on behalf of the Network, Comcast Services improperly chose to obey Comcast Lender and to disregard the Network's instruction.[10] An email sent by counsel to the Network to counsel to the Teams describing the situation is attached hereto as Exhibit A.

---

[7] in excess of $500,000] was paid as a priority claim under the Order Authorized Payment of Gap Period Expenses, dated May 20, 2014.") [D.I. 623].

[7] Oct. 22, 2014 Hr'g Tr. 140-41.

[8] Although the June 2 cash collateral budget had been subsequently amended so as to not include payment for the apparently unpaid NBA Media fees, *see* Notice of Second Extension of Budget Period Pursuant to Final Order Authorizing Use of Cash Collateral and Granting Adequate Protection [D.I. 515] (extending the budget period to December 5, 2014), on information and belief, the Network had carried forward certain other previously budgeted items between budget periods and Comcast Services never refused to pay any such item in a later period.

[9] The Teams reserve their rights to pursue claims against Comcast Lender for this action, including pursuant to section 362(k) of the Bankruptcy Code.

[10] *See* Comcast Services Agreement, § 2.1(c) (with limited exception not here applicable "Comcast [Services] acknowledges and agrees that any and all other undertakings and actions by Comcast [Services] on behalf of

3

The provision of Services, and particularly the affiliate sales services and financial services, was so "fundamental to [the] contract" that Comcast Services' failure to perform "defeat[ed] the essential purpose of the contract." *See Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *11 (Del. Ch. July 24, 2013). Accordingly, Comcast Services repeatedly and materially breached the Comcast Services Agreement, causing significant but recoupable damages to the Network. *See generally Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church, Inc.*, 2006 WL 2567916, at *19 (Del. Super. Ct. Aug. 31, 2006). And yet, Comcast Services now demands payment of the maximum amount of allegedly outstanding service fees as a condition to Comcast Services providing Transition Services. The demand is not only unreasonable in light of the value of the Services provided,[11] it is also incorrect for at least three reasons.

*First*, the payment of service fees was conditioned upon Comcast Services' full provision of the Services. This is clear from the plain language of the Comcast Services Agreement. *See* Comcast Services Agreement, § 3.1 (payment of service fees is "in consideration for . . . performance of the Services.").[12] But for the provision of the Services (and all of the Services), Comcast Services is not entitled to the maximum amount of service fees. Although section 4.4 of the Comcast Services Agreement requires the Network to pay service fees as a condition to receipt of Transition Services, the Network need only pay service fees reflective of the extent to which Comcast Services provided the Services and the value of the provided Services.

---

Network in connection with providing the Services (*i.e.* all Service-related transactions other than Non-Discretionary Transactions) shall be subject to approval by Network.").

[11] Comcast Services provided some Services during the Chapter 11 Case, but the benefit that the Network received for the Services is nowhere close to the amount allegedly owed to Comcast Services. Additionally, Mr. Pick has testified that the expense to Comcast Services for providing the Services was approximately $250,000. Pick Dep. Sept. 22, 2014 at 162. Nonetheless, Comcast Services has been paid more than $4.78 million since the Petition Date, and now seeks another $2,279,059.53, for a total in excess of $7 million.

[12] Service fees are paid for Services that have been provided and are not payment for future performance. *See* Comcast Services Agreement, § 3.1 (noting that service fees are paid in installments at the end of periods "in which any Services are provided.").

NEWYORK 9380920 (2K)

*Second*, Comcast Services is not in a position to complain about the Network's withholding of payment of the sought service fees because Comcast Services was the first breaching party when it failed to provide all of the Services. "[A] party cannot be heard to complain about a breach of contract when he first has committed a material breach." *Palekar v. Batra*, 2010 WL 2501517, at *8 (Del. Super. Ct. May 18, 2010) (citing *Hudson v. D. & V. Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Supr. 1969) ("As a general rule the party first guilty of a material breach of contract cannot complain if the other party subsequently refuses to perform.")); *see also Commonwealth Constr. Co.*, 2006 WL 2567916, at *22 (finding that injured party did not breach contract by stopping performance where the counterparty first materially breached). Indeed, "[p]erformance under a contract is justifiably excused when the other party to the contract commits a material breach." *Id.* at *19.[13] An injured party's failure to make payments under a contract after its counterparty materially breaches is not, in and of itself, considered a breach by the injured party. *See NorthPointe Holdings, LLC v. Nationwide Emerging Managers, LLC*, 2014 WL 3611669, at *18 (Del. Super. July 16, 2014). In light of Comcast Services' material breaches, the Network's failure to pay the maximum amount of service fees does not relieve Comcast Services of its other obligations under the agreement.

*Third*, the Network appears to have suffered significant damages which it might be able to recoup from any payment obligation it may have to Comcast Services. Since Comcast Services refused to pay NBA Media, the Proponents have been attempting to determine whether there are other accounts payable that had been approved for payment by the Court and the

---

[13] The Network's failure to make full payment to Comcast Services was consistent with its duty to mitigate damages. *See Lowe v. Bennett*, 1994 WL 750378, at *4 (Del. Super. Dec. 29, 1994) ("A party has a duty to mitigate once a material breach of a contract occurs."); *see also Reddy v. Primecare Int'l, Inc.*, 2000 WL 1654834, at *4 (Del. Ch. Oct. 20, 2000) ("The reality is that it is Reddy who is in material default on his contractual obligations to PhyCor and PCI, and not the other way around. Reddy's material breach excuses any current non-performance on PCI's part. It would turn Reddy's duty to PhyCor and PCI on its head to require them to dig a deeper hole for themselves by funding the full cost of [certain alleged obligations] for Reddy.").

NEWYORK 9380920 (2K)

Network but which Comcast Services failed to pay.  Discovery may be needed to determine whether Comcast Services' failure to make payments extends beyond NBA Media.  Though the magnitude of damages is presently unknown, the damages can be recouped from any service fees that the Network might owe Comcast Services.  *See generally Holford v. Powers (In re Holford)*, 895 F.2d 176, 178 (5th Cir. 1990) ("Recoupment allows a defendant to reduce the amount of plaintiff's claim by asserting a claim against the plaintiff which arose out of the same transaction to arrive at a just and proper liability on the plaintiff's claim. . . . There need not have been any express contractual right to withhold payments for the transaction to be a recoupment.") (internal citations and emphases omitted).  Importantly, Comcast Services required the Teams to pay $2.2 million in service fees as a prerequisite to receiving any Transition Services.  Pursuant to the terms of the confirmation order, the Teams have already lost the right to recoup damages from this payment.[14]  The Teams agreed to Comcast Services' demands because the Transition Services were critical to taking the Plan effective and resolving this dispute prior to effectiveness would have resulted in substantial losses to the Teams in the form of lost media rights and could have jeopardized the Plan.  The Teams should not be required to make any more payments to Comcast Services until this Court determines the amounts that are actually owed to Comcast Services under the Comcast Services Agreement.

Further, given Comcast Lender's apparent violation of the automatic stay, Comcast Services' complicity therewith, and Comcast Services' failure to adequately perform its treasury function and provide affiliate sales services, the Network should not be required to immediately make a payment that would otherwise be subject to recoupment in order to receive the Transition Services.  *See Wagner v. Hendry*, 2000 WL 238009, at *5 (Del. Ch. Feb. 23, 2000) (an injured party not free from fault with respect to performance of dependent promises, counterpromises or

---

[14]  *See* Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Chapter 11 Plan of Reorganization Dated October 29, 2014 In Respect of Houston Regional Sports Network, L.P., at ¶ 38 [D.I. 798].

conditions precedent can compel the first breaching party's performance).  An evidentiary hearing is first necessary to determine, among other thing, the damages that the Network suffered at Comcast Services' hands (which damages should significantly reduce, if not completely eliminate, the Network's liability to Comcast Services).

## CONCLUSION

At this time, the Court need only decide whether Comcast Services is required to provide Transition Services if it is compensated based upon the Services it actually provided (after consideration of damages suffered by the Network due to Comcast Services' breaches).  If the Court concludes (1) that a breach by Comcast Services could justify reduction in the service fees and (2) that Comcast Services could be obligated to perform the Transition Services if not paid the maximum amount of allegedly outstanding service fees, then the Teams respectfully request that an evidentiary hearing be scheduled so that the Court may consider and determine whether Comcast Services materially breached the Comcast Services Agreement and, if so, the amount of fees to which it is entitled.

Dated:  November 20, 2014
      New York, New York

VINSON & ELKINS LLP
Harry A. Perrin
Duston K. McFaul
1001 Fannin Suite 2500
Houston, Texas 77002
Telephone:      (713) 758-2548
Facsimile:       (713) 615-5016


KIRKLAND & ELLIS LLP
Paul M. Basta, P.C. (admitted *pro hac vice*)
David S. Meyer (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900

Jeffrey S. Powell (admitted *pro hac vice*)
Judson D. Brown (admitted *pro hac vice*)
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone:      (202) 879-5000
Facsimile:       (202) 879-5200

    *Counsel for Houston Astros, LLC*

WHITE & CASE LLP

By:   /s/ Alan Shore Gover
    Alan Shore Gover
    Ian J. Silverbrand (admitted *pro hac vice*)
    1155 Avenue of the Americas
    New York, New York  10036-2787
    Telephone:      (212) 819-8200
    Facsimile:       (212) 354-8113


Roberto J. Kampfner (admitted *pro hac vice*)
633 West Fifth Street, Suite 1900
Los Angeles, California  90071-2007
Telephone:      (213) 620-7700
Facsimile:       (213) 452-2329

MITHOFF LAW FIRM
Richard Warren Mithoff
Sherie Potts Beckman
One Allen Center, Penthouse
500 Dallas Street
Houston, Texas  77002-4800
Telephone:      (713) 654-1122
Facsimile:       (713) 739-8085

    *Counsel for Rocket Ball, Ltd.*

8