IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Chapter 11** |
| **HOUSTON REGIONAL SPORTS** | § | |
| **NETWORK, L.P.** | § | |
| | § | **Case No.: 13-35998** |
| Debtor. | § | |
| | § | |
| **ROBERT E. OGLE, AS LITIGATION** | § | |
| **TRUSTEE OF THE HRSN LITIGATION** | § | |
| **TRUST,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adv. Proceeding No. _____** |
| | § | |
| **COMCAST CORPORATION, INC.,** | § | |
| **COMCAST SPORTS MANAGEMENT** | § | **Demand For Jury Trial** |
| **SERVICES, LLC, COMCAST CABLE** | § | |
| **COMMUNICATIONS, LLC, HOUSTON** | § | |
| **SPORTSNET FINANCE, LLC, HOUSTON** | § | |
| **SPORTSNET HOLDINGS, LLC,** | § | |
| **NATIONAL DIGITAL TELEVISION** | § | |
| **CENTER, LLC (D/B/A COMCAST MEDIA** | § | |
| **CENTER), COMCAST SPORTSNET** | § | |
| **CALIFORNIA, LLC, NBCUNIVERSAL** | § | |
| **MEDIA, LLC (F/K/A NBCUNIVERSAL,** | § | |
| **INC.), JON LITNER, JOHN RUTH,** | § | |
| **ROBERT PICK, AND MADISON BOND,** | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFF'S COMPLAINT

Robert E. Ogle, as Litigation Trustee of the HRSN Litigation Trust ("**Plaintiff**") files this

Complaint against Comcast Corporation, Comcast Sports Management Services, LLC, Comcast

Cable Communications, LLC, Houston SportsNet Finance, LLC, Houston SportsNet Holdings,

LLC, National Digital Television Center, LLC (d/b/a Comcast Media Center), Comcast

SportsNet California, LLC, NBCUniversal Media, LLC (f/k/a NBCUniversal, Inc.), Jon Litner, John Ruth, Robert Pick, and Madison Bond (collectively, "**Comcast Defendants**") and respectfully states:

## Introduction

1.      Comcast Corporation's Code of Conduct requires its employees, officers, directors, and subsidiaries to "[b]e honest, fair and trustworthy in all [their] business activities and relationships."  Yet, year after year, Comcast is consistently ranked amongst the worst in customer service in the country, with a number of particularly egregious examples of its customer interactions going viral this past year.  But individual customers are not the only ones who have borne the brunt of Comcast's bad behavior.  Houston Regional Sports Network, L.P. (the "**Debtor**" or the "**Network**") has experienced Comcast's dishonesty firsthand.  Through the Debtor, Comcast partnered with the Houston Astros and the Houston Rockets to operate a regional sports network that would produce and distribute sports-related programming to Houston's sports fans.  But instead of working with its partners for the good of the Debtor and the Houston community, Comcast did everything in its power to financially impair the Debtor so that Comcast would have the leverage to acquire the Debtor's greatest assets (*i.e.*, the right to broadcast Astros and Rockets games, and related programming) for itself at a significant discount.

## Parties

2.      Plaintiff HRSN Litigation Trust is a litigation trust with its principal place of business in Houston, Texas.  Robert E. Ogle is the Litigation Trustee of the HRSN Litigation Trust (the "**Litigation Trustee**") and files this action in this capacity.  The HRSN Litigation Trust was created pursuant to the Third Amended Chapter 11 Plan of Reorganization Dated

October 29, 2014 in Respect of Houston Regional Sports Network, L.P. (the "**Plan of Reorganization**"), which was confirmed on October 30, 2014.  On November 17, 2014 (the "**Effective Date**"), the Debtor transferred to the HRSN Litigation Trust the Transferred Causes of Action (as defined in the Plan of Reorganization), which includes certain causes of action of the Debtor against the Comcast Entities (as defined in the Plan of Reorganization).  The HRSN Litigation Trust was established for the benefit of the holders of Litigation Trust Beneficial Interests, who are creditors of the Debtor's estate as created under § 541 of the Bankruptcy Code upon the commencement of the above-captioned Chapter 11 case (the "**Estate**").  The Litigation Trustee was appointed to be the representative of the Estate to pursue the Transferred Causes of Action on behalf of the Estate and its creditors who suffered generalized injuries as a result of Comcast Defendants' wrongful conduct.

3.      Defendant Comcast Corporation, Inc. ("**Comcast Corp.**"), on information and belief, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast Corp. has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to Arthur R. Block (Senior VP, General Counsel, and Secretary for Comcast Corp.) c/o Comcast Corporation, One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Service is also being made on Comcast Corp.'s counsel of record: Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.

4.     Defendant Comcast Sports Management Services, LLC ("**Comcast Services**"), on information and belief, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast Services has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to Jon D. Litner (President of Comcast Services) c/o Comcast Sports Management Services, LLC, 1 Blachley Road, Stamford, CT 06902.  Service is also being made on Comcast Services' counsel of record: Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.

5.     Defendant Comcast Cable Communications, LLC ("**Comcast Cable**"), on information and belief, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 200 Cresson Boulevard, Oaks, PA 19456.  Comcast Cable has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to Arthur R. Block (Senior VP and Secretary for Comcast Cable) c/o Comcast Corporation, One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Service is also being made on Comcast Cable's counsel of record Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.

6.     Defendant  Houston  SportsNet  Finance,  LLC  ("**Comcast  Lender**"),  on information and belief, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at One Comcast Center, 1701

John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast Lender has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to Robert S. Pick (Senior VP of Comcast Lender) c/o Comcast Corporation, One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Service is also being made on Comcast Lender's counsel of record: Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.

7.      Defendant Houston SportsNet Holdings, LLC ("**Comcast Partner**"), on information and belief, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast Partner has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to John Ruth (officer of Comcast Partner) c/o Comcast Sports Management Services, LLC, 1 Blachley Road, Stamford, CT 06902.  Service is also being made on Comcast Partner's counsel of record: Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.

8.      Defendant National Digital Television Center, LLC (d/b/a Comcast Media Center) ("**Comcast Media**"), on information and belief, is a limited liability company organized and existing under the laws of the State of Colorado, with its principal place of business located at One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.  Comcast Media has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by

mailing a copy of this Complaint and the summons by first class mail postage prepaid to Bruce A. Davis (VP of Financial Operations for Comcast Media) c/o National Digital Television Center, LLC, 4100 E. Dry Creek Road, Centennial, CO 80122.  Service is also being made on Comcast Media's counsel of record: Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.

9.     Defendant Comcast SportsNet California, LLC ("**Comcast California**"), on information and belief, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 4450 East Commerce Way, Sacramento, CA 95834.  Comcast California has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to John Ruth (Executive VP of Finance, Planning and Business Operations for Comcast California) c/o Comcast Sports Management Services, LLC, 1 Blachley Road, Stamford, CT 06902.  Service is also being made on Comcast California's counsel of record: Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.

10.    Defendant NBCUniversal Media, LLC, formerly known as NBCUniversal, Inc. ("**NBCU**"),[1] on information and belief, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 30 Rockefeller Plaza, New York, NY 10112.  NBCU has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class

---

[1]    On information and belief, NBCUniversal, Inc. was converted to a limited liability company (NBCUniversal Media, LLC) on January 28, 2011.

mail postage prepaid to Stephen B. Burke (CEO of NBCU) c/o NBCUniversal Media, LLC, 30 Rockefeller Plaza, New York, NY 10112.  Service is also being made on NBCU's counsel of record: Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.  On information and belief, at all times relevant to Plaintiff's causes of action asserted herein, NBCU was acting as an agent of Comcast Corp., Comcast Services, Comcast Cable, Comcast Lender, and/or Comcast Partner.

11.     Defendant Jon Litner ("**Litner**"), on information and belief, is an individual residing in the Commonwealth of Pennsylvania. Litner has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to Jon Litner c/o Comcast Sports Management Services, LLC, 1 Blachley Road, Stamford, CT 06902 (the address where, on information and belief, Litner regularly conducts business).  Service is also being made on Litner's counsel of record Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.  On information and belief, at all times material to this action, Litner was an officer, director, agent, and/or employee of Comcast Services, NBCU, Comcast Partner, and Houston Regional Sports Network, LLC.  On information and belief, Litner has actively participated in and/or benefitted directly from the tortious activities described herein, both in his individual capacity and as an officer, director, agent, and/or employee of Comcast Services, NBCU, Comcast Partner, and/or Houston Regional Sports Network, LLC.

12.     Defendant John Ruth ("**Ruth**"), on information and belief, is an individual residing in the State of Connecticut.  Ruth has appeared in the above-captioned Chapter 11 bankruptcy proceeding as an interested party, and may be served with process pursuant to FED.

R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to John Ruth c/o Comcast Sports Management Services, LLC, 1 Blachley Road, Stamford, CT 06902 (the address where, on information and belief, Ruth regularly conducts business).  Service is also being made on Ruth's counsel of record Vincent P. Slusher, c/o DLA Piper (US) LLP, 1717 Main, Suite 4600, Dallas, TX 75201.   On information and belief, at all times material to this action, Ruth was an officer, director, agent, and/or employee of Comcast Services, NBCU, Comcast California, and Houston Regional Sports Network, LLC.   On information and belief, Ruth has actively participated in and/or benefitted directly from the tortious activities described herein, both in his individual capacity and as an officer, director, agent, and/or employee of Comcast Services, NBCU, Comcast California, and/or Houston Regional Sports Network, LLC.

13.    Defendant Robert Pick ("**Pick**"), on information and belief, is an individual residing in the State of New Jersey.  Pick may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to Robert Pick c/o Comcast Corporation, One Comcast Center, 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103 (the address where, on information and belief, Pick regularly conducts business).  On information and belief, at all times material to this action, Pick was an officer, director, agent, and/or employee of Comcast Corp., Comcast Partner, and/or Comcast Lender.   On information and belief, Pick has actively participated in and/or benefitted directly from the tortious activities described herein, both in his individual capacity and as an officer, director, agent, and/or employee of Comcast Corp., Comcast Partner, and/or Comcast Lender.

14.     Defendant Madison (Matt) Bond ("**Bond**"), on information and belief, is an individual residing in the State of New York.  Bond may be served with process pursuant to FED. R. BANKR. P. 7004(b) by mailing a copy of this Complaint and the summons by first class mail postage prepaid to Matt Bond c/o NBCUniversal Media, LLC, 30 Rockefeller Plaza, New York, NY 10112 (the address where, on information and belief, Bond regularly conducts business).  On information and belief, at all times material to this action, Bond was an officer, director, agent, and/or employee of NBCU and/or Comcast Services.  On information and belief, Bond has actively participated in and/or benefitted directly from the tortious activities described herein, both in his individual capacity and as an officer, director, agent, and/or employee of NBCU and/or Comcast Services.

### Jurisdiction and Venue

15.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and FED. R. BANKR. P. 7001.  Further, § 13.1(xiv) of the Plan of Reorganization provides that this Court "shall retain and shall have exclusive jurisdiction . . .  [t]o hear and determine all controversies, suits, and disputes that may related to, impact upon, or arise in connection with Causes of Action of the Debtor (including Avoidance Actions and Transferred Causes of Action) commenced by . . . the Litigation Trustee . . . before or after the Effective Date . . ."  The present Complaint falls within this Court's retained jurisdiction.

16.     This adversary proceeding is a non-core proceeding arising in or related to the above-captioned chapter 11 case.  Plaintiff consents to the entry of final orders or judgment by this Bankruptcy Court, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure.

17.     The Court has personal jurisdiction over Comcast Defendants pursuant to FED. R. BANKR. P. 7004(f) and/or TEX. CIV. PRAC. & REM. CODE § 17.042, and the exercise of such jurisdiction is consistent with due process under the United States Constitution.

18.     Venue for this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409.  Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, errors, omissions, and misrepresentations that give rise to the claims at issue in this case occurred in this District.

## **Factual Background**

### A.     **The Debtor was formed.**

19.     The Debtor was a Delaware limited partnership formed by the Astros[2] and the Rockets[3] in 2003 to operate a regional sports network ("**CSN Houston**" or the "**Service**") that produces and distributes content relating to Houston's sports teams, including the Houston Astros,[4] the Houston Rockets,[5] and the Houston Dynamo.  The substantial majority of the Debtor's revenue would be derived from affiliation agreements with multi-channel video programming distributors ("**MVPDs**") for the redistribution of CSN Houston in exchange for monthly, per-subscriber rates.

20.     As of May 8, 2003, the Debtor consisted of two limited partners, Rockets Partner, L.P. ("**Rockets Partner**") and Houston McLane Company, LLC ("**HMC**"), and one general

---

[2]     Unless otherwise specified, "**Astros**" refers to Houston Astros, LLC and/or its affiliates and predecessors including McLane Company, LLC f/k/a Houston McLane Company, Inc. d/b/a the Houston Astros.

[3]     Unless otherwise specified, "**Rockets**" refers to Rockets Partner, L.P., JTA Sports, Inc., Rocket Ball, Ltd., and/or their affiliates and predecessors.

[4]     Unless otherwise specified, "**Houston Astros**" refers to the Major League Baseball's Houston Astros franchise.

[5]     Unless otherwise specified, "**Houston Rockets**" refers to the National Basketball Association's Houston Rockets franchise.

partner, Houston Regional Sports Network, LLC ("**General Partner**").  The General Partner was formed as a Delaware limited liability company and consisted of two members: JTA Sports, Inc. ("**Rockets Member**") and HMC.  On or around May 10, 2010, HMC transferred (i) its limited partnership interest in the Debtor to McLane HRSN LP Holdings, LLC ("**Astros Partner**") and (ii) its membership interest in the General Partner to McLane HRSN GP Holdings, LLC ("**Astros Member**").[6]

21.     Rockets Partner and Rockets Member (collectively, "**Rockets Constituents**") are affiliates of Rocket Ball, Ltd. ("**Rocket Ball**"), the owner of the Houston Rockets.  As owner of the Houston Rockets, Rocket Ball has the right to exhibit and exploit, and license to others the rights to exhibit and exploit, certain team-related programming by licensed distribution means. Rocket Ball and the Debtor were parties to a Media Rights License Agreement (as amended through October 22, 2010, the "**Original Rockets Media Rights Agreement**"), through which Rocket Ball granted the Debtor the exclusive right and license to produce and exhibit or otherwise exploit all of the specified programming of the Houston Rockets.

22.     HMC was the prior owner of the Houston Astros, and is the predecessor to Houston Astros, LLC ("**Astros LLC**"), the current owner of the Houston Astros.[7]  Astros Partner and Astros Member (collectively, "**Astros Constituents**") are affiliates of Astros LLC (and former affiliates of HMC.  As owner of the Houston Astros, Astros LLC (and previously HMC) has the right to exhibit and exploit, and license to others the rights to exhibit and exploit, certain team-related programming by licensed distribution means.  HMC and the Debtor were parties to

---

[6]     The terms "**Astros Member**" and "**Astros Partner**," as used herein, also refer to the successors of such entities (*i.e.*, Astros HRSN GP Holdings, LLC and Astros HRSN LP Holdings, LLC).

[7]     In 2011, Houston Baseball Partners LLC ("**HBP**") purchased the Houston Astros, including the approximately 46% equity interest in the Debtor, from HMC and its affiliates for $615 million.

a Media Rights License Agreement (as amended through October 22, 2010, the "**Original Astros Media Rights Agreement**"), through which HMC granted the Debtor the exclusive right and license to produce and exhibit or otherwise exploit all of the specified programming of the Houston Astros.

**B.    Comcast becomes involved with the Debtor.**

23.    In 2010, Comcast,[8] the largest cable company in the Houston metropolitan area, expressed an interest in purchasing an interest in the Debtor.  One of the largest and most sophisticated companies in the United States, Comcast is a Fortune 50 company with more than $68 billion in revenue reported last year.  It is an experienced and aggressive player in the mergers and acquisitions market, as well as in the ownership and operation of sports television networks.  Through its various affiliates and subsidiaries, Comcast owns and operates a chain of regional sports networks around the country.

24.    After lengthy negotiations and a competitive bid process, on October 29, 2010, Comcast Partner was admitted as a limited partner in the Debtor and a member of the General Partner.  As a result, Comcast Partner held 22.443% of the equity interests in the Debtor, while Rockets Partner, Astros Partner, and the General Partner held 30.923%. 46.384%, and 0.25%, respectively.  Comcast Partner also held 22.5% of the equity interests in the General Partner, while Rockets Member and Astros Member held 31.0% and 46.5%, respectively.  The primary reason the Debtor chose to partner with Comcast was because it represented to the Debtor that it would use its immense market power to achieve carriage of CSN Houston at the promised rates.

---

[8]    Unless otherwise specified, "**Comcast**" refers to Comcast Corp. and/or its direct and indirect wholly-owned and partially owned subsidiaries, including but not limited to Comcast Partner, Comcast Services, Comcast Cable, Comcast Finance, Comcast Media, and Comcast California.

25.     The rights and responsibilities of the Debtor's partners were governed by the Second Amended and Restated Agreement of Limited Partnership of Houston Regional Sports Network, L.P. (as amended, the "**LP Agreement**").  Pursuant to the LP Agreement, the Debtor was managed by the General Partner, which itself was governed by the Second Amended and Restated Limited Liability Company Agreement of the General Partner (as amended, the "**LLC Agreement**").  The General Partner was managed by a board of directors (the "**GP Board**," and each member thereof a "**Director**").  The GP Board consisted of one individual appointed by Rockets Member (Tad Brown), one individual appointed by Astros Member (James Crane),[9] and two individuals appointed by Comcast Partner (Litner and Ruth).  Under the LP Agreement and the LLC Agreement, unanimous consent of the Directors of the GP Board was required for various actions by the Debtor.

26.     Also on October 29, 2010, the Debtor entered into various agreements with other Comcast affiliates related to the operation and business of the Debtor, including, but not limited to, the following:

- Credit Agreement ("**Comcast Credit Agreement**") with Comcast Lender, pursuant to which Comcast Lender agreed from time to time prior to a termination date of not later than September 30, 2017 to make advances to the Debtor in the maximum aggregate principal amount of $100 million;

- Security Agreement with Comcast Lender ("**Comcast Security Agreement**"), through which the Debtor granted Comcast Lender security interests in certain assets of the Debtor to secure the Debtor's obligations under the Comcast Credit Agreement;

- Comcast Network Services Agreement ("**Comcast Services Agreement**") with Comcast Services, pursuant to which Comcast Services agreed to provide management oversight and certain enumerated operational services (including affiliate sales services, affiliate finance services, executive oversight services, operations and engineering, business and legal affairs services, as well as certain

---

[9]     Crane was replaced on the GP Board on February 5, 2013, by Giles Kibbe.

other services), identification of prospective MVPDs, and negotiation of distribution agreements with MVPDs interested in carrying and eligible to distribute CSN Houston, and, in return, the Debtor agreed to pay $5 million annually to Comcast Services (subject to certain increases or decreases as provided in the agreement) along with all reasonable out-of-pocket costs; and

- Affiliation Agreement ("**Comcast Cable Affiliation Agreement**") with Comcast Cable, pursuant to which Comcast Cable carries CSN Houston on its cable system in exchange for a monthly per-subscriber rate that varies based upon the territory of the subscriber.

27.     In conjunction with executing the above agreements with the various Comcast entities, the Debtor also amended its Original Media Rights Agreements with the Astros and the Rockets on October 29, 2010.  Specifically, the Debtor and HMC executed an Amended and Restated Media Rights Agreement ("**Astros Media Rights Agreement**"), pursuant to which HMC granted the Network the exclusive right and license to produce and exhibit or otherwise exploit all of the Available Games, Related Shows and Additional Programming (each as defined in the Astros Media Rights Agreement) of the Houston Astros through the year 2032.[10]   In exchange for such right and license, the Debtor agreed to make, over time, hundreds of millions of dollars of payments to HMC.  Similarly, the Debtor and Rocket Ball executed an Amended and Restated Media Rights Agreement ("**Rockets Media Rights Agreement**," and collectively with the Astros Media Rights Agreement, the "**Media Rights Agreements**"), pursuant to which Rocket Ball granted the Network the exclusive right and license to produce and exhibit or otherwise exploit all of the Available Games, Related Shows and Additional Programming (each as defined in the Rockets Media Rights Agreement) of the Houston Rockets through the year 2032.  In exchange for such right and license, the Debtor agreed to make, over time, hundreds of millions of dollars of payments to Rocket Ball.  Under both Media Rights Agreements, if the

---

[10]   HMC assigned its rights and interests in the Astros Media Rights Agreement to Astros LLC when HBP purchased the Houston Astros in 2011.

Debtor failed to make a required media rights payment and did not cure such default within sixty (60) days, the Astros and the Rockets would each be entitled to terminate their respective Media Rights Agreement.

### C. Comcast decides to financially cripple the Debtor in order to obtain the Debtor's assets for itself.

28.     On information and belief, by 2013 (and potentially as early as mid-2010), Comcast decided that, instead of working to make the Debtor successful, it would do everything in its power to acquire for itself the Debtor's primary and most valuable assets: the right to telecast programming related to the Houston Astros and Houston Rockets, and the right to receive revenue from affiliation agreements with MVPDs that carry CSN Houston (collectively, the "**Assets**").

29.     In or around February 2012, Comcast Services and its affiliate, NBCU,[11] pursuant to the Comcast Services Agreement,[12] began to reach out to MVPDs in advance of a planned October 2012 launch of CSN Houston.  On February 28, the GP Board approved the 2012 budget for the Debtor.  This budget was based on a business plan and corresponding projections prepared for the Debtor (the "**Business Plan**").

---

[11]   NBCU is a subsidiary of Comcast Corp.

[12]   Although NBCU was not a party to the Comcast Services Agreement, on information and belief, it was subcontracted and/or authorized by Comcast Services to provide certain services pursuant to that agreement, including but not limited to, services related to obtaining distribution of CSN Houston.  Indeed, Matt Bond, Vice President of Content Distribution for NBCU, and Dana Zimmer, the number two affiliate sales person at NBCU, were the two primary individuals responsible for leading the distribution effort.  The Comcast Services Agreement allows Comcast Services to subcontract any of its obligations under the agreement, but notes that "any such subcontract shall not relieve Comcast [Services] of its obligations and duties under this Agreement." *See* Comcast Services Agreement, attached hereto as **Exhibit A**, at § 2.6.  The agreement further provides that "[a]s between Comcast [Services] and [the Debtor], Comcast [Services] shall be responsible for any breach of this Agreement by any subcontractor that is performing Services that are otherwise required to be performed directly by Comcast [Services] pursuant to Attachment B."  *Id.*

30.     By June 2012, the Debtor had not entered into any affiliation agreements with any major MVPDs (other than Comcast Cable).  By September 2012 (one month before the launch of CSN Houston), the Debtor, through Comcast Services/NBCU,[13] had exchanged proposals with certain MVPDs, but it still had not signed any new major affiliation agreements.  Throughout September and October 2012, the Debtor, through Comcast Services/NBCU, continued to exchange proposals with various MVPDs.  But the Debtor was unable to reach agreement with a major MVPD at per-subscriber rates that would lead to a financially viable venture.

31.     This development led to a dispute within the GP Board regarding the Debtor's strategic next steps.  In November 2012, after CSN Houston launched, the affiliate sales team at NBCU recommended that the Debtor make a proposal to a major MVPD that was significantly below the rates called for in the Business Plan.  These lower rates, when plugged into the business model, would have been financially crippling to the Debtor.  Concerned that the Business Plan not viable, the Astros Constituents requested that Comcast Services/NBCU formulate an alternate business plan that demonstrated a profitable set of operating parameters, starting with revenue adequate to achieve viability.  The Astros Constituents also objected to the MVPD proposal presented by Comcast Services/NBCU, reasoning that until a new viable business plan was formulated, it would not be in the Debtor's best interest to approve any key revenue agreements.  Without knowing exactly what types of deals would be required to make it financially viable, the Debtor could not reasonably assess whether a particular deal should be approved.

32.     For months the Astros Constituents repeatedly requested that Comcast Services/NBCU formulate a new business plan for the Debtor.  Comcast Services/NBCU had the

---

[13]   For ease of reference, the term "**Comcast Services/NBCU**" shall mean Comcast Services and/or NBCU.

relevant expertise in this area and were obligated to provide those services under the Comcast Services Agreement, so the Debtor was relying on them to put a new business plan together. Yet Comcast Services/NBCU did not consider the Debtor's concerns in good faith, as they were required to do under the Comcast Services Agreement. *See* Ex. A, Comcast Services Agreement at § 2.2(e). Instead, when the Astros Director on the GP Board raised reasonable and justifiable concerns about formulating a new business plan, Comcast Services/NBCU completely brushed off such concerns as premature and refused to comply with his request. Comcast Services/NBCU did so despite being aware that the Debtor could not enter into any affiliation agreements without the consent of the Astros Director. They also knew that, without incoming revenue from major affiliation agreements, the Debtor could never survive financially. Indeed, as of Spring 2013, the Debtor had not negotiated or entered into an affiliation agreement with any major distributor other than Comcast Cable and, unsurprisingly, its revenue was far less than the amount needed to keep pace with the Debtor's costs.[14]

33.    It was in the Debtor's best interest for Comcast Services/NBCU to formulate a new business plan. But, unbeknownst to the Debtor, Comcast had no intention of acting in the Debtor's best interest. Comcast had decided that, instead of working to make the Debtor successful, it would do everything in its power to obtain the Debtor's Assets for itself. If the Debtor was struggling financially, Comcast would be best positioned to acquire the Debtor, or substantially all of its assets, at a deeply discounted price.

---

[14]    Notably, even Litner concedes that by April 2013 it was no longer "premature" to prepare a new business plan for the Debtor, yet Comcast Services/NBCU still failed to do so. And by September 2013, Litner admits that a new business plan for the Debtor was required. But again, Comcast Services/NBCU failed to prepare or present one.

34.     Failing to formulate a new business plan was not the only way Comcast sabotaged the Debtor's business.  Comcast Services/NBCU had the means and resources to negotiate affiliation agreements at higher rates, but intentionally chose not to do so.  The primary reason that the Debtor entered into a business relationship with Comcast was that, in addition to being the largest cable provider in Houston, Comcast has enormous market power by virtue of the fact that, through NBCU, it owns and operates a large portfolio of news and entertainment television networks, including NBC.[15]  Thus, Comcast has business relationships with all of the major MVPDs (*e.g.*, DirecTV, AT&T, FOX, DISH Network, etc.), as these MVPDs must contract with Comcast in order to carry these various networks.  Due to Comcast's increased market power by virtue of its larger networks, it had the ability to obtain carriage for its smaller regional sports networks ("**Comcast RSNs**"), including CSN Houston, at higher rates.

35.     In fact, Comcast had indicated to the Debtor that it would use its strength in other markets to get carriage for CSN Houston at financially viable rates.  Yet, when negotiating with MVPDs regarding carriage for the Debtor, Comcast Services/NBCU did not leverage this market power as they indicated they would.  Comcast did, however, on information and belief, employ this strategy with its other Comcast RSNs.  For example, on information and belief, in January 2013, Comcast entered into a global deal with Suddenlink that incorporated every network in Comcast's portfolio **except for CSN Houston**.  Comcast never brought this potential deal to the GP Board.  Indeed, the Debtor did not find out about the Suddenlink deal until after it had been entered into.

---

[15]   Comcast's proposed acquisition of NBCU was announced in December 2009, almost a year before it became involved with the Debtor.  The acquisition received government approval, and Comcast took control of NBCU on January 28, 2011.

36.     Comcast's reason for prioritizing and providing a higher level of service to the other Comcast RSNs than it did for the Debtor is clear: money.  On information and belief, Comcast owned most, if not all, of the equity in those other Comcast RSNs, while it only owned 22.5% of the Debtor.  Thus, Comcast Services/NBCU (and their affiliates) had a greater financial incentive to promote and obtain distribution for the Comcast RSNs than it did for CSN Houston.[16]  But an even greater motivating factor was Comcast's desire to obtain the Debtor's Assets for itself.  Comcast knew that the best way to acquire these Assets at a low cost would be to financially cripple the Debtor so that it would have no choice but to sell itself to Comcast.  Thus, on information and belief, Comcast Services/NBCU intentionally and willfully failed to negotiate and obtain the best possible carriage rates for the Debtor.

37.     Notably, the conduct of Comcast Services/NBCU was directly contrary to their obligations under § 2.4 of the Comcast Services Agreement:

> (b) Comcast [Services] shall devote such time, personnel and resources as are reasonably necessary to, and shall, ensure the proper, timely and efficient provision of such Services to [the Debtor] in a manner that is, under the circumstances, **at a minimum, consistent in all material respects with . . . (iii) the same highest level and quality of service that Comcast [Services] uses when providing similar services to any other Comcast-Related RSN** . . .

> (c) In providing the Services, in general, Comcast [Services] shall allocate its time, personnel and resources equitably and fairly as between the [Debtor] and all other Comcast-Related RSNs based on the totality of the circumstances and **shall not base such allocation of time, personnel and resources on the amount or nature of any Comcast Party's ownership interest in such Comcast-Related RSN**.

---

[16]  Moreover, Comcast Cable financially benefitted by being the only major MVPD that carried CSN Houston, as Houston sports fans would be more likely to move to and/or stay with Comcast as their cable provider if they wanted the ability to watch the Houston Astros and the Houston Rockets on their home televisions.

(d) With respect to bulk purchases of products or services made by Comcast [Services] from non-Affiliate third-parties on behalf of the Comcast-Related RSNs negotiated primarily on the total volume of all participating Comcast-Related RSNs, Comcast [Services] agrees that it shall not discriminate against [the Debtor] in negotiating the pricing, benefits and other terms available to [the Debtor] under such agreements.   With respect to all other purchases of products or services from non-Affiliate third-parties negotiated by Comcast [Services] on [the Debtor's] behalf, Comcast [Services] **shall use commercially reasonable efforts to obtain for [the Debtor] the best pricing, benefits and other terms available to [the Debtor] under the circumstances**. . . .

See Ex. A, Comcast Services Agreement at § 2.4(b)-(d) (emphasis added).

38.     At a May 8, 2012 GP Board meeting, the Rockets' GP Board Director raised concerns about Comcast not using its leverage to obtain carriage for CSN Houston through NBCU global distribution deals.   In response, Litner (GP Board Director and President of Comcast Services) claimed that CSN Houston had not been included in some of the more recent global discussions because, as a timing matter, it was not in the Debtor's best interest to do so. Notably, this determination was made unilaterally by Comcast; the Debtor was never consulted about these discussions and, in fact, did not even find out about them until after the global deal had been finalized.   Moreover, even assuming the "timing" excuse was true at that time, this does not explain why Comcast Services/NBCU **never** included CSN Houston in a global distribution deal in the four years it worked with Debtor.

39.     Unsurprisingly, due to Comcast's actions and omissions, in early to mid-2013, the Debtor experienced liquidity constraints.   And just as Comcast had hoped, by April 2013, the Astros and the Rockets had proposed to sell their 77.5% equity interest in the Debtor to NBCU based upon the original implied enterprise value of the Debtor (i.e., $700 million).   On information and belief, Comcast did not want to pay that price and instead bided its time,

allowing the Debtor to become even more financially distressed, in the hopes that it could get what it wanted at better terms.

40.     On May 17, 2013, Pick (Senior Vice President of Corporate Development at Comcast Corp. and Comcast Partner and Senior Vice President of Comcast Lender) sent an e-mail to Rockets' GP Board Director Brown and Margaret Barradas (Managing Director at Astros' affiliate Crane Capital Group), with the terms of a debt restructuring proposal that Comcast was suggesting to the Debtor.  In addition to suggesting that the Debtor enter into an affiliation agreement with a major MVPD at rates below those set forth in the Business Plan, Comcast proposed certain governance changes that would increase its own ability to control the Debtor by taking control away from the Astros and Rockets.  Not surprisingly, the Rockets' and Astros' GP Board Directors would not agree to such terms.

41.     The Debtor's liquidity concerns continued to worsen.  On May 31, 2013, in order to continue to satisfy its obligations under the Astros Media Rights Agreement, the Debtor exhausted its $100 million line of credit under the Comcast Credit Agreement and the limited partners of the Debtor agreed to a capital call.  The limited partners then had to issue another capital call in order to satisfy the Debtor's June media rights payment to the Astros.  But by the next month, the Debtor was unable to make its July media rights payment to the Astros.  Astros LLC immediately notified the Debtor by letter that the failure to make such payment was an "Event of Default" under the Astros Media Rights Agreement.  The Debtor had until September 30, 2012 to cure the default; otherwise Astros LLC had the contractual right to terminate the Astros Media Rights Agreement.  On August 31, 2013, the Debtor again failed to make its monthly media rights payment to the Astros, leading Astros LLC to send another notice of default letter to the Debtor.

21

42.     Smelling blood in the water, Comcast Partner met with Astros Partner and Rockets Partner on or around August 5, 2013, and proposed a potential buyout of the Astros' 46.5% equity interest in the Debtor for more than $185 million (based on an implied enterprise value of $500 million for the Debtor).  With the Astros' equity interest, Comcast Partner would own the majority of, and be able to exercise total control over, the Debtor.  Rockets Partner, who had a contractual consent right to approve or veto the Astros' sale of its equity, requested the same deal (at the same value) from Comcast Partner.  Because Comcast Partner refused, Rockets Partner would not consent to the sale of the Astros' equity.

43.     But while Comcast Partner was seemingly negotiating a potential deal with the Astros, in actuality Comcast had concocted a plan to get what it wanted at a much cheaper price.  Comcast would put the Debtor into bankruptcy, which would cause its value to immediately decrease.  Comcast would then publicly announce its intention to bid a substantial amount of money to acquire the Debtor, or substantially all of its assets, in bankruptcy, which would scare away other potential purchasers.[17]  Finally, once Comcast was the only viable purchaser, it could purchase the Debtor, or substantially all of its assets, at a steep discount from what it publicly promised.

**D.     Comcast has its affiliates file an involuntary bankruptcy petition against the Debtor and does everything in its power to ensure that an order for relief is entered.**

44.     Comcast knew that the unanimous consent of the Directors on the GP Board was required in order for the Debtor to file a bankruptcy petition.  So it conceived of a plan whereby

---

[17]   Because Comcast and the Debtor had an existing relationship, potential purchasers would reasonably assume that Comcast would be the Debtor's preferred purchaser, in order to avoid the additional time and expenses associated with transitioning to a new owner.  Thus, these potential purchasers would reasonably expect that they would need to make a higher offer than Comcast in order to be considered.  This is compounded by the fact that Comcast Lender would likely be entitled to credit bid the $100 million it was owed pursuant to the Comcast Credit Agreement.

its own affiliates would file a petition to place the Debtor into an involuntary bankruptcy. In September of 2013, Comcast approached the Rockets, informed them that it wanted to place the Debtor into bankruptcy, and asked if the Rockets would join them as petitioning creditors. The Rockets told Comcast that they would be willing to support the bankruptcy, but **only** if Comcast would commit to making a stalking horse bid for the Debtor in an amount equal to, or in the proximity of, the valuation Comcast had placed on the Debtor just one month prior (*i.e.*, $500 million). During a telephone call on or around September 26, 2013, Pick informed Tad Brown that Comcast refused to make such a commitment. As a follow-up to this call, Comcast's counsel, Craig Goldblatt, called the Rockets' counsel, Alan Gover and Douglas Mayer on September 26. No representative of the Astros was on this call. During this telephone conversation the Rockets' counsel asked Goldblatt why Comcast was not willing to make the requested commitment. On information and belief, Goldblatt responded that there was no reason for Comcast to commit to such a bid because the value of the Debtor would change (*i.e.*, decrease) due to the bankruptcy.

45.     On September 27, 2013 (the "**Petition Date**"), a Chapter 11 Case was commenced involuntarily against the Debtor by Comcast Services, Comcast Media, Comcast California, and Comcast Lender (collectively, the "**Comcast Petitioning Creditors**").[18] They claimed that they filed the involuntary petition (the "**Petition**") to prevent the Astros from terminating the Astros Media Rights Agreement in order to preserve the going concern value of the Debtor. But the Astros had not actually confirmed that they would terminate the Astros Media Rights Agreement; on the contrary, the Astros were still negotiating in good faith for the sale of their equity in the Debtor to Comcast. Indeed, on the Petition Date, but before the

---

[18]     The Comcast Petitioning Creditors are affiliates of Comcast Corp.

Petition was actually filed, Michael Angelakis (Comcast Corp. Vice Chairman and CFO) had received and read an e-mail from the Astros with a draft of terms for the proposed sale. The Astros had no idea that, later that same day, the Comcast Petitioning Creditors would be placing the Debtor into an involuntary bankruptcy.

46.     On September 28, 2013, the Comcast Petitioning Creditors filed a motion to appoint a Chapter 11 trustee. They used this motion as an opportunity to express their interest in acquiring the assets of the Debtor at a price that would result in a material distribution for the limited partners and the General Partner (collectively, the "**Partners**"), stating:

> The Network does have assets – including the right to telecast Astros and Rockets games, the right to receive monthly fees under an affiliation agreement with [Comcast Cable] for distribution of the Network's Services, and rights to receive revenue from a few smaller operators that carry the Service. **These assets have significant value**, the protection of which is the central purpose of this involuntary bankruptcy filing. [Comcast Lender], the Network's secured lender, believes the Network's assets have meaningful value, and **would be prepared to make a bid to acquire either the Network (under a plan of reorganization) or substantially all of its assets**. Comcast Lender believes that such a transaction – if it were to close by the end of the calendar year, and based on the Network's indebtedness of which it is presently aware and that which it anticipates the Network would incur by year end – **would likely lead to prepetition creditors' claims and all reasonably foreseeable administrative expenses being paid in full, and a material distribution to equity holders**. [emphasis added].

Pick (Senior VP of Comcast Corp., Comcast Partner, and Comcast Lender) made similar statements in his declaration filed in support of the motion.

47.     At a September 30, 2013 hearing before the Bankruptcy Court, counsel for the Comcast Petitioning Creditors (Goldblatt) publicly reaffirmed Comcast's interest as a potential bidder.

48.     On October 7, 2013, the Comcast Petitioning Creditors filed an amended motion to appoint a trustee, which again publicly reiterated Comcast Lender's interest in purchasing the Debtor's assets:

> [Comcast Lender], the Network's sole secured lender, **would be prepared to make a bid to acquire either the Network (under a plan of reorganization) or substantially all of its assets**. **Comcast Lender believes that such a transaction** – if it were to close by the end of 2013, and based on the Network's indebtedness of which Comcast Lender is presently aware and that which it anticipates the Network would incur by year end – **would likely lead to full payment of all pre-petition creditors' claims and all reasonably foreseeable administrative expenses, and also lead to a material distribution to equity holders**.  [emphasis added].

Pick again made similar statements in his declaration filed in support of the amended motion.

49.     The Astros Constituents and Astros LLC (the "**Astros Entities**") immediately filed a motion to dismiss the Petition, as well as an opposition to the trustee motion, arguing, among other things, that the Petition should be dismissed because it was filed in bad faith and the Comcast Petitioning Creditors failed to satisfy the requirements of 11 U.S.C. § 303.  In their opposition to the Astros Entities' motion to dismiss, filed October 15, 2013, the Comcast Petitioning Creditors again reiterated Comcast Lender's intention to bid on the Debtor's assets:

> The critical facts are that the Network is losing money and has no prospect of turning that around under the current governance structure.  But **it is also true that the Network has value**.  And in a fair and open bankruptcy auction conducted by a trustee, those assets would go to the highest bidder.  **Perhaps Comcast Lender will acquire the assets, and be in a position to operate the Network free of the Astros' veto rights**.  If the Astros value (or any other party values) the Network more highly, that party would have every opportunity to acquire the Network, free of Comcast Owner's rights under the partnership agreement to exercise control.  [emphasis added] [internal footnote omitted].

And in their reply supporting their trustee motion, filed October 24, 2013, the Comcast Petitioning Creditors echoed the same sentiments:  "All that Comcast Lender has stated is that **it**

would be willing to make a bid in bankruptcy for the Network or substantially all of its assets as part of an open auction process, and that *such an acquisition* would likely lead to full payment of creditors' claims." [emphasis added].

50.    At this time (October 2013), two of the three owners of the Debtor were at odds; Comcast Partner supported the Petition, while the Astros Constituents opposed it. Thus, the Debtor's ability to act depended on the position of the Rockets Constituents.

51.    The Rockets Constituents, Clutch City Sports & Entertainment, L.P. ("**Clutch City**"),[19] and Rocket Ball (collectively, the "**Rockets Entities**") filed a statement on October 21, 2013, opposing the appointment of a trustee, but supporting the entry of an order for relief under Chapter 11. The Rockets Entities' support of the Petition was based **entirely** on the Comcast Petitioning Creditors' repeated assurances that Comcast Lender would bid on the Debtor (or substantially all of its assets) in the bankruptcy in an amount sufficient to pay all prepetition creditors, administrative expenses, and provide a material distribution to equity holders. In their statement, the Rockets Entities proposed, among other things, that (i) a responsible officer be appointed to run the day-to-day operations of the Debtor and carry out the normal administrative functions required of a debtor-in-possession, (ii) Comcast, the Rockets Entities, and the Astros Entities engage in negotiations for one week to attempt to reach consensus on a path forward, and (iii) the question of whether to appoint an estate fiduciary should be abated until it is absolutely necessary to preserve the value of the estate.

---

[19]    Clutch City is an affiliate of Rocket Ball and the landlord under a Suite Lease, dated October 1, 2011, with the Debtor, pursuant to which the Debtor is obligated to Clutch City for yearly rental installments in respect of a suite at the Toyota Center.

52.     Based on the Rockets Entities' support of the Petition, on October 24, 2013, HP Fannin Properties, LP ("**HP Fannin**"), the Debtor's landlord,[20] also filed a statement in support of the Petition.  HP Fannin would not have supported the Petition if the Rockets Entities had not supported it.  In fact, the Rockets Entities affirmatively asked HP Fannin to support the Petition, and HP Fannin agreed so long as the Rockets Entities' filed their support of the Petition first.

53.     On October 28, 2013, the Bankruptcy Court held a hearing on the Petition, the Astros Entities' motion to dismiss, and the Comcast Petitioning Creditors' trustee motion.  While being questioned by Arthur Burke (counsel for the Comcast Petitioning Creditors), Pick testified as follows:

> Q:  Is Comcast Lender prepared to bid to require [sic] the Network out of bankruptcy?
>
> A:  **It is**.
>
> Q:  And without giving a precise dollar figure, can you describe the magnitude of the bid that Comcast Lender is prepared to make?
>
> A:  **Based on the facts as we know it today, if the Network were acquired by the end of this year, we believe we would bid an amount that would be sufficient to pay all prepetition claims, administrative expenses and return a significant amount of equity to the partners**.  [emphasis added].

That same day, Clutch City and Rocket Ball (collectively, the "**Rockets Petitioning Creditors**") each filed formal joinders to the Petition.  HP Fannin followed suit the next morning.

54.     The hearing on the motion to dismiss continued on October 29.  Near the conclusion of that hearing, the Bankruptcy Court announced that it would abate consideration of whether an order for relief should be entered, whether the Petition should be dismissed, and whether the disputes among the Partners ought to be considered by the Bankruptcy Court at all.

---

[20]   The Debtor, as tenant, and HP Fannin, as landlord, were parties to a Lease Agreement in connection with the property at which the Debtor operated its business.

The Court then, with the consent of all parties, entered an order appointing the Astros as lead negotiator for the Debtor and provided them through December 12, 2013 to conduct negotiations with third parties for the purpose of restructuring or reorganizing the Debtor (the "**Negotiations Order**").  Any final agreement that purported to bind the Debtor, however, would still be subject to the approval of the GP Board and the Court.

55.     During their time as lead negotiator, the Astros spoke with various third parties (*e.g.*, AT&T, DirecTV, FOX, Dish Network, Time Warner) regarding a potential restructuring or purchase of the Debtor.  But many of these third parties told the Astros that they were not interested in getting involved in the Debtor's bankruptcy case, and, more importantly, that it was their understanding that Comcast would be buying the Debtor out of bankruptcy, so it would be futile for them to get involved.  For example, FOX expressed its reluctance to become involved in the Debtor's bankruptcy proceedings.[21]  But FOX also affirmatively stated that it would be willing to do a deal with better terms for the Debtor if the Debtor was not in bankruptcy.  AT&T and DirecTV also noted their extreme hesitation with getting involved in the Debtor's bankruptcy proceedings.  In fact, on numerous occasions AT&T and/or DirecTV told the Debtor that the bankruptcy was "getting ugly" and "hurting [the Debtor's] value."

56.     Additionally, during the negotiation process, certain potential counterparties were requesting information and documents related to the Debtor from the Astros.  This documentation and information, while property of the Debtor, was maintained by Comcast Services/NBCU pursuant to the Comcast Services Agreement.  The Astros requested that Comcast provide such information so that the Astros could then provide it to the potential

---

[21]   FOX did make an extremely low offer to the Astros at this time, noting that it would only be worth its while to deal with the bankruptcy proceedings if it could acquire the Debtor at a deeply discounted rate.

counterparties.  But Comcast refused to release the requested information in a timely manner, in violation of the Comcast Services Agreement.  *See* Ex. A, Comcast Services Agreement at § 2.5. On information and belief, Comcast's obstructive behavior impeded the negotiations process.

57.     In late November (and on the eve of the statute of limitations), Astros' affiliate, HBP, filed a lawsuit in state court against McLane Champions, LLC, R. Drayton McLane Jr., Comcast Corp., NBCU, and Litner relating to HBP's purchase of the Astros in 2011 (the "**Astros Lawsuit**").  In response, on November 22, 2013, Comcast Corp. and NBCU released a public statement denouncing the Astros Lawsuit and stating, yet again, that they "remain[] committed to a reorganization of the Network in Bankruptcy Court."

58.     By December 12, 2013, the Astros were still negotiating with DirecTV regarding a potential restructuring or reorganization of the Debtor, but had not yet finalized a deal.  On that same date, by agreement of the parties, the Bankruptcy Court entered an amended version of the Negotiations Order pursuant to which the Rockets were named lead negotiator for the Debtor through January 7, 2014 (the "**Amended Negotiations Order**").[22]  Immediately following entry of the Amended Negotiations Order, the Rockets began working with the Astros to continue the third-party negotiations that the Astros had previously initiated.[23]  These negotiations continued throughout December and into January.

59.     The Rockets also began to contact other potential transaction counterparties, both strategic (*i.e.*, within the media industry) and financial (*i.e.*, private equity type investors).  But

---

[22]   Similar to the Negotiations Order, the Amended Negotiations Order authorized the Rockets to investigate and negotiate potential agreements, but any final agreement that purported to bind the Debtor would still be subject to the approval of the GP Board and the Court.

[23]   DirecTV would not talk to the Rockets at first because it was concerned about violating a non-disclosure agreement it had entered into with the Astros.  Ultimately, the Astros signed a release allowing DirecTV to include the Rockets in the negotiations.

these third parties were still hesitant and/or unwilling to get involved in the Debtor's bankruptcy proceedings. FOX, for example, reiterated its unwillingness to do a market deal with the Debtor while it was in bankruptcy.

60. On or around January 6, 2014, Pick sent a letter (the "**Offer Letter**") to Rockets GP Board Director Brown, in which he reiterated Comcast's intention to bid for the Debtor:

> **Comcast's position throughout this matter, beginning with the pleadings it filed for the appointment of a trustee that accompanied the filing of the involuntary petition, has been that it is prepared to make a bid to acquire the Network, thus ensuring that the Network could successfully reorganize in bankruptcy**. Although the passage of time and other events have affected the valuation, **Comcast Owner remains prepared to make a 'stalking horse' bid for the acquisition of the Network**. [emphasis added].

In the Offer Letter, Pick described that the stalking horse bid would (subject to a reasonable aggregate cap) satisfy in full all prepetition secured, administrative, priority and general unsecured claims, including the amounts necessary to cure existing defaults under the Media Rights Agreements. Notably, in contrast to its prior promises, Comcast was no longer offering to bid an amount that would result in a "material" or "significant" distribution to the Debtor's equity holders.

61. After receiving the Offer Letter, Rocket Ball and Astros LLC requested clarification from Comcast regarding certain material terms of Comcast's offer, but never received any substantive response.[24] Contrary to Comcast's later claims, the Rockets Entities and the Astros Entities considered the Offer Letter in good faith.[25] They merely wanted

---

[24] Comcast's counsel merely responded with general assurances that Comcast understood that, in order for a plan to be confirmed, the deal would have to pay all of the Debtor's debts and assume all of the Debtor's contracts, and that that was what was intended.

[25] And, of course, the Rockets were not authorized at that time to accept any deal on behalf of the Debtor without the Court's approval.

additional explanation from Comcast, which Comcast refused to provide.  On information and belief, Comcast refused to respond to the reasonable requests for clarification because, at the time Pick sent the Offer Letter, Comcast had no intention of submitting a bid in an amount that would pay all the Debtor's creditors in full.

62.      The same day that they received the Offer Letter, the Rockets filed an emergency request for an extension of exploratory period under the Amended Negotiations Order.   On January 7, 2014, the Bankruptcy Court entered an order extending the Rockets' authority to act as lead negotiator for the Debtor through February 4, 2014 (the "**Second Amended Negotiations Order**").  Following entry of the Second Amended Negotiations Order, the Rockets continued to explore strategic opportunities for the Debtor.

63.      On January 10, 2014, the Comcast Petitioning Creditors filed a motion to terminate exclusivity and appoint an examiner, in which they stated:  "Comcast remains prepared to serve as a stalking-horse bidder, and is prepared to acquire the Network, and thus permit the Network successfully to reorganize in bankruptcy."

64.      On February 3, 2014 (the day before the Second Amended Negotiations Order was set to expire), the Rockets learned that an agreement with a third-party (*i.e.*, DirecTV and AT&T) would not be possible.  During their negotiations with DirecTV and AT&T, the Rockets had been clear that any deal with them would have to be better than what had been publicly promised by Comcast.  This is because, unlike a deal with Comcast, a deal with a third party would necessarily involve the added hassle and expense of transitioning to a brand new owner.  On February 3, DirecTV and AT&T informed the Rockets that while they were interested in doing deal on the same terms that Comcast had promised (in exchange for all or substantially all of the equity of the Debtor), they were not willing to exceed Comcast's terms.  Given that the

terms were no better than Comcast's, the Rockets, on behalf of the Debtor, felt that it would not make sense for the Debtor to pursue such a deal.  On February 4, 2014, at the continued hearing on the motion to dismiss, Brown advised the Bankruptcy Court of the foregoing and noted that the only remaining offer on the table was Comcast's.

65.     At that same hearing, the Bankruptcy Court asked Comcast's counsel, Goldblatt, whether, if an order for relief was entered, the two Comcast GP Board Directors (Litner and Ruth) would perform as fiduciaries to the Debtor and its Estate.  In response, Goldblatt stated:

> Your Honor, our answer to that question is yes.  We believe that, as a matter of federal bankruptcy law and policy, individuals who, as a matter of non-bankruptcy or corporate law, exercise control over the affairs of a Debtor-in-possession, whether directly or indirectly, through the structure, have, if not by non-bankruptcy, then by implication, by – from bankruptcy law, the duty to act in the best interests of the Bankruptcy Estate.

Goldblatt also reaffirmed, on the record, that "Comcast believes that the Network can survive as a going concern, and is prepared to back that belief with a financial commitment."

## E.     The Bankruptcy Court enters an Order for Relief.

66.     At the conclusion of the February 4 hearing, after listening to closing arguments, the Bankruptcy Court orally issued preliminary findings of fact and conclusions of law, including that an order for relief would be entered against the Debtor.   On that same date (the "**Commencement Date**"), an order for relief and case management order was issued against the Debtor (the "**Order for Relief**").   On February 12, the Court entered its Memorandum Opinion, which set forth its written findings of fact and conclusions of law relating to the Order for Relief.

67.     The Court determined that the requirements of 11 U.S.C. § 303 had been met.  In particular, § 303 requires that an involuntary petition be supported by at least **three** petitioning creditors holding claims not subject to bona fide dispute.  Notably, the Court held that, of the

four Comcast Petitioning Creditors, only **two** (*i.e.*, Comcast Services and Comcast Lender) properly qualified as petitioning creditors.  Thus, without the joinder of the Rockets Petitioning Creditors (which led to the joinder of HP Fannin), there would not have been a sufficient number of petitioning creditors to allow the Court to enter the Order for Relief.  Brown, the Rockets' GP Board Director and CEO of both of the Rockets Petitioning Creditors, and Rafael Stone, the Rockets' general counsel, relied on Comcast's repeated representations that it (or one of its affiliates) would purchase the Debtor in bankruptcy in an amount sufficient to pay all prepetition claims, administrative expenses, and return a significant amount of equity to the Partners. Without such assurances from Comcast, the Rockets Petitioning Creditors would have never supported the Petition.  And without the support of the Rockets Petitioning Creditors, HP Fannin would not have supported the Petition either.

68.     Additionally, in deciding to enter the Order for Relief, the Bankruptcy Court noted that, under § 303, it was "required to grant relief to an involuntary petition unless it is timely contested by the Debtor . . . . [and] [t]here ha[d] been no timely contest by the Debtor." But, in fact, it was Comcast's misrepresentations that induced the Debtor to refrain from moving to dismiss the Petition.  Based on its own governance provisions, the Debtor could not have objected to the Petition without the consent of the Rockets' GP Board Director.  The Debtor is controlled by the General Partner, which in turn is controlled by the GP Board.  Pursuant to § 5.8 and § 5.9 of the LLC Agreement, the affirmative vote of a majority of Directors entitled to vote was required in order for the Debtor to file a motion to dismiss the Petition.  The two Comcast representatives would not have been entitled to vote, as they were Conflicted Directors pursuant to § 5.8.  Thus, the affirmative vote of both the Astros GP Board Director (Kibbe) **and** the Rockets GP Board Director (Brown) would have been required in order for the Debtor to be able

to take such an action.  And in reliance on Comcast's misrepresentations, Brown chose not to oppose the Petition and instead caused the Rockets Petitioning Creditors to join the Petition.

**F.    Comcast shows its true colors once the Order for Relief is entered.**

69.    As soon as Comcast got what it wanted (*i.e.* the Order for Relief), it suddenly became very quiet with respect to its proposed acquisition of the Debtor.  When the Rockets and the Astros reached out to Comcast to get specifics, Comcast became evasive.  It ignored the Rockets' and the Astros' requests for additional information and, as a stall tactic, instructed them that the Debtor would need to hire its own counsel before Comcast could move any further with the deal.  The Debtor hired its own bankruptcy counsel on or around February 25, 2014.  The Debtor's counsel continued the effort to finalize the deal with Comcast.  But Comcast continued to stall.  This continued for approximately six weeks.

70.    Meanwhile, Bond, without the Debtor's knowledge, resumed discussions with DirecTV and AT&T about their potential carriage of CSN Houston.  On information and belief, Bond undertook these discussions in order to acquire confidential information regarding the Debtor to be used for the benefit of Comcast and to the detriment of the Debtor.  DirecTV informed Bond that the proposed rate card was ten times too high and that they were not going to pay anywhere near what the Debtor was asking for carriage.  Such information was property of the Debtor, which Bond and Comcast Services/NBCU were obligated to provide to the Debtor pursuant to the Comcast Services Agreement.  *See* Ex. A, Comcast Services Agreement at § 2.5.  But Bond did not inform the Debtor or the GP Board about his discussions with DirecTV.  Bond did, however, provide this information to certain individuals at NBCU, including, on information and belief, Litner and Ruth.  On information and belief, Litner and Ruth immediately passed this

information along to Comcast Lender (or directed others to do so), while withholding such information from the Rockets' and Astros' GP Board Directors.

71.     Then, on March 17, 2014, a mere six weeks after the Order for Relief was entered, the Comcast Petitioning Creditors publicly filed a statement with the Bankruptcy Court declaring that Comcast was no longer interested in acquiring the Debtor or its assets (the "**Notice**").[26]  They stated:

> Comcast initiated this bankruptcy proceeding in the belief that the chapter 11 process would permit the Network to reorganize, thus preserving the Network's value and the jobs of many employees. **Much has happened, however, in the nearly six months since this involuntary case was filed.  In view of these developments, Comcast is no longer prepared to purchase the Network**. Comcast remains open to considering any proposal by the Debtor for reorganizing the Network successfully in chapter 11, including through an auction or through further efforts to obtain additional carriage.  [emphasis added].

Unsurprisingly, the news of Comcast's Notice spread quickly.  The same day the Notice was filed, the Houston Chronicle ran an article titled "Comcast won't purchase struggling CSN," which quoted the Notice in its entirety.  *See* 3/17/14 Houston Chronicle Article, attached hereto as **Exhibit B**.  On information and belief, most, if not all, of the MVPDs in the industry heard about the Notice.

72.     But contrary to the statements made in the Notice, there had been no material change in the Debtor's finances or circumstances between February 4, when Comcast last publicly reiterated its intention to bid on the Debtor, and March 17, when the Comcast Petitioning Creditors filed the Notice.[27]  Nor had the Debtor's finances or circumstances changed

---

[26]  Notably, filing the Notice publicly was entirely inconsistent with Comcast's prior behavior during the bankruptcy, when it regularly filed pleadings and other documents under seal.

[27]  The only arguably new piece of information obtained by Comcast during this time period was the information related to Bond's discussion with DirecTV.  Even if this conversation could be considered a material change in

materially in the previous six months, other than as a result of the Comcast Petitioning Creditors placing it into bankruptcy and publicly promising to bid on the Debtor.

73.     Indeed, on information and belief, at the time the Notice was filed, Comcast still had every intention of purchasing the Debtor (or substantially all of its assets), just not at the price it had previously promised.  And it did not want to have any competition driving up the price.  On information and belief, by filing the Notice publicly, Comcast was intentionally sending a false message to potential third-party purchasers that it was no longer interested in purchasing the Debtor because, in Comcast's view, the Debtor had little to no value.  As Comcast was intimately involved with the Debtor, a reasonable potential purchaser would believe that Comcast had superior knowledge regarding the Debtor's value.  Thus, on information and belief, the purpose of the Notice was to chill any outside interest in the Debtor, so that the Debtor would have no choice but to sell itself, or substantially all of its assets, to Comcast at whatever low price Comcast was willing to pay.

74.     Now aware of Comcast's true intentions, the Rockets and the Astros began the search for new purchasers as soon as they received the Notice.  They reached out to, and engaged in extensive discussions with, several counterparties in an effort to develop a transaction to successfully restructure the Debtor.

75.     Meanwhile, from early February to mid-April, Litner and Ruth still had not informed the GP Board about Bond's discussions with DirecTV.  In early April 2014, at the insistence of the Astros and the Rockets, Debtor's counsel requested that Comcast Services provide details about what it had done to obtain carriage for the Debtor since the Petition Date.

---

the Debtor's circumstances, Comcast Lender obtained such information unlawfully and in breach of Bond's contractual duties, and Litner's and Ruth's fiduciary duties, to the Debtor.  Regardless, on information and belief, Bond's conversation with DirecTV was not the reason Comcast filed the Notice.

During the April 10, 2014 GP Board Meeting, the Rockets and the Astros requested that the Comcast representatives in attendance, including Litner and Ruth, provide these details.   On information and belief, at that time, Litner and Ruth had knowledge of Bond's prior discussions with DirecTV, yet withheld such knowledge from the GP Board.   Moreover, in response to the Rockets' and the Astros' questions, Goldblatt, Comcast's counsel, indicated that Comcast Services had not engaged in any efforts on behalf of the Debtor to solicit potential carriage deals because the Debtor had not requested that Comcast Services do so.   Goldblatt did, however, agree to make Bond available to the GP Board to provide a general discussion on the carriage market.

76.    On April 15, Bond presented the GP Board with an update on current carriage market conditions.   It was at this meeting that Bond first informed the Rockets' and Astros' GP Board Directors of his discussions with DirecTV (and AT&T) several months prior.   Bond also acknowledged during this meeting that while the Debtor's "bankruptcy filing in and of itself was not fatal [to the Debtor's ability to negotiate potential carriage deals with interested parties,] it indicated instability to operators . . ."

77.    Throughout the spring and early summer of 2014, contrary to the statements made in the Notice, Comcast continued to actively pursue a purchase of the Debtor, or substantially all of its assets.   In late May or early June, Comcast's counsel (Golblatt and Rockford) requested a call with the Rockets' general counsel (Stone) and the Astros' general counsel (Kibbe).   On that call, Comcast's counsel proposed an offer that was significantly less than the amount Comcast had previously represented it would offer.   Kibbe immediately dismissed such offer, while Stone agreed to take the offer under advisement.   As a follow-up to that call, on June 2, 2014, Goldblatt sent a letter to counsel for the Rockets and Astros, enclosing a revised term sheet for Comcast's

proposed restructuring of the Debtor.  Contrary to its prior representations, Comcast's lowball bid would not have even paid the Debtor's creditors in full,[28] let alone made any contribution to equity.  Moreover, Comcast expected the Rockets and Astros to add additional value to the Debtor by taking significantly less in future media rights payments.  Comcast knew that such a condition was a nonstarter for the Astros and the Rockets, whose consent was necessary for such a deal to get done.  And without a deal, the Debtor would continue to languish in bankruptcy, incurring more and more debt along the way.

78.     At a GP Board meeting the following day (June 3), Stone acknowledged that the Rockets had received and were considering Comcast's offer to purchase the Debtor.  Stone also noted that the Rockets and the Astros were considering other options for the Debtor.  Indeed, the Rockets and the Astros were then in discussions with DIRECTV, LLC ("**DTV**") and AT&T Services, Inc. ("**AT&T**") regarding a potential reorganization of the Debtor.[29]

79.     Ultimately, the Debtor, Rocket Ball, and Astros LLC (the "**Proponents**") were able to reach a deal with DTV and AT&T (the "**DTV/AT&T Deal**"), who each agreed to execute an affiliation agreement, subject to AT&T Teleholdings, Inc. ("**AT&T Teleholdings**") and DIRECTV Sports Networks, LLC ("**DTV Sports**") collectively receiving 100% of the equity interests in the Reorganized Debtor.[30]  The DTV/AT&T Deal was incorporated into a plan of reorganization for the Debtor, which was approved unanimously by the GP Board.  After an

---

[28]   For example, under Comcast's proposal, the Astros would not be paid in full for amounts due under the Astros Media Rights Agreement for the 2014 MLB season.

[29]   On or around May 18, 2014, AT&T had announced its intent to merge with DirecTV.  Believing this proposed merger might have changed AT&T and/or DirecTV's view on potentially purchasing the Debtor, the Astros immediately reached out to the CEO of AT&T, flying up to meet with him in Dallas within days of the announcement.  AT&T expressed an interest in a potential acquisition and, from that point on, the Astros and the Rockets focused primarily on pursuing that deal.

[30]   The Reorganized Debtor is a new legal entity and is not a successor to the Debtor.  As of the Effective Date, the Debtor, as a legal entity, no longer exists.

extensive multi-day confirmation hearing, the Plan of Reorganization was confirmed, despite Comcast's objection, on October 30, 2014, with an Effective Date of November 17, 2014.

80.     While Comcast may have failed in its ultimate plan to acquire the Assets for itself, it certainly succeeded in severely damaging the Debtor and its Estate along the way.  Comcast's wrongful conduct put the Debtor in a far worse position than it would have been in otherwise. Had Comcast lived up to its repeated promises, the Debtor's prepetition claims and administrative expenses would have been paid in full and its equity holders would have received a significant distribution.[31]  But instead, under the DTV/AT&T Deal,[32] the Debtor's unsecured creditors and equity holders received no money on the Effective Date.[33]  Additionally, on information and belief, the terms of the DTV/AT&T Deal were significantly less favorable to the Debtor than they would have been if Comcast had not publicly filed the Notice.[34]  In fact, the DTV/AT&T Deal provided less value to the Debtor's Estate than the Debtor would have received if it had just liquidated (or sold all of its assets) in September 2013.  Under either scenario the Debtor would have lost the Assets and ceased to exist.  But in September 2013, the Debtor had significantly less debt than it did at the time the Plan of Reorganization was confirmed.  Instead,

---

[31]   Even Comcast's reduced offer on January 6, 2014, while not including a distribution to equity holders, promised to pay all the Debtors' creditors in full.

[32]   Because of Comcast's wrongful conduct, by the late summer/fall of 2014, the DTV/AT&T Deal was the best possible deal available to the Debtor.  It was certainly superior to Comcast's lowball offer from June 2014, especially given Comcast's unreasonable conditions related to the reduction of the Astros' and the Rockets' media rights fees which foreclosed any reasonable prospect for a reorganization of the Debtor under such a proposal.

[33]   Instead, under the Plan, the Debtor's unsecured creditors and equity holders became holders of beneficial interests in the HRSN Litigation Trust.  The only assets owned by the HRSN Litigation Trust are certain Transferred Causes of Action of the Debtor, including the causes of actions asserted herein.  Thus, the claims of the Debtor's unsecured creditors and equity holders will only be paid if and to the extent that the HRSN Litigation Trust is successful in prosecuting the Transferred Causes of Action.

[34]   On February 3, 2014, DirecTV and AT&T had expressed their interest in doing a deal on the same terms as those promised by Comcast.  Just a few months later, after the Notice was filed, the proposed terms of the new DTV/AT&T Deal were significantly less favorable to the Debtor.

the prolonged bankruptcy proceedings, resulting from Comcast's wrongful conduct, caused the Debtor's Estate to incur a substantial amount of additional debt and increased the exposure of the Debtor's creditors.

## Causes of Action

### *Count 1 - Fraudulent Misrepresentation*

81.     Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

82.     Plaintiff asserts a claim against Defendants Comcast Lender, Comcast Services, Comcast Media, Comcast California, Comcast Corp., Comcast Partner, and Pick for common law fraudulent misrepresentation.

83.     From late September 2013 until January 6, 2014, Defendants[35] falsely represented to the Debtor, on at least four separate occasions, that Comcast Lender (or some other Comcast entity) would bid on and/or purchase the Debtor, or substantially all of its assets, in bankruptcy in an amount sufficient to (i) satisfy all prepetition claims and administrative expenses in full, and (ii) return a "significant" or "material" amount of equity to the Partners.  From January 6, 2014 through February 4, 2014, Defendants falsely represented to the Debtor that Comcast Lender (or some other Comcast entity) would bid on and/or purchase the Debtor, or substantially all of its assets, in bankruptcy in an amount sufficient to satisfy in full all prepetition secured, administrative, priority, and general unsecured claims, including the amounts necessary to cure the existing defaults under the Media Rights Agreements.

---

[35]   For ease of reference, the term "**Defendants**" as used in each separate Count will mean the specific Comcast Defendants identified under such Count.

84.    Defendants also made these misrepresentations to the GP Board, the Astros, and the Rockets, with the intent or expectation that such misrepresentations would be repeated to the Debtor.

85.    Defendants' misrepresentations to the Debtor were material in that they were of a nature that a reasonable person, such as the Debtor, would attach importance to and be induced to act, or refrain from acting, on such information in determining whether to seek to dismiss, or otherwise contest, the Petition.

86.    At the time the misrepresentations were made, Defendants knew the misrepresentations were false, or made the misrepresentations recklessly, as positive assertions, and without knowledge of their truth.

87.    These misrepresentations were false promises of future performance which were made by Defendants while purporting to have special knowledge regarding those future events and/or with the knowledge that such representations were false.  The promises made by Defendants were sufficiently certain and of the type that a person such as the Debtor could reasonably and justifiably rely on them.  Defendants had no intention of performing when they made the promises.  Additionally and/or alternatively, these misrepresentations were false statements of fact, false statements of opinion, and/or false representations by conduct, including silence and deceptive conduct.  Defendants knew such misrepresentations were false at the time they were made, supported such misrepresentations with false statements of fact, and/or knew that the Debtor would justifiably rely on such misrepresentations because of Defendants' special knowledge.

88.    Defendants intended for the Debtor to rely on the misrepresentations or had reason to expect that the Debtor would do so.

89.     The Debtor actually and justifiably relied on the misrepresentations when it refrained from contesting or seeking to dismiss the Petition.  Additionally, the Rockets GP Board Director, acting on behalf of the Debtor (as well as the Rockets), actually and justifiably relied on the misrepresentations when he took actions to support the Petition, including but not limited to, causing the Rockets Petitioning Creditors to formally join the Petition, which in turn caused HP Fannin to formally join the Petition.

90.     The Debtor's reliance was to its detriment.  By the Debtor not contesting the Petition, the Bankruptcy Court entered the Order for Relief.  Prior to the bankruptcy, the Debtor owned the Assets, which had significant value.  Because of the bankruptcy proceedings, the value of the Debtor decreased and the Debtor lost opportunities to (i) restructure or reorganize itself such that it could maintain its Assets and run a profitable business, (ii) sell such Assets for an amount sufficient to fully satisfy the claims of its creditors and provide a distribution to its equity owners, or (iii) dissolve in order to prevent further harm to the Debtor's creditors.  Ultimately, as a result of the Plan of Reorganization, the Debtor no longer exists and its Assets now belong to AT&T Teleholding and DTV Sports.  The amount received by the Debtor's Estate through the AT&T/DTV Deal was significantly less than the pre-bankruptcy value of the Assets and was insufficient to pay any of the claims of the Debtor's unsecured creditors or to provide any distribution to the equity owners.  The amount received by the Debtor's Estate through the AT&T/DTV Deal was also significantly less than the proposed purchase price promised by Defendants.  Additionally, the Debtor incurred debts, fees, and expenses that it would not have incurred if it had not been placed into bankruptcy, including, but not limited to, hundreds of millions of dollars in additional media rights payments owed to the Astros and the Rockets.

91.     Defendants' misrepresentations directly and proximately caused injury to the Debtor and its Estate, resulting in damages that exceed the minimum jurisdictional limits of the Court, and for which Plaintiff herein sues.  These damages include, but are not limited to, actual damages, consequential damages, incidental damages, compensatory damages, out-of-pocket damages, benefit-of-the-bargain damages, lost profits, loss of sales, loss of credit and/or investment, loss of business reputation and goodwill, loss of business, mitigation expenses and/or increased business expenses, exemplary damages, costs of court, prejudgment interest, and post-judgment interest.

### *Count 2 - Fraud by Nondisclosure*

92.     Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

93.     Additionally and/or alternatively, Plaintiff asserts a claim against Defendants Comcast Lender, Comcast Services, Comcast Media, Comcast California, Comcast Corp., Comcast Partner, Pick, Bond, Litner, and Ruth for common law fraud by nondisclosure.

94.     From late September 2013 until March 17, 2014, Defendants concealed or failed to disclose material facts to the Debtor relating to Comcast's intention of purchasing the Debtor, or substantially all of its assets, in bankruptcy at a particular price.  Prior to the Commencement Date, Defendants knew that Comcast had no intention of submitting a bid for the Debtor, or substantially all of its assets, at the price it had publicly promised.  This information was material in that it was of a nature that a reasonable person, such as the Debtor, would attach importance to and be induced to act, or refrain from acting, on such information in determining whether to seek to dismiss, or otherwise contest, the Petition.  Defendants had a duty to disclose such information to the Debtor because (i) the information was new, and it made Defendants' earlier representations to the Debtor false or misleading, (ii) Defendants partially disclosed the

information to the Debtor, which created a substantially false impression, and/or (iii) Defendants voluntarily disclosed some of the information to the Debtor. Defendants Litner and Ruth also had a duty to disclose such information to the Debtor because as early as the Petition Date (but in no event later than the Commencement Date) they owed a fiduciary duty to the Debtor.

95.     Additionally and/or alternatively, Defendants Bond, Litner, Ruth, Comcast Services, and NBCU concealed or failed to disclose material facts to the Debtor regarding Bond's conversations with DirecTV. Defendants knew that (i) Bond had spoken with DirecTV in February 2014 regarding carriage of CSN Houston, (ii) DirecTV had told Bond that it had no interest in carrying CSN Houston because the rate card was too high by a factor of ten, and (iii) the Debtor was not aware that such discussions had taken place or of the substance of such conversations. Defendants concealed or failed to disclose such information to the Debtor. This information was material in that it was of a nature that a reasonable person, such as the Debtor, would attach importance to and be induced to act, or refrain from acting, on such information in determining whether to pursue potential restructuring opportunities with Comcast or other third parties. Defendants Litner and Ruth had a duty to disclose the information to the Debtor because as early as the Petition Date (but in no event later than the Commencement Date) they owed a fiduciary duty to the Debtor. Defendants Comcast Services, NBCU, and Bond had a duty to disclose the information to the Debtor pursuant to the Comcast Services Agreement. Defendants also had a duty to disclose such information to the Debtor because (i) the information was new, and it made their earlier representations to the Debtor false or misleading, (ii) they partially disclosed the information to the Debtor, which created a substantially false impression, and/or (iii) they voluntarily disclosed some of the information to the Debtor.

96.     Defendants knew that the Debtor was ignorant of the concealed information and did not have an equal opportunity to discover the truth.

97.     Defendants deliberately remained silent and did not disclose the information to the Debtor.  By deliberately remaining silent, Defendants intended for the Debtor to act without the information.

98.     The Debtor justifiably relied on Defendants' deliberate silence.  The Debtor's reliance was to its detriment.  By the Debtor not contesting the Petition, the Bankruptcy Court entered the Order for Relief.  Prior to the bankruptcy, the Debtor owned the Assets, which had significant value.  Because of the bankruptcy proceedings, the value of the Debtor decreased and the Debtor lost opportunities to (i) restructure or reorganize itself such that it could maintain its Assets and run a profitable business, (ii) sell such Assets for an amount sufficient to fully satisfy the claims of its creditors and provide a distribution to its equity owners, or (iii) dissolve in order to prevent further harm to the Debtor's creditors.   Ultimately, as a result of the Plan of Reorganization, the Debtor no longer exists and its Assets now belong to AT&T Teleholding and DTV Sports.  The amount received by the Debtor's Estate through the AT&T/DTV Deal was significantly less than the pre-bankruptcy value of the Assets and was insufficient to pay any of the claims of the Debtor's unsecured creditors or to provide any distribution to the equity owners.  The amount received by the Debtor's Estate through the AT&T/DTV Deal was also significantly less than the proposed purchase price promised by Defendants.  Additionally, the Debtor incurred debts, fees and expenses that it would not have incurred if it had not been placed into bankruptcy, including, but not limited to, hundreds of millions of dollars in additional media rights payments owed to the Astros and the Rockets.

99.     Additionally and/or alternatively, to the extent information regarding Bond's conversations with DirecTV were material to the Debtor or to Comcast's decision on whether to purchase the Debtor, the Debtor relied on the concealment of such information to its detriment. Believing Comcast's promises, the Debtor chose to negotiate a potential deal with Comcast instead of a potential deal with DirecTV and AT&T on the same terms.  If the Debtor had been told such information at the time it occurred (February 2014), the Debtor could have re-opened negotiations with DirecTV and AT&T sooner (prior to Comcast filing the Notice) and potentially obtained better terms than those the Debtor ultimately obtained in the final DTV/AT&T Deal.

100.     By deliberately remaining silent, Defendants directly and proximately caused injury to the Debtor and its Estate, resulting in damages that exceed the minimum jurisdictional limits of the Court, and for which Plaintiff herein sues.  These damages include, but are not limited to, actual damages, consequential damages, incidental damages, compensatory damages, out-of-pocket damages, benefit-of-the-bargain damages, lost profits, loss of sales, loss of credit and/or investment, loss of business reputation and goodwill, loss of business, mitigation expenses and/or increased business expenses, exemplary damages, costs of court, prejudgment interest, and post-judgment interest.

### Count 3 – Business Disparagement

101.     Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

102.     Additionally and/or alternatively, Plaintiff asserts a claim against Defendants Comcast Lender, Comcast Services, Comcast Media, and Comcast California for business disparagement.

103.     By filing the Notice, Defendants published a disparaging written statement about the Debtor's value and/or financial position.  In the Notice, Defendants stated: "Comcast initiated

this bankruptcy proceeding in the belief that the chapter 11 process would permit the Network to reorganize, thus preserving the Network's value and the jobs of many employees.  Much has happened, however, in the nearly six months since this involuntary case was filed.  In view of these developments, Comcast is no longer prepared to purchase the Network."

104.    The disparaging and false statements contained in the Notice cast serious doubt on the value and financial viability of the Debtor.  In addition, the statements published by Defendants, taken as a whole, created a substantially false and defamatory impression to a reasonable reader by omitting and/or juxtaposing facts in a misleading way.  These statements imply that Comcast, an insider with special knowledge, determined that the Debtor had little to no value.  These statements also imply that the Debtor's financial circumstances had materially changed in the prior six months to warrant Comcast's apparent change of heart.

105.    The statements in the Notice were false because, at the time the Notice was filed, (i) Comcast still intended on purchasing the Debtor, (ii) the Debtor had significant value, and (iii) there had been no material changes in the Debtor's circumstances to justify Comcast's apparent reversal on its decision to purchase the Debtor.

106.    The statements in the Notice were seen by and/or published to all persons and entities that had made an appearance in the bankruptcy proceedings and/or had requested notice of pleadings filed in the bankruptcy proceedings.  The statements in the Notice were also published to the general public, as the Notice was publicly filed on the Court's docket and was available for anyone to view (including various third-party MVPDs that were following the bankruptcy proceedings carefully).  Additionally, the statements in the Notice were re-published to the public by the Houston Chronicle.  A reasonable person would recognize that Defendants' actions created an unreasonable risk that the disparaging statements would be communicated to

other parties. And, in fact, a number of MVPDs, including but not limited to, AT&T and DirecTV confirmed to the Rockets that they had in fact seen the Notice.

107. Defendants published the statements with malice because they: (i) knew the statements were false; (ii) acted with reckless disregard for whether the statement was true; (3) acted with ill will; and/or (iv) intended to interfere with the Debtor's economic interests.

108. Defendants published the statements without privilege.

109. Defendants' disparaging statements played a substantial part in inducing third parties not to deal with the Debtor, causing actual, consequential, incidental, compensatory, and special damages to the Debtor and its Estate in an amount that exceeds the minimum jurisdictional limits of the Court, and for which Plaintiff herein sues. These damages include, but are not limited to, loss of sales, loss of credit and/or investment, loss of business reputation and goodwill, loss of business, mitigation expenses and/or increased business expenses, exemplary damages, costs of court, prejudgment interest, and post-judgment interest.

### Count 4 – Tortious Interference with Prospective Business Relations

110. Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

111. Additionally and/or alternatively, Plaintiff asserts a claim against Defendants Comcast Lender, Comcast Services, Comcast Media, Comcast California, Comcast Corp., Comcast Partner, and Pick for tortious interference with prospective business relations.

112. Both prior to and after the Petition was filed, the Debtor engaged in discussions with certain third parties, including MVPDs and potential investors/purchasers, regarding a potential purchase or restructuring of the Debtor.

113. There was a reasonable probability the Debtor would have entered into contracts and/or business relationships with one or more of these third parties if Defendants had not (i)

filed the Petition, (ii) publicly announced Comcast's intention to purchase the Debtor, or substantially all of its assets, for a particular price, (iii) obtained an Order for Relief from the Bankruptcy Court based on false pretenses, and/or (iv) publicly filed the Notice. The bankruptcy filing, along with Comcast's involvement and public interest in the Debtor, chilled interest and alternative opportunities because these potential counterparties were aware of Comcast's supposed interest in the Debtor, Comcast Lender's potential right to credit bid its $100 million claim, and Comcast's commitment to paying a price that would pay all creditors in full and provide a material return for equity. Additionally, by filing the Notice, Defendants Comcast Lender, Comcast Services, Comcast Media, and Comcast California chilled interest and alternative opportunities because these potential counterparties reasonably interpreted the Notice as a determination by Comcast that the Debtor had little to no value. Moreover, there are not many MVPDs competing in this space,[36] so when one MVPD (*i.e.*, Comcast) publicly withdraws itself from the running, as Comcast did by filing the Notice, it changes the economics for everyone. The Debtor would have been able to negotiate more favorable terms with the other MVPDs if Comcast had not publicly stated that it was no longer interested in purchasing the Debtor and implied that the Debtor had little to no value.

114.    Defendants knew of the Debtor's prospective business relationships with these third parties and intentionally interfered with those relationships through their actions as delineated above.

115.    Defendants' conduct was independently tortious or unlawful in nature, regardless of the effect such conduct had on the Debtor's prospective business relationships with these third

---

[36]    It was critical that any deal the Debtor negotiated included carriage of CSN Houston. There are only a few MVPDs in the industry that could provide such carriage (*e.g.*, Comcast, AT&T, DirecTV, DISH Network).

parties.  In particular, Defendants' conduct was fraudulent and disparaging, as set forth in the paragraphs above.

116.    Defendants' interference proximately caused injury to the Debtor and its Estate, resulting in damages that exceed the minimum jurisdictional limits of the Court, and for which Plaintiff herein sues.  These damages include, but are not limited to, actual damages, consequential damages, incidental damages, compensatory damages, out-of-pocket damages, benefit-of-the-bargain damages, lost profits, loss of sales, loss of credit and/or investment, loss of business reputation and goodwill, loss of business, mitigation expenses and/or increased business expenses, exemplary damages, costs of court, prejudgment interest, and post-judgment interest.

### Count 5 – Promissory Estoppel

117.    Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

118.    Additionally and/or alternatively, Plaintiff asserts a claim against Defendants Comcast Lender, Comcast Services, Comcast Media, Comcast California, Comcast Corp., Comcast Partner, and Pick for promissory estoppel.

119.    From late September 2013 until January 6, 2014, Defendants repeatedly promised the Debtor that Comcast Lender (or some other Comcast entity) would bid on and/or purchase the Debtor, or substantially all of its assets, in bankruptcy in an amount sufficient to (i) satisfy all prepetition claims and administrative expenses in full, and (ii) return a "significant" or "material" amount of equity to the Partners.  From January 6, 2014 through February 4, 2014, Defendants promised the Debtor that Comcast Lender (or some other Comcast entity) would bid on and/or purchase the Debtor, or substantially all of its assets, in bankruptcy in an amount sufficient to satisfy in full all prepetition secured, administrative, priority, and general unsecured claims,

including the amounts necessary to cure the existing defaults under the Media Rights Agreements.

120.    The Debtor relied on Defendants' promises by refraining from contesting or seeking to dismiss the Petition.  Because of the nature of the promise, the Debtor's reliance was both reasonable and substantial.  The Debtor's reliance was to its detriment.  By the Debtor not contesting the Petition, the Bankruptcy Court entered the Order for Relief.  Prior to the bankruptcy, the Debtor owned the Assets, which had significant value.  Because of the bankruptcy proceedings, the value of the Debtor decreased and the Debtor lost opportunities to (i) restructure or reorganize itself such that it could maintain its Assets and run a profitable business, (ii) sell such Assets for an amount sufficient to fully satisfy the claims of its creditors and provide a distribution to its equity owners, or (iii) dissolve in order to prevent further harm to the Debtor's creditors.  Ultimately, as a result of the Plan of Reorganization, the Debtor no longer exists and its Assets now belong to AT&T Teleholding and DTV Sports.  The amount received by the Debtor's Estate through the AT&T/DTV Deal was significantly less than the pre-bankruptcy value of the Assets and was insufficient to pay any of the claims of the Debtor's unsecured creditors or to provide any distribution to the equity owners.  Additionally, the Debtor incurred debts, fees and expenses that it would not have incurred if it had not been placed into bankruptcy, including, but not limited to, hundreds of millions of dollars in additional media rights payments owed to the Astros and the Rockets.

121.    Defendants knew, or reasonably should have known, that the Debtor would rely on Defendants' promises.

122.    Injustice to the Debtor can be avoided only if Defendants' promise is enforced.

123.    The Debtor's reliance on Defendants' promise resulted in injury to the Debtor and its Estate, resulting in damages that exceed the minimum jurisdictional limits of the Court, and for which Plaintiff herein sues.  These damages include, but are not limited to, actual damages, out-of-pocket damages, reliance damages, costs of court, prejudgment interest, post-judgment interest, and attorney's fees.

### *Count 6 – Breach of Fiduciary Duty*

124.    Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

125.    Additionally and/or alternatively, Plaintiff asserts a claim against Defendants Litner and Ruth for breach of fiduciary duty.

126.    Defendants had a fiduciary relationship with the Debtor as early as the Petition Date (but in no event later than the Commencement Date).  Pursuant to federal bankruptcy law (including, but not limited to, 11 U.S.C. §§ 704, 1106-1107 and Local Bankruptcy Rule 4002-1), Defendants, as GP Board Directors, owed fiduciary duties to the Debtor and its Estate. Additionally and/or alternatively, by causing Comcast Services and Comcast California to file the Petition and by affirmatively confirming to the Debtor and the Bankruptcy Court that they owed fiduciary duties to the Debtor and its Estate, Defendants voluntarily assumed a fiduciary duty such that the Debtor was justified in relying on Defendants to act in the best interests of the Debtor and its Estate.

127.    Defendants breached their fiduciary duties to the Debtor and its Estate by concealing or failing to disclose material facts to the Debtor regarding Bond's conversations with DirecTV.  Defendants were in possession of material confidential information with respect to the Debtor's inability to obtain additional carriage with DirecTV which they did not share with the non-Comcast GP Board Directors.  Additionally, Defendants breached their fiduciary duties to

the Debtor and its Estate by disclosing, or causing the disclosure of, such material confidential information (which was the Debtor's property) to Comcast affiliates for Comcast to use to the detriment of the Debtor.

128.    By such actions, Defendants: (i) failed to make full and fair disclosure of important information to the Debtor; (ii) failed to act with loyalty (iii) failed to act in good faith; (iv) failed to act with integrity of the strictest kind; (v) failed to act with utmost candor; (vi) failed to act in the best interests of the Debtor and its Estate; (vii) failed to act to promote the Debtor's long-term profitable operation; (viii) engaged in self-dealing; (ix) placed the interests of Comcast above the interests of the Debtor and its Estate; and/or (x) failed to act with due care. Defendants' actions were fraudulent, intentional, reckless, malicious, in bad faith, and/or grossly negligent.

129.    Defendants' breaches of fiduciary duty injured the Debtor and its Estate, resulting in damages that exceed the minimum jurisdictional limits of the Court, and for which Plaintiff herein sues.  These damages include, but are not limited to, actual damages, consequential damages, incidental damages, compensatory damages, out-of-pocket damages, benefit-of-the-bargain damages, lost profits, loss of sales, loss of credit and/or investment, loss of business reputation and goodwill, loss of business, mitigation expenses and/or increased business expenses, exemplary damages, costs of court, prejudgment interest, and post-judgment interest.

130.    Additionally and/or alternatively, Defendants benefitted from their breaches of fiduciary duty.  Accordingly, Plaintiff seeks the return, disgorgement, and/or forfeiture of, and/or a constructive trust upon, all funds, profits, fees, and benefits that Defendants realized, received, or obtained as a result of their breaches of fiduciary duty.

### *Count 7 – Breach of Contract*

131.    Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

132.    Additionally and/or alternatively, Plaintiff asserts a claim against Defendants Comcast Services and NBCU for breach of the Comcast Services Agreement.

133.    On October 29, 2010, the Debtor and Comcast Services executed the Comcast Services Agreement, which was a valid and enforceable written contract.  The Comcast Services Agreement provided that Comcast Services would provide management oversight and certain enumerated operational services (including affiliate sales services, affiliate finance services, executive oversight services, operations and engineering, business and legal affairs services, as well as certain other services), identification of prospective MVPDs, and negotiation of distribution agreements with MVPDs interested in carrying and eligible to distribute CSN Houston, and, in return, the Debtor agreed to pay $5 million annually to Comcast Services (subject to certain increases or decreases as provided in the agreement) along with all reasonable out-of-pocket costs.

134.    The Comcast Services Agreement remained in effect until the Effective Date, at which time it was terminated pursuant to the Plan of Reorganization.

135.    The Debtor fully performed its contractual obligations under the Comcast Services Agreement.

136.    Comcast Services subcontracted NBCU to perform its contractual obligations under the Comcast Services Agreement.  Additionally and/or alternatively, NBCU was acting as Comcast Services' agent when it provided, or failed to provide, services to the Debtor pursuant to the Comcast Services Agreement.

137.    Through their conduct discussed herein, Defendants intentionally and/or willfully breached §§ 2.2(e) and 2.4 of the Comcast Services Agreement by (i) failing to consider the Debtor's concerns in good faith, (ii) failing to provide services to the Debtor in a manner that was, "under the circumstances, at a minimum, consistent in all material respects with . . . the same highest level and quality of service that Comcast [Services] uses when providing similar services to any other Comcast-Related RSN[,]" (iii) improperly basing their "allocation of time, personnel and resources" to the Debtor "on the amount or nature of" Comcast's ownership interest in the Debtor; and/or (iv) failing to "use commercially reasonable efforts to obtain for [the Debtor] the best pricing, benefits and other terms available to [the Debtor] under the circumstances[.]"

138.    Defendants also intentionally and/or willfully breached the Comcast Services Agreement by (i) failing to engage in negotiations with MVPDs to obtain additional carriage for the Debtor between the Commencement Date and the Effective Date, notwithstanding their contractual obligation to do so, (ii) failing to disclose to the Debtor confidential information obtained by Defendants in connection with their provision of services under the Comcast Services Agreement, and (iii) withholding, and/or delaying the provision of, the Debtor's records and documents in order to impede the Debtor's negotiations with third parties.

139.    Defendants' breaches of the Comcast Services Agreement caused injury to the Debtor and its Estate, resulting in damages that exceed the minimum jurisdictional limits of the Court, and for which Plaintiff herein sues.  These damages include, but are not limited to, actual damages, consequential damages, incidental damages, compensatory damages, nominal damages, out-of-pocket damages, benefit-of-the-bargain damages, restitution damages, loss of sales, loss of credit and/or investment, mitigation expenses and/or increased business expenses,

costs of delay in performance, costs of substitute performance, costs of court, prejudgment interest, post-judgment interest, and attorney's fees.  Such damages are the result of Defendants' intentional misrepresentations, fraud, and/or willful misconduct related to their breaches of the Comcast Services Agreement.

140.    All conditions precedent to Plaintiff's claim for relief have been performed or have occurred.

### Count 8 – Vicarious Liability (Agency, Respondeat Superior, Ratification, Vice-Principal Liability)

141.    Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

142.    Additionally and/or alternatively, Comcast Defendants are vicariously liable for the wrongful acts and omissions of their agents, employees, and representatives (whether defendants or non-defendants), as alleged herein, under the doctrines of agency (authorized agency, apparent agency, ostensible agency, and agency by estoppel), *respondeat superior*, ratification, and/or vice-principal liability.   In all circumstances, the acts or omissions complained of were committed or omitted with authorization and/or ratification of Comcast Defendants, and/or were done in the course and scope of the actor's employment or agency relationship with Comcast Defendants.

143.    Additionally and/or alternatively, Comcast Corp. is vicariously liable for the wrongful acts and omissions of Defendants Comcast Services, Comcast Cable, Comcast Lender, Comcast Partner, Comcast Media, Comcast California, NBCU, Litner, Ruth, Bond, and Pick.  At all times relevant herein, Defendants Comcast Services, Comcast Cable, Comcast Lender, Comcast Partner, Comcast Media, Comcast California, NBCU, Litner, Ruth, Bond, and Pick (i) were agents, employees, and/or vice-principals of Defendant Comcast Corp., and, (ii) were

acting within their general authority as agents, employees, and/or vice-principals of Comcast Corp. in furtherance of Comcast Corp.'s business and for the accomplishment of the object for which such agent, employee, or vice-principal was hired.

144.    Additionally and/or alternatively, Comcast Services is vicariously liable for the wrongful acts and omissions of Defendants NBCU, Litner, Ruth, and Bond.  At all times relevant herein, Defendants NBCU, Litner, Ruth, and Bond (i) were agents, employees, and/or vice-principals of Defendant Comcast Services, and (ii) were acting within their general authority as agents, employees, and/or vice-principals of Comcast Services in furtherance of Comcast Service's business and for the accomplishment of the object for which such agent, employee, or vice-principal was hired.

145.    Additionally and/or alternatively, Comcast Lender is vicariously liable for the wrongful acts and omissions of Defendant Pick.  At all times relevant herein, Defendant Pick (i) was an agent, employee, and/or vice-principal of Defendant Comcast Lender, and (ii) was acting within his general authority as agent, employee, and/or vice-principal of Comcast Lender in furtherance of Comcast Lender's business and for the accomplishment of the object for which he was hired.

146.    Additionally and/or alternatively, Comcast Partner is vicariously liable for the wrongful acts and omissions of Defendants Litner, Ruth, and Pick.  At all times relevant herein, Defendants Litner, Ruth, and Pick (i) were agents, employees, and/or vice-principals of Defendant Comcast Partner, and, (ii) were acting within their general authority as agents, employees, and/or vice-principals of Comcast Partner in furtherance of Comcast Partner's business and for the accomplishment of the object for which such agent, employee, or vice-principal was hired.

147.    Additionally and/or alternatively, NBCU is vicariously liable for the wrongful acts and omissions of Defendants Litner, Ruth, and Bond.   At all times relevant herein, Defendants Litner, Ruth, and Bond (i) were agents, employees, and/or vice-principals of Defendant NBCU, and, (ii) were acting within their general authority as agents, employees, and/or vice-principals of NBCU in furtherance of NBCU's business and for the accomplishment of the object for which such agent, employee, or vice-principal was hired.

### *Count 9 – Aiding & Abetting*

148.    Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

149.    Additionally and/or alternatively, Plaintiff asserts a claim against all Comcast Defendants for aiding and abetting.

150.    Defendants Comcast Lender, Comcast Services, Comcast Media, Comcast California, Comcast Corp., Comcast Partner, NBCU, Pick, Bond, Litner, and Ruth committed tort(s) against the Debtor, as set forth in the factual allegations and causes of action detailed above, including, but not limited to, fraud, business disparagement, tortious interference with prospective relations, and breach of fiduciary duty.   With respect to each tort for which a particular Comcast Defendant was a primary actor, the other Comcast Defendant(s) knew that such primary actor's conduct constituted tort(s).  With the intent to assist the primary actor in the tort(s), the other Comcast Defendant(s) substantially assisted and/or encouraged the primary actor.  The other Comcast Defendant(s)' assistance or encouragement was a substantial factor in causing the tort(s).  Therefore, all of the Comcast Defendants are considered joint tortfeasors and are responsible for the consequences of the tort(s), including joint and several liability for the damages suffered by the Debtor and its Estate as described herein.   Additionally and/or alternatively, Plaintiff seeks the return, disgorgement, and/or forfeiture of, and/or a constructive

trust upon, all funds, profits, fees, and benefits that each Comcast Defendant realized, received, or obtained as a result of its participation in and/or benefit from Litner's or Ruth's breaches of fiduciary duty.

151.    Additionally and/or alternatively, Defendants Litner and Ruth substantially assisted Comcast Lender, Comcast Services, Comcast Media, Comcast California, Comcast Corp., Comcast Partner, NBCU, Bond, and/or Pick in causing the tort(s).  Litner's and Ruth's assistance and participation, separate from the primary actor's acts, breached Litner's and Ruth's fiduciary duties to the Debtor and its Estate.  Litner's and Ruth's assistance and participation was a substantial factor in causing the tort(s).  Therefore, Litner and Ruth are considered joint tortfeasors and are responsible for the consequences of the tort(s), including joint and several liability for the damages suffered by the Debtor and its Estate as described herein.  Additionally and/or alternatively, Plaintiff seeks the return, disgorgement, and/or forfeiture of, and/or a constructive trust upon, all funds, profits, fees, and benefits that Litner and/or Ruth realized, received, or obtained as a result of their assistance and/or participation in Comcast Defendants' torts.

### Count 10 – Conspiracy

152.    Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

153.    Additionally and/or alternatively, Plaintiff asserts a claim against all Comcast Defendants for conspiracy.

154.    Comcast Defendants, in combination with each other, agreed to accomplish an unlawful purpose and/or a lawful purpose by unlawful means, as set forth in the factual allegations and causes of action detailed above, by financially crippling the Debtor in order for Comcast to obtain the Assets for itself through fraud, business disparagement, tortious

interference with prospective business relations, and/or breach of fiduciary duty. Comcast Defendants had a meeting of the minds on the object or course of action, acting with the intent to harm the Debtor. To accomplish the object of their agreement, one or more of Comcast Defendants committed an unlawful, overt act, including, but not limited to, fraud, business disparagement, tortious interference with prospective business relations, and/or breach of fiduciary duty.

155.    The Debtor and its Estate suffered injuries as a proximate result of Comcast Defendant(s)' agreement to financially cripple the Debtor through fraud, business disparagement, tortious interference with prospective business relations, and/or breach of fiduciary duty. Therefore, all of the Comcast Defendants are considered joint tortfeasors and are responsible for the consequences of the tort(s), including joint and several liability for the damages suffered by the Debtor and its Estate as described herein. Additionally and/or alternatively, Plaintiff seeks the return, disgorgement, and/or forfeiture of, and/or a constructive trust upon, all funds, profits, fees, and benefits that each Comcast Defendant realized, received, or obtained as a result of the conspiracy to breach Litner's and Ruth's fiduciary duties to the Debtor.

### *Count 11 – Piercing the Corporate Veil*

156.    Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

157.    Additionally and/or alternatively, Defendant Comcast Corp. is vicariously liable for the actions and omissions of Defendants Comcast Services, Comcast Lender, Comcast Partner, Comcast Media, Comcast California, and NBCU (collectively, the "**Alter Ego Defendants**") under the theory of piercing the corporate veil.

158.    The corporate forms of the Alter Ego Defendants should be disregarded and their corporate veil should be pierced because (i) they were each organized and operated as mere tools

60

or business conduits (alter egos) of Comcast Corp., (ii) their corporate forms were used by Comcast Corp. as a sham to perpetrate a fraud on the Debtor, (iii) their corporate forms were used by Comcast Corp. to evade a legal obligation, (iv) their corporate forms were used by Comcast Corp. to achieve or perpetrate a monopoly, (v) they were formed by Comcast Corp. to circumvent statutes, (vi) they were formed by Comcast Corp. to hide a crime or to justify a wrong, and/or (vii) they were allowed by Comcast Corp. to operate with inadequate capital for the type of business they were conducting.

159.    On information and belief, Defendant Comcast Corp., wholly owns, either directly or indirectly, each of the Alter Ego Defendants.  The Alter Ego Defendants were created, established, and/or operated by Comcast Corp. for the purpose of facilitating its own business interests and limiting its liability in that effort.  On information and belief, at all times relevant herein, Comcast Corp. exercised complete dominion and control over the Alter Ego Defendants such that the separateness thereof had ceased and they functioned as a single economic entity. On information and belief, (i) Comcast Corp. and the Alter Ego Defendants share many of the same officers, directors, and employees, (ii) Comcast Corp. files consolidated financial statements for itself and its subsidiaries, including the Alter Ego Defendants, (iii) most of the Alter Ego Defendants share a principal place of business with Comcast Corp., and (iv) Comcast Corp. and the Alter Ego Defendants were represented by the same counsel during the Debtor's bankruptcy proceedings.  Moreover, Defendants Comcast Lender and Comcast Partner were created approximately one month before Comcast acquired an interest in the Debtor and, on information and belief, were created solely to insulate Comcast Corp. from any liability to the Debtor.

160.     Comcast Corp. used the Alter Ego Defendants for the purpose of perpetrating, and did perpetrate, an actual fraud and/or injustice upon the Debtor for Comcast Corp.'s direct personal benefit by, among other things, causing some or all of the Alter Ego Defendants to file the Petition against the Debtor and make false representations regarding Comcast's intentions to purchase the Debtor.

161.     Adherence to the fiction that the Alter Ego Defendants are entities wholly independent from Comcast Corp. would promote a grave injustice to the Debtor and its Estate.

### Count 12 – Exemplary Damages

162.     Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

163.     The wrongful acts and/or omissions of Comcast Defendants described herein were committed intentionally, knowingly, maliciously, wantonly and willfully, and in conscious disregard of the well-established rights of the Debtor and its Estate.  As a result of their malice, actual fraud, and/or gross negligence, Comcast Defendants have caused significant harm to the Debtor and its Estate.  Thus, Plaintiff is entitled to recover exemplary and/or punitive damages under TEX. CIV. PRAC. & REM. CODE § 41.003(a).

164.     Plaintiff also seeks exemplary and/or punitive damages from Comcast Defendants based on the fraudulent, malicious, and/or grossly negligent actions and omissions of their agents, employees, and/or vice-principals that were taken on behalf of Comcast Defendants, in the course and duty of their employment of Comcast Defendants, and/or were authorized, approved, and/or ratified by Comcast Defendants.

### Count 13 – Attorney's Fees

165.     Plaintiff re-alleges and incorporates the facts and allegations set forth in the foregoing paragraphs as if fully set forth herein.

166.    Plaintiff has been required to retain the undersigned counsel and has agreed to pay them a reasonable fee for their services in prosecuting Plaintiff's claims in this action.  Plaintiff is entitled to recover reasonable and necessary attorney fees under TEX. CIV. PRAC. & REM. CODE § 38.001(8) with respect to its claims for promissory estoppel (Count 5) and breach of contract (Count 7).

## Jury Demand

167.    Plaintiff demands trial by jury of all issues so triable.

## Prayer for Relief

For these reasons, Plaintiff asks that the Court issue citation for Comcast Defendants to appear and answer, and that Plaintiff be awarded a judgment against Comcast Defendants for the following:

a.      actual damages;

b.      nominal damages;

c.      exemplary damages;

d.      equitable relief, including but not limited to, fee forfeiture, disgorgement, and/or constructive trust;

e.      prejudgment and post-judgment interest;

f.      court costs;

g.      attorney's fees; and

h.      any and all other relief, in law and in equity, both special and general, to which Plaintiff is entitled.

[SIGNATURE BLOCK ON NEXT PAGE]

Respectfully submitted,

THE LANIER LAW FIRM, P.C.


/s/ W. Mark Lanier
W. Mark Lanier
Texas State Bar No.: 11934600
Mark.Lanier@LanierLawFirm.com
Eugene Egdorf
Texas State Bar No.: 06479570
Gene.Egdorf@LanierLawFirm.com
M. Michelle Carreras
Texas State Bar No.: 24040647
Michelle.Carreras@LanierLawFirm.com
6810 FM 1960 West
Houston, Texas 77069
Telephone: (713) 659-5200
Fax: (713) 659-2204


*Attorneys for Plaintiff Robert E. Ogle, as Litigation Trustee of the HRSN Litigation Trust*