

ENTERED
11/02/2018

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| HOUSTON REGIONAL SPORTS | § | CASE NO: 13-35998 |
| NETWORK, L.P. | § | |
|    Debtor(s) | § | |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION

At issue is whether this Court may, must, or may not reopen the evidentiary record on remand. Houston SportsNet Finance, LLC ("Comcast Lender") argues that the Court may but should refrain from reopening the evidentiary record on remand, because doing so would amount to legal error. Comcast posits that the Court's sole task on remand is a mathematical exercise from which the Court can use previously introduced evidence, obviating the need for further evidence. Houston Sports Regional Network, L.P argues that the Fifth Circuit's mandate requires a reopening of the record in order to properly re-valuate the collateral at issue—Comcast's Affiliation Agreement—in light of the proposed Plan of Reorganization required under 11 U.S.C. § 506(a).

The Court finds that it has the discretion to reopen the evidentiary record on remand. The record will be reopened.

## Background[1]

In October 2012, Comcast and two of Houston's professional sports teams—the Astros and the Rockets ("the Teams")—formed the Houston Regional Sports Network ("the Network") to produce telecasts of the Teams' games and related content for broadcast in the Houston

---

[1] The underlying facts of the commencement of this bankruptcy case are set forth in detail in a prior opinion by this Court. *In re Houston Reg'l Sports Network, L.P.,* 505 B.R. 468, 471 (Bankr. S.D. Tex. 2014). The facts and procedural history contained in this Opinion are only those relevant to the present issue.

metropolitan area. (ECF No. 1040 at 3). As part of its formation, "[t]he Network entered into media-rights agreements with each of the Teams, pursuant to which the Network was granted exclusive rights to broadcast games in exchange for fees" through the year 2032. *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d 523, 526 (5th Cir. 2018); (ECF No. 1040 at 3; ECF. No. 1041 at 3). "The Network also entered into an Affiliation Agreement with Comcast Cable Communications, LLC, pursuant to which Comcast would carry the Network on its cable systems through 2032, in exchange for a monthly fee based on the number of Comcast subscribers." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 526.

In 2010, a Comcast affiliate, Comcast Lender, entered into an agreement with the Network, under which it provided a $100 million loan to the Network, "secured by a lien on substantially all of the Network's tangible and intangible assets, including the Agreement but not the Teams' media rights." *Id*; (ECF No. 1041 at 4). The valuation of the Agreement is the crux of the issue before the Court.

According to the Network, "[w]hile the Affiliation Agreement generated some revenue . . . it was not nearly enough to pay the amounts owed by the Network to the Teams to license their media rights, let alone cover the Network's operations." (ECF No. 1040 at 4). Consequently, "[b]y July 2013, the Network was unable to pay the media rights fees owed to the Astros and defaulted under the terms of the Astros' media rights agreement." (ECF No. 1040 at 4). Thereafter, the "Astros sent a notice of default to the Network, stating that if the Network did not cure the default by September 29, the Astros would have the right to terminate its agreement with the Network." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 526.

On September 27, 2013, various Comcast entities filed an involuntary Chapter 11 petition against the Network. *Id.* The Astros filed a motion to dismiss the petition, which the Court

denied. *Id.* Meanwhile, "Comcast and the Teams began negotiations for Comcast to purchase the network out of bankruptcy, but no agreement was reached." *Id.* Instead, the Teams entered into an agreement with AT&T and DirecTV in June 2014, which was incorporated into the Network's proposed Plan of Reorganization, under which AT&T and DirecTV would acquire the reorganized Network's equity "and enter into separate agreements to pay the Network for the right to broadcast the Network's content." *Id*; (ECF No. 1040 at 5; ECF No. 1041 at 5).

On October 30, 2014, the Court confirmed the Network's Third Amended Plan of Reorganization. (*See* ECF No. 778; *see also* ECF No. 772). Under the Plan, "the Teams agreed to waive their rights to approximately $107 million in media-rights fees owed by the Network that had accrued during the bankruptcy." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 526.

Before the Plan was confirmed, however, Comcast Lender elected to apply 11 U.S.C. § 1111(b) to its $100 million claim.[2] (*See* ECF No. 569). The § 1111(b) election entitled Comcast to receive payments with a face value equal to the amount of its claim, the present value of which must at least equal the value of the collateral. 11 U.S.C § 1129(b)(2)(A)(i)(II). In other words, Comcast sought to have its claim treated as fully secured and paid in full. The Network contested this election.

Under the Network's Plan, Comcast Lender's tangible collateral—cash, accounts receivable, furniture, fixtures, and equipment—was to be abandoned or sold. (ECF No. 1041 at 6). The parties stipulated that the value of the tangible collateral was $26.2 million. *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 527. Comcast Lender's intangible collateral—

---

[2] Under 11 U.S.C § 1111(b), an unsecured creditor—a creditor whose collateral is worth less than its claim but is nevertheless not "of inconsequential value"—may elect to have its claim treated as fully, rather than partially, secured.

the Comcast Affiliation Agreement—would remain with the Network.  (ECF No. 1041 at 6).  The Network, however, argued that Comcast could not make an § 1111(b) election because its intangible collateral, the Agreement, was of "inconsequential value."  (ECF No. 1040 at 7).  The Court agreed.

To value the Affiliation Agreement, the Court used a discounted cash flow analysis—the method proposed by both parties' experts.  (ECF No. 715 at 82).  The Court projected the Network's net income through 2032, discounted it to present value, and apportioned it among the Network's intangible assets in proportion to the revenue that each asset would generate each year.  (Case No. 14-3133, ECF No. 34 at 5).  Using the discounted cash flow method, the Court determined that the value of the Agreement, as of the effective date of the Plan, was $54,274,740.00.  However, the Court adopted the holding of *In re Stembridge*, 394 F.3d 383, 388 (5th Cir. 2004), and valued the collateral as of the petition date.  *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 528.  In choosing the petition date, the Court "apportioned income to agreements that did not exist as of the petition date based on the probability that such agreements would come to fruition."  *Id.* at 527.  Specifically, the Court assumed a 100% likelihood that Comcast would close its merger with Time Warner Cable, which provided that Time Warner Cable would carry the Network by April 1, 2016, and the Court also assumed, with varying degrees of probability, that other carriage agreements with programming distributers, such as Dish and Suddenlink, would also agree to carry the Network.  (ECF No. 715 at 89–90).

In evaluating the Agreement as of the petition date, this Court applied a 9.5% discount rate, used by both experts, to the $54,274,740.00 effective-date valuation.  (ECF No. 715 at 92).  It then deducted the Team's waived media-rights fees from the Network's income in the period between the petition and the effective date, concluding that the Agreement was of

inconsequential value. (ECF No. 715 at 94 ("As a result, I find that the value of the Comcast contract, as of the petition date, was zero.")). "Because a creditor cannot make an § 1111(b) election as to collateral of 'inconsequential value,' Comcast was unable to have its claim treated as fully secured." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 527.

Comcast appealed the Court's decision to the District Court. (*See* ECF No. 779). On August 20, 2015, the District Court affirmed, "holding that the petition date was the proper date from which to value the Agreement and that the expenses incurred by the Network during bankruptcy were appropriately offset against the Agreement's value." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 527.

Comcast subsequently appealed to the Fifth Circuit, claiming that this Court: (i) erred in valuing the Agreement as of the petition date, and (ii) improperly deducted the accrued but unpaid media rights fees from the value of Comcast's collateral. *See id*. at 527; (ECF No. 1040 at 9; *see* ECF No. 1041 at 10).

The Fifth Circuit's opinion remanded the case "for a re-valuation of the collateral in light of the Plan." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d 523 at 534. In doing so, the Fifth Circuit held, first, that *Stembridge* did not control, and that this Court was not required to value the collateral as of the petition date. *Id*. at 532 ("The petition-date mandate in *Stembridge* does not apply to involuntary Chapter 11 bankruptcies."). Rather, it held that under "the flexible approach" this Court had the discretion to decide the appropriate date for valuation "tak[ing] into account the development of the proceedings . . . ." *Id*. However, because this Court indicated that it would have chosen the petition date as the date for valuation of the collateral regardless of *Stembridge's* mandate, the Fifth Circuit found this Court's reliance harmless. *Id*. The Fifth Circuit further held that this Court had "erred in deducting the Teams' unpaid, waived media fees

from the value of Comcast's collateral." *Id*. It found that in subtracting the Team's unpaid media fees from the Agreement's value, this Court failed to "consider the collateral's value in light of the actual proposed post-reorganization use, as required by § 506(a) and the Supreme Court's decision in *Rash*." *Id*. at 533. It therefore remanded the case for a re-valuation of Comcast's collateral in light of the Plan. *Id*. at 534.

On May 22, 2018, the Court held a status conference and requested briefing on whether it must, may, or may not re-open the evidentiary record to re-value Comcast's intangible collateral. (ECF No. 1033 at 21). On August 14, 2018, the Court held a hearing on whether to re-open the evidentiary record. (*See* ECF No. 1049).

At the outset of the hearing, the Court set out four question for the parties to answer in light of the Fifth Circuit's mandate:

1. What is to be decided on remand? (ECF No. 1049 at 5 ("Am I supposed to decided what's the value that it would cost to replace the contract as under Rash? Am I supposed to decide what would that Contract have brought if it were sold in the open market? Am I supposed to decide the relative value of the Contract within the bundle of rights that gets assigned out under the Plan? . . . [W]hat are you telling me I need to measure?")).

2. Should the Court value Comcast's intangible collateral as of the petition date, and if so, since there are no expert opinions within the evidentiary record as to valuation as of the petition date, how should the Court proceed without a new evidentiary record? (ECF No. 1049 at 6).

3. What is the effect of a determination by the Court that the debtor has not met their burden of proof as to value, given that the Plan has already been confirmed?  (ECF No. 1049 at 6–7).

4. Should the Court decide, without the benefit of expert testimony, whether actual experience should be applied to the valuation?  (ECF No. 1049 at 7 ("I think the answer, which is heavily within your briefing, may depend on what it is that I conclude that I'm supposed to measure.")).

Both parties provided comprehensive responses.

Comcast argues that although "the Court has some discretion to determine how to proceed," such discretion is "subject to the ordinary principles of the application of the law of case doctrine," which although "not absolutely mandatory," should "guide the exercise of the Court's discretion in important ways."  (ECF No. 1049 at 35).  In essence, Comcast contends that even if the Court has discretion to reopen the evidentiary record to explore answers to the questions posited by the Court at the beginning of the hearing, that it is not necessary, because all that is left to do on remand is a mechanical calculation in line with the Fifth Circuit's instructions using evidence currently in the record.  (*See* ECF No. 1049 at 36–37).  Comcast further maintains that using the Court's discretion to reopen the evidentiary record would be improper.  (ECF No. 1049 at 52 ("While the Remand Order itself does not preclude the Court from doing so, reopening for either of the reasons suggested by the Teams would amount to legal error.")).

The Network, however, takes the position that this Court cannot properly effectuate the Fifth Circuit's mandate without reopening the record.  (ECF No. 1049 at 58).  At the hearing, the Network argued that in order to "implement both the letter and the spirit" of the mandate, this Court must "have a new valuation at trial."  (ECF No. 1049 at 58, 64 ("[T]o agree with Comcast

now and not to reopen the record for an evidentiary hearing would give Comcast the same result that it requested from the Fifth Circuit but did not get.")). Specifically, the Network takes the position that "a new valuation with a new valuation hearing," which could "look at other methodologies for valuing [the Affiliation Agreement] beyond just the discounted flow method" and take into account post-confirmation events is appropriate in this circumstance. (ECF No. 1049 at 27; *see* ECF No. 1040 at 16–17).

The Court took the matter under advisement on August 14, 2018.

## Jurisdiction

This matter is being considered on remand by the Fifth Circuit directly to the Bankruptcy Court. Jurisdiction cannot be contested.

## Analysis

When the Fifth Circuit remanded the case, it indicated that it did so for a "re-valuation of the collateral in light of the Plan." *In re Houston Reg'l Sports, L.P.*, 886 F.3d at 534. The parties, as detailed above, have interpreted this language differently. Comcast argues that reopening the record "for either of the reasons suggested by the Teams would amount to legal error." (ECF No. 1049 at 38, 52 ("They argue a replacement value theory . . . and they suggest that there should be evidence of value that is based on post-confirmation performance of the Network")). The Network, on the other hand, maintains that the Court's mandate as directed by the Fifth Circuit, is to hold a "new valuation with a new hearing," which requires reopening the evidentiary record. (ECF No. 1049 at 27).

The Court holds that it has discretion to reopen the evidentiary record on remand. The Fifth Circuit declined Comcast's invitation to hold that the issue could be resolved with a simple mathematical calculation based on the existing record; this Court will not substitute its judgment

for that of the Fifth Circuit. Accordingly, the record will be reopened to allow this Court to implement the Fifth Circuit's mandate.

I. **Reopening the Evidentiary Record**

    *a. The Court has discretion to reopen the evidentiary record*

In its opinion, the Fifth Circuit held that the "Agreement must be valued in light of the Plan, without recourse to hypothetical situations which are neither proposed nor likely in this Chapter 11 cram-down." *In re Houston Reg'l Sports, L.P.*, 886 F.3d at 534. In other words, valuation of Comcast's intangible collateral must be done within the context of the confirmed Plan with a focus on the Agreement's proposed use and disposition within the Plan, as required by § 506(a). How that valuation is completed, however, is not addressed in the Fifth Circuit's opinion. Rather, it left the manner and method of such valuation to the Court's discretion, subject only to the instruction that the waived media-fees could not properly be deducted. *See id.* ("The fees will never be paid under the Plan, and thus cannot be attributed to the value of the Agreement in light of its 'proposed use.'"). There is nothing in the Fifth Circuit's mandate that precludes the Court from reopening the evidentiary record on remand to properly re-valuate the collateral in light of the Plan.

Case law supports the Court's discretion to reopen the evidentiary record. "On remand, the decision on whether to reopen the record should be left to the sound discretion of the trial court." *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 551 (1983); *see also State Industries, Inc. v. Mor-Flo Industries, Inc.*, 948 F.2d 1573, 1577 (Fed. Cir. 1991) ("Absent contrary instructions, a remand for reconsideration leaves the precise manner of reconsideration—whether on the existing record or with additional testimony or other evidence—to the sound discretion of the trial court."). "Where further proceedings are

contemplated by an appellate opinion, the district court retains the discretion to admit additional evidence." *U.S. v. Bell Petroleum Services, Inc.*, 64 F.3d 202, 204 (5th Cir. 1995) (citing *Westwego Citizens for Better Government v. City of Westwego*, 906 F.2d 1042, 1043–44 (5th Cir. 1990)). Implicit in the Fifth Circuit's remand are further proceedings to re-value the collateral in light of the Plan.

At oral arguments, Comcast provided three separate bases for reversal,[3] arguing that if the Fifth Circuit reversed for any of those reasons, "the only consequence is that the Teams are then required to pay Comcast its secured claim in full." (ECF No. 1040-1 at 7). The Fifth Circuit explicitly agreed with Comcast's second argument—it was improper to deduct "the Teams' unpaid media fees from the Agreement's value." *In re Houston Reg'l Sports, L.P.*, 886 F.3d at 533. The Fifth Circuit, however, refrained from approving of the argument that followed. Specifically, Comcast claimed that the Court had erred in its allocation of the deducted costs on the value of the collateral. (ECF No. 1040-1 at 22–23). Comcast maintained that the allocation of the first-year losses should have been "divided among parts of the collateral" as opposed to Comcast's interest alone. (ECF No. 1040 at 22–23; *see* ECF No. 715 at 95). In making its argument, Comcast pointed to the Court's decision, which explicitly stated that if the calculations were in fact incorrect, then it should properly be reversed. (ECF No. 715 at 95 ("[I]f the reviewing court believes that the allocation of the first year losses that I have done should not be toward the valuation of the Comcast interest alone, [] I should be reversed because the numbers will come out in Comcast's favor, as opposed to in the [Network's] favor.")). The Fifth

---

[3] Comcast's three arguments were as follows: (i) the correct date of valuation is the effective date of the plan; (ii) it was improper to deduct from "the value of the collateral costs that were never borne by the estate;" and (iii) even if those fees were properly deducted, "it was error to allocate all of those costs to the value of Comcast's collateral as opposed to allocating them ratably across the assets." (ECF No. 1040-1 at 2).

Circuit did not do what Comcast requested.  (*See* ECF No. 1049 at 55 ("If I thought it was a hard question, I wouldn't have asked them just to render.  And I did and they didn't do it.")).

When asked if there was enough on the record to render, or whether a remand was required to re-valuate the collateral, Comcast affirmatively stated that, "there is nothing left to do." (ECF No. 104-1 at 23).  In essence, Comcasts asked the Fifth Circuit to reverse and render.  (ECF No. 1040-1 at 23 ("I don't believe there is anything left to do.  I think that Section 7.12 of the Plan makes clear that if the judgment is reversed, we are permitted to make the 1111(b) election and therefore have an allowed secured claim. . . .")).  The Fifth Circuit, however, opted to remand.  Their decision to deny Comcast's explicit request to render on any of the three bases Comcast provided, indicates that the Fifth Circuit's directive to re-value the collateral in light of the Plan requires more than a mere mathematical exercise using the current evidentiary record—a record that was available to the Fifth Circuit when it made its decision to remand.  Comcast cannot now ask this Court to do what the Fifth Circuit did not do on appeal.  The Court finds the Fifth Circuit's decision to remand—rather than reverse and render in favor of Comcast—instructive and therefore a reopening of the record is proper.

Comcast appropriately concedes that this Court has discretion to reopen the evidentiary record. (ECF No. 1049 at 36–37, 52 ("[W]e think the Court of Appeals left it for this Court to decide whether there was anything that needed to be done to determine value and, if so, how to do it.")).  In leaving open the manner and method of valuation, the Fifth Circuit prompted questions such as those posed by the Court at the August 14, 2018 hearing.  Those questions cannot properly be answered without a reopening of the evidentiary record.  Accordingly, the Court has determined that reopening the evidentiary record is appropriate in this instance.

### b. The Mandate Rule does not limit the Court's discretion to reopen the record

Comcast, however, asserts that reopening the record "would amount to legal error" because "neither of the paths proposed" by the Network "is a proper basis for reopening the record." (ECF No. 1049 at 44–52; ECF No. 1044 ("Because the evidence the Teams offer is legally irrelevant under section 506(a), the evidence could not be admitted, notwithstanding this Court's discretion generally to reopen the record on remand.")). Specifically, Comcast argues that the Network's replacement value theory and post-confirmation evidence are precluded from consideration by the Court. (ECF No. 1049 at 44–45). As an impediment to the Network's arguments, and this Court's ability to exercise its discretion to reopen the evidentiary record, Comcast cites the mandate rule.

"The mandate rule requires a district court on remand to effect" the mandate of a superior court "and to do nothing else." *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 454 (5th Cir. 2007) (citing *United States v. Becerra*, 155 F.3d 740, 753 (5th Cir. 1998)). "[O]n remand, the district court 'must implement both the letter and the spirit of the appellate court's mandate and may not disregard the explicit directives of that court.'" *Id.* (quoting *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002)). In implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'" *Id.* (quoting *United States v. Lee*, 358 F.3d 315, 321 (5th Cir. 2004)). "Because the mandate rule is a corollary of the law of the case doctrine, it 'compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *Id.* (citation omitted). "The law of the case doctrine, however, is an *exercise of judicial discretion* which 'merely expresses the practice of courts generally to refuse to reopen what has been decided,' not a limit on judicial power." *Lee*, 358 F.3d at 321 (emphasis added)

(quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)). "The doctrine, therefore, 'is not inviolate,' but rather permits an appellate court or a district court on remand to deviate from a ruling made by a court of appeal in an earlier state of the same case in certain exceptional circumstances." *Id*. (citations omitted).

Comcast's argument looks to the scope of the reopened record as opposed to whether reopening the record under the Court's discretion is appropriate in this circumstance. The Court here is not deviating from the Fifth Circuit's ruling, nor is the Fifth Circuit's holding so narrow that it precludes this Court from exercising discretion in reopening the record. As detailed above, in its ruling, the Fifth Circuit left open the method by which this Court was to conduct its re-valuation of the collateral in light of the Plan. As Comcast stated, "[T]he most natural inference to be drawn" from the Fifth Circuit's remand "is that the Court of Appeals was leaving it to this Court to decide in the first instance whether there was anything left to do and, if so, what ought to be done." (ECF No. 1049 at 36). As such, the mandate rule should not now as act as a limit on the Court's judicial discretion.

In any event, the Court declines to reach beyond the question at issue—whether this Court may, must, or may not reopen the record. The Fifth Circuit has tasked this Court with a re-valuation of the collateral in light of the Plan. It provides no further instructions other than the directive above. Inherent in the Fifth Circuit's mandate is further consideration of the Affiliation Agreement's value, taking into consideration the collateral's "proposed used or disposition" as required under Section 506(a). *See In re Houston Reg'l Sports, L.P.*, 886 F.3d at 531. In light of this directive, the Court will exercise its judicial discretion to reopen the evidentiary record to determine value. *State Industries, Inc.*, 948 F.2d at 1577 ("Absent contrary instructions, remand for reconsideration leaves the precise manner of reconsideration . . . to the sound discretion of

the trial court."); *Bell Petroleum Services, Inc.*, 64 F.3d at 204 ("Where further proceedings are contemplated by an appellate opinion, the district court retains the discretion to admit additional evidence."). The scope of the evidentiary record need not be decided at the outset. To be clear, Comcast will be free to argue whether evidence, when offered, is relevant to the valuation issue.

## Conclusion

The Court will issue an Order consistent with this Memorandum Opinion.

SIGNED **November 2, 2018.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE