

ENTERED
07/31/2019

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| HOUSTON REGIONAL SPORTS | § | CASE NO: 13-35998 |
| NETWORK, L.P. | § | |
|     Debtor(s) | § | |
| | § | CHAPTER 11 |

## MEMORANDUM OPINION

The question that must be answered on remand from the Fifth Circuit is:

"Was the Affiliation Agreement between Comcast and the Network of inconsequential value as of the petition date, based on the proposed use or disposition of the Affiliation Agreement under the confirmed Plan?"

### Background[1]

In October 2010, Comcast and two of Houston's professional sports teams—the Astros and the Rockets ("the Teams")—formed the Houston Regional Sports Network ("the Network") to produce telecasts of the Teams' games and related content for broadcast in the Houston metropolitan area. (ECF No. 1040 at 3). As part of its formation, "[t]he Network entered into media-rights agreements with each of the Teams, pursuant to which the Network was granted exclusive rights to broadcast games in exchange for fees" through the year 2032. *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d 523, 526 (5th Cir. 2018); (ECF No. 1040 at 3; ECF. No. 1041 at 3). "The Network also entered into an Affiliation Agreement with Comcast Cable Communications, LLC, pursuant to which Comcast would carry the Network on its cable systems through 2032, in exchange for a monthly fee based on the number of Comcast subscribers." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 526.

---

[1] The underlying facts of the commencement of this bankruptcy case are set forth in detail in prior Opinions by this Court. *In re Houston Reg'l Sports Network, L.P.*, 505 B.R. 468 (Bankr. S.D. Tex. 2014); *In re Houston Reg'l Sports Network, L.P.*, 593 B.R. 461 (Bankr. S.D. Tex. 2018). The facts and procedural history contained in this Opinion are only those relevant to the present issue.

In 2010, a Comcast affiliate, Comcast Lender, entered into an agreement with the Network, under which it provided a $100 million loan to the Network, "secured by a lien on substantially all of the Network's tangible and intangible assets, including the Affiliation Agreement but not the Teams' media rights." *Id*; (ECF No. 1041 at 4).

According to the Network, "[w]hile the Affiliation Agreement generated some revenue . . . it was not nearly enough to pay the amounts owed by the Network to the Teams to license their media rights, let alone cover the Network's operations." (ECF No. 1040 at 4). Consequently, "[b]y July 2013, the Network was unable to pay the media rights fees owed to the Astros and defaulted under the terms of the Astros' media rights agreement." (ECF No. 1040 at 4). Thereafter, the "Astros sent a notice of default to the Network, stating that if the Network did not cure the default by September 29, the Astros would have the right to terminate its agreement with the Network." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 526.

On September 27, 2013, various Comcast entities filed an involuntary Chapter 11 petition against the Network. *Id*. The Astros filed a motion to dismiss the petition, which the Court denied. *Id*. Meanwhile, "Comcast and the Teams began negotiations for Comcast to purchase the network out of bankruptcy, but no agreement was reached." *Id*. Instead, the Teams entered into an agreement with AT&T and DirecTV in June 2014, which was incorporated into the Network's proposed Plan of Reorganization, under which AT&T and DirecTV would acquire the reorganized Network's equity "and enter into separate agreements to pay the Network for the right to broadcast the Network's content." *Id*; (ECF No. 1040 at 5; ECF No. 1041 at 5).

On October 30, 2014, the Court confirmed the Network's Third Amended Plan of Reorganization. (*See* ECF No. 778; *see also* ECF No. 772). Under the Plan, "the Teams agreed to waive their rights to approximately $107 million in media-rights fees owed by the Network

that had accrued during the bankruptcy." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 526.

Before the Plan was confirmed, however, Comcast Lender elected to apply 11 U.S.C. § 1111(b) to its $100 million claim.[2] (*See* ECF No. 569). The § 1111(b) election entitled Comcast to receive payments with a face value equal to the amount of its claim, the present value of which must at least equal the value of the collateral. 11 U.S.C § 1129(b)(2)(A)(i)(II). In other words, Comcast sought to have its claim treated as fully secured and paid in full. The Network contested this election.

Under the Network's Plan, Comcast Lender's tangible collateral—cash, accounts receivable, furniture, fixtures, and equipment—was to be abandoned or sold. (ECF No. 1041 at 6). The parties stipulated that the value of the tangible collateral was $26.2 million. *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 527. Comcast Lender's intangible collateral—the Comcast Affiliation Agreement—would remain with the Network. (ECF No. 1041 at 6). The Network argued that Comcast could not make an § 1111(b) election because the Affiliation Agreement was of "inconsequential value." (ECF No. 1040 at 7). The Court agreed.

To value the Affiliation Agreement, the Court used a discounted cash flow analysis—the method proposed by both parties' experts. (ECF No. 715 at 82). The Court projected the Network's net income through 2032, discounted it to present value, and apportioned it among the Network's intangible assets in proportion to the revenue that each asset would generate each year. *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 527. Using the discounted cash flow method, the Court determined that the value of the Affiliation Agreement, as of the effective date of the Plan, was $54,274,740.00. (ECF No. 715 at 92). However, the Court

---

[2] Under 11 U.S.C. § 1111(b), an undersecured creditor—a creditor whose collateral is worth less than its claim but is nevertheless not "of inconsequential value"—may elect to have its claim treated as fully, rather than partially, secured.

adopted the holding of *In re Stembridge*, 394 F.3d 383, 388 (5th Cir. 2004), and valued the collateral as of the petition date. *In re Houston Reg'l Sports Network, L.P.,* 886 F.3d at 528. In choosing the petition date, the Court "apportioned income to agreements that did not exist as of the petition date based on the probability that such agreements would come to fruition." *Id*. at 527. Specifically, the Court assumed a 100% likelihood that Comcast would close its merger with Time Warner Cable, which provided that Time Warner Cable would carry the Network by April 1, 2016, and the Court also assumed, with varying degrees of probability, that other carriage agreements with programming distributers, such as Dish and Suddenlink, would also agree to carry the Network. (ECF No. 715 at 89–90).

In evaluating the Affiliation Agreement as of the petition date, this Court applied a 9.5% discount rate, used by both experts, to the $54,274,740.00 effective-date valuation. (ECF No. 715 at 92). It then deducted the Team's waived media-rights fees from the Network's income in the period between the petition and the effective date, concluding that the Affiliation Agreement was of inconsequential value. (ECF No. 715 at 94 ("As a result, I find that the value of the Comcast contract, as of the petition date, was zero.")). "Because a creditor cannot make an § 1111(b) election as to collateral of 'inconsequential value,' Comcast was unable to have its claim treated as fully secured." *In re Houston Reg'l Sports Network, L.P*., 886 F.3d at 527.

Comcast appealed the Court's decision to the District Court. (*See* ECF No. 779). On August 20, 2015, the District Court affirmed, "holding that the petition date was the proper date from which to value the [Affiliation] Agreement and that the expenses incurred by the Network during bankruptcy were appropriately offset against the Agreement's value." *In re Houston Reg'l Sports Network, L.P*., 886 F.3d at 527.

Comcast subsequently appealed to the Fifth Circuit, claiming that this Court: (i) erred in valuing the Affiliation Agreement as of the petition date, and (ii) improperly deducted the accrued but unpaid media rights fees from the value of Comcast's collateral. *See id*. at 527; (ECF No. 1040 at 9; *see* ECF No. 1041 at 10).

The Fifth Circuit's opinion remanded the case "for a re-valuation of the collateral in light of the Plan." *In re Houston Reg'l Sports Network, L.P*., 886 F.3d 523 at 534. In doing so, the Fifth Circuit held, first, that *Stembridge* did not control, and that this Court was not required to value the collateral as of the petition date. *Id*. at 532. ("The petition-date mandate in *Stembridge* does not apply to involuntary Chapter 11 bankruptcies."). Rather, it held that under "the flexible approach" this Court had the discretion to decide the appropriate date for valuation "tak[ing] into account the development of the proceedings . . . ." *Id*. However, because this Court indicated that it would have chosen the petition date as the date for valuation of the collateral regardless of the petition-mandate in *Stembridge*, the Fifth Circuit found this Court's reliance harmless. *Id*. The Fifth Circuit further held that this Court had "erred in deducting the Teams' unpaid, waived media fees from the value of Comcast's collateral." *Id*. It found that in subtracting the Team's unpaid media fees from the Agreement's value, this Court failed to "consider the collateral's value in light of the actual proposed post-reorganization use, as required by § 506(a) and the Supreme Court's decision in *Rash*." *Id*. at 533. It therefore remanded the case for a re-valuation of Comcast's collateral in light of the Plan. *Id*. at 534.

On May 22, 2018, the Court held a status conference and requested briefing on whether it must, may, or may not re-open the evidentiary record to re-value Comcast's intangible collateral. (ECF No. 1033 at 21). On November 2, 2018, the Court held that it had the discretion to reopen the evidentiary record in light of the Fifth Circuit's directive. (*See* ECF No. 1053).

*Question to be Answered*

On December 17, 2018, the Court held a hearing to determine the question to answer in accordance with the Fifth Circuit's mandate on remand. At the conclusion of the hearing, the Court requested that the parties formulate and file the question or questions that the Court must answer in light of § 506(a)(1) and the Fifth Circuit's remand.

On December 31, 2018, Houston SportsNet Finance, LLC ("Comcast") along with the Houston Astros, LLC and Rocketball, LTD, filed their proposed re-valuation questions.

Comcast proposed the following:

(i) "[T]he question whether the Assets"—that secured the loan from Comcast to the Network—had "consequential value" under 11 U.S.C. § 1111(b)(1)(B)(i) "should be determined by reference to the value that the Assets would have to the reorganized debtor, upon the *effective date* of the Plan, based on the Plan's proposed use of those Assets, in the hands of the reorganized debtor, as of the effective date.

(ii) "To the extent the Court determines to value the Assets as of the *petition date*, however, the question whether the Assets had consequential value should be determined by reference to the value the Assets had to the bankruptcy estate as predecessor-in-interest to the reorganized debtor, upon the petition date, based on the Plan's proposed use of those Assets in the hands of the reorganized debtor."

(ECF No. 1064 at 1–2) (emphasis added).

The Houston Astros, LLC and Rocketball, LTD proposed the following:

(i)    Whether the Affiliation Agreement 'is of inconsequential value' under 11 U.S.C. § 1111(b)(1)(B)(i), measured by the value of the Affiliation Agreement as of the *petition* date, considering the value the Network would exchange in a market transaction to replace or acquire the Affiliation Agreement and taking into account all facts and evidence known as of the petition date of the re-valuation hearing as required by § 506(a) of the Bankruptcy Code.

(ECF No. 1065 at 1) (emphasis added).

**<u>Analysis</u>**

Under the Fifth Circuit court's remand: (i) this Court has discretion to choose between valuing the Affiliation Agreement using the petition date or the effective date, and (ii) the valuation must take into account the proposed use or disposition of the Affiliation Agreement as set forth in 11 U.S.C § 506(a)(1). *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d 523 at 528 ("Courts have the flexibility to select the valuation date so long as the bankruptcy court takes into account the purpose of the valuation and the proposed use or disposition of the collateral at issue.").

Section 506(a)(1) states:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined *in light of the purpose of the valuation* and *of the proposed disposition or use of such property*, and *in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest*.

11 U.S.C. § 506(a)(1).

The Fifth Circuit instructs that § 506(a)(1) directs courts to consider: (i) the purpose of the valuation and (ii) the proposed disposition or use of the property, which must be done (iii) in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest. *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 531. Specifically, the Fifth Circuit noted that in accordance with the Supreme Court's decision in *Rash*, "§ 506(a) commands that the collateral be valued in light of its proposed use *by the reorganized debtor*." *Id*. at 533 (emphasis added). Section 506(a)(1) essentially boils down to two considerations:

(i) the purpose of the Affiliation Agreement's valuation, and (ii) the Network's proposed use or disposition of the Affiliation Agreement under the Plan.

        I.      *What was the purpose of the Affiliation Agreement's valuation?*

Under the Plan, the Network proposed to retain the Affiliation Agreement. Before the Plan was confirmed, Comcast made an § 1111(b) election, asking to have its claim be treated as fully secured and paid in full.[3] In order to retain the Affiliation Agreement and confirm the Plan, the Network invoked the Code's cram-down provision, § 1129(b). The Fifth Circuit highlighted § 1129(b)'s application in the context of § 506(a). It stated that often § 506 is used in conjunction with other provisions of the Code, including § 1129(b), "which requires valuation of collateral in the context of plan confirmation when the debtor retains possession of the collateral." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 528. "[I]t is § 506 that instructs the court on how to make the initial valuation, before the collateral's present value is calculated under § 1129." *Id*. "Section 1129 merely uses that value to set a floor for what sum the creditor must receive in deferred cash payments while the debtor retains possession of the collateral." *Id*. at 529–58. Thus, the purpose of the Affiliation Agreement's valuation was to determine Comcast's treatment under the Plan.[4]

The Fifth Circuit, following the flexibility approach, left the determination of the proper date for the Affiliation Agreement's valuation to this Court's discretion. *In re Houston Reg'l*

---

[3] The § 1111(b) election entitled Comcast to receive payments with a face value equal to the amount of its claim, the present value of which must at least equal the face value of the collateral. § 11 U.S.C. § 1129(b)(2)(A)(i)(II); *see* 4 COLLIER ON BANKRUPTCY ¶ 506.03[7][d][ii] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("The significance of the § 1111(b) election is best understood by examining its effect on the application of § 1129(b)(2)(A), which sets forth the standards for determining whether a chapter 11 plan is fair and equitable with respect to a class of secured claims.").

[4] In the context of confirmation of a plan under the provisions of chapter 11, valuation under § 506(a) may be critical in three important respects: (i) the determination of the secured creditor's claim for purposes of payment under the plan, (ii) the determination of whether the value of the secured creditor's post-confirmation lien rights will be adequately preserved if the secured claim is to be paid over time, and (iii) the application of the best interest of creditor's test. 4 COLLIER ON BANKRUPTCY ¶ 506.03[7][d] (Richard Levin & Henry J. Sommer eds., 16th ed.).

*Sports Network, L.P.,* 866 F.3d 523 at 532. This Court found that the petition date was the proper point of valuation under the facts of this case. (ECF No. 715 at 80). This Court's finding remains undisturbed under the Fifth Circuit's remand.

In choosing to follow the flexibility approach to valuation, the Fifth Circuit highlighted that in order to decide the appropriate date for valuation, courts must "take into account the development of the proceedings." *In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 532. Thus, Comcast's conduct throughout the bankruptcy proceedings informed the Court's decision. (*See* ECF No. 715 at 80 (finding the petition date reasonable because a flexible approach requires the Court to determine "a fair date and a date that really takes into account the realities of the case . . . .")).

Comcast and the Network entered into the Affiliation Agreement in 2010, approximately three years before various Comcast entities filed an involuntary Chapter 11 petition against the Network. *See In re Houston Reg'l Sports Network, L.P.*, 886 F.3d at 256; (ECF No. 1041 at 4). As of the petition date, the Affiliation Agreement had in fact generated some revenue, but according to the Network "not nearly enough to pay the amount owed . . . to the Teams to license their media rights, let alone cover the Network's operations." (ECF No. 1040 at 4).

In filing the involuntary Chapter 11 against the Network, Comcast alleged it was under "the belief that the chapter 11 process would permit the Network to reorganize, thus preserving the Network's value and the jobs of many employees." (ECF No. 326 at 1). As part of that belief, Comcast offered to purchase the Network and pay all debts. (*See* ECF No. 715 at 80 ("This case commenced on Comcast's representations that all creditors would be paid in full, and that there would be money left over for equity.")). Comcast's assurances created a focus in the case, bringing to the forefront both the Affiliation Agreement with the Network and the media-

rights agreements with the Teams both of which were at issue in the case. However, Comcast's assurances never came to fruition. On March 17, 2014, Comcast determined it would not bid to acquire the Network. (ECF No. 326; *see* ECF No. 792 at 107 ("Comcast . . . changed its course of conduct and decided that, rather than having an outcome that it had assured us in the beginning of the case would be one where every creditor was paid in full, including the Teams, and that it would make that purchase, altered it and changed course in the middle of the case.")). If the Court had chosen the effective date as the proper point of valuation, it would have ignored the realities of the case—the Affiliation Agreement had a proposed use or disposition on the date the Network entered bankruptcy, and its proposed use or disposition changed as a consequence of Comcast's actions or inactions. Thus, in order for the Court to "take into account the development of the proceedings" it must look to the petition date as the proper point of valuation.

    II.    *What was the Network's proposed use or disposition of the Affiliation Agreement?*

The Affiliation Agreement between Comcast Cable Communications, LLC, and the Network was originally made so that "Comcast would carry the Network on its cable systems through 2032, in exchange for a monthly fee based on the number of Comcast subscribers." *In re Houston Reg'l Sports Network, L.P.*, 866 F.3d 523 at 526. The Fifth Circuit noted that "[u]nder the Plan, the Network [would] be able to use the Affiliation Agreement to generate revenue free and clear of the previously outstanding media-rights fees, as the Teams [had] agreed to waive them." *Id*. at 533. Thus, the media-rights fees were not to be deducted from the Agreement's value. *Id*. at 533–34.

10 / 11

    III.    *In conjunction with what?*

In determining that the media-rights fees were not to be deducted from the value of the Affiliation Agreement (viewing the Agreement in the hands of the reorganized debtor), the Fifth Circuit highlighted that under *Rash*, "bankruptcy court valuations must be based on actual use." *Id*. at 533–32. Thus, the Court must take the Affiliation Agreement's proposed use or disposition—to leave the reorganized debtor with access to Comcast's distribution system—in conjunction with the Plan. § 506(a)(1).

To answer the question set forth at the beginning of this Memorandum Opinion, we must answer two "building block" questions:[5]

1. What was the fair market value of the Affiliation Agreement to the Reorganized Debtor on the effective date?
2. What adjustments, if any, should be made to determine the fair market value of the Affiliation Agreement to the Network as of the petition date?

### Conclusion

The Court will issue an Order consistent with this Memorandum Opinion.

SIGNED **July 31, 2019.**

                                          Marvin Isgur
                                  UNITED STATES BANKRUPTCY JUDGE

---

[5] Neither of these questions are intended to set forth a valuation theory. The "fair market value" language relates to the outcome that is required of the valuation but does not dictate the methodology for determining fair market value. (*See* ECF No. 715 at 85).